UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

-------------------------------------------------------------X

| | | |
|---|---|---|
| JOHN DOE, | : | 17-cv-00191-JJM-LDA |
| | : | |
| Plaintiff, | : | |
| | : | SECOND |
| | | AMENDED COMPLAINT |
| -against- | : | "*REDACTED*" |
| | : | |
| BROWN UNIVERSITY | : | JURY TRIAL |
| in Providence in the State of Rhode Island | : | DEMANDED |
| and Providence Plantations, | : | |
| | : | |
| Defendant. | : | |

-------------------------------------------------------------X

## I.    The Nature of This Action

1.      From the first semester of his freshman year in 2013 through the Spring of 2017, John, who identifies as African-American and is male, went from being a High School All American athlete to failing his courses and attempting suicide after defendant Brown University in Providence in the State of Rhode Island and Providence Plantations ("Brown" or "Brown University") brought two Title IX actions against John and promised more disciplinary actions (including one for damaging the vehicle John jumped in front of in his attempt to kill himself) as a direct result of Brown's pattern or practice and continuing violation of gender and racial discrimination and hostile education environment in violation of the requirements of 42 USCS § 1981, Title VI and IX of the Education Amendments of 1972 and applicable State law, as well as breach of Brown's own codes and policies.

2.      Prior to matriculating at Brown, John was awarded the distinction of High School All American three times not only for his athleticism but for his good character and

sportsmanship, the depth of which was honored when he was nominated by the coach of a rival team who actually ventured to "hostile" territory to personally award John the certificate.

3.      Throughout his high school experience, John received accolades from students, parents, faculty, as well as his school's headmaster for his character and won the school's good sportsmanship award his senior year.

4.      John matriculated at Brown in September 2013.

5.       During his first semester, John was sexually assaulted by a white, female student, Jane Doe (Jane), who initiated "kinky" and aggressive sexual activity and in doing so bit his lip so hard it drew blood; choked him and forcibly pinned him against a wall and told him that she "makes the rules."

6.      But it was Jane who brought a Title IX action against John. During the action, Jane did not refute that she bit John's lip, and a witness, REDACTED, (Student 1), corroborated that John's lip was swollen the next morning.

7.      Further, Jane did not refute that she participated in "kinky" asphyxiation actions, and Jane expressly admitted to pinning John against a wall while declaring that she "makes the rules." Regardless, Brown did not bring an action against Jane.

8.      While the evidence showed that John had been assaulted, forcibly choked without his consent, and held against his will all without his affirmative consent while being told by Jane that his consent and will were subject to her "rules," Brown found John responsible.

9.      Brown imposed the sanction of "Deferred Suspension" on John, which is a pathway sanction to more severe penalties should John be found in violation of other school policies.

2

10.   Jane investigated John's other encounters with female students and reported to Brown an encounter Sally Roe (Sally) had with John in October 2013 in which John and Sally kissed. Other than kissing, no other sexual activity occurred between John and Sally.

11.   John also allegedly asked her to go inside the shower with him, which Sally rejected. John's request was in compliance with Brown's consent rules.

12.   For this, John was immediately separated from Brown's community and he was subjected to a second Title IX investigation.

13.   Sally later contacted John to apologize for her role in the second Title IX action (Title IX 2) and informed him that she did not initiate the investigation and that she did not seek a no-contact order.

14.   Brown launched the second Title IX investigation in May 2014 just before final exams were to begin.

15.   While Brown allowed John to take his final exams, he was otherwise subject to an "emergency removal" from Brown while the Title IX 2 action was ongoing.

16.   The investigation lasted into August of 2014 causing John severe emotional distress.

17.   During that time, Brown did not give John any witness statements or evidence in connection with the investigation.  There was no hearing.

18.   Brown decided to not move forward with Title IX 2 in August 2014 and John was permitted to return to class for the fall semester.

19.   Regardless, damage had been done:  John had been sexually assaulted.  While Brown ignored his assault, it brought two rounds of investigations in connection with white, female students against John, an African American male.

3

20.     In Title IX 1, Brown prosecuted the white, female student's claim against John, but Brown did not prosecute Jane for the injuries she caused John. In Title IX 2, Brown pursued an investigation against John on behalf of a white, female student, even though she did not believe that John had violated her rights and she did not even want to pursue the claim. However, With regard to the African-American, male student claims against Jane, Brown neither pursued a claim on his behalf as it did for Sally, nor did Brown prosecute Jane.

21.     John twice faced the stress of being sanctioned and the distress and trauma of being sexually abused by Jane, all while being exposed to a pattern or practice of sexism and/or racism that allowed John to be sexually abused, but denied him the ability to exercise his rights pursuant to Brown's codes and policies to the same extent it allowed its white, female students who suffered sexual abuse to do so. The toll these experiences had on John's academic performance and mental health were severe.

22.     Brown's pattern or practice of racial and/or sexual bias was palpable. For example, during and subsequent to Title IX 1, Jane repeatedly violated the no-contact order by appearing at events where John was present including parties for his team. When John's Mother complained about this to Dean Castillo-Appolonio, she explained to John's Mother that "it is normally expected that the guy would leave the area." John's Mother asked whether "the guy" is expected to leave his own team events, or if she were to show up at a game, would he be expected to vacate the field if the restricted female appeared.

23.     Brown threatened John but not Jane with disciplinary action based on John's alleged violations of the no-contact order.

24.     Whereas Jane took a leave of absence from Brown in 2015-2016, Brown imposed another no contact order on John to protect Jane upon her return to Brown for the 2016-2017 academic year and until she graduated that spring.

25.     In October 2014, John attempted suicide by jumping in front of a moving vehicle and John was hospitalized.

26.     On the day of his release, Maria Suarez, Associate Dean and Director of Student Support Services for Brown's Offices of Student Life and Vice-President Margaret Klawunn, Associate Dean and Director of Student Support Services for Brown's office of Student Life acted willfully and maliciously to compel John to leave Brown and informed him that it intended to resume Title IX 2, initiate a disciplinary action against him for the damage he caused to the vehicle, and initiate other disciplinary actions against him.

27.     John sought and received a medical leave from Brown for the 2014-2015 academic year.

28.     When John requested readmission for the fall of 2015, Brown rejected his application in a letter dated June 1, 2015 asserting that John had not yet achieved a long enough period of sustained stability.

29.     John appealed that decision and Brown readmitted John on appeal.

30.     John's education and academic performance and emotional wellbeing had been negatively impacted as a result of Brown's actions during the Relevant Period, for which John seeks damages.

**II.     Parties**

5

31.     Plaintiff John Doe ("John Doe") is a natural person residing in California currently enrolled at Brown University.  During the events described herein, John Doe was a student at Brown and resided on the Brown campus in Providence, Rhode Island.

32.     Upon information and belief, Defendant Brown University in Providence in the State of Rhode Island and Providence Plantations ("Brown" or "Brown University") is a non-profit corporation organized under the laws of the State of Rhode Island operating as a private liberal arts university located in Providence, Rhode Island.

## III.     Jurisdiction and Venue

33.     This Court has diversity, federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because: (i) John Doe and Defendant Brown are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; (ii) the claims herein arise under federal law; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

34.     This Court has personal jurisdiction over Defendant Brown on the grounds that Defendant Brown is conducting business within the State of Rhode Island.

35.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## IV.     Factual Allegations

### The First Title IX Action (Title IX 1)

36.     In September 2013, John Doe enrolled as a freshman at Brown.  The relevant time period for this action is fall 2013, when Jane sexually assaulted John to spring 2017 when Jane graduated and the no-contact order against John expired (the "Relevant Period").

37.     As a matriculated student at Brown and member in good standing of the Brown community John relied on Brown's policies in particular, Brown's Sexual and Gender-Based Harassment, Sexual Violence, Relationship and Interpersonal Violence and Stalking Policy (the "Policy") and Brown's Code of Student Conduct 2013-2014 (the Code").

38.     On or around the night of September 20, 2013, John had an encounter with Jane, a white, female student who was a sophomore at a party at a local bar.  Both were underage and both had been drinking alcohol.

39.     That night, John and Jane spoke to each other in the bar.  They stepped outside, sat at a picnic table, and chatted and flirted for around 20 minutes.

40.     John and Jane walked out to an alley behind the bar.

41.     They began kissing and engaging in some "kinky" behavior initiated by Jane including biting and asphyxiation.

42.     John responded to some of her actions, but largely acted to defend himself and diffuse Jane's kinky actions.

43.     Jane's response to John's efforts to resist her and defend himself was more aggression, and as she stated in a personal statement submitted to Brown as part of Title IX 1,she "tried to push his shoulders back and went for his neck" and that she eventually put her "right forearm across his shoulders . . . and push him back" and said, "I make the rules."

44.     Although Jane was forcibly keeping John from leaving, John left anyway.

45.     In the course of the encounter only one party was bruised and battered: John, who Student 1 reported had a swollen and damaged lip.

46.     However, Jane reported to witness REDACTED (Student 2), who was not present during the incident, that John had "struck" Jane, and that "[h]e hit her hard enough that [Jane] clutched her face and braced herself against the wall."

47.     However at the hearing, Student 2 reported that she saw Jane the evening of the incident but did not see any mark or other indication that John had hit or slapped or struck Jane.

48.     Another witness for Jane, REDACTED (Student 3), who also was not present during the incident, reported that Jane told her that John "had pushed her to the ground."

49.     Jane changed her story during the course of Title IX 1 and reported another version in which John "took his left arm and simultaneously moved [Jane's] arm out of the way, pushing/slapping [Jane's] face down and away from him harshly."

50.     In Jane's December 4, 2013 written statement (the "Dec. 4 Statement"), Jane did not report that she had been pushed to the ground or struck so hard that she had to brace herself against the wall.

51.     In or around December 2013, Brown informed John that Jane had filed a complaint containing the following charges:   Level 1 - sexual misconduct (a nonconsensual contact involving violence or intimidation) (she claimed he hit her) Level 3 - sexual misconduct (a nonconsensual contact) and Underage Drinking. A Student Conduct Board hearing took place in February 2014.

