UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

)
JOHN DOE,                                    )
    Plaintiff,                           )
                                             )
    v.                                   )    C.A. No. 17-191-JJM-LDA
                                             )
BROWN UNIVERSITY,                            )
    Defendant.                           )
                                             )

MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Judge.

John Doe[1] ("John") was a student at Brown University who was accused of
sexual assault by a female classmate. He alleges in his twelve-count Second
Amended Complaint (ECF No. 21) that Brown's student conduct hearing and events
in its aftermath were motivated by discriminatory animus, and that Brown violated
certain contractual obligations. The immediate issue here is Brown's Motion to
Dismiss based on pleading issues and statutes of limitations. ECF No. 22. The Court
begins with a recitation of the necessary plausible facts as pleaded by John in the
light most favorable to him, the nonmovant plaintiff, followed by an analysis of the
legal issues raised in the motion.

---

[1] An obvious pseudonym because of the highly personal nature of the
allegations and his denial of those allegations. The Court granted John's Motion to
Proceed Under Pseudonym (ECF No. 16) without objection by Brown University.

## I.   BACKGROUND

### A.   Factual Allegations

John was a freshman at Brown in the fall of 2013.  He is an African-American male and was a member of a Brown varsity sports team.  In September 2013, he went to a local bar and met a fellow Brunonian, sophomore Jane Doe ("Jane").[2]  Jane is white and a member of a sorority at Brown.  At the bar, both John and Jane consumed alcohol, although they were both under the legal drinking age.  They went outside, sat at a picnic table where they "flirted" with each other, and then headed into an alley and began kissing.  In the back alley, they engaged in some "kinky" behavior. Jane bit John's lip and choked him.  She pushed him against the wall and held him there.  John had to defend himself against Jane's advances.  Jane restrained John and tried to keep him from leaving.  She was the more aggressive one and at one point told John, "I make the rules."

Two and a half months later, in December 2013, Jane filed a written complaint with Brown against John.  Brown charged John with a Level 1 offense, sexual misconduct (a nonconsensual contact involving violence or intimidation); a Level 3 offense, sexual misconduct (a nonconsensual contact); and underage drinking.  John subsequently complained to Brown about his encounter with Jane, but Brown brought no charges against her.

A Student Conduct Board hearing took place in February 2014.  Brown treated John and Jane differently at the hearing.  Brown allowed Jane to amend her initial

---

[2] Another pseudonym.

statement without having first submitted it to the Student Conduct Board at least twenty-four hours in advance. John had no opportunity to prepare a defense to this "new" statement of allegations, nor did Brown allow John to question Jane about changes in her statement. Brown allowed Jane to allege and argue conclusory statements based on "racist and/or misandristic" stereotypes, but prohibited John from making conclusory statements. Brown prohibited John from asking Jane about her intentions when she bit John's lip, choked him, and pinned him against the wall. Brown allowed Jane to accuse John's coach of "creating a misogynistic and hyper masculine environment." Jane's story was inconsistent from her original statement and from statements she made to friends after the incident. Brown prohibited John from asserting his claims that Jane had assaulted him and engaged in coercive, nonconsensual sexual touching and underage drinking.

The Student Conduct Board found John "not responsible" for offenses involving "violent physical force, penetration, or injury" but "responsible" for "nonconsensual contact and underage drinking." The Board issued a protective order so that John and Jane were not to have contact.[3] The Board also imposed a sanction of a one-year deferred suspension against John. Jane appealed the sanction arguing that Brown should have expelled John. Brown denied her appeal.

Throughout the investigation and afterwards, Jane breached confidentiality restrictions by discussing the proceedings with others. She told others that John was

---

[3] Jane violated the no-contact order by appearing at events where John was present, including at parties for his team. When John's mother complained about this to Dean Yolanda Castillo-Appollonio, she explained, "it is normally expected that the guy would leave the area."

a sexual predator and a danger to the Brown community. John complained of this breach of confidentiality to Dean Maria Suarez, but Brown took no action against Jane.

At the end of the semester, just before exams in May 2014, John received two letters from Brown administrators: one alleging that he may have committed sexual misconduct involving another Brown student, Sally Roe,[4] and the other informing him that "effective immediately [he] was separated and barred from the Brown University campus on an interim basis." Brown conducted no pre-charge investigation. The day before Brown sent the letters to John, Dean Suarez called John's coach and said, "We got your boy now. He is out of here."

John sought counsel from Deans Yolanda Castillo-Appollonio and Suarez.[5] Dean Suarez informed him that, unless he could prove he was not present, he would "pretty much" be found guilty and expelled since he already was serving a deferred suspension.

Brown allowed John to remain on campus only until 5 p.m. following his last exam. Because of the stress of the accusations, John failed two exams resulting in Brown placing him on academic warning. He returned home for the summer.

---

[4] Yet another pseudonym. Sally had become friends with Jane that spring and pledged to become a member of Jane's sorority.

[5] John would later find out that Dean Suarez provided support to the Title IX office and to student-accusers, including Jane. John alleges that Dean Suarez serving as John's counselor and confidant violated Brown's Conflict of Interest and Commitment Policy.