52.     At the hearing, John and Jane faced different treatment from the Conduct Board.

8

53.     One difference was that Jane was permitted to present in her opening statement an amended version of her Dec. 4 Statement without first submitting it to the Conduct Board at least 24 hours in advance as required by Brown's Complaint Process pursuant to the Policy, p. 5**.**

54.     The Conduct Board allowed her to present her amended statement even though doing so deprived John the opportunity to review her statement and prepare a defensive response in violation of Brown's duty to allow him "every opportunity to offer a relevant response" to the evidence against him, as required by the Code of Student Conduct 2013-2014 (the Code"), p.7.

55.     The Conduct Board also prevented John from asking Jane why she amended her statement and withheld it until the hearing, in further violation of the "every opportunity" requirement.

56.     Another difference that favored Jane was that she was permitted to allege and argue conclusory statements that were based on stereotypes that were racist and/or misandristic. For example, Jane argued that John was a predator and a danger to the Brown community.

57.     In her cross examination of John's coach, REDACTED (Coach), Jane accused the Coach of creating a misogynistic and hyper masculine environment, which indicated a pattern of behavior irrelevant to Title IX 1 and in violation of the Policy's Complaint Process, p, 4.

58.     However, the Conduct Board prohibited John from asserting any conclusory statements against Jane, even if such conclusions were based on the facts about the incident in further violation of the "relevant response" policy.

59.     For example, John attempted to question Jane about her intentions during the incident with regard to biting his lip, choking him and pinning him against the wall, but the Conduct Board prohibited this line of questioning.

60.     Such unfair treatment prohibited John from adequately highlighting the discrepancies in Jane's account of the incident and violated John's right pursuant to the Code "[t]o be given every opportunity to articulate relevant concerns and issues, express salient opinions, and offer evidence before the hearing body or officer." (Code, p. 7).

61.     Instead, the central issue during the hearing was whether John assaulted Jane.

62.     At the hearing, Jane's witnesses, Students 1 and 2 represented that on the night of the incident and for days afterwards, Jane disclosed that John had forcefully assaulted her, and on the night of the incident, Jane told different witnesses that she was struck was so hard, she either had to brace the wall to steady herself, or she fell to the ground.

63.     Regardless, one Student 2 further represented that she detected no bruising on Jane.

64.     At the hearing, Jane alleged that the alleged strike or hit or slap was a push.

65.     John's account of the incident remained consistent throughout the investigation and hearing.

66.     At no point during the hearing did Brown allow John to assert his accusations against Jane that she had assaulted him, engaged in coercive non-consensual sexual touching and underage drinking.

67.     The Student Conduct Board panel found John Doe "not responsible" for the offenses involving violent physical force, penetration or injury.

68.     The Student Conduct Board panel found John Doe "responsible" for nonconsensual contact and underage drinking.

69.     Brown did not bring any charges against Jane in connection with John's allegations of nonconsensual sexual contact, assault, asphyxiation, coercion and force even

though such actions involved violent physical force caused John physical injury and according to the Code warranted "severe sanctions . . . separation being the standard. Code, 4.

70.     Jane also made misrepresentations about John's conduct to the Conduct Board and to other Brown officials during the course of the investigation with impunity in violation of the Code's requirement that misrepresentations are "immediately actionable." Code, p. 6.

71.     The Conduct Board imposed a sanction of a one-year deferred suspension against John.

72.     The sanction of deferred suspension allows Brown to impose harsher sanction on John should he be found in violation of any further policies.

73.     Jane appealed the sanction, arguing that John Doe should be expelled.  The appeal was denied.

**The Second Title IX Action (Title IX 2)**

74.     On or around May 7, 2014, John received two letters from Brown regarding another alleged violation of Brown's Title IX sexual misconduct policies.

75.     In the first letter, the Office of Student Life notified John that the office "had information" of his possible involvement in a different incident of sexual misconduct involving another female student, Sally Roe (Sally).

76.     According to the first letter, Sally alleged she was the victim of conduct by John that would constitute violations of Offense III (Sexual misconduct that involves nonconsensual physical contact) and Offense IV (Subjecting another person ... to abusive, threatening, intimidating or harassing actions, including…those based on race, religion, gender, disability, age, …).

77.     The second letter was signed by J. Allen Ward, Senior Associate Dean for Student Life.  In that letter, he stated that "effective immediately [John Doe] was separated and barred from the Brown University campus on an interim basis." It was for an indefinite period pending the outcome of the school's investigation.

78.      The letter identified Sally, but provided little information about the nature of the accusations.

79.     On information and belief, Brown did not conduct a pre-charge investigation before it removed John from Campus in violation of the Code that allowed "[a]ll members of the Brown University Community . . . the right to attend, make use of or enjoy the facilities and functions of the University subject to prescribed rules." Code, p.3.

80.     Although John did not learn of it until later, the day before John received the letters, Dean Suarez called John's Coach and said words to the effect of, "We got your boy now. He is out of here."

81.     The Coach also reported to John's Mother that Dean Suarez also told him something to the effect of "you think you know your boy but you don't."  Based on these comments, the Coach communicated to John's Mother that Dean Suarez had a clear agenda in going after John and she wanted John removed from Brown permanently.

82.     On information and belief, and unbeknownst to John at the time, Jane and Sally became close friends in April 2014 when Sally pledged to become a member of the sorority in which Jane was a member.

83.     John received the May 7 letters and discussed them with Dean Castillo-Appolonio.

12

84.     In their conversation, John had a strong emotional reaction, collapsing to the floor and crying uncontrollably.   Dean Castillo-Appolonio referred him to Dean Suarez for counseling due to his reaction. Dean Suarez comforted him, but at the same time told him words to the effect that unless he could prove he was not present, he would "pretty much" be determined to be guilty and expulsion would follow, since he already was serving a deferred suspension.

85.     John was allowed to remain on campus for the sole purpose of taking his exams but had to vacate by 5 p.m. following his last exam, and that he had to respond to the charges in writing within five days.   He later received an extension of ten additional days to respond to the charges against him.

86.     Due to his distress John failed his final exams and therefore failed two courses.

87.     While Brown allows students to delay exams, this option was not offered to John.

88.     In response to his failing two courses, Brown placed John on "academic warning."

89.     John submitted a written response to the charges against him in the May 7 letters in which he recalled meeting Sally at a party in October 2013.  They ended up "making out" in a bathroom (as John's roommate was in his room).   After 10-15 minutes of kissing, they left the bathroom.  They returned to the quad where Sally met her friends, and they parted.  John did not recall any further contact with Sally until receiving the May 7 letters from Brown.

90.     John returned to his home shortly after taking his last spring semester exam.  Over the summer, he and his parents asked Brown several times to clarify the nature of the charges, and to explain the basis for the order of immediate removal, given that more than six months had elapsed between the alleged event and the issuance of the letters.

91.     Brown refused to explain the nature of the charges, saying the matter was under investigation and could not be divulged until formal charges were made.

92.     With regard to the separation order, Brown stated it properly exercised its authority under the Code of Student Conduct to take this action "for matters in which individuals pose a danger to themselves or the immediate well-being of the University Community."

93.     Brown also stated that they were having difficulty contacting Sally due to her summer travel.

94.     During the summer of 2014, concerns about the future of John's academic career caused John and his family emotional trauma for which they sought and obtained psychiatric counseling.

95.     On or around August 7, 2014, Brown sent John an email informing him the investigation had concluded, and he was free to return to campus to resume his courses.

96.      The email did not explain what had happened, or why Brown had ordered his removal the previous May.  John's nightmare appeared to be over.

**Severe Emotional Distress and Suicidal Ideation**

97.     Unfortunately, the trauma from the previous semester left a residue.  Upon returning to Brown, John suffered from undiagnosed depression.  His depression caused him to avoid people, particularly women. He also started missing classes.

98.     One evening in October 2014, John had an encounter with another female student who started flirting with him, climbing into his lap as they and a group of friends watched a movie.

99.      At the end of the evening, John waited for her to walk her home.  She lingered with others for a while, leaving him uncertain about whether she viewed his waiting as an

14

intrusion.  He finally left, but continued to reflect on his choice. On the one hand, he worried that he had acted rudely by waiting too long to walk her home speculating that she did not want this. On the other hand, he worried he had acted rudely by leaving without her, speculating that she may have wanted him to wait and walk her home.

100.    Unable to resolve this question, John ruminated in a cycle of self-doubt, fueled by worries he was perceived as a sexual predator.  He began to scream, and threw himself into an oncoming, moving vehicle. He landed on the windshield, cracking it, and started thrashing and screaming, beating his arms and crying.

101.    Somehow, John came out of this encounter with only bruises and lacerations.  He climbed off the hood, apologized to the driver, and declared that he wanted to die and kill himself.

102.    After a witness contacted 911, campus police arrived.  John was restrained and transported by ambulance to a hospital, where he stayed for four days.

103.    Upon discharge, he was given clearance to return to class and to participate in a week of intensive therapy.  However, his academic performance had suffered terribly as result of his depression.  As a result, John's doctors recommended he take a medical leave of absence from school so he could clear the failures from his transcript, overcome the trauma of the incident and return fresh in the fall.

104.    While John, who was on a varsity team, was reluctant to leave and interrupt his athletic career, he ultimately decided, shortly after his discharge from the hospital, to withdraw his enrollment.

105.    Unaware of John's decision to withdraw, Vice President Klawunn (who was deeply involved in Title IX awareness and worked with the student group Imagine Rape Zero

that included Jane) and Dean Suarez summoned John and his mother to an "urgent" meeting the same day of his discharge from the hospital on or about October 28, 2014.

106.    The two Brown officials were aware of John's severe emotional state and that he had been released from the hospital just hours before they held the scheduled meeting.

107.    Regardless, they informed John that if he chose not to leave, he could expect to face hearings on several matters, including the damage sustained by the vehicle that he threw himself into when he attempted to harm himself (it would be regarded as vandalism), and an allegation he had violated his "no contact" order with Jane.

108.    Vice President Klawunn and Dean Suarez also informed John they would seek to remove John from his dormitory that day because of the claimed violation of his no-contact order.

109.    Finally, Vice President Klawunn informed John that the sexual misconduct complaint from the previous spring involving Sally could still be revived.  It would be several months before John learned this was an idle threat, because Sally had informed Vice President Klawunn she did not wish to pursue a complaint against John.