During the summer of 2014, John and his parents asked Brown several times to clarify the new charges. John's only memory of Sally is that he met her at a party in October 2013, and that they "made out" in a dorm bathroom. John and his parents wanted to know why Brown would have immediately removed him from campus for an incident that allegedly occurred six months beforehand. In August 2014, Brown informed John that the investigation had concluded and he was free to return to campus and continue his studies. Brown offered no further explanation.

John returned to Brown in September 2014 for his sophomore year. The incidents the previous school year had caused him to become depressed. After a non-sexual encounter one evening in October with a female classmate, self-doubt overcame John. He started to scream and "threw himself into an oncoming, moving vehicle. He landed on the windshield, cracking it, and started thrashing and screaming, beating his arms and crying." John suffered bruises and lacerations and was hospitalized.

John was discharged four days later; that day, Dean Suarez "summoned John and his mother to an 'urgent' meeting" and informed John that if he did not leave the University, he could expect to face hearings on "several matters," including for damage to the vehicle sustained by his attempt at self-harm, which would be brought up as a vandalism charge. She also told him that there was an allegation that he had violated his no-contact order with Jane, and that the University could revive the allegations involving Sally. Within the week, John left campus.

When John first applied to return to Brown for the fall 2015 semester, Brown denied his application claiming John's severe emotion distress required a lengthier period of "sustained stability." When John appealed, Brown granted the appeal and allowed him to return.

The 2015–16 academic year was rather uneventful as far as our story goes. Jane was on leave from Brown for the academic year. Yet John did find out more about Sally and the allegations she had made against him. Sally informed John that Jane had a "major role" in her complaint against him. She said that Dean Suarez and Vice President Margaret Klawunn had summoned her to their office and interviewed her about whether she had ever interacted with John. They asked her a series of leading questions about her encounter with John. Sally also told John that after she joined Jane's sorority, they shared stories about men, at which time they learned they both knew John. Jane told Brown officials she could produce another "victim" of John's. According to Sally, Brown officials generated the claim against John, as Sally herself never felt anything "bad" had happened between them him and never filed a complaint against him. Sally apologized to John for the grief she had caused him.

When Jane came back to campus for the 2016–17 academic year, Brown again imposed a no-contact order between John and Jane.

John and his family assert that John was targeted because of his gender, race, and racial stereotypes about black athletes.

B.    Procedural History

John filed his complaint on May 4, 2017, against Brown University.[6]  ECF No.
1-1.  He filed an amended complaint on September 29, 2017 (ECF No. 11) which
Brown moved to dismiss (ECF No. 12).  The Court denied the motion to dismiss
without prejudice and granted John leave to file a Second Amended Complaint, which
he did on December 11, 2017.  ECF No. 21; Text Order, Dec. 11, 2017.

The Second Amended Complaint asserts twelve Counts:

Counts I through IV: Title IX of the Education Amendments of 1972, 20 U.S.C.
§ 1681 *et seq.* (hostile education environment/sexual harassment, erroneous outcome,
and selective enforcement).  ECF No. 21 at 31–42.  Title IX reads:

> No person in the United States shall, on the basis of sex, be excluded
> from participation in, be denied the benefits of, or be subjected to
> discrimination under any education program or activity receiving
> Federal financial assistance . . . .

Count V: Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*
(racial discrimination).  ECF No. 21 at 42–45.  Title VI reads:

> No person in the United States shall, on the ground of race, color, or
> national origin, be excluded from participation in, be denied the benefits
> of, or be subjected to discrimination under any program or activity
> receiving federal financial assistance.

Counts VI through VIII: Rhode Island Civil Rights Act ("RICRA"), R.I. Gen.
Laws § 42-112-1 (gender discrimination, racial discrimination, and disability
discrimination).  ECF No. 21 at 45–54.

---

[6] John filed his complaint in state court and the Defendants removed it to this
Court.  ECF No. 1.  In addition, John voluntarily dismissed as Defendants the three
individually named Brown administrators: Maria Suarez, Margaret Klawunn, and
Yolanda Castillo-Appollonio.  ECF No. 3.

<u>Counts IX–XI</u>: Rhode Island state common law (intentional infliction of emotional distress, breach of contract, breach of the covenant of good faith and fair dealing). *Id.* at 55–63.

<u>Count XII</u>: 42 U.S.C. § 1981 (unequal rights under the law by racial discrimination). ECF No. 21 at 63–65. Section 1981(a) reads:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Brown has again moved to dismiss the complaint (ECF No. 22), to which John objects (ECF No. 24), and Brown replies (ECF No. 26). The Court held a hearing on the motion.

## II.    STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court must accept a plaintiff's allegations as true and construe them in the light most favorable to him. *Gargano v. Liberty Int'l Underwriters, Inc.*, 572 F.3d 45, 48 (1st Cir. 2009). "A Rule 12(b)(6) motion will be granted only if, when viewed in this manner, the pleading shows no set of facts which could entitle plaintiff to relief." *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir. 1988) (citing *Conley v. Gibson*, 355 U.S. 41, 45–48 (1957)).

When a defendant raises a statute of limitations defense in its motion to dismiss, dismissal "is entirely appropriate when the pleader's allegations leave no doubt that an asserted claim is time-barred." *LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 509 (1st Cir. 1998).