110.    John jumped up from his seat and cried, "Do you just want me out of here?"

111.     At that point, John's Mother said to them both, "Enough! This is enough! You have traumatized him enough."

112.    John stayed on campus a few days longer to attend his intensive therapy sessions (voluntarily) and to clear out his dorm, but he returned home within the week.

113.    During the following months, John complied with the program Brown required for him to be eligible to resume his education the following Fall.  He attended therapy, worked as a fellow at a local medical center, coached sports and stayed healthy, active and fit.

16

114.    When he initially applied to return to Brown for the Fall, 2015 semester, Brown denied his application because John's severe emotion distress required a more lengthy period of "sustained stability."   When John appealed, the appeal was granted.

**Aftermath:  2015-2016 Academic Year**

115.    In or around late October 2015, Sally approached John and flirted with him.  She teased him, stating words to the effect of, "What's the matter; why are you being so cold with me?"

116.    John responded that he was cautious because she had filed a complaint of sexual misconduct against him.  Sally replied in words to the effect that Jane had a major role in Sally's complaint against him without elaborating further.

117.    In the spring of 2016, Sally and John chatted on Facebook about the prior incident.  She said that Dean Suarez and Dean Klawunn had summoned her to their office and interviewed her about whether she had ever had any interaction with John.  They asked her a series of leading questions about the nature of her encounter with him.

118.    Sally also told John Doe that after she joined Jane's sorority, they shared stories about guys, at which time they learned they each knew John.

119.    Sally informed John that her friend Jane told Brown officials she could produce another "victim" of John.

120.    In Sally's account, Brown officials generated the claim against John, as Sally herself did not feel anything "bad" had happened during her encounter with him and she did not seek to file a complaint against him.

121.    Sally apologized to John for the grief she had caused him, stating that Brown's "no contact" order had prevented her from telling him sooner.

122.    Also during the 2015-2016 academic year, Jane was on leave from Brown and in attendance in an off campus program.  She returned to Brown for the 2016-2017 academic year and to graduate in the spring.  Upon her return, Brown put John under a no contact order.

**John's Reports of Racial Animus**

**Title IX 1**

123.    During Title IX 1, John felt that Brown's treatment of him made him feel "more black" than he had ever felt before since being at Brown.  He feared that because he was a black athlete, he had been singled out as a predator, and that he was not going to be treated fairly.

124.    Prior to the hearing and during the investigation of Title IX 1, John reported these concerns to his Coach.  John made similar reports to Dean Yolanda Castillo-Appollonio, who held the position of Associate Dean of Student Life and Director of Student Conduct at Brown and was supervising the Title IX investigation.

125.    John also reported his concerns about being stereotyped as a black, male athlete to Dean Suarez who Dean Castillo-Appollonio recommended to be John's counselor and confident during Title IX 1.  Dean Suarez's training and background is in psychology.

126.    On information and belief Dean Suarez provided support to the Title IX office and to student-accusers including Jane and had an impermissible conflict of interest and should not have been John's counselor and confident.

127.    Dr. Suarez' conflict of interest was in violation of Brown University Conflict of Interest and Commitment Policy (Policy p. 12), which states that  "[i]n addition to refraining from prohibited activities, members of the Brown community must disclose any activity, relationship, or interest that is, or may be perceived to be, a conflict of interest so that these activities, relationships, and interests can be managed properly.

18

128.    John met with Dean Suarez four to five times for one-hour sessions and disclosed to her his most private concerns about the investigation, including fears of racial animus, its impact on him, his emotional state and his wellbeing.

129.    Despite these reports, Brown denied that racial animus was an issue and was deliberately indifferent to John's concerns and did nothing to assuage John's concerns.

130.    During Title IX 1, John also complained to his parents during the December 2013 winter break that because he was a black athlete, he was being singled out as a predator.

131.    Indeed, John had become aware that Jane had breached her duty to keep Title IX 1 confidential and had been stating to third parties (and fellow students) representations about John that suggested he was a sexual predator.

132.    John's parents shared John's concerns about racial profiling to Jonh's Coach and with John's advocate, Carol Norris, before Title IX 1was heard.

**Title IX 2**

133.    After Brown initiated Title IX 2, John's father traveled to Brown during the week of Sept 24, 2014, and spoke to Dean Castillo-Appollonio and Academic Dean Carol Cohen to report his concern that John was being subjected to negative treatment due to race and that John should be  treated fairly.

134.    John's father made it clear to Dean Castillo-Appollonio that he believed that John was targeted for his race, which concerns are heightened because of racial stereotypes about black athletes.   John's father told her that the facts didn't support the school's reaction and that he has a daughter and many sisters and he takes sexual misconduct issues seriously.

135.    He shared Dean Castillo-Apollonio's belief that the new regulations had made the university's actions go too far and they were not looking at all the facts objectively and that he wanted to know that they were going to treat him fairly.

136.    Dean Castillo-Apollonio acknowledged his concern, and said the pendulum had possibly swung too far against the accused in these circumstances but maybe it would swing the other way in the future.  For now, they were just doing their job.

137.    John's father also met with Dean Cohen discuss John's academic situation.  Dean Cohen said it was "strange" about the timing of informing him of the second allegation.  She also said it was an old complaint and questioned why John was told during finals or why any action was taken at all since the semester was ending.

### Racial and Gender Bias at Brown

### Jane is Similarly Situated to John

138.    Jane is white and John is African American.  Jane is a female and John is a male.

139.    In Title IX 1, both Jane and John were similarly situated to the other is that both reported to Brown acts of non-consensual sex, coercion and force.  John reported that Jane sexually assaulted him by, among other things, biting his lip causing it to bleed.

140.    During the course of Title IX 1, Jane admitted that she choked John and pinned him to a wall telling him to subject himself to her "rules."

141.    Moreover, Jane's claims that John hit or slapped her were proved to be false.

142.    Yet Brown pursued Jane's claims and did not pursue John's claims.

143.    Further, John was found responsible and was sanctioned, yet Jane faced no action against or sanction.

20

144.    When faced with a white, female accuser, Jane, and an African-American male accuser, John, Brown only prosecuted the claims of the female accuser, Jane.

145.    Although John alleged that he was a victim of a sexual assault, Brown did not identify him as a victim or as an accuser.  Throughout Title IX 1, John's only role was that of respondent.

146.    As a respondent to a claim of sexual assault, John was not presumed innocent. Instead he was presumed to exercise power dynamics and to be manipulative. *See* Potential Campus Sexual Assault Investigating Models for Brown University,

http://www.brown.edu/web/documents/president/SATF-Final-Report-B.pdf

147.    As an accuser, Jane was presumed to be credible and to the extent her allegations changed, such changes were the result of the effects of trauma or related symptoms as a result of the sexual assault.

148.    Further, both Jane and John were similarly situated in that both accused the other of various violations of Brown policy:  Jane accused John of breaching the no contact order. In particular, John accused Jane of breaching the no contact order by appearing at events at which John would surely be present, such as a team party.  John also accused Jane of making false statements causing damage to his character and reputation as well as breaches of confidentiality in which she characterized John as a predator to third parties.

149.    John complained to Dr. Suarez about the Jane's breaches of confidentiality and the racial animus against him it could arouse, but Brown took no action against Jane.

150.    However, Brown responded to Jane's accusation that John allegedly breached the no contact order and threatened to discipline John for doing so.

21

151.    In addition, Brown re-reissued and/or extended the no contact order against John with respect to Jane in the Fall of 2016 that stayed in effect against John until Jane graduated in the Spring of 2017.

**Sally is Similarly Situated to John**

152.    Sally is white and John is African American.  Sally is female and John is male.

153.    Both Sally and John were alleged victims of sexual assault, yet Brown initiated and pursued Title IX 2 on Sally's behalf  even though Sally herself did not want to initiate a complaint.

154.    Brown did not initiate and pursue an investigation on John's behalf even though he had been assaulted by Jane, which drew blood, and had been forcibly coerced to follow Jane's kinky "rules," which included asphyxiation.

155.    Further, Brown accommodated Sally and gave her extended time to submit her statement and supporting statements while she was on vacation, but required John to submit his statements within days of being notified of the claim against him even though he was facing finals, suffered a severe emotional breakdown and had to move out of the dorms.

**Pattern or Practice of Racial Animus**

156.    Brown does not afford its Title IX respondents who are nearly exclusively male the presumption of innocence.

157.    Instead Brown presumes that the male respondent benefits from certain "power" and "privilege dynamics" that are expressed through "manipulative tactics." *Id.*

158.    At Brown, "power" and "privilege" are negative traits almost exclusively attributed to males who exploit or otherwise manipulate people with less power and privilege, a large group of humanity which includes women.

22

159.    African-American men and in particular African-American male athletes have acquired a stereotype with respect to their perceived power and privilege primarily in the sexual conquest of white women. This racist stereotype informed Jane's denouncement of John as a predator who will strike again.

160.    Such attitudes are part of "structural racism," a pervasive form of racism defined by Brown's Center for the Study of Race and Ethnicity in America (CSREA) as "the normalized and legitimized range of policies, practices, and attitudes that routinely produce cumulative and chronic adverse outcomes for people of color, especially black people . . . ."

161.    Despite Brown's seeming awareness of the problem, in action, Brown perpetuated the racial stereotype and was indifferent to John's claims that Jane violated John's rights pursuant to Brown's Title IX Policy and Code by biting his lip, asphyxiating him and holding him forcibly, but was treated by Brown with impunity.

162.    Compounding Brown's indifference to John's claims of Jane's Title IX violations against him, Brown was also indifferent to the racial stereotype in which they were casting John and endorsed the racist characterization of John as a "sexual predator," when it launched Title IX 2 based on Jane's efforts to produce a second "victim."

163.    Browns racial and/or gender animus did not coalesce into a pattern or practice until Title IX 2 when Brown brought an action against John on behalf of Sally, even though Sally's experience with John—some kissing, a request for Sally's consent to meet him for a rendezvous-- did not rise to a violation of Brown's Title IX policies, and in any event did not involve physical coercion or bloodletting, which warrant "severe sanctions," but did not warrant an investigation when the person on the receiving end of such abuse is an African-American male. Code, p. 4.