## III. DISCUSSION

In moving to dismiss, Brown raises two main arguments: that the statute of limitations bars some claims and that many claims are implausible and thus warrant dismissal. The Court addresses each, and the related issues they present, in turn.

### A. Statute of Limitations

Brown asserts that five of the six federal claims—the Title IX and Title VI claims in Counts I through V—are barred by a three-year statute of limitations.[7] Therefore, Brown argues, the Court must exclude John's allegations that predate May 4, 2014, from those Counts. This would exclude all the allegations involving Jane that took place during the 2013–14 academic year.

John, on the other hand, asserts that the continuing violation doctrine as enunciated by the Supreme Court in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), applies and that none of his allegations against Brown are time-barred. The First Circuit has defined this doctrine as "an equitable exception that allows . . . damages for otherwise time-barred allegations if they are deemed part of

---

[7] "Title IX borrows a state statute of limitations period," *Stanley v. Trs. of Cal. State Univ.*, 433 F.3d 1129, 1136 (9th Cir. 2006), which here is Rhode Island's three-year statute of limitations for personal injury, R.I. Gen. Laws § 9-1-14(b). The same reasoning applies "with equal force to claims under Title VI." *LeGoff v. Trs. of Bos. Univ.*, 23 F. Supp. 2d 120, 127 (D. Mass. 1998).

an ongoing series of discriminatory acts and there is some violation within the statute of limitations period that anchors the earlier claims." *Loubriel v. Fondo del Seguro del Estado*, 694 F.3d 139, 144 (1st Cir. 2012) (quoting *O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001)).

### 1.    Continuing Violation Doctrine – Applicability

The first question is whether the continuing violation doctrine applies to Title IX and Title VI. This appears to be an open question in our circuit, but two other circuits suggest that it does apply. *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011) (applying doctrine to Title IX); *Stanley v. Trs. of Cal. State Univ.*, 433 F.3d 1129, 1136–37 (9th Cir. 2006) (same).

The Supreme Court's decision in *Morgan* involved discrete claims of retaliation and discrimination, as well as hostile environment claims, all under Title VII. 536 U.S. at 105. The Court held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113. That said, the Court distinguished between discrete acts and claims based on a hostile environment. *Id.* at 115. When there is a hostile environment, an unlawful practice "cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act . . . may not be actionable on its own." *Id.* Hostile environment claims are "based on the cumulative effect of individual acts." *Id.* The Court therefore explained, "[i]t does not matter, for purposes of the statute [of limitations], that some of the component acts . . . fall outside the statutory time period. Provided that an act contributing to the claim

occurs within the filing period, the entire time period of the hostile environment may be considered . . . ." *Id.* at 117.

Although Brown argues that this logic does not apply here, the First Circuit looks to Title VII for guidance in interpreting Title IX. *See Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65 (1st Cir. 2002) ("We have not previously considered a Title IX claim of sexual harassment involving a plaintiff and defendant of the same gender. For guidance, we turn to Title VII of the Civil Rights Act of 1964."); *see also Wills v. Brown Univ.*, 184 F.3d 20, 25 n.3 (1st Cir. 1999) (recognizing that some aspects of Titles VII and IX are to be construed *in pari materia*); *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 896–98 (1st Cir. 1988) (applying Title VII sexual harassment legal framework to similar Title IX allegations). Furthermore, the differences between Title IX and Title VI vis-à-vis Title VII, highlighted by Brown (ECF No. 26 at 4), do not suffice to cause the Court to change course.

This Court therefore concludes that the doctrine announced in *Morgan* can apply to Title IX claims where there is a continuing violation. By extension, this applies to Title VI as well. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) (noting that Title IX "was modeled after Title VI . . . which is parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs").

2.     Continuing Violation Doctrine – Application

The next question is whether the continuing violation doctrine applies to John's Title IX and Title VI claims. At first blush, Brown's two investigations into

John appear to be discrete, separable events with independent beginnings and ends. That said, the Court believes that the facts, as pleaded, tell the tale of a singular ongoing and evolving interaction between John and Brown, motivated by discriminatory animus, which gives rise to certain of his claims.

John first learned of Brown's investigation of the Sally incident on May 7, 2014, a date within the three-year "anchor" period. *See Loubriel*, 694 F.3d at 144. This second investigation—from its inception to its consequences for John to its ultimate conclusion—is linked to the first investigation involving John and Jane. As pleaded, the initial investigation, though seemingly outside the statute of limitations, is the source of the discrimination faced by John during the second investigation.

John alleges that, after the first investigation, Brown administrators had "a clear agenda in going after John" and "wanted John removed from Brown permanently." This is borne out by what Sally later told John: that she never complained to Brown about their encounter; that the complaint had originated with Jane, who told Brown she could produce another "victim" of John's; and that Brown asked Sally leading questions in interviewing her to generate a claim against John. The administrators also made comment such as "We got your boy now. He is out of here," suggesting John was a sought-after target of the University.