164.    In bring Title IX 2, Brown established a pattern that it considers the black, male athlete as a sexual predator and a danger—just as Jane said during the hearing in Title IX 1 with impunity-- and immediately removed John from the campus on the basis that he was a threat to the school's safety.

165.    Brown's students of color have accused Brown of contributing to the pervasive structural racism at Brown during the Relevant Period, and in particular during October 2013 when Brown invited New York Police Department Commissioner Ray Kelly to speak. Mr. Kelly was drowned out by the students' "heckler's veto," denouncing Mr. Kelly's role in allegedly racist "stop and frisk" police tactics.

166.    Brown's students of color have maintained their stance against Brown's pervasive structural racism as recently as 2015 despite a $100 million plan by Brown to change and diffuse its legacy of adversarial race relations.

167.    In an encounter with students of color after Brown's plan was unveiled, such students spoke of feeling traumatized by Brown's pervasive structural racism, allegations Brown dismissed though swastikas have appeared on campus during the Relevant Period.

168.    Such gender and racial biases informed and impacted Title IX 1 in that both John and Jane alleged incidences of nonconsensual touching, assault and coercion, but only the allegations of the white female were validated. The allegations of the African-American male student of having been assaulted by Jane were not validated.

169.    Brown promotes the notion that "false accusation of sexual violence" are rare, and that "[t]he widespread but unsubstantiated fear of false accusations is a sign of the need for continued efforts to raise awareness regarding the true dynamics of sexual violence." Brown's Sexual Assault Task Force, *Interim Report*, Dec. 2014, p. 10.

24

170.    However, to have discarded John's allegations that he had been assaulted by Jane and/or sexually touched without his consent, Brown would have to abandon its conviction that false accusation of sexual violence" are rare and concede that John's claims are as viable as any claim made by a white, female accuser.

171.    They did not concede that John's claims were viable because as an African American, John is a sexual predator, a danger and as a male, he is a manipulator.

**Pattern or Practice of Gender Bias**

172.    On information and belief, Brown's flawed program and mishandling of John's case were symptomatic of a broader culture of inherent, systematic and intentional gender bias against male students accused of sexual misconduct, through which male students are unable to receive a fair and impartial student conduct process when a complaint of sexual assault is made against them by a female student.

173.    On information and belief, Brown sacrificed John's rights to the expediency of accommodating institutional pressures.  During the pendency of John's case, Brown was under investigation by the Department of Education Office of Civil Rights for its handling of sexual misconduct cases under Title IX, and faced severe financial consequences if the Department determined that Brown did not deal with sexual assault in a way the Department felt was appropriate.

174.    Brown created an environment where an accused male student is fundamentally denied due process by being prosecuted through the conduct process under a presumption of guilt.  Such a one-sided process deprived John, as a male student, of educational opportunities at Brown on the basis of his sex.

175.     Upon information and belief, Brown's handling of John's case fits within a pattern or practice of showing gender bias toward female students in cases of sexual misconduct, including its conduct in: (i) *supra,* McCormick v. Dresdale; (ii) a sexual misconduct case against former Brown student Adam Lack (Class of 1997); and (iii) other instances documented in the *Brown Daily Herald* (April 29, 2010) and the *Brown Spectator* (May 26, 2012).

176.     Upon information and belief, former and present Brown employees and/or administrators

a.     recognize the great miscarriage of justice to the male accused students in sexual misconduct cases at Brown, but are unable to change things because they are fearful of losing their jobs.

b.     recognize that Brown treats males as "guilty until proven innocent" in cases of sexual misconduct and have a pattern or practice of taking the female student's allegations at face value and banishing male students from campus without first hearing the male student's version of the story.

177.     Brown's policies effectuate a failure of due process for the student population, especially the male student population, in their current state, because they encourage and facilitate the reporting of potentially false reports of sexual misconduct and/or other grievances without any recourse for those who may be falsely accused.

178.     Because of the persistent pro-complainant and anti-respondent bias that permeates Brown's sexual misconduct procedures and practices, Brown University's program disproportionately affects the male student population of the Brown community as a result of the higher incidence of female complainants of sexual misconduct against male complainants of sexual misconduct.

26

179.    Male respondents in sexual misconduct cases at Brown are discriminated against solely on the basis of sex.  They are invariably found guilty, regardless of the evidence, or lack thereof.

180.    Brown's pro-complainant bias also suits its institutional convenience, accommodating pressures imposed upon it by the recent national media focus on campus sexual misconduct and Brown's investigation by the Department of Education Office of Civil Rights.

181.    Based on the foregoing, Brown engaged in a series of actions that ultimately resulted in a separation order against John based on a manufactured complaint from a student who did not wish to pursue the matter.

182.    The erroneous outcome of the Deans in ordering John's separation from campus was caused in substantial part by gender bias against males in cases involving allegations of sexual misconduct. This bias is reflected in the patterns of decision making and procedural missteps demonstrated by Brown throughout the entire investigative process.

183.    Moreover, upon information and belief, in virtually all cases of campus sexual misconduct at Brown, the accused student is male and the accusing student is female. Brown has created an environment in which it is impossible for a male student accused of sexual misconduct to receive the due process guaranteed by Title IX. This significant gender-based disparity demonstrates discrimination against male students on the basis of their sex. In fact, Brown treats male students accused of sexual misconduct as "guilty until proven innocent" based on invidious gender stereotypes.

184.    Brown is primarily concerned with its image and reputation to potential incoming students, rather than its obligations to provide a fair and equitable investigative process.

185.    On information and belief, at Brown a female who makes an accusation of sexual assault is by the fact of making the accusation deemed by Brown to be an actual victim of sexual assault.

186.    However, at Brown a male who makes an accusation of sexual assault is still deemed by Brown to be a perpetrator sexual assault rather than its victim.

187.    The status of victim, even if arbitrarily granted to white women like Jane even if she in fact may be the perpetrator of sexual assault carried material benefits.  Such benefits were denied John, an African-American male who was a victim of sexual assault.

188.    By classifying accusers as a victim, Brown attributes to the white, female student a cluster of psychological effects of the assault including trauma.

189.    Such psychological effects provide the white, female accuser with a defense for changes in her allegations as the trauma or other psychological effects of the sexual assault may have interfered with her ability to remember and relate the details of her incident accurately.

190.    On information and belief, Brown attributed inconsistencies in a female student's statements, as was the case with Jane, as either of no material consequence on the viability of her claims or as the consequence of trauma caused by her encounter with the accused and therefore as validation of the underlying claims.

191.    In particular, Jane's false statements, breaches of confidentiality, and violation of the no contact order added to John's feeling of being racially profiled and stereotyped as she characterized John as a rapist and a predator publicly to other Brown students.  John feared that the accusation that he as a black athlete assaulted a white women would arouse feelings of racial animus against him.

192.    On information and belief, Brown engages in a discriminatory pattern or practice to not ask a male respondent who alleges violations made by the female accuser whether he wants to file a Title IX complaint and otherwise disallows so-called dual complaints that are investigated and heard at the same time, a practice permitted by the OCR and regularly practiced at other institutes of higher learning.

193.    On information and belief, Brown has never initiated a Title IX case based on allegations of Title IX violations made by an African-American male student against a female respondent.

194.    Brown gives preferential treatment and advantages to its white, female students Jane and Sally and did not exercise fair and equal treatment to John, even when he had alleged he was the victim of a sexual assault.

195.    Upon information and belief, numerous past and present employees of Brown, including professors, administrators and coaches, perceive an inherent and systematic gender bias against male students accused of sexual misconduct at Brown which prevents male students from  receiving a fair and impartial hearing when a complaint of sexual assault is made against them by a female student.

196.    Upon information and belief, Brown promotes an institutional "regime of fear" surrounding the issue of sexual assault, in which administrators and employees are deterred from advocating on behalf of male accused students out of concern for their job security, as reported in the May 26, 2012 issue of the *Brown Spectator*.

197.    Upon information and belief, Brown promotes an atmosphere of bias against male students accused of sexual misconduct, including the common notion that any male athlete accused of sexual misconduct will be found responsible and thrown out of school.

29

198.    Upon information and belief, one former Brown employee stated that Brown treats male students as "guilty, until proven innocent," that Brown has "loaded the dice against the boys" and that the fact-finding process in cases of sexual misconduct at Brown operates under the assumption that it's always the "boy's fault."

199.    As an example of "boy's fault" mentality, John's mother asked Dean Castillo-Appolonio about the mutual no contact order placed against both John and Jane.  Jane had accused John of violating the order, and Brown threatened to prosecute him and to remove him from his dorm immediately as a result of the violation.

200.    On information and belief Brown has never disciplined a female student for violating a no contact order.

201.    Upon information and belief, Brown treats male students as "adults" who have a "choice" and, thus, are the "responsible" party in sexual encounters, yet, they treat female students as "children" who "never have a choice" in sexual encounters so "they are never responsible" in sexual encounters.

202.    Upon information and belief, one Brown professor stated that "there is gender bias that is overwhelming at Brown" when referencing sexual misconduct cases at Brown.

203.    Upon information and belief, in December 2014, a Brown professor held a debate to discuss rape issues on campus.  During the debate, one female debater remarked that males are "bad" and females are "victims" when it comes to sexual misconduct.  The Brown professor stated that these remarks are consonant with the culture of thinking on Brown's campus.

204.    On information and belief, Brown has never initiated a Title IX case based on allegations of Title IX violations made by a male and/or African American student against a white, female respondent, and on information and belief Brown's male students of color are

30

accused more frequently of violations of Brown policies and receive more serious sanctions than white students in similar circumstances.

**V**.       **Causes of Action**

**COUNT I**
**20 U.S.C. § 1681 *et seq***
**TITLE IX OF THE EDUCATION AMENDMENTS OF 1972**
**Hostile Education Environment/Sexual Harassment**

205.    Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

206.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

207.    Defendant receives federal financial assistance for research and development.

208.    Plaintiff's gender is protected by Title IX.

209.    During the events herein, John was a matriculated student and in attendance at Brown.

210.    John was subject to harassment from Jane when she assaulted him by drawing blood from his lip, asphyxiating him and forcibly pinning him to a wall all without his affirmative consent.

211.    Jane's harassment was sufficiently severe and/or pervasive to alter the conditions of Plaintiff's education and created an abusive educational environment for Plaintiff and constituted a continuing violation.