Without the first investigation, Brown would not have placed John on deferred suspension. According to John, Dean Castillo-Appollonio told him that the deferred suspension meant that he "pretty much" would be found guilty in the school's investigation of the Sally incident; this sent John into a depression and caused him

12

to fail his classes, attempt suicide, and ultimately miss out on a year of school. The damages and discrimination he suffered as a result of the Sally investigation, then, are directly linked to the allegations and investigation brought upon him by Jane.

Nor did John have notice of the link between the two investigations until 2016, a time firmly within the three-year limitations period, when Sally told John of Jane's involvement. *See Stanley*, 433 F.3d at 1136 ("[T]he touchstone for determining the commencement of the limitations period is notice: 'a cause of action generally accrues when a plaintiff knows or has reason to know of the injury which is the basis of his action.'" (alteration in original) (quoting *Hoesterey v. City of Cathedral City*, 945 F.2d 317, 319 (9th Cir. 1991))).

The Court cannot ignore the direct link between the pre-limitations period conduct and the allegations that fall within the three-year anchor period. Any such distinction would be artificial and ignore why what happened happened. As for John's Second Amended Complaint, application of the continuing violation doctrine suffices to defeat the statute of limitations defense for some—but not all—of John's claims.

Counts I and II allege a hostile environment and/or sexual harassment in violation of Title IX. Specifically, John objects to Brown's handling of the investigation of the Jane incident, including that Brown did not investigate John's claims of sexual assault but did investigate Jane's (which he blames on gender discrimination). He also alleges that the resulting investigation created an abusive educational environment that continued past May 4, 2014, directly leading to Brown's

decision to put him on deferred and ultimately interim suspension pending the outcome of the Sally investigation. He also faults Brown for ignoring Jane's breaches of confidentiality and the no-contact order, which subjected him to a hostile environment. While the Defendants argue that any hostile environment or sexual harassment can fairly be cabined to the end of Brown's investigation into the Jane incident, John continued to face discriminatory conditions after the first investigation ended, into the investigation of the Sally incident, and thus into the applicable statute of limitations period.

Count III pleads an erroneous outcome claim over Brown's investigations of the Jane and Sally incidents. Brown challenges only the timeliness of John's claims for the first investigation. John argues that the erroneous outcome of the first investigation "was the first step in a greater, extended and ongoing process meant to upend John's education." ECF No. 24-1. Even if that is so, that does not mean John can challenge the *outcome* of the first investigation, as all the determinations leading to that outcome were made before May 4, 2014, outside the statute of limitations period. Thus, John cannot challenge the supposedly erroneous outcome of the first investigation.

Count IV is a selective enforcement claim in which John alleges that Brown chose to begin its two investigations because of John's gender. Once again, Brown argues that the statute of limitations applies only to the first investigation. And once again, this claim is barred by the statute of limitations. Any decision to start the Jane investigation was made well outside the three-year limitations period, as was

14

any punishment imposed because of that investigation. While John argues that the connection between the Jane investigation and the Sally investigation did not become apparent until 2016, he still had sufficient notice within the statute of limitations period to put him on notice that Brown had started proceedings against him or meted out punishment because of his gender. As a result, the statute of limitations bars John's selective enforcement claim over the first investigation.

Count V is John's Title VI claim in which he alleges that Brown intentionally targeted him for discipline and sanctioned because he is black (and because his alleged victims are white). John alleges that he was racially discriminated against in the filing of, and his treatment during, the first Title IX investigation; that Brown was deliberately indifferent to Jane's violation of a confidentiality order, where she told others that John was a "predator"; and that Dean Suarez made statements betraying a racially motivated animus for the second investigation, telling John's coach that they "got your boy now" and John's mother that "you think you know your boy but you don't." Taken together, these allegations—some occurring before May 4, 2014, and some occurring after—paint a picture of an ongoing, racially discriminatory pattern of conduct that suffices to bring John's claim within the continuing violation doctrine.

In sum, although the continuing violation doctrine keeps Counts I, II, and V afloat at this stage, the discrete nature of the claims in Counts III and IV as they relate to the first investigation are barred by the statute of limitations.

B.    Plausibility of Federal and State Law Claims

Brown next argues that all of John's allegations are implausible and that the Court should dismiss the Second Amended Complaint in its entirety.

1.    Counts I and II (hostile education environment/sexual harassment)

Counts I and II allege that Brown violated Title IX by creating a hostile education environment in failing to respond adequately to Jane's harassment of John.[8] To establish such a claim, a plaintiff must allege:

> (1) that he or she was subject to "severe, pervasive, and objectively offensive" sexual harassment by a school peer, . . . (2) that the harassment caused the plaintiff to be deprived of educational opportunities or benefits . . . (3) [that the funding recipient] knew of the harassment, (4) in its programs or activities and (5) it was deliberately indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances.

*Porto v. Town of Tewksbury*, 488 F.3d 67, 72–73 (1st Cir. 2007) (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)); *see Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 93 (1st Cir. 2018) ("To succeed on a Title IX deliberate indifference claim, a plaintiff must show that an official with authority to implement corrective measures was aware of and deliberately indifferent to an act of discrimination on the basis of sex."); *Morgan v. Town of Lexington, Mass.*, 823 F.3d 737, 745 (1st Cir. 2016)

---

[8] Count II is closely related to Count I, but the parties dispute what Count II pleads. Count II alleges that Brown's gender discrimination against John during the first Title IX proceeding led to a hostile education environment that he endured throughout his time at the University. Essentially, Count II adds to the allegations of Count I by explaining how John was subjected to an ongoing hostile environment well beyond the first Title IX investigation. The Court considers the factual allegations in Counts I and II together as presenting one theory of liability: that Brown subjected John to a hostile education environment.