212.    Plaintiff reported the sexual harassment to representatives of Brown who had authority to address the discriminatory harassment.

31

213.    Brown's representatives failed to adequately respond to or address the harassment.  Indeed, Brown's representative acted with deliberate indifference with respect to the sexual harassment of Plaintiff.

214.    Brown's conduct as set forth herein was in violation of Title IX's strictures against sexual harassment and Brown is liable to Plaintiff.

215.    Indeed, whereas Brown has the right and does initiate Title IX disciplinary actions on behalf of alleged female victims of sexual harassment, Brown did not bring an action against Jane on John's behalf. Moreover, Brown disallowed John from asserting a counter claim or defense against Jane regarding in connection with his allegations.

216.    Brown's conduct as set forth herein was in violation of Title IX's strictures against sexual harassment and Brown is liable to Plaintiff.

217.    By reason of the sexual harassment Plaintiff has suffered and continues to suffer, and Plaintiff is entitled to all legal and equitable remedies available under Title IX, including an award of punitive damages, attorneys' fees and costs.

218.    Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including extreme emotional distress, and loss of capacity for the enjoyment of life.

219.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

**COUNT II.**
**20 U.S.C. § 1681 *et seq.***
**TITLE IX OF THE EDUCATION AMENDMENTS OF 1972**
**Gender Discrimination**

220.     Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

221.     Title IX of the Education Amendments of 1972 provides, in relevant part, that: No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

222.     Defendant receives federal financial assistance for research and development.

223.     Plaintiff's gender is protected by Title IX and during the events herein, John was a matriculated student and in attendance at Brown.

224.     Defendant discriminated against Plaintiff by permitting a pattern or practice of gender discrimination against John in violation of Title IX as set forth herein.

225.     Such pattern or practice constitutes a continuing violation and Brown is liable to John from September 2013 when Jane assaulted John to when Jane graduated in 2017 and the no-contact order against John expired, the Relevant Period.

226.     John and Jane, a female student, were similarly situated in that both alleged that the other sexually harassed the other in violation of Brown's Title IX Policy.

227.     However, Plaintiff's complaint that Jane, a female student, violated Brown's Policies regarding sexual misconduct, breach of confidentiality restrictions and a no contact order against him were treated with deliberate indifference by Brown's representatives.

33

228.    In contract, Brown investigated and heard Jane's Title IX allegations against John and pursued her complaints regarding his violations of the no contact order.

229.    Brown's indifference adversely effected John as he was vulnerable to a) a subsequent investigation, b) a protective order limiting his access to campus, c) a sanction that is not only a cloud on his academic record, but as a pre-existing record makes him vulnerable to further sanctions, d) a second investigation, e) immediate and unwarranted separation from campus, f) a lengthy investigation in violation of the Policy's and the OCR's 60-day rule, and g) threats of disciplinary action based on alleged violations of the no contact order.

230.    Moreover, John was also found responsible for underage drinking, a violation only he, but not Jane, (also an underage drinker) had to face because Brown pursued Jane's allegations against John, but not John's allegations against Jane. John suffered failing grades, academic suspension and severe emotional distress.

231.    Brown was also deliberately indifferent to John's claims that Jane a) breached her duty to uphold the confidentiality of the proceeding by spreading misindrastic rumors about John and among other things called him a sexual predator and a danger to the Brown community, b) violated the Code's prohibition to not misrepresent information and lie during  the Title IX 1 action;  c) breached the no-contact order even though Jane was seemingly going out of her way to appear at events in connection with John's sport's program where John would appear—all with impunity.

232.    Further, as Brown was aware, Jane sought and found an alleged new "victim" of John's, Sally, a female student.

233.    By being indifferent to Jane's violation of confidentiality restrictions, Brown seized the opportunity to bring a second action against John based on the allegations of another female student, Sally, who Jane mined from her circle of friends.

234.    Sally was similarly situated to John in that like John she alleged violations of the Title IX Policy.

235.    However, whereas Brown did not initiate an action on John's behalf against Jane, a female student, Brown did initiate an action against John, the male student, on Sally's behalf.

236.    By bringing an action against John on Sally's behalf, John was adversely affected and immediately separated from campus after his final exams and was denied the option to extend the time to take his exams. John failed his exams.

237.    Brown discriminated against John's gender and detrimentally and adversely affected Plaintiff's education because he is male.

238.    Defendant's pattern or practice of gender discrimination was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

239.    As a direct and proximate result of Defendant's aforementioned conduct, Plaintiff has suffered extreme emotional and physical distress, mental anguish, humiliation and embarrassment.

240.    By reason of the continuous nature Defendant's discriminatory conduct, persistent from when he was sexually assaulted in September 2013 through the spring of 2017, Plaintiff is entitled to the application of the continuing violation doctrine to all of the violations alleged herein.

241.    Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including extreme emotional distress, and loss of capacity for the enjoyment of life.

242.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

## COUNT III.
### 20 U.S.C. § 1681 *et seq.*
### TITLE IX OF THE EDUCATION AMENDMENTS OF 1972
### Erroneous Outcome

243.    Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

244.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dept. of Education); 28 C.F.R. § 54.135(b) (Dept. of Justice).  Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.

245.    On September 22, 2017 the United States Department of Education, Office for Civil Rights (OCR) withdrew the Dear Colleague Letter on Sexual Violence, dated April 4, 2011 and  Questions and Answers on Title IX and Sexual Violence, dated April 29, 2014

(https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.), keeping in place it guidelines Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, Title IX, January 19, 2001 (https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf) (the OCR Standards) as well as newly issued interim guidance (https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf), Q&A on Campus Sexual Misconduct, September 2017 (https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf).

246.     As set forth herein, Jane was favored and John was adversely treated during Title IX 1 in that among other things Jane's credibility was flawed and that John's allegations that Jane had assaulted him and engaged in sexual touching without his consent were not acknowledged by Brown and that John was found responsible for assaulting Jane.

247.     As indicated by Title IX 2, Brown is on the alert and willing to bring disciplinary actions against its male students even when the accuser is unwilling to participate.  Title IX 2 established the pattern or practice under which Title IX 1's conclusions were erroneous.

248.     Brown exhibited a pattern or practice of intentional and substantial gender bias when it failed to prosecute Jane for her actions against John which included a bruised and battered lip, asphyxiation, and being pinned against a wall and being told that his will has been subjugated to Jane's right to "make the rules" reaching an erroneous outcome by finding John responsible in Title IX 1 and punishing him.

249.     In Title IX 2, Brown engaged in a series of actions that ultimately resulted in a separation order against John based on a manufactured complaint from a student who did not wish to pursue the matter.

250.    The erroneous outcome of ordering John's separation from campus was caused in substantial part by gender bias against males in cases involving allegations of sexual misconduct. This bias is reflected in the patterns of decision making and procedural missteps demonstrated by Brown throughout the entire investigative process.

251.    Brown's gender bias caused such erroneous outcomes as a) a protective order limiting his access to campus, c) a sanction that is not only a cloud on his academic record, but as a pre-existing record makes him vulnerable to further sanctions, d) a second investigation, e) immediate and unwarranted separation from campus, f) a lengthy investigation in violation of the Policy's and the OCR's 60-day rule, and g) threats of disciplinary action based on alleged violations of the no contact order.

252.    Moreover, John was also found responsible for underage drinking, a violation only he but not Jane (also an underage drinker) had to face because Brown pursued Jane's allegations against John, but not John's allegations against Jane. John suffered failing grades, academic suspension and severe emotional distress.

253.    Brown's violations of its obligations under Title IX proximately caused John to sustain tremendous damages, including, without limitation, emotional distress, economic injuries, reputational damages, and the loss of educational and post-graduate opportunities and other direct and consequential damages.

254.    John is entitled to compensatory damages for the harm he suffered as a result of Brown's violation of its Title IX obligations.

**COUNT IV.**
**20 U.S.C. § 1681 *et seq.***
**TITLE IX OF THE EDUCATION AMENDMENTS OF 1972**
**Selective Enforcement**

255.    Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

256.    Defendant exhibited patterns and practices of decision-making that show that the penalties John endured and the very decisions to initiate Title IX I and 2 against John as well as the decision to not initiate a Title IX action against Jane were motivated Brown's pattern or practice of intentional animus against John's gender.

257.    John and Jane were similarly situated in that each reported to Brown that the other violated Brown's Title IX sexually misconduct Policy; however, Brown encouraged and endorsed Jane's claims against John, and discouraged and did not endorse John's claims against Jane.

258.    John and Sally were similarly situated in that John and Sally reported accusations that violated Brown's Title IX sexually misconduct Policy, but Brown encouraged and endorsed Sally's claims by initiating an action on her behalf, and discouraged and did not support John's claims whatsoever.

259.    As indicated by Title IX 1, Brown is on alert and willing to bring a disciplinary action on behalf of a female student against a male student, but not willing to bring a disciplinary action on behalf of a male student against a female student even if the male student alleges allegations of Policy violations similar to the allegations asserted by the female student.

260.    As indicated by Title IX 2, Brown is on the alert and willing to bring a disciplinary action against a male student even when the female accuser is unwilling to participate and/or doesn't believe a violation occurred, but Brown is unwilling to bring a disciplinary action against a female student even when the male accuser is willing to participate.

261.    Brown's selective enforcement effected John as he was vulnerable to a) a subsequent investigation, b) a protective order limiting his access to campus, c) a sanction that is not only a cloud on his academic record, but as a pre-existing record makes him vulnerable to further sanctions, d) a second investigation, e) immediate and unwarranted separation from campus, f) a lengthy investigation in violation of the Policy's and the OCR's 60-day rule, and g) threats of disciplinary action based on alleged violations of the no contact order.

262.    Moreover, John was also found responsible for underage drinking, a violation only he but not Jane (also an underage drinker) had to face because Brown pursued Jane's allegations against John, but not John's allegations against Jane. John suffered failing grades, academic suspension and severe emotional distress.

263.    Brown was also deliberately indifferent to John's claims that Jane a) breached her duty to uphold the confidentiality of the proceeding by spreading misindrastic rumors about John and among other things calling him a sexual predator and a danger to the Brown community,  b) violated the Code's prohibition to not misrepresent information and lie during  the Title IX 1 action;  c) breached the no-contact order even though Jane was seemingly going out of her way to appear at events in connection with John's sport's program where John would appear—all with impunity.