(explaining that severe sexual harassment creating a hostile environment can constitute actionable sex discrimination).

Brown argues that John fails to allege facts supporting the fifth prong: that it was deliberately indifferent. Deliberate indifference "is not a mere 'reasonableness' standard." *Davis*, 526 U.S. at 649. Rather than "'remedy' peer harassment," schools "must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Id.* at 648–49.

John alleges sufficient plausible facts that, if proven, could lead a jury to find that Brown was deliberately indifferent to known harassment so that its response to that harassment was unreasonable. For example, he alleges that both he and Jane reported the other to Brown for sexual assault occurring from their alley encounter, but Brown chose to pursue disciplinary action against John while failing to bring any charges against Jane.[9] In addition, during the disciplinary hearing, John alleges that Brown did not allow him to assert any counterclaim or defense regarding the allegations, including being prohibited from posing certain questions to Jane. John alleges that, following the hearing, Brown imposed a no-contact order requiring John to remove himself from situations in which Jane was present; when she showed up at his sporting events, she complained to Brown that John violated the order, and Brown responded to those complaints. John also alleges that Brown knew Jane violated a confidentiality order, calling John a rapist and sexual predator on campus, and that Brown took no action against Jane.

---

[9] Similarly, Brown brought underage drinking charges against John but not Jane.

17

If John can prove these allegations, a jury could plausibly conclude that Brown's response to Jane's harassment of John was unreasonable. The Court thus denies Brown's motion over Counts I and II.[10]

### 2. Count III (erroneous outcome)

John's remaining allegation in Count III is that the outcome of Brown's second Title IX investigation was erroneous. To state a claim, John "must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and indicate that "gender bias was a motivating factor." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994); *see also Doe*, 892 F.3d at 90 (noting that First Circuit has not adopted an erroneous outcome framework but using *Yusuf*'s by agreement of the parties).

The outcome of the second Title IX investigation is that Brown dropped it; Brown informed John that it closed its investigation. Because John does not—and cannot—challenge "the accuracy of the outcome of the disciplinary proceeding," *Yusuf*, 35 F.3d at 715, the remainder of his claims under Count III fail.

### 3. Count IV (selective enforcement)

John's final Title IX Count alleges a selective enforcement theory. Such a claim "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender."

---

[10] Because Brown challenges only the deliberate indifference prong (ECF No. 22-1 at 28–29), the Court does not address the others at length. That said, the Court notes that these events plausibly allege severe harassment that deprived John of educational opportunities well into the statute of limitations period (*see supra* section III.A.2), and that Brown knew that these events occurred in its programs or activities.

*Id.* Accordingly, a similarly situated comparator of another gender is required. *See Haidak v. Univ. of Mass. at Amherst*, 299 F. Supp. 3d 242, 270 (D. Mass. 2018).

John alleges that Brown's decision to investigate the Sally incident—and the immediate separation order pending the outcome of that investigation—were affected by his gender. As discussed above, John alleges he was subjected to gender discrimination by Brown creating a hostile education environment stemming from Brown's handling of the first Title IX investigation and its aftermath. Because the decision to launch the second investigation, and the decision to separate, were directly related to the first investigation, John plausibly alleges that those decisions were affected by his gender.

John also argues that Jane serves as a comparator: when John claimed that Jane sexually assaulted him, Brown took no action; however, Brown decided to investigate John when Jane made a complaint of sexual assault against him, even though the conduct did not involve her. Brown argues that Jane is not a valid comparator because the comparator conduct is outside the statute of limitations period.

However, Brown fails to argue persuasively why this matters. A comparator must be "similarly situated in material respects." *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996). In *Perkins*, which involved race discrimination, the First Circuit explained that "[t]he test is whether a 'prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.'" *Id.* (quoting *Dartmouth Review v. Dartmouth*

*Coll.*, 889 F.2d 13, 19 (1st Cir. 1989)). "While an exact correlation is not necessary, the proponent must demonstrate that the cases are 'fair congeners.'" *Id.* (quoting *Dartmouth Review*, 889 F.2d at 19); *see also Holland v. Gee*, 677 F.3d 1047, 1063 n.7 (11th Cir. 2012) ("The presence of a comparator 'is not an element of a [Title VII] claim.'" (alteration in original) (quoting *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1154 (11th Cir. 2005))).

That fact that the relevant conduct involving Jane as a comparator occurred before May 4, 2014, has limited relevance given the other similarities between them. Both John and Jane were students at Brown. Both brought complaints of sexual assault. Both complaints of sexual assault occurred, at most, within six months of each other. Brown investigated Jane's complaint; it ignored John's complaint. While the two are not exactly identical,[11] the allegations as pleaded present John and Jane as similarly situated.