264.    Further, as Brown was aware, Jane sought and found an alleged new "victim" of John's, Sally, a female student.

265.    By being indifferent to Jane's violation of confidentiality restrictions, Brown seized the opportunity to bring a second action against John based on the allegations of another female student, Sally, who Jane mined from her circle of friends.

266.    Defendant exhibited a pattern or practice of anti-male bias during Title IX 1 by the differential and selective treatment he and the female accuser received in that, among other things, the undisputed facts showed that Jane was the aggressor and that she was acting willfully and with force.

267.    Defendant exhibited a pattern or practice of anti-male bias during the disciplinary action by the differential selective treatment he and Jane received in that, among other things, Jane alleged conclusory, false and unsubstantiated claims to which John was prohibited to respond.

268.    Defendant exhibited a pattern or practice of anti-male bias during the disciplinary action by the differential and selective treatment he and Jane and Sally received in that, among other things, Defendant could not attribute a negative motive to Jane or Sally but determined that by virtue of being accused, John could not be presumed innocent, but instead was presumed manipulative.

269.    Brown exhibited intentional and substantial gender bias when it failed to prosecute Jane for her actions against John which included a bruised and battered lip, asphyxiation, and being pinned against a wall and being told that his will has been subjugated to Jane's right to "make the rules."

270.    Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including emotional distress, and loss of capacity for the enjoyment of life.

41

271.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

### COUNT V.
### 42 U.S.C. § 2000d *et seq.*
### TITLE VI OF THE CIVIL RIGHTS ACT OF 1964
### (Racial Discrimination)

272.    Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

273.    Plaintiff is African American and is a member of a protected class.

274.    Plaintiff had an excellent academic and athletic record before arriving at Brown and qualified to continue his education and is currently doing so at Brown.

275.    Plaintiff suffered a continuous violation of adverse actions in pursuit of his education by Brown, which was deliberately indifferent to a claim of racial harassment in which Plaintiff was profiled as a sexual predator because of his race.

276.    Plaintiff and his father reported to Brown as set forth herein that John was being racially profiled and stereotyped.

277.    Brown was deliberately indifferent to John's reports of severe and/or pervasive racial animus.

278.    Indeed, just prior to launching Title IX 2, Brown seemingly gloated to John's Coach that it "got his boy now," a racially-tinged choice of words that reveals Brown's severe racial animus.

279.    Plaintiff suffered an adverse action in pursuit of his education in that, among other things, John was disciplined and sanctioned, put under a no-contact order, separated from

42

Brown, failed his exams, suffered severe emotional distress and suicidal ideation, and lost a year of school.

280.    John and Jane were similarly situated in that each reported to Brown that the other violated Brown's Title IX sexually misconduct Policy; however, Brown encouraged and endorsed Jane's claims against John, and discouraged and did not endorse John's claims against Jane.

281.    John and Sally were similarly situated in that John and Sally reported accusations of violated Brown's Title IX sexually misconduct Policy, but Brown encouraged and endorsed Sally's claims by initiating an action on her behalf, and discouraged and did not support John's claims whatsoever.

282.    As indicated by Title IX 1, Brown is on alert and willing to bring a disciplinary action on behalf of a white student against an African American student, but not willing to bring a disciplinary action on behalf of an African American student against a white student even if the African American student alleges allegations of Policy violations similar to the allegations asserted by the white student.

283.    As indicated by Title IX 2, Brown is on the alert and willing to bring a disciplinary action against an African American student even when the white accuser is unwilling to participate and/or doesn't believe a violation occurred, but Brown is unwilling to bring a disciplinary action against a white student even when the African American accuser is willing to participate.

284.    Defendant exhibited a pattern or practice of racial bias during Title IX 1 by the differential treatment he and the white accuser received in that, among other things, the

undisputed facts showed that Jane was the aggressor and that she was acting willfully and with force.

285.    Defendant exhibited a pattern or practice of racial bias during the disciplinary action by the differential treatment he and Jane received in that, among other things, Jane called John a predator to which John was prohibited to respond.

286.    Defendant exhibited a pattern or practice of racial bias during the disciplinary action by the differential treatment he and Jane and Sally received in that, among other things, Defendant could not attribute a negative motive to Jane or Sally but determined that by virtue of being accused, John could not be presumed innocent, but instead was presumed manipulative.

287.    Defendant exhibited a pattern or practice of racial bias during the disciplinary action by the differential treatment he and Jane received in that, among other things, Defendant could not attribute a single negative motive to Jane or Sally even though John complained of retaliation, and assault at the hands of Jane and John's Mother complained about Jane's breach of the no contact order.

288.    Brown exhibited intentional and substantial racial bias when it failed to prosecute Jane for her actions against John which included a bruised and battered lip, asphyxiation, and being pinned against a wall and being told that his will has been subjugated to Jane's right to "make the rules."

289.    Brown exhibited intentional and substantial racial bias when Suarez and Kluwaan willfully planned John's removal from Brown by threatening him with manufactured, baseless and biased disciplinary actions.

290.    An intentional and motivating factor in Defendant's decision to proceed with both Title IX actions was the Plaintiff's race.

44

291.     As a result of Defendant's prosecution, Plaintiff was adversely treated causing detrimental interference delay in his education.

292.     Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including pain, suffering, mental anguish, psychological trauma, emotional distress, loss of capacity for the enjoyment of life.

293.     By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of liquidated and punitive damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

## COUNT VI.
## R.I.G.L. § 42-112-1
## Gender Discrimination

294.     Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

295.     Plaintiff is male and is in a protected class by R.I.G.L. § 42-112-1.

296.     The Plaintiff had a contract with Defendant Brown under which it provided educational services to him which is defined in part by him paying sums to Defendant Brown University to receive an education from the institution and is in part governed by a Code of Student Conduct.

297.     Plaintiff had an excellent academic and athletic record before arriving at Brown.

298.    Plaintiff suffered a continuous violation of adverse actions in pursuit of his education by Defendant in that Plaintiff was profiled as a sexual predator because of his gender by Defendant.

299.    Defendant exhibited patterns of decision-making that tend to show the influence of gender discrimination against the Plaintiff that affected both Title IX actions including among other things allowing Jane to characterize John as a sexual predator that was directly tied to his sex.

300.    Defendant discriminated against Plaintiff by permitting a pattern or practice of gender discrimination against John in violation of Title IX as set forth herein.

301.    Such pattern or practice constitutes a continuing violation and Brown is liable to John from September 2013 when Jane assaulted John to when Jane graduated in 2017 and the no-contact order against John expired, the Relevant Period.

302.    John and Jane, a female student, were similarly situated in that both alleged that the other sexually harassed the other in violation of Brown's Title IX Policy.

303.    However, Plaintiff's complaint that Jane, a female student, violated Brown's Policies regarding sexual misconduct, breach of confidentiality restrictions and no contact against him were treated with deliberate indifference by Brown's representatives.

304.    In contract, Brown investigated and heard Jane's Title IX allegations against John and pursued her complaints regarding his violations of the no contact order.

305.    Brown's indifference adversely effected John as he was vulnerable to a) a subsequent investigation, b) a protective order limiting his access to campus, c) a sanction that is not only a cloud on his academic record, but as a pre-existing record makes him vulnerable to further sanctions, d) a second investigation, e) immediate and unwarranted separation from

46

campus, f) a lengthy investigation in violation of the Policy's and the OCR's 60-day rule, and g) threats of disciplinary action based on alleged violations of the no contact order.

306.    Moreover, John was also found responsible for underage drinking, a violation only he but not Jane (also an underage drinker) had to face because Brown pursued Jane's allegations against John, but not John's allegations against Jane. John suffered failing grades, academic suspension and severe emotional distress.

307.    Brown was also deliberately indifferent to John's claims that Jane a) breached her duty to uphold the confidentiality of the proceeding by spreading misindrastic rumors about John and among other things calling him a sexual predator and a danger to the Brown community,  b) violated the Code's prohibition to not misrepresent information and lie during the Title IX 1 action;  c) breached the no-contact order even though Jane was seemingly going out of her way to appear at events in connection with John's sport's program where John would appear—all with impunity.

308.    Further, as Brown was aware, Jane sought and found an alleged new "victim" of John's, Sally, a female student.

309.    By being indifferent to Jane's violation of confidentiality restrictions, Brown seized the opportunity to bring a second action against John based on the allegations of another female student, Sally, who Jane mined from her circle of friends.

310.    Sally was similarly situated to John in that like John she alleged violations of the Title IX Policy.

311.    However, whereas Brown did not initiate an action on John's behalf against Jane, a female student, Brown did initiate an action against John, the male student, on Sally's behalf.

312.     Sally's allegations of one-time kissing and turning down John's request for affirmative consent to meet him was by Sally's own estimation a nominal violation of Brown's Title IX policies particularly in comparison to John's allegations against Jane that included assault so severe it drew blood from his lip, attempts to asphyxiate him, while forcibly and coercively pinning him to a wall and being ordered to subject himself to Jane's "rules."

313.     By bringing an action against John on Sally's behalf, John was adversely affected and immediately separated from campus after his final exams and was denied the option to extend the time to take his exams. John failed his exams.

314.     Brown discriminated against John's gender and detrimentally and adversely affected Plaintiff's education because he is male.

315.     Defendant's pattern or practice of gender discrimination was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

316.     As a direct and proximate result of Defendant's aforementioned conduct, Plaintiff has suffered extreme emotional and physical distress, mental anguish, humiliation and embarrassment.

317.     By reason of the continuous nature Defendant's discriminatory conduct, persistent from when he was sexually assaulted in September 2013 through the spring of 2017, Plaintiff is entitled to the application of the continuing violation doctrine to all of the violations alleged herein.

318.     Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional

opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including extreme emotional distress, and loss of capacity for the enjoyment of life.

319.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

## COUNT VII.
## R.I.G.L. § 42-112-1
## Racial Discrimination

320.    Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

321.    Plaintiff is African American and is a member of a protected class.

322.    The Plaintiff had a contract with Defendant Brown under which it provided educational services to him which is defined in part by him paying sums to Defendant Brown University to receive an education from the institution and is in part governed by a Code of Student Conduct.