As a result, John may proceed with his selective enforcement Count as it relates to the second Title IX investigation.

### 4. Count V (Title VI) and Count XII (42 U.S.C. § 1981)

For both John's Title VI claim and his § 1981 claim, Brown argues only that John has not sufficiently alleged the intentional race discrimination as required by each cause of action. ECF No. 22-1 at 37; *see Hammond v. Kmart Corp.*, 733 F.3d

---

[11] For example, John complained of his own sexual assault, while Jane complained of someone else's. That a male victim's complaint was not investigated while a female non-victim's was may also support a finding of gender-driven selective enforcement.

360, 362 (1st Cir. 2013) (§ 1981); *Doe v. Trs. of Univ. of Pa.*, 270 F. Supp. 3d 799, 829 (E.D. Pa. 2017) (Title VI).

John points to two allegations that he claims satisfy his burden at this stage. First, that he—a black man—was unable to exercise his rights under Brown's Code of Student Conduct, while Jane and Sally—white women—could. Second, that Dean Suarez used a potential racial epithet when telling John's coach that John was about to have new charges brought against him, suggesting a racial motivation for the investigation.

Taken together and drawing reasonable inferences from these allegations, the Court holds that John has plausibly alleged intentional racial discrimination. It is plausible that the reason behind John's differential treatment was that he is black and his accusers white; this is amplified by John's allegations that Brown did not act against Jane when she violated a confidentiality order in referring to John as a "predator," impliedly of white women. And while the use of "boy" in this context may or may not have been imbued with racial hostility, it is plausible that a jury could find it was. *See Mayale-Eke v. Merrill Lynch*, 754 F. Supp. 2d 372, 381 (D.R.I. 2010) (noting that it is "unrealistic to think that in the 21st century any sophisticated" person would make a blatant statement tainted with impermissible discriminatory animus).

The plausibility required to infer an unlawful motive "'does not impose a probability requirement at the pleading stage.' It simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal motive." *Id.*

(quoting *Twombly*, 550 U.S. at 556). John has met that burden as to Counts V and XII.

### 5. Count VI (RICRA – gender discrimination)

Count VI alleges gender discrimination under RICRA. Both John and Brown agree that Count VI rises and falls with John's Title IX claims, which involve gender discrimination. Because John presents viable Title IX claims involving gender discrimination, his state law cause of action survives as well.

### 6. Count VII (RICRA – racial discrimination)

Count VII alleges racial discrimination under RICRA. Again, this claim is tied to its federal law analogue; here, John's Title VI claim under Count V. Because the Court has determined that that claim is viable, the Court will deny the motion to dismiss Count VII.

### 7. Count VIII (RICRA – disability discrimination)

Count VIII alleges that Brown discriminated against John based on a disability. He alleges that Dean Suarez and Vice President Klawunn, with full knowledge of John's depression, summoned him to a meeting the day he was released from the hospital following a suicide attempt and tried to coerce him into leaving the University. John alleges that Brown knew of his disability but failed to accommodate it. But John does not plead what accommodations he was denied, and so this theory fails.

Alternatively, John argues in his opposition memorandum that Brown subjected him to a hostile environment because of his disability. *See* ECF No. 24-1

at 45–47. Even if John properly pleaded this theory, it too comes up short. To state a hostile education environment claim, John must allege (among other requirements) that he was subjected to harassment "sufficiently severe or pervasive that it alters the conditions of [his] education." *Guckenberger v. Bos. Univ.*, 957 F. Supp. 306, 314 (D. Mass. 1997); *accord Fox v. Costco Wholesale Corp.*, 239 F. Supp. 3d 564, 577 (E.D.N.Y. 2017). However, John does not explain how the conditions of his education were altered; indeed, he pleads that he had already decided to withdraw from Brown before his meeting with Dean Suarez and Vice President Klawunn. ECF No. 21 ¶¶ 104–05 (administrators were "[u]naware of John's decision to withdraw" when seeking to meet with him). And while John was at first denied readmission to Brown pending a longer period of "sustained stability," he succeeded in his appeal of that decision and returned to campus for the 2015–16 academic year.

Because John fails to state a claim under Count VIII, it must be dismissed.

8. Count IX (intentional infliction of emotional distress)

John next alleges that Brown intentionally inflicted emotional distress upon him. Under Rhode Island law, a properly pleaded IIED claim has four elements:

> (1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe.

*Champlin v. Wash. Tr. Co., of Westerly*, 478 A.2d 985, 989 (R.I. 1984). Additionally, "a plaintiff must prove physical symptomatology resulting from the alleged improper conduct." *Vallinoto v. DiSandro*, 688 A.2d 830, 838 (R.I. 1997).

The conduct required to state an IIED claim in Rhode Island must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hoffman v. Davenport-Metcalf*, 851 A.2d 1083, 1090 (R.I. 2004) (emphasis deleted) (quoting *Jalowy v. Friendly Home, Inc.*, 818 A.2d 698, 707 (R.I. 2003)). This is a "very high standard." *Id.* In addition, IIED claims are subject to a three-year statute of limitations. R.I. Gen. Laws § 9-1-14(b).