323.    Plaintiff had an excellent academic and athletic record before arriving at Brown.

324.    Plaintiff suffered a continuous violation of adverse actions in pursuit of his education by defendant, which was deliberately indifferent to a claim of racial discrimination in which Plaintiff was profiled as a sexual predator because of his race.

325.    Plaintiff and his father reported to Brown as set forth herein that John was being racially profiled and stereotyped.

326.    Brown was deliberately indifferent to his and his father's claims.

49

327.     Indeed, just prior to launching Title IX 2, Brown seemingly gloated to John's Coach that it "got his boy now."

328.     Defendant exhibited patterns of decision-making that tend to show the influence of racial animus against the Plaintiff that affected both Title IX actions including among other things allowing Jane to characterize John as a sexual predator.

329.     John and Jane were similarly situated in that each reported to Brown that the other violated Brown's Title IX sexually misconduct Policy; however, Brown encouraged and endorsed Jane's claims against John, and discouraged and did not endorse John's claims against Jane.

330.     John and Sally were similarly situated in that John and Sally reported accusations that violated Brown's Title IX sexually misconduct Policy, but Brown encouraged and endorsed Sally's claims by initiating an action on her behalf, and discouraged and did not support John's claims whatsoever.

331.     As indicated by Title IX 1, Brown is on alert and willing to bring a disciplinary action on behalf of a white student against an African American student, but not willing to bring a disciplinary action on behalf of an African American student against a white student even if the African American student alleges allegations of Policy violations similar to the allegations asserted by the white student.

332.     As indicated by Title IX 2, Brown is on the alert and willing to bring a disciplinary action against an African American student even when the white accuser is unwilling to participate and/or doesn't believe a violation occurred, but Brown is unwilling to bring a disciplinary action against a white student even when the African American accuser is willing to participate.

333.    Defendant exhibited a pattern or practice of racial bias during Title IX 1 by the differential treatment he and the white accuser received in that, among other things, the undisputed facts showed that Jane was the aggressor and that she was acting willfully and with force.

334.    Brown's indifference adversely effected John as he was vulnerable to a) a subsequent investigation, b) a protective order limiting his access to campus, c) a sanction that is not only a cloud on his academic record, but as a pre-existing record makes him vulnerable to further sanctions, d) a second investigation, e) immediate and unwarranted separation from campus, f) a lengthy investigation in violation of the Policy's and the OCR's 60-day rule, and g) threats of disciplinary action based on alleged violations of the no contact order.

335.    Moreover, John was also found responsible for underage drinking, a violation only he but not Jane (also an underage drinker) had to face because Brown pursued Jane's allegations against John, but not John's allegations against Jane. John suffered failing grades, academic suspension and severe emotional distress.

336.    Brown was also deliberately indifferent to John's claims that Jane a) breached her duty to uphold the confidentiality of the proceeding by spreading misindrastic rumors about John and among other things calling him a sexual predator and a danger to the Brown community,  b) violated the Code's prohibition to not misrepresent information and lie during the Title IX 1 action;  c) breached the no-contact order even though Jane was seemingly going out of her way to appear at events in connection with John's sport's program where John would appear—all with impunity.

337.    Defendant exhibited a pattern or practice of racial bias during the disciplinary action by the differential treatment he and Jane received in that, among other things, Jane alleged conclusory, false and unsubstantiated claims to which John was prohibited to respond.

338.    Defendant exhibited a pattern or practice of racial bias during the disciplinary action by the differential treatment he and Jane and Sally received in that, among other things, Defendant could not attribute a negative motive to Jane or Sally but determined that by virtue of being accused, John could not be presumed innocent, but instead was presumed manipulative.

339.    Defendant exhibited a pattern or practice of racial bias during the disciplinary action by the differential treatment he and Jane received in that, among other things, Defendant could not attribute a single negative motive to Jane or Sally even though John complained of retaliation, and assault at the hands of Jane and John's Mother complained about Jane's breach of the no contact order.

340.    Defendant exhibited intentional and substantial racial bias when it failed to prosecute Jane for her actions against John which included a bruised and battered lip, asphyxiation, and being pinned against a wall and being told that his will has been subjugated to Jane's right to "make the rules."

341.    Defendant exhibited patterns of decision-making that tend to show the influence of racial animus against the Plaintiff that affected both Title IX actions including among other things allowing Jane to characterize John as a sexual predator.

342.    Defendant exhibited racial bias during the disciplinary action by the differential treatment he and Jane received in that, among other things, John's mental state deteriorated and he suffered extreme sense of hopelessness, as if his life had no meaning as a result of the racial prosecution during his freshman year.

343.    An intentional and motivating factor in Defendant's decision to proceed with both Title IX actions was the Plaintiff's race.

344.    As a result of Defendant's prosecution, Plaintiff was adversely treated causing detrimental interference delay in his education.

345.    Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including pain, suffering, mental anguish, psychological trauma, emotional distress, loss of capacity for the enjoyment of life.

346.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of liquidated and punitive damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

## COUNT VIII.
### R.I.G.L. § 42-112-1
### Disability Discrimination

347.    Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

348.    The Plaintiff had a contract with Defendant Brown under which it provided educational services to him which is defined in part by him paying sums to Defendant Brown University to receive an education from the institution and is in part governed by a Code of Student Conduct.

349.    Plaintiff suffered severe emotional distress and exhibited suicidal ideation because of his severe and unrelenting depression for which he was hospitalized and is protected by R.I.G.L. § 42-112-1, and is a person with a disability or was otherwise regarded by Defendant as a person with a disability.

350.    Plaintiff confided his emotional state to Dean Suarez, who was John's assigned psychological counselor and was at all times aware of his emotional state.

351.    More than anyone, Dean Suarez and Vice President Kluwann knew John's vulnerabilities but refused to accommodate his disability.

352.    Instead, Brown threatened John with disciplinary action thus subjecting John to inhumane and extreme emotional distress on the very day he was released from the hospital for suicidal actions in response to Brown's handling of two Title IX actions as set forth herein.

353.    When John reapplied to school, Brown acknowledged John's disability and even rejected his application stating that John had not yet sustained emotional stability.

354.    Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including pain, suffering, mental anguish, psychological trauma, emotional distress, loss of capacity for the enjoyment of life.

355.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of liquidated and punitive damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

**COUNT IX.**
**Intentional Infliction of Emotional Distress**

356.    John repeats and realleges each and every allegation hereinabove as if fully set forth herein.

357.    As a result of Brown's pattern or practice of gender-biased and/or racially motivated actions towards John during the Relevant Period, John suffered extreme emotional distress and suicidal ideation when John resumed his enrollment at Brown University in the fall of 2015, which led to a hospitalization for depression.

358.    When he was discharged from the hospital, he was undecided about whether to resume his enrollment or to take a leave of absence.

359.    In discussing John's options with him, Vice President Klawunn and Dean Suarez informed John that if he chose to re-enroll, Brown may consider pursuing further disciplinary actions against him as set forth herein including but not limited to reviving Sally's charges against him.

360.    Brown did not have probable cause for reviving those charges.

361.    Suarez and Klawunn acted with the willful malice of someone tripping a person wearing a cast and on crutches—they wanted to heighten John's distress so that he would become so emotionally ill he could not return to Brown or voluntarily remove himself from Brown

362.    Brown's conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community in that the threats which were idle, were of a nature that Brown knew could have devastating consequences on Plaintiff John Doe who was in a fragile emotional state.

55

363.    Brown acted recklessly, knowingly and/or intentionally in threatening John with an investigation that could not take place, while knowing his fragile emotional state and the likely impact of such threats upon his well being.

364.    Brown's threats to John were extreme and outrageous and were issued to John intentionally and/or in reckless disregard of causing him emotional distress.

365.    There was a causal connection between Brown's threats and the emotional distress John suffered.

366.    The emotional distress John suffered was extreme and resulted in medically established symptomatology.

367.    As a direct and foreseeable consequence of the intentional infliction of emotional distress by Defendant John sustained damages, including, without limitation, emotional distress, economic injuries, and other direct and consequential damages.

## COUNT X.
### Breach of Contract

368.    John repeats and realleges each and every allegation hereinabove as if fully set forth herein.

369.    Brown's Code of Conduct 2013-2014 (the Code) and Sexual and Gender-Based Harassment, Sexual Violence, Relationship and Interpersonal Violence and Stalking Policy (the ("Policy")  each represent a contractual commitment to its students.

370.    John matriculated at Brown and at all relevant times relied on the Code and Policy.

**Brown's Breach of the Policy**

56

371.     In particular, John relied on Brown's duty as set for in the Policy to "not discriminate on the basis of sex, race, color . . . [and] disability, . . . in the administration of its educational policies . . . or other school administered programs.

372.     Brown violated this Policy provision by granting white, female students, Jane and Sally, each of whom was similarly situated to John as set forth herein.

373.     As a result Jane and Sally—white, female students-- had access to the Policy's full procedural process for Title IX violations, yet Brown did not grant John—an African American, male student--the same rights under the Policy.

374.     Brown also breached the Policy's prohibition to not discriminate on the basis of disability when Dean Suarez and VP Klawunn intentionally and maliciously failed to accommodate John's disability--severe emotional distress-- as a result of the disciplinary actions he was made a part of in the previous academic year by making idle threats to John to compel him to remove himself from Brown of more disciplinary actions, even promising to revive Title IX 2, which Brown previously concluded. As if they were tripping someone who had just left the hospital with a cast on his leg and on crutches, Dean Suarez and VP Klawunn made these threats on the very day John left the hospital for severe emotional distress and suicidal ideation.

375.     Brown University also breached the Policy's *Conflict of Interest and Commitment Policy*, which disallows  "[p]erceived conflicts of interest: In addition to refraining from prohibited activities, members of the Brown community must disclose any activity, relationship, or interest that is, or may be perceived to be, a conflict of interest so that these activities, relationships, and interests can be managed properly." Policy, p. 12.

376.     Brown breached this Policy by allowing—indeed recommending—Dean Suarez be John's advisor and confidant, though Suarez' interests, biases, and associations-- particularly with the Title IX Office-- were opposed to John's best interests and needs.