John alleges that Brown committed the tort of IIED by engaging in a "pattern or practice of gender-biased and/or racially motivated actions toward John" resulting in suicidal ideation and hospitalization for depression. ECF No. 21 ¶ 357. Cabining John's allegations to events occurring on or after May 4, 2014, one potential IIED claim can be sussed out: that Brown intentionally targeted John for the second Title IX investigation based on his race, as evidenced by Dean Suarez's use of the word "boy" in her conversations with John's coach and John's mother; that this outrageous conduct was intentional or with reckless disregard of the likelihood of causing John emotional distress; that it indeed caused severe emotional distress; and that this physically manifested itself in depression.

Accepting these allegations as true, the Court holds that a jury could plausibly conclude that the statements made by Dean Suarez signal that the second Title IX investigation was racially motivated, and that this is extreme and outrageous behavior intolerable in a civilized community. A reasonable jury could also conclude that this conduct was the proximate cause of John's emotional distress resulting in

24

depression and a suicide attempt. The Court thus denies the motion to dismiss John's IIED claim.

### 9. Count X (breach of contract)

John's next Count alleges that Brown breached its contractual obligations to him. "Under Rhode Island law, '[a] student's relationship to his university is based in contract.'" *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 191 (D.R.I. 2016) (alteration in original) (quoting *Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007)). "The relevant terms of the contractual relationship between a student and a university typically include language found in the university's student handbook." *Id.* (quoting *Havlik*, 509 F.3d at 34). "Rhode Island courts 'interpret such contractual terms in accordance with the parties' reasonable expectations, giving those terms the meaning that the university reasonably should expect the student to take from them.'" *Id.* (quoting *Havlik*, 509 F.3d at 34).

John's complaint puts forth four separate theories for breach of contract. ECF No. 21 ¶¶ 368–404. The Court addresses each theory individually.

#### a. Breach of the Sexual and Gender-Based Harassment, Sexual Violence, Relationship, and Interpersonal Violence and Stalking Policy (the "Policy")

John's first theory is that Brown flouted the Policy during the first Title IX investigation and in its dealings with him in 2014. ECF No. 21 ¶¶ 371–82. However, Brown enacted its Policy and the related complaint process at the beginning of the 2015–16 school year. *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 316–17 (D.R.I. 2016). Because every allegation in this Count involving a breach of the Policy predates its

existence, and because Brown cannot breach a contract that did not yet exist, this theory of liability fails.

b.    Breach of Brown's Code of Conduct ("Code") 2013–14

John's next theory is that Brown breached the Code by not excluding Jane's contradictory statements from the investigative report and by allowing her to submit a written statement less than twenty-four hours before the hearing. ECF No. 21 ¶¶ 383–85. Brown argues that the Code provides John the right to appeal, and because John did not appeal, this theory of liability must be foreclosed for failure to exhaust his contractual remedies. John argues that his failure to exhaust must be excused because any administrative appeal would have been futile.

The Court does not believe that any appeal taken by John necessarily would have been futile. The Code allows appeals "when a substantial procedural error by the University or hearing body/officer is demonstrated and in the reasonable judgment of the Appeal Officer such error is sufficient enough that it may have affected the decision of the original hearing authority."[12] ECF 22-2 at 11–12. Both of the identified flaws during the hearing—Brown's failure to exclude contradictory statements from the report and its acceptance of Jane's untimely statement—are the kinds of procedural errors that would be allowed on appeal.

As John did not exhaust his contractual remedies, and because an appeal would not have necessarily been futile, he cannot recover on this theory.

---

[12] This is one of two scenarios in which appeals are "normally" considered (the other being when there is new evidence). ECF No. 22-2 at 11. This means that an appeal may be considered when it satisfies neither scenario, and casts even more doubt on John's assertion that any appeal certainly would have been futile.

### c. Breach of the Covenant to Uphold Individual Integrity

John next alleges that Brown breached the Code's covenant to uphold individual integrity by failing to discipline Jane, Dean Suarez, and Vice President Klawunn for separating John from campus during the second Title IX investigation and for threatening to revive that investigation a few months later. ECF No. 21 ¶¶ 387–88.

> The covenant to uphold individual integrity reads:

> In order to ensure that the University can dedicate itself fully to its academic and educational vision, it is expected that an individual's personal integrity will be reflected not only in honest and responsible actions but also in a willingness to offer direction to others whose actions may be harmful to themselves or the community. The University expects that members of the Brown community will be truthful and forthright. The University expects that community members will not engage in behavior that endangers their own sustained effectiveness or that has serious ramifications for their own safety, welfare, academic well-being or professional obligations, or for that of others.

ECF No. 22-2 at 2 (2013–14 Code); ECF No. 22-3 at 2 (2014–15 Code).

The parties recognize that another judge of this Court rejected a similar theory for breach of contract based on this provision. *Doe*, 166 F. Supp. 3d at 192. Seeking to avoid a similar fate, John argues that the covenant to uphold individual integrity is broader, and encompasses other provisions of the Code, including one stating that "[l]ying in the course of a student conduct hearing constitutes an offense that is immediately actionable." ECF No. 22-2 at 7; ECF No. 22-3 at 7.