377.     In the Policy, Brown promises to respect "a complainant's autonomy in making the determination regarding how to proceed, including whether to make a report and/or file a Complaint.  In limited circumstances, typically where a risk of imminent harm to an individual or others or a threat to the health and safety of the campus is determined to exist, Brown University may be required to take immediate action upon receipt of a report of Prohibited Conduct. In such circumstances, the reasons and steps the University will take will always be explained to the individual(s) making the report." Policy, pp. 9-10.

378.     In Title IX 1, Defendant breached this policy by not respecting John's "autonomy" to "make a report and/or file a Complaint" against Jane.

379.     By denying John the capacity of being a complainant in Title IX 1, he was denied protection pursuant to Brown's policy granting "amnesty to a reporting Student, whether as a complainant or a witness, for the personal ingestion of alcohol or other drugs in violation of Brown University Code of Student Conduct." Policy, p. 11.

380.     In Title IX 1, both Jane and John were drinking and underage, and both John and Jane alleged sexual assault among other things against the other, but only Jane was granted amnesty and only John was found responsible for underage drinking.

381.     By denying John his "autonomy" to be a Complainant, Brown also deprived John of such "reasonable and appropriate measures to protect the complainant and the complainant's access to Brown University employment or education programs and activities regardless of whether they choose to file a Complaint under the applicable procedures. These

58

measures may be both remedial (designed to address a complainant's safety and well-being and continued access to educational opportunities) or protective (involving action against a respondent). Remedial and protective measures, which may be temporary or permanent, may include counseling and emotional support, no contact and communication directives, residence modification, academic schedule modification, academic accommodations or assistance, escort, voluntary leave of absence, interim suspension, administrative leave, restrictions on campus activities, work schedule modifications, and other remedies as reasonable and appropriate." Policy, p. 11.

382.    Without the aforementioned measures in place, John was vulnerable to Jane's actions in breach of the confidentiality requirements, and the no-contact order.

**Brown's Breach of the Code**

383.    Further, Brown breached the Code's prohibition of "[l]ying or materially misrepresenting information to an official University body or officer, including a member of the Department of Public Safety.  The Code states that "[l]ying in the course of a student conduct hearing constitutes an offense that is immediately actionable."

384.    Jane asserted a number of misrepresentations to her witnesses that were then memorialized as witness statements and presented to Brown during the Title IX 1 investigation. Even though these statements were contradictory, and hearsay, Brown did not exclude them from the investigative report. Further, Jane continued to misrepresent her experience with John at the hearing, yet Brown took no action against Jane whatsoever immediately or otherwise.

385.    Brown also breached its Code in Title IX 1 by permitting Jane to submit a written statement less than 24 hours prior to the hearing and violated John's right pursuant to the

Code "[t]o be given <u>every opportunity</u> to articulate relevant concerns and issues, express salient opinions, and offer evidence before the hearing body or officer."  Code, p. 7.

**Breach of Covenant to Uphold Individual Integrity**

386.    Brown's policy on individual integrity requires that members of the Brown community will be truthful and forthright as set forth in its Code of Conduct p. 1.  Brown expects that community members will not engage in behavior that has serious ramifications for the safety, welfare, academic well-being, or professional obligations of others.

387.    In committing egregious violations of John's rights during the issuance of a separation order and a threat to revive a nonexistent sexual misconduct case, Brown violated the policies of the Code of Conduct.

388.    Brown's failure to hold Jane, Dean Suarez or VP Klawunn accountable for individual integrity breached its own policies, the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

**Breach of Procedural Rights in Connection with Title IX 2**

389.    According to the Code, Brown's authority to separate a student from the University is limited to instances where the student "pose[s] a danger to themselves or the immediate well-being of the University community."

390.    Brown's May 7 separation order to John was not based on an actual allegation, but instead on an overstated one from a student who was unwilling to press charges.

391.    Brown had no reasonable basis on which to order John's separation from campus on or around May 7, 2014.

392.    Brown has deprived John, of his contractual rights to due process and equal
protection through the improper administration of the student separation order process in
violation of Brown's guidelines and regulations.

393.    The Brown University Code of Conduct, at p. 7, Paragraphs A-K, sets forth
eleven "Student Rights and Responsibilities."

394.    Paragraph I of that list confers upon students the right "[t]o have a timely
determination of the charges."

395.    In the case of Sally's alleged complaint, Brown University first presented the
charges to John in a May 7, 2014 letter.

396.    At the end of the summer, 2014, Brown University informed John that the
investigation into Sally's charges had concluded and he would not be investigated.

397.    As set forth in its Title IX Complaint Process, Brown also breached its obligation
to "ordinarily complete its investigation and disciplinary process, if any, within sixty (60) days"
In Title IX 2, Brown took nearly 90 days on the investigation before it dropped the action prior
to a hearing.  Policy, Complaint Process, p. 7.

398.    In October 2014, Brown University informed John that if he did not leave
campus, the charges that had been advanced in May and dropped in August could be revived.

399.    By threatening to revive charges it had previously dropped, Brown violated
John's right, under Paragraph I of the Student Rights and Responsibilities, to have a timely
determination of those charges.

**Brown's Breach of John's Contractual Rights Caused Damage**

400.    In committing egregious violations of John's rights during Title IX 1 and Title IX
2 by among other things issuing  a separation order and threatening to revive a nonexistent

61

sexual misconduct case, and the inherent racism and/or sexism inherent Brown's actions throughout the Relevant Period, Brown violated the policies of the Code and degraded, weakened and breached the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

401.   Brown agreed to allow its community members to live in a discrimination- and harassment- free environment as stated in its Code, p3.

402.   Brown committed numerous investigative and procedural missteps and harbored an overall institutional gender bias against John, as a male and African American student, accused of sexual misconduct during his student conduct proceeding, all of which led to the erroneous separation order.

403.   Brown's discrimination of John, on the basis of his male gender and race, breached its own policies, the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

404.   As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT XI.
## Covenant of Good Faith and Fair Dealing

405.   John repeats and realleges each and every allegation hereinabove as if fully set forth herein.

406.   Based on the aforementioned facts and circumstances, Brown breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John by

ordering his separation from the University based on a nonexistent complaint, and by threatening to revive the charges after having told him their investigation was concluded.

407.   As a direct and foreseeable consequence of these breaches, John sustained tremendous damages, including, without limitation, emotional distress, economic injuries, and other direct and consequential damages.

408.   John is entitled to recover damages for Brown's breach of the express and/or implied contractual obligations described above.

409.   As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT XII.
## 42 USCS § 1981
### (Equal Rights under the Law—Racial Discrimination)

410.   John repeats and realleges each and every allegation hereinabove as if fully set forth herein.

411.   42 USCS § 1981 in relevant part requires that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other".

412.   42 USCS § 1981 protects the African American student's "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" pursuant to Brown's Code of Student Conduct 2013-2014 (the "Code") and Sexual and Gender-Based

Harassment, Sexual Violence, Relationship and Interpersonal Violence and Stalking Policy (the "Policy").

413.   Brown's Code and Policy represent a contractual commitment to John.

414.   As an African American, Plaintiff is a member of a protected class.

415.   Plaintiff was qualified to attend Brown, was accepted to Brown and was a member of an athletic team.

416.   Plaintiff suffered adverse actions in that he was deprived of his contractual rights pursuant to Brown's Code and Policy as stated herein and in particular set forth in Count X and XI above.

417.   Most significantly, Brown encouraged Jane, a white student, to assert a claim pursuant to its Code and Policy against John, an African American student, but discouraged John, as an African American, to bring a claim against Jane, a white student.

418.   As a result, of the forgoing John was injured during a sexual assault with no recourse and instead was unduly punished with a deferred suspension.

419.   Brown then initiated a process pursuant to its Code and Policy on behalf of Sally, a white student, who was similarly situated to John, in that like John she alleged violations of Brown's Title IX Policy.  Brown encouraged her to file a complaint or otherwise initiated a complaint on her behalf against John, an African –American student.

420.   Both Jane and Sally, both white students, were similarly situated to John in that John, Jane and Sally each sought recourse for sexual misconduct pursuant to Brown's Title IX Policy and Code, but Brown enforced its Policy and Code with respect to Sally and Jane, the white students and did not enforce its Policy and Code with respect to John, the African-American student.

421.   Moreover, Plaintiff was deprived of the rights and privileges of the accuser or victim as set forth herein and was found responsible for underage drinking.

422.   Plaintiff also suffered violations to his academic well-being in that his access to campus was restricted, he was removed from campus, and he was not permitted the right to delay or reschedule exams.

423.   Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including pain, suffering, mental anguish, psychological trauma, emotional distress, loss of capacity for the enjoyment of life.

424.   By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of liquidated and punitive damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

425.   As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements pursuant to 42 USCS §1988.

### **Prayer for Relief**

**WHEREFORE,** for the foregoing reasons, John Doe demands the following relief from Defendant Brown University:

(i)     An award of compensatory damages in an amount to be determined at trial, including, without limitation, damages to physical well-being,

emotional distress, economic injuries, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)     If warranted by the evidence, punitive damages;

(iii)    A declaratory judgment that no probable cause exists to support an investigation of the incident referred to in the May 7, 2014 letters;

(iv)    An injunction prohibiting Brown University from taking any further action against John Doe with regard to the events described in the May 7, 2014 letters;

(v)     An expungement of all records in John's academic file in connection with Title IX 1 and Title IX 2.

(vi)    An award of the costs and expenses of suit;

(vii)   Attorney's fees as well as attorney's fees and costs pursuant to 42 USCS §1988; and

(viii)  Such other and further relief as the Court deems just, equitable and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all matters for which there is a right to a jury trial.

Dated:  New York, NY
        November 30, 2017

                        Respectfully Submitted,

                        */s/* Susan Kaplan
                        Susan Kaplan (*pro hac vice*)
                        *Attorney for Plaintiff, John Doe*
                        30 Wall St., 8th Fl.
                        New York, NY 10005
                        347.683.2505
                        skaplan@lawkaplan.com

                                -and-

                        *Local counsel for Plaintiff, John Doe*

                        /s/ Sonja L. Deyoe
                        Sonja L. Deyoe #6301
                        395 Smith Street
                        Providence, RI 02908
                        (401) 864-5877
                        (401) 354-7464
                        sld@the-straight-shooter.com

67