The Court does not believe that the covenant to uphold individual integrity encompasses these separate provisions in the Code.[13] Even if it did, the actions that John complains of—failure to act against Dean Suarez and Vice President Klawunn for the separation order and for threatening to revive the second Title IX investigation—did not occur in the context of a student conduct hearing.[14]

Because John has not plausibly alleged a breach of the covenant to uphold individual integrity, this theory also fails.

d.    Breach of Procedural Rights in Connection with the Second
       Title IX Investigation

Brown's final breach of contract theory is that Brown violated certain procedural rights to which John was entitled during the second Title IX investigation. First, John alleges that Brown's order separating him from campus pending the outcome of the investigation was improper. ECF No. 21 ¶¶ 389–92. Second, he alleges that Brown did not determine the outcome of these charges timely. *Id.* ¶¶ 393–99.

---

[13] John also suggests that the covenant to uphold individual integrity incorporates other, non-Code documents that are not in John's possession. The Court rejects John's invitation to speculate about what other contractual provisions Brown may have breached.

[14] John also alleges that Brown breached the covenant by not acting against Jane, though he lists no specific actions attributable to Jane in setting forth this theory. Assuming that he refers to her allegedly giving false statements during the hearing, just because lying is "actionable"—i.e., subject to action—does not mean that Brown necessarily *must* act against her, and thus that Brown breached a contractual duty to John by failing to take that action.

### i.         Separation Order

Brown ordered John separated from campus pending the outcome of the second Title IX investigation. Under the Code, Brown has authority to do so when a student "pose[s] a danger to themselves or the immediate well-being of the University community." ECF No. 22-2 at 10. However, accepting John's allegations as true and drawing reasonable inferences in his favor, this rationale is implausible. This was an "old complaint" that Brown had known about for some time, and involved conduct many months prior—in other words, John could not pose an immediate threat. At this stage, then, John has stated a plausible claim that the separation order violated his reasonable expectations under the Code.

### ii.         Timely Determination

John also alleges that Brown breached his right to "a timely determination of the charges." *Id.* at 8. The Code also elaborates that "[h]earings shall be scheduled to commence within sixty (60) calendar days of the receipt of a complaint or a report of information that forms the basis of the charges against the respondent," though extensions may be granted depending on the complexity of the case, the number of individuals involved, and the practicality of the academic calendar. *Id.* at 12.

John makes two arguments: first, that he learned of the investigation on May 7 and that it was not closed until August 7, ninety-two days later; second, that Brown learned of the charge sometime before May 7, thus making the delay even longer than it appears.[15] Both contentions, and the allegations supporting them, fail to create a

---

[15] The Court does not consider arguments that Brown violated its Policy, as that document was not in effect at the relevant time.

contractual violation. Although the investigation lasted ninety-two days, this was reasonable because of the academic calendar—it was summer and witnesses could not be reached.[16] John does plead that Brown knew of the factual underpinnings of the second investigation at an earlier time. That said, he does not allege that it was so long before as to make the determination untimely, especially given that the events unfolded over the summer. John therefore has not pleaded a violation of his right to a timely determination of these charges.

In sum, the only breach of contract theory that John has successfully put forward at this stage is that Brown violated his procedural rights in ordering his interim separation pending the outcome of the second Title IX investigation; all of his other theories under Count X are dismissed.

### 10. Count XI (breach of covenant of good faith and fair dealing)

Along with his contract claim, John alleges Brown breached the covenant of good faith and fair dealing. "Rhode Island law states that 'contracts contain an implied duty of good faith and fair dealing.'" *Doe*, 166 F. Supp. 3d at 196 (quoting *Havlik v. Johnson & Wales Univ.*, 490 F. Supp. 2d 250, 261 (D.R.I. 2007)). "The implication of the duty is that the parties will act in a manner consistent with the purposes of the contract." *Id.* (quoting *Havlik*, 490 F. Supp. 2d at 261). Because John has a viable claim for a breach of contract, he similarly has a viable claim that Brown violated the covenant of good faith and fair dealing inherent in that contract. *See id.*

---

[16] John does not allege that an extension was not given by the "Senior Associate Dean for Student Life upon a written petition by the Case Administrator, the charged student, or the responding student," as set forth in the Code. ECF No. 22-2 at 12.

Accordingly, the Court dismisses Count XI except as it relates to John's remaining claim in Count X.

### C. Requests for Re-pleading

In closing, Brown asks the Court to require John to re-plead the surviving claims with more specificity. John, for his part, seeks leave to amend and attempt to re-plead any claims that the Court dismisses. The Court denies both requests. Over the past fifteen months, this matter has been governed by three separate complaints and been subjected to two motions to dismiss. The time has finally come for this case to go on to discovery and toward an ultimate resolution.

## IV. CONCLUSION

For all these reasons, the Court GRANTS the Defendant's Motion to Dismiss (ECF No. 22) in part and DISMISSES the following:

- Count III;
- Count IV as to the first Title IX investigation;
- Count VIII;
- Count X as to all claims except for breach of procedural rights in connection with the May 2014 separation order; and
- Count XI as to all claims except for the remaining contract claim in Count X.

The Court otherwise DENIES the motion to dismiss.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
United States District Judge

August 27, 2018