# UNITED STATES DISTRICT COURT

## DISTRICT OF RHODE ISLAND

**JOHN DOE,**
        **Plaintiff,**

**v.**
                                    **C.A. NO.: 17-191-JJM-LDA**

**BROWN UNIVERSITY,**
        **Defendant.**

# DEFENDANT BROWN UNIVERSITY'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**BROWN UNIVERSITY**
**BY ITS ATTORNEYS,**

**STEVEN M. RICHARD (#4403)**
**NIXON PEABODY LLP**
**ONE CITIZENS PLAZA, SUITE 500**
**PROVIDENCE, RI  02903**
**TEL: 401-454-1020**
**FAX: 401-454-1030**
**EMAIL: srichard@nixonpeabody.com**

**MICHAEL GRABO (#6871)**
**BROWN UNIVERSITY**
**OFFICE OF THE**
**GENERAL COUNSEL**
**BOX 1913**
**PROVIDENCE, RI 02912**
**TEL: 401-863-3122**
**FAX: 401-863-1120**
**EMAIL: michael_grabo@brown.edu**

**January 31, 2020**

# TABLE OF CONTENTS

Page

I.    BACKGROUND ................................................................................................ 1

II.   STANDARD OF REVIEW ............................................................................... 7

   A.   The Rule 56 Standard and the First Circuit's Recent Application of the Summary
        Judgment Analysis in Comparable Cases ................................................... 7

   B.   The Court's Limited Role in its Review of Disciplinary Cases ................... 8

III.  ARGUMENT .................................................................................................... 9

   A.   In its Title IX Analysis, the Court Should Distinguish Between the Proof Required in
        Plaintiff's Deliberate Indifference Claims (Counts I & II) and What Remains in his
        Disparate Treatment Claim (Count IV) ..................................................... 9

   B.   Plaintiff's Deliberate Indifference Claims Regarding Brown's Actions Before and
        After May 4, 2014 Fail as a Matter of Law ............................................. 12

        1.   Before May 4, 2014, Brown did not Respond with Deliberate Indifference
             During the Title IX 1 Case. ................................................................ 15

        2.   After May 4, 2014. Jane Doe did not Commit Any Gender Based, Actionable
             Sexual Harassment Against Plaintiff, so There is No Basis for Title IX
             Deliberate Indifference Liability Against Brown ................................ 19

        3.   Plaintiff's Deliberate Indifference Claim Also Fails for Lack of Causation ..... 26

   C.   Plaintiff's Selective Enforcement Challenge to the Title IX 2 Case Fails as a Matter
        of Law ..................................................................................................... 27

   D.   Brown did not Engage in any Intentional Racial Discrimination Against Plaintiff ... 29

   E.   Brown did not Commit a Contractual Breach in its Initiation of the Title IX 2 Case  33

   F.   Plaintiff's Claim of a Breach of the Implied Covenant of Good Faith and Fair Dealing
        Fails with his Contract Claim .................................................................. 34

   G.   Plaintiff's Claim for Intentional Infliction of Emotional Distress Fails as a Matter of
        Law ......................................................................................................... 35

IV.   CONCLUSION ............................................................................................... 37

4815-9664-2483.1

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).................................................................................................. 7

*Bd. of the County Comm'rs v. Brown*,
   520 U.S. 397 (1997).................................................................................................. 14

*Bowman v. Shawnee State Univ.*,
   220 F.3d 456 (6th Cir. 2000) .................................................................................... 25

*Carmona v. Toledo*,
   215 F.3d 124 (1st Cir. 2000)...................................................................................... 7

*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*,
   526 U.S. 629 (1999)..........................................................................................*passim*

*Doe v. Amherst Coll.*,
   238 F. Supp. 3d 195 (D. Mass. 2017) ................................................................ 10, 30

*Doe v. Baum*,
   903 F.3d 575 (6th Cir. 2018) .................................................................................... 12

*Doe v. Brandeis Univ.*,
   Civil Action No. 15-11557-FDS, 2016 WL 1274533 (D. Mass. Mar. 31, 2016) ....................... 36

*Doe v. Brown Univ.*,
   166 F. Supp. 3d 177 (D.R.I. 2016)............................................................................ 12

*Doe v. Columbia Coll. Chicago*,
   933 F.3d 849 (7th Cir. 2019) ................................................................................24-25

*Doe v. Cummins*,
   662 F. Appx 437 (6th Cir. 2016)............................................................................... 28

*Doe v. Trs. of Bos. Coll.*,
   893 F.3d 67 (1st Cir. 2018)................................................................................... 7, 13

*Doe v. Univ. of Mass-Amherst*,
   C.A. No. 14-30143-MGM, 2015 WL 4306521 (D. Mass. July 14, 2015)..................... 10, 25

*Doe v. Trs. of the Univ. of Pa.*,
   270 F. Supp. 3d 799 (E.D. Pa. 2017) ....................................................................... 12

*Doe v. Univ. of the South*,
   687 F. Supp. 2d 744 (E.D. Tenn. 2009)................................................................... 8,9

4815-9664-2483.1

*Doe v. Univ. of Sciences.*,
No. CV 19-358, 2019 WL 3413821 (E.D. Pa. July 29, 2019) .................................................... 12

*Doe v. Univ. of St. Thomas*,
240 F. Supp. 3d 984 (D. Minn. 2017) ...................................................................................... 12

*Doe v. University of Chicago*,
No. 16 C 08298, 2017 WL 4163960 (N.D. Ill. Sept. 20, 2017) .................................................. 24

*Doe v. Washington Univ.*,
Case No. 4:19 CV 300 (JMB), 2020 WL 353587 (E.D. Mo. Jan. 21, 2020) ............................. 25

*Fellheimer v. Middlebury Coll.*,
869 F. Supp. 2d 246-47 (D. Vt. 1994) ...................................................................................... 36

*Frazier v. Fairhaven Sch. Comm.*,
276 F.3d 52 (1st Cir. 2001) ....................................................................................................... 13

*Goodman v. Bowdoin Coll.*,
380 F. 3d 33 (1st Cir. 2004) ...................................................................................................... 30

*Haidak v. Univ. of Mass. at Amherst*,
299 F. Supp. 3d 242 (D. Mass. 2018) ..............................................................................9-10, 18

*Haidak v. University of Massachusetts-Amherst*,
933 F.3d 56 (1st Cir. 2019) ...............................................................................................*passim*

*Harris v. St. Joseph's Univ.*,
Civil Action No. 13-3937, 2014 WL 1910242 (E.D. Pa. May 13, 2014) ................................... 36

*Havlik v. Johnson & Wales Univ.*,
509 F.3d 25 (1st Cir. 2007) ....................................................................................................... 33

*Honda Corp. v. Polymer Research Corp. of America*,
275 F. Supp. 2d 229 (D.R.I. 2003) ........................................................................................... 35

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005) .................................................................................................................. 10

*John Doe v. Brown University*,
210 F. Supp. 3d 310 (D.R.I. 2016) .................................................................................8, 33-34

*Kollaritsch v. Michigan St. Univ. Bd. of Trs.*,
944 F.3d 613 (6th Cir. 2019) .................................................................................................... 13

*Mallory v. Ohio Univ.*,
76 F. App'x 634 (6th Cir. 2003) ............................................................................................... 28

*Morgan v. Town of Lexington*,
823 F.3d 737 (1st Cir. 2016) .................................................................................................... 13

iii

*Noonan v. Staples, Inc.*,
    556 F.3d 20 (1st Cir. 2009) ................................................................................. 7

*Nungesser v. Columbia Univ.*,
    169 F. Supp. 3d 353 (S.D.N.Y. 2016) ............................................................. 10, 20-24

*Nungesser v. Columbia Univ.*,
    248 F. Supp. 345 (S.D.N.Y. 2017) ................................................................. 10, 23

*Pierre v. Univ. of Dayton*,
    2017 WL 1134510 (S.D. Ohio Mar. 27, 2017) ................................................. 9

*Porto v. Town of Tewksbury*,
    488 F.3d 67 (1st Cir. 2007) ........................................................................... 13, 14

*Pride Hyundai, Inc. v. Chrysler Financial Company, LLC*,
    263 F. Supp. 2d 374 (D.R.I. 2003) ................................................................. 35

*Salau v. Denton*,
    139 F. Supp. 3d 989 (W.D. Mo. 2015) ........................................................... 25

*Santiago-Ramos v. Centennial P.R. Wireless Corp.*,
    217 F.3d 46 (1st Cir. 2000) ........................................................................... 7

*T.G. Plastics Trading Co., Inc. v. Toray Plastics (America), Inc.*,
    958 F. Supp. 2d 315 (D.R.I. 2013) ................................................................. 34

*Yu v. Vassar Coll.*,
    97 F. Supp. 3d 448 (S.D.N.Y. 2016) .............................................................. 9, 28

**Federal Statutes**

20 U.S.C. §§ 1681-88 ......................................................................................... 9

20 U.S.C. § 1681(a) ........................................................................................... 9

42 U.S.C. § 1981 .............................................................................................. 6, 29

42 U.S.C. § 2000d et. seq. ................................................................................. 29

**State Statutes**

Rhode Island Civil Rights Act, R.I.G.L. § 42-112-1 *et seq.* .............................. 6

Defendant Brown University ("Brown" or the "University") submits its memorandum in support of its motion for summary judgment.[1]

## I.       BACKGROUND

Plaintiff enrolled in Brown in September 2013 and graduated in May 2018 with B.A. degree in Theater and Performing Arts.  At Brown, Plaintiff was afforded with and took advantage of many educational and extracurricular opportunities to enhance his aspirations of a post-graduation career in the Los Angeles entertainment industry and hopes to become a Hollywood motion picture actor.  As a four-year varsity athlete, he excelled on the athletic playing field.

Plaintiff has actively used his Brown degree, experiences, and alumni connections to promote himself and further his career goals.  SUF ¶¶ 155-62.  Since graduation, Plaintiff has worked at an entertainment talent agency, while also seeking to become a professional athlete. Despite all that he earned at Brown and received from the University, in his self-proclaimed pursuit of "maximum damages" and lifetime financial security through this litigation, he told his paid forensic psychological witness that "I got nothing from them [alluding to Brown]."  *Id*. at ¶ 165.

Academically, Brown provided Plaintiff with interactive educational support and significant accommodations.  SUF ¶¶ 131-44.  For example, when Plaintiff suffered a concussion on the playing field in May 2017 near the end of the 2016-17 academic year, Brown granted him significant extensions (well into the summer of 2017) to complete his spring 2017 semester course requirements (even as Plaintiff wrote to Brown's President accusing Deputy Dean of the College Christopher Dean Dennis of being a liar).  *Id*. at ¶¶ 129-34.  During the fall 2017 semester, Plaintiff chose not to attend mandatory session meetings in one of his courses, resulting in his automatic

---

[1]      The factual background is detailed in Brown's concurrently filed Local Rule Cv. 56(a) Statement of Undisputed Facts ("SUF").

4815-9664-2483.1

failing grade and imperiling his ability to achieve the necessary credits to graduate in May 2018. *Id*. at ¶¶ 136-44.  When Plaintiff's own actions threatened his ability to graduate, Brown worked diligently with him to develop an alternative academic pathway to ensure his May 2018 graduation. During the 2017-18 academic year, Dean Dennis met regularly with Plaintiff to monitor his academic progress and remind him that "90% of success is showing up for [his classes]."  SUF at ¶ 141.

Through his academic concentration in Theater and Performing Arts and the many opportunities that it opened for him both on and off campus during his Brown undergraduate education, Plaintiff secured leading acting roles in theatrical, musical, and motion picture productions.  *Id*. at ¶¶ 146-47.  He was also a runway model in fashion shows held on Brown's campus and in New York City.  *Id*. at ¶¶ 148.

Professionally, Brown connected Plaintiff with its alumni in the entertainment industry (even after he sued the University), including introducing him to an alumnus in Los Angeles who hired him for a summer 2017 internship at an internationally known corporation.  *Id*. at ¶¶ 124-28. Athletically, Plaintiff was a starting varsity athlete for four seasons, earning All-Ivy recognitions during his last three seasons.  *Id*. at ¶¶ 63, 108, 123, & 150.

Socially, Plaintiff was an active member of a Brown fraternity and enjoyed campus life to the fullest extent through his attendance at parties and formal dances (as is evident from his many social media postings).  *Id*. at ¶¶ 149, 152.  He had many friends at Brown, participated in many recreational activities (such as paintball games and fraternity events).  He maintained an active exercise regime beyond his varsity team training, such as his passion for indoor rock climbing.  *Id*. at ¶ 149.

While privately telling his paid damages forensic witness that he "got nothing from Brown" and casting scandalous aspersions at Brown in his court filings while litigating anonymously behind the shield of a pseudonym, Plaintiff touts himself publicly as a proud Brunonian, as shown by his social media publication of several graduation pictures in his Brown cap and gown standing in front of the Van Wickle Gate and posing confidently with several other graduates.  *Id*. at ¶ 154. After his graduation and as he seeks millions of dollars from his alma mater, Plaintiff has travelled from Los Angeles to Providence each October to attend Brown's annual Parents' Weekend festivities, including his participation in a scrimmage on campus pitting Brown's varsity athletes against returning alumni players.  *Id*. at ¶ 156.[2]

The undisputed facts clearly show that Plaintiff was not subjected to a gender and racially biased educational environment or any discrimination at Brown, as he has publicly and wrongly pled in his 69-page, 425 paragraph Second Amended Complaint and subsequent court filings. Cutting through all of the bluster of his filings (such his ugly and untrue contentions of institutionalized gender-bias and historical "structural racism" at Brown, against which the University has been forced to publicly defend itself), Plaintiff now has the burden at the summary judgment stage to support what he has alleged through <u>admissible evidence</u>.

---

[2]     There is no disciplinary remark on Plaintiff's Brown transcript to expunge.  SUF at <u>Ex. A</u>. Plaintiff, age 25, wants this litigation to give him lifetime financial security.  He demands that Brown must pay him up to $1.9 million dollars for alleged future lost wages spanning the next four decades through the year 2060, when he will reach his anticipated retirement age of 65.  Brown has concurrently filed a motion to strike Plaintiff's future damages claim and exclude proffered testimony by Lee E. Miller, who purports to be able to predict with prescience the next forty years of Plaintiff's work life based upon a single meeting of less than two hours.  Additionally, Plaintiff claims that he is severely emotionally damaged by Brown (even though he has not attended any counseling for several years) and that the University somehow bears responsibility for his daily, recreational usage of marijuana in Los Angeles (nearly two years after his graduation and for which he has sought no professional help).

3

The Court's Rule 12(b)(6) ruling narrowed significantly the scope of Plaintiff's claims. 8/27/18 Mem. & Order (Doc. No. 29), 327 F. Supp. 3d 397 (D.R.I. 2018).  Regarding what remains, the Court should analyze Plaintiff's educational experience at Brown sequentially over each of the five academic years of his enrollment:  2013-14, 2014-15, 2015-16, 2016-17, and 2017-18.  Brown has structured its Local Rule 56(a) Statement of Undisputed Facts to address each academic year *seriatim*.

Under the applicable limitations periods, the remaining claims cover distinct time periods. For each claim, the following questions must be answered: (1) to what extent may Plaintiff litigate any events pre-dating May 4, 2014 (the date three years before he sued the University) and (2) whether any of his timely asserted claims present any triable questions of fact to withstand the entry of final judgment in Brown's favor.

Primarily, Plaintiff challenges two student conduct cases that occurred during his freshman year at Brown (2013-14), which he has labeled in his Second Amended Complaint and throughout this litigation as the "Title IX 1" and "Title IX 2" cases.  In the Title IX 1 case, Plaintiff was placed on a one-year deferred suspension, which was akin to probation, after being found responsible for two of four Code violation charges.  SUF at ¶¶ 37-63.  The Title IX 2 case ended with no charges filed against Plaintiff.  *Id*. at ¶¶ 73-88.  These are the only student conduct cases at issue in this litigation, as Plaintiff was not ever a respondent in any other student conduct case at Brown during the four academic years between 2014-15 and 2017-18.  *Id*. at ¶¶ 89-154.  While Plaintiff seeks to challenge and attack broadly the Title IX 1 and 2 cases, his legal ability to do so must be framed by and be consistent with the Court's Rule 12(b)(6) ruling, as Brown analyzes *infra*.

Additionally, regarding the 2014-15 academic year, Plaintiff seeks to hold Brown liable for his purported "suicide" attempt on October 24, 2014, when he lunged onto the hood of a

virtually stopped vehicle (that he testified was rolling at a speed of no more than 2 to 3 mph) and smashed its windshield. *Id.* at ¶ 91. At the time of the incident, Plaintiff was significantly impaired by his consumption of an excessive amount of marijuana a short time earlier while socializing with friends. *Id.* at ¶¶ 90, 94-95. During his resulting four-day hospitalization, Plaintiff decided voluntarily and upon the advice of his medical providers to take a leave of absence from Brown for the remainder of the 2014-15 academic year. *Id.* at ¶¶ 96-101. Brown has no liability to Plaintiff arising from the October 24, 2014 incident or concerning his leave of absence. Plaintiff's decision to take a leave was a sound one to stabilize himself personally, emotionally and academically, enabling his return to the University in September 2015 and ultimately his graduation in May 2018.

There are no liability questions whatsoever regarding any events during Plaintiff's last three academic years at Brown: 2015-16, 2016-17, and 2017-18.[3] From September 2015 through May 2018, the University never took any action that, in any conceivable way and even giving Plaintiff every reasonable inference, can be construed as creating any liability to Plaintiff under any statutory discrimination, contract, or tort law claim. While Plaintiff blustered often during his final three academic years about how he felt mistreated by Brown (including his emails to Brown's President and other senior deans and administrators, stating bold proclamations such as "the nation would agree with me," portraying deans as liars, and threatening to sue the University before he eventually did so), Plaintiff enjoyed full access to and the many benefits of all educational, athletic, extracurricular, and social activities that he chose to pursue on Brown's campus.

---

[3]     In its SUF, Brown details the many opportunities that were afforded to Plaintiff during his final three academic years at the University: 2015-16 (¶¶ 105-10); 2016-17 (¶¶ 121-35); 2017-18 (¶¶ 136-53).

Based upon the manner in which he pled his Second Amended Complaint and his approach to discovery, Plaintiff will likely oppose Brown's summary judgment motion by trying to blend his claims and blur their distinct elements of proof and time periods.  For purposes of its summary judgment motion, Brown properly focuses on each remaining claim as framed by the Court's Rule 12(b)(6) ruling and the law:

- **Title IX Gender Discrimination Claims**: (1) "Deliberate Indifference" applying a "continuing violation" analysis (<u>Counts I & II</u>, as combined by the Court's Rule 12(b)(6) ruling) and (2) Selective Enforcement (limited only to the Title IX 2 case) (<u>Count IV</u>);

- **Federal Racial Discrimination Claims**:  (1) Title VI claim applying a "continuing violation" analysis (<u>Count V</u>) and (2) 42 U.S.C. § 1981 (<u>Count XII</u>);

- **Rhode Island Civil Rights Act Claims ("RICRA")**:  The RICRA claims (<u>Counts VI and VII</u>) are analyzed under the frameworks applicable to the federal statutory gender and racial discrimination claims, although R.I.G.L. § 42-112-2 limits such claims to a three-year period (on or after May 4, 2014) and there is no statutory language or Rhode Island Supreme Court precedent indicating that a continuing violation theory can extend the RICRA claims to reach back more than three years;

- **Breach of Contract Claim**:  While Plaintiff pled a myriad of contractual claims, the Court's Rule 12(b)(6) ruling has limited what remains to one discrete claim: an alleged breach of procedural rights in connection with the May 2014 separation order at the outset of the Title IX 2 case (<u>Count X</u>).  Nothing else remains in the breach of contract count, and it does not reach back or relate to the Title IX 1 case or reach forward to any events from the 2014-15 academic year and thereafter;

- **Intentional Infliction of Emotional Distress Claim**:  Under R.I.G.L § 9-1-14(b), this tort claim is limited only to events on or after May 4, 2014 (<u>Count IX</u>), so it cannot reach back or relate back to the Title IX 1 case.

Based upon the undisputed material facts and for legal reasons argued below, Brown is entitled to the entry of a final judgment regarding each of Plaintiff's remaining claims.

6

## II.     STANDARD OF REVIEW

### A.     The Rule 56 Standard and the First Circuit's Recent Application of the Summary Judgment Analysis in Comparable Cases

The Court grants summary judgment when no genuine issue of material fact exists, and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Facts are material if they carry the potential to affect the outcome of the suit under applicable law.  *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000) (citation omitted).  The movant must show the absence of a genuine issue of material fact.  *Carmona v. Toledo*, 215 F.3d 124, 132 (1st Cir. 2000).  If the movant meets that burden, the non-moving party must "with respect to each issue on which [he] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [his] favor," *Borges ex. rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010), instead of merely resting upon allegations or denials in the pleadings.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The Court views the record in the light most favorable to the non-moving party, drawing all reasonable inferences in his favor.  *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).

Regarding the Court's summary judgment review, the First Circuit's recent rulings in *Doe v. Trustees of Boston College*, 892 F.3d 67 (1st Cir. 2018) and *Haidak v. University of Massachusetts-Amherst*, 933 F.3d 56 (1st Cir. 2019), are particularly illustrative regarding Plaintiff's burden of proof at this stage of the litigation, especially in his statutory discrimination claims.  In *Boston College*, the First Circuit affirmed the entry of summary judgment in the college's favor on a Title IX claim, stressing that generalized allegations are insufficient to withstand summary judgment and that the party opposing its entry must present admissible record evidence to show a question of material fact.  892 F.3d at 92.  In *Haidak*, the First Circuit ruled similarly in its affirming of a Title IX summary judgment ruling in the university's favor.  933

F.3d at 75.

### B.     The Court's Limited Role in its Review of Disciplinary Cases

The United States Supreme Court has stated that "courts should refrain from second guessing the disciplinary decisions made by school administrators." *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999).  Consequently, it is important to place this litigation in its proper context.

This is not a civil lawsuit between Plaintiff and the two female students referenced in his Second Amended Complaints under the pseudonyms "Jane Doe" and "Sally Roe," and it is not a criminal proceeding against Plaintiff.  Plaintiff's claims do not require the Court to make an independent determination: (1) regarding what happened between him and each of the two female students; (2) whether a sexual assault occurred during Plaintiff's interactions with each female student; (3) whether either female student consented to Plaintiff's actions during her encounter with him; or (4) who, as between Plaintiff and each female student, gave the more credible account to Brown.  *See Doe v. Univ. of the South.*, 687 F. Supp. 2d 744, 755 (E.D. Tenn. 2009).

In *John Doe v. Brown University*, 210 F. Supp. 3d 310, 312-13 (D.R.I. 2016), the Court stressed its limited role:

> It is not the Court's role to determine the facts of what happened between [the respondent] and [the complainant]; to decide whether the Court would have, in the panel's position, found [the respondent] responsible for sexual misconduct; to evaluate whether the Court would have made the same judgment calls on evidence and other issues as [the university] did; or to determine whether the procedure [the respondent] received was optimal. This Court is not a super-appeals court for sexual misconduct cases, nor is it an advisor to [a university] on how it should handle these messy and unfortunate cases.

"To be perfectly clear, a student is not entitled to a perfect disciplinary process, and it is not the Court's role to be an appeals court for a [university's] disciplinary decisions.  Nor is it the case that any minor technical violation entitles the student to a new disciplinary hearing or a review by

4815-9664-2483.1

this Court." *Id.* at 331; *Pierre v. Univ. of Dayton*, 2017 WL 1134510, at *8 (S.D. Ohio Mar. 27, 2017) (quoting *Wood v. Strickland*, 420 U.S. 308, 326 (1975) ("It is not the role of federal courts to set aside decisions of school administrators which the court may view as lacking in compassion.")); *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 461 (S.D.N.Y. 2016) ("The Court's role, of course, is neither to advocate for best practices or policies nor to retry disciplinary proceedings.") (citing *Univ. of the South.*, 687 F. Supp. 2d at 755).

## III.   ARGUMENT

### A.   In its Title IX Analysis, the Court Should Distinguish Between the Proof Required in Plaintiff's Deliberate Indifference Claims (Counts I & II) and What Remains in his Disparate Treatment Claim (Count IV)

Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88, provides that "[n]o person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a) (italics added).  A private action against an educational institution is cognizable only when a student has been "excluded from participation in," "denied the benefits of," or "subjected to" gender discrimination under the institution's "programs or activities."  *Davis*, 526 U.S. at 650, 659.

Generally, federal courts have recognized two distinct categories of claims in Title IX private lawsuits: (1) in the context of student discipline, claims of intentional "disparate treatment" gender bias that caused an "erroneous outcome" in a flawed disciplinary proceeding or resulted in "selective enforcement" in the proceeding's initiation or sanctioning, *Yusuf*, 35 F.3d at 714-15; and (2) claims of "deliberate indifference" in a school's response to known student-on-student or teacher-on-student sexual harassment.  *Davis*, 526 U.S. at 643; *Haidak v. Univ. of Mass. at Amherst*, 299 F. Supp. 3d 242, 269-70 (D. Mass. 2018) (discussing the separate line of cases, distinguishing between the *Yusuf* analysis and the deliberate indifference analysis), *aff'd in rel.*

*part*, 933 F.3d 56 (1st Cir. 2019);  *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 221-22 (D. Mass. 2017) ("Separate lines of cases have established individuals' rights to damages from a school under Title IX where they can establish differential treatment on the basis of sex, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74, 125 S. Ct. 1497, 161 L. Ed. 2d 361 (2005), or deliberate indifference to sexual harassment, *Davis* [].") (italics added); *Doe v. Univ. of Mass-Amherst*, C.A. No. 14-30143-MGM, 2015 WL 4306521, at *6-7 (D. Mass. July 14, 2015) (explaining the separate lines of cases under Title IX private causes of action).[4]

As addressed in the Court's Rule 12(b)(6) ruling, Plaintiff pled four Title IX claims in his Second Amended Complaint - two deliberate indifference claims (Counts I and II) and two disparate treatment claims (Counts III and IV).  Regarding Plaintiff's allegations in Counts I and II, the Court held that they can be combined to state a "deliberate indifference" claim, testing whether "Brown violated Title IX by creating a hostile education environment in failing to respond adequately to Jane [Doe's] harassment of [Plaintiff]" before and after May 4, 2014.  *Id.* at 410 (citing *Porto v. Town of Tewksbury*, 488 F.3d 67, 72-73 (1st Cir. 2007)).  The Court held that a "continuing violation" theory could be applied to Counts I and II to reach back and test whether Brown acted with any "deliberate indifference" before May 4, 2014 (namely, in connection with the Title IX 1 case).  *Id.* at 408-11.

---

[4]        *See also Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 363 (S.D.N.Y. 2016) ("*Nungesser I*"); *Nungesser v. Columbia Univ.*, 248 F. Supp. 345, 362 (S.D.N.Y. 2017) ("*Nungesser II*").  Both *Nungesser I and II* describe the distinction between a cause of action where the allegations claim that the university directly discriminated against a charged student (e.g., erroneous outcome and selective enforcement) and a claim focused on alleged "deliberate indifference" to student-on-student harassment.  As addressed in detail *infra*, *Nungesser I and II* are directly applicable to Plaintiff's deliberate indifference claims in Counts I and II.  *Nungesser I and II* are dispositive to show that Jane Doe did not engage in "gender based harassment" against Plaintiff on "the basis of sex."

Regarding Plaintiff's disparate treatment claims pled in Counts III and IV, the Court dismissed Plaintiff's erroneous outcome and selective enforcement challenges to the Title IX 1 case because they were untimely raised after the expiration of the limitations period. 327 F. Supp. 3d at 410. Plaintiff's erroneous outcome challenge to the Title IX 2 case was dismissed as implausible because Brown closed its investigation in his favor. *Id*. at 412. Plaintiff's sole surviving disparate treatment claim is his selective enforcement challenge to the Title IX 2 case. *Id*. at 412-13.[5]

Turning first to the particulars of what Plaintiff seeks to litigate in his Title IX deliberate indifference claim, in Count I (labeled as "Hostile Environment/Sexual Harassment"), Plaintiff focuses entirely upon Brown's actions in connection with the Title IX 1 case between December 4, 2013 (when Jane Doe filed her complaint) and March 12, 2014 (when Brown denied Jane Doe's appeal). SUF at ¶¶ 37-63. All of Count I's allegations pertain to events predating May 4, 2014. SAC, Doc. 21 at ¶¶ 206-219.

Count II (generically titled "Gender Discrimination") claims that Jane Doe harassed Plaintiff <u>after</u> Brown's resolution of the Title IX 1 case. Yet, Plaintiff also wrongly weaves contentions into the deliberate indifference count that are more appropriately raised through a disparate treatment challenge of a disciplinary case. *See* SAC 21 at ¶ 225 ("John and Jane, a female student, were similarly situated in that both alleged that the other sexually harassed the other in violation of Brown's Title IX Policy"); ¶ 234 ("Sally [Roe, the complaint in the Title IX 2 case] was similarly situated to John in that like John she alleged violations of the Title IX Policy"); ¶ 235 ("However, whereas Brown did not initiate an action on John's behalf against Jane, a female

---

[5]     Brown addresses *infra* why Plaintiff's remaining selective enforcement claim in Count IV fails as a matter of law regarding the Title IX 2 case.

student,  Brown did initiate an action against John, the male student, on Sally's behalf.").  Plaintiff should not be allowed to use his "deliberate indifference" claims to resurrect back into this litigation his time-barred disparate treatment challenges (erroneous outcome and selective enforcement) to the Title IX 1 case.  The result of the Title IX 1 case, which Plaintiff accepted and did not appeal, should stand as adjudicated without any judicial alteration.  Brown has no liability to Plaintiff relating to the Title IX 1 case's initiation, proceedings, and result.  Particularly, in a prior "John Doe "case against Brown, the Court explained the poor fit between the deliberate indifference theory and a challenge of disciplinary proceedings.  *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 190-91 (D.R.I. 2016) ("Moreover, as Brown points out in its briefing, deliberate indifference claims are typically brought in cases where a school has ignored a victim's complaint of sexual harassment or assault . . . .  Some courts have questioned its application to a case of a disciplined student.").[6]

### B.   Plaintiff's Deliberate Indifference Claims Regarding Brown's Actions Before and After May 4, 2014 Fail as a Matter of Law

Under the First Circuit's application of *Davis* and to survive summary judgment, Plaintiff must present admissible evidence that Brown had actual notice of and responded with "deliberate

---

[6]     *See also Doe v. Baum*, 903 F.3d 575, 588 (6th Cir. 2018) ("The deliberate-indifference theory was designed for plaintiffs alleging *sexual harassment*" and "to plead a Title IX-deliberate-indifference claim, 'the misconduct alleged must be sexual harassment,' not just a biased disciplinary process." (emphasis in original) (citations omitted)); *Doe v. Univ. of Sciences.*, No. CV 19-358, 2019 WL 3413821, at *8 (E.D. Pa. July 29, 2019) ("It is undecided whether [the deliberate indifference] theory reaches disciplinary proceedings."); *Doe v. Trs. of the Univ. of Pa.*, 270 F. Supp. 3d 799, 825 (E.D. Pa. 2017) ("We are likewise skeptical that a Title IX deliberate indifference claim can be pursued "to challenge either the initiation or outcome of a disciplinary proceeding" and that such a claim is not limited to situations in which deliberate indifference is alleged to have "cause[d] students to undergo harassment or ma[d]e them liable or vulnerable to it.") (quoting *Mallory v. Ohio Univ.*, 76 Fed. Appx. 634 (6th Cir. 2000)); *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 990 n.2 (D. Minn. 2017) ("[I]t is an open question whether the Title IX deliberate indifference standard applies to claims related to alleged gender discrimination in a university's disciplinary proceedings.").

indifference" to actionable sexual harassment by committed against Plaintiff by Jane Doe that was

"severe, pervasive and objectively offensive."  *Porto*, 488 F.3d at 72 (citing *Davis*).

> Sexual harassment in schools can constitute prohibited sex-based discrimination actionable under Title IX where there is a "hostile environment," such that "*acts of sexual harassment* [are] sufficiently severe and pervasive to compromise or interfere with educational opportunities normally available to students," and relevant school officials with actual knowledge of the harassment "exhibit [] deliberate indifference to [the harassment]." [*Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52], 65,66 (1st Cir. 2001)] . . . .The purportedly illegal acts must be taken *"on the basis of sex." See Frazier*, 275 F.3d at 66 ("Discrimination *on the basis of sex* is the sine qua non of a Title IX sexual harassment case . . . .").

*Morgan v. Town of Lexington*, 823 F.3d 737, 745 (1st Cir. 2016) (emphasis added).   The student

peer harassment forming the basis of the Title IX deliberate indifference claim must be "gender-

oriented."  *Davis*, 526 U.S. at 651; *see also Doe v. Trs. of Bos. Coll.*, 893 F.3d 67, 93 (1st Cir.

2018), ("To succeed on a Title IX deliberate indifference claim, a plaintiff must show that an

official with authority to implement corrective measures was aware of and deliberately indifferent

to *an act of discrimination on the basis of sex*.") (emphasis added).  In the absence of "severe,

pervasive, and objectively offensive" sexual harassment" on the "basis of sex," there is no

actionable Title IX deliberate indifference claim against the institution for student-on-student

actions.  *Frazier*, 276 F.3d at 67; *Porto*, 488 F.3d at 72.[7]

---

[7]     The Sixth Circuit's December 12, 2019 ruling in *Kollaritsch v. Michigan St. Univ. Bd. of Trs.*, 944 F.3d 613, 619-621 (6th Cir. 2019), provides a detailed explanation of what constitutes "actionable sexual harassment" to require a university's response under the deliberate indifference analysis.  As the Sixth Circuit stated, "[t]he critical point … is that the *Davis* formulation requires that the school had actual notice of some actionable sexual harassment and that the school's deliberate indifference to it resulted in further actionable harassment of the student-victim."  *Id.* at 620.  The Sixth Circuit explained and provided examples of when "actionable sexual harassment" can be deemed to be "severe," "pervasive", and "objectively offensive."  *Id.* at 620-21.  "Even upon establishing actionable student-on-student harassment, a plaintiff must also … prove four elements of a deliberate-indifference based intentional tort: (1) knowledge, (2) an act, (3) injury, and (4) causation."  *Id.* at 621.

13

If such a "severe, pervasive and objectively offensive" student-on-student sexual harassment occurred and the school had actual notice of its occurrence, the focus turns to the school's response.  Deliberate indifference is a "stringent standard of fault." *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 410 (1997).   Proof of deliberate indifference is a high burden because "[s]chool administrators must continue to enjoy the flexibility they require in disciplinary decisions unless their response to harassment is clearly unreasonable." *Davis*, 526 U.S. at 643. "In the educational setting, a school might be found deliberately indifferent only "where it had notice of sexual harassment and either did nothing or failed to take reasonable measures after it learned that its initial remedies were ineffective." *Porto*, 488 F.3d at 74 (citing *Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999)).   Deliberate indifference "is not a mere negligence standard." *Davis*, 526 U.S. at 649.  Title IX does not require schools to "'remedy' peer harassment" or to "ensure that students conform their conduct to certain rules." *Id*. at 648 (alterations omitted).  Under the causation requirement necessary to support Title IX liability, a school's deliberate indifference "must at a minimum cause [students] to undergo harassment or make them vulnerable to it." *Porto*, 488 F.3d at 72 (internal quotations omitted; alteration in original).

Under the application of the "continuing violation theory," as allowed by the Court's Rule 12(b)(6) ruling, the deliberate indifference analysis here requires the determination of the following questions:  (1) Before May 4, 2014 and particularly during the Title IX 1 case, did Brown act with deliberate indifference after its receipt of actual notice of the September 20, 2013 incident between Plaintiff and Jane Doe?; (2) After May 4, 2014, did Jane Doe engage in any actionable sexual harassment of Plaintiff and did Brown respond in a deliberately indifferent manner, if it had actual notice of any such harassment; (3) Can any such deliberate indifference pre-dating and post-

14

dating May 4, 2014 be linked together to form a "continuing violation"?

As argued below, before May 4, 2014, Brown never acted with any deliberate indifference during the Title IX 1 case, so there is no Title IX violation to reach back to and pull forward under a "continuing violation" theory. Second, after May 4, 2014, no Title IX deliberate indifference occurred to anchor a "continuing violation" claim. Specifically, after the Title IX 1 case, Jane Doe never committed *any actionable sexual harassment against Plaintiff because of his gender,* so Brown cannot possibly have any Title IX institutional liability under a deliberate indifference claim.

### 1. Before May 4, 2014, Brown did not Respond with Deliberate Indifference During the Title IX 1 Case.

On the evening of September 20, 2013, Plaintiff and Jane Doe, two Brown undergraduates, were strangers to one another when they met in an off-campus bar. That evening, they interacted inside the bar, left the bar together, and eventually were in an alley behind the bar where sexual activity ensued. What happened in the alley was disputed by the two students, which was precisely what Brown addressed and adjudicated in the Title IX 1 case through its student conduct procedures stated in its Code.

On December 4, 2013, Jane Doe, not Plaintiff, filed a written complaint invoking the Code's student conduct investigative and adjudicative procedures. SUF at ¶ 37, Ex. C. When Brown notified Plaintiff of Jane Doe's complaint against him on December 6, 2013, he could not remember Jane Doe by her name. *Id.* at ¶¶ 38-43. Apparently, his reading of Jane Doe's complaint refreshed his recollection to the events of the evening of September 20, 2013. Plaintiff filed a written response, as was his right under the Code, but he never filed a complaint with Brown against Jane Doe. *Id.* at ¶¶ 43, 59-61.

After Brown's completion of its investigation that included its receipt of several third-party witness statements, the University convened a Student Conduct Board hearing on February 10, 2014 under its Code, during which the hearing panel heard from and questioned Jane Doe, Plaintiff, and their respective witnesses. *Id*. at ¶¶ 48-54. In his sworn deposition testimony, Plaintiff admitted that he was able to present fully at the hearing all of his contentions raised in his written response, including his assertion that Jane Doe, not he, was the aggressor during the incident. *Id*. at ¶¶ 52-53.

During the Student Conduct Board hearing held on February 10, 2014, a panelist questioned Plaintiff regarding his understanding of consent in a sexual encounter. *Id*. at ¶¶ 49-50. Plaintiff responded with words to the effect that a male can "keep trying until a girl gives up."[8] *Id*. After reviewing the written record and testimony presented at the hearing, the panel held Plaintiff responsible for two of four charged offenses, but not the most serious of the charges.[9] *Id*. at ¶ 54. Plaintiff was sanctioned with a one-year deferred suspension (which was akin to probation and did not impose any interruption in his education or participation in his varsity sport). *Id*. at ¶¶ 54, 63. Jane Doe, not Plaintiff, filed an appeal, contending that the sanction was too lenient. *Id*. at ¶ 61. Brown denied Jane Doe's appeal. *Id*. at ¶¶ 62. Under *Davis* and its progeny, nothing in Brown's responsive measures comes anywhere to proof of deliberate indifference in the Title IX 1 case.

---

[8]     During his deposition, Plaintiff acknowledged his answer during the Student Conduct Board hearing, but he tried to retreat six years later by portraying it as a "poor choice" of words. When asked to clarify what he actually meant, Plaintiff articulated his personal views from "experience" that women "like to be seduced" or "take things slow." SUF at ¶ 50.

[9]     The Student Conduct Board found Plaintiff as not responsible for the two more serious charges (Code Offenses 2a and 3b), pertaining to physical harm and penetrative sexual conduct, which would have likely borne more serious consequences, including the possibility of a suspension or expulsion, if he were held responsible. SUF at ¶ 54.

16

The First Circuit's recent ruling in *Haidak* can be properly applied here to expose the legal and factual fallacies of Plaintiff's deliberate indifference contentions regarding the Title IX 1 case. The First Circuit affirmed the entry of summary judgment in the defendant university's favor concerning the plaintiff's Title IX claim.  While the First Circuit addressed a Title IX selective enforcement, not a deliberate indifference, claim, its analysis similarly addressed a male plaintiff's assertion that he, not the female complainant, was the actual victim in their sexual encounter and that the university did not respond appropriately to his allegations against the complainant.

Specifically, in *Haidak*, the plaintiff asserted "that both the decision to initiate charges [against him] and the penalty imposed were affected by his sex."  *Id*. at 74.  As the First Circuit wrote, the plaintiff's "claim that the decision to initiate charges was affected by his sex rests on the fact that the university filed charges against him when [complainant] accused him of misconduct, yet filed no charges against her when he accused her of misconduct."  *Id*.  The First Circuit found that the two students "were not similarly situated as complainants.  [Complainant] and mother affirmatively contacted the university to report her charges and to seek relief.  A reasonable administrator would have construed that contact as a request to pursue the matter to provide relief.  Haidak's accusations came second in time and arose only defensively."  *Id*.  Even if the university could have initiated a charge against [the female complainant] on its own initiative, the university was not obligated to do so to avoid Title IX liability:

> More importantly, showing that the university had an "unwritten race-to-the-dean's office policy," as Haidak alleges, is not enough to support an inference of discrimination on the basis of sex.  To make out a claim under Title IX, Haidak must show that "gender bias was a motivating factor" in the disciplinary process. *Trs. of Bos. Coll.*, 892 F.3d 67, 90 (1st Cir. 2018) (quoting *Yusuf*, 35 F.3d at 715).  At most, Haidak has alleged that the university pursued [complainant's] case instead of his because [complainant] made the allegation first – *not* because Haidak's sex influenced the university.

*Id*. at 74 (emphasis in original).

If such a comparable factual scenario in *Haidak* could not impose Title IX liability under a disparate treatment, selective enforcement theory, it begs the question of how it can possibly prove Plaintiff's arguably much higher burden here to prove deliberate indifference.  Simply put, nothing under the deliberate indifference analysis entitles Plaintiff to what he actually wants – the judicial vacating of the result of the Title IX 1 case (which he could not achieve through his previously dismissed, time-barred disparate treatment claims alleging an erroneous outcome and selective enforcement).

In fact, during the district court proceedings in *Haidak*, the plaintiff raised a deliberate indifference theory (which he did not include in his appeal), in addition to his erroneous outcome and selective enforcement claims.  299 F. Supp. 3d at 270.  Judge Posner held that the plaintiff's deliberate indifference claim failed as a matter of law:

> Here, Plaintiff's only evidence of any severe or pervasive discriminatory environment is that the Defendants were deliberately indifferent to alleged violence perpetrated against him by [complainant].  As an initial matter, it is hard to fault the University for not pursuing charges against [complainant] when Plaintiff himself declined to do so.  More importantly, even if Plaintiff's characterization of [complainant's] behavior were believed, the fact that the University took no action in response to this one incident would hardly demonstrate the existence of a pervasive discriminatory environment.  The pattern of conduct here, even accepting Plaintiff's version of it entirely, in no way approximated the sort of lengthy brutality described in the Supreme Court's LaShonda D. [Davis] decision.  Even with the court accepting Plaintiff's claim that he declined to pursue a charge against [complainant] because Defendants indirectly discouraged him from doing so, this evidentiary insufficiency is fatal to any claim of a pervasive environment of harassment.

*Id*.

Based upon *Davis* and its progeny and the precedent's application to the undisputed facts, Plaintiff's deliberate indifference challenge to the Title IX 1 case fails as a matter of law.  The undisputed facts show that there was no deliberate indifference before May 4, 2014.

18

2.      **After May 4, 2014. Jane Doe did not Commit Any Gender Based, Actionable Sexual Harassment Against Plaintiff, so There is No Basis for Title IX Deliberate Indifference Liability Against Brown**

As stated in the Court's Rule 12(b)(6) ruling, "John alleges that, following the [Student Conduct Board] hearing [in the Title IX 1 case], Brown imposed a no-contact order requiring John to remove himself from situations in which John was present when she showed up for his sporting events, she complained to Brown that John violated the order, and Brown responded to these complaints.  John also alleges that Brown knew Jane violated a confidentiality order calling John a rapist and sexual predator on campus, and that Brown took no action against Jane.  If John can prove these allegations, a jury could possibly conclude that Brown's response to Jane's harassment of John was unreasonable."  327 F. Supp. 3d at 411.

Nothing in the record comes anywhere close to proving these allegations.  Plaintiff testified only that Jane Doe showed up at parties where she should have known that he may be in attendance.  SUF at ¶¶ 64-66.  As Plaintiff admitted in his deposition testimony, Plaintiff never once complained to Brown about any no contact order violation by Jane Doe.  *Id*.   In fact, over a long period of time spanning approximately twenty-two months from early November 2014 through September 2016, there were only three days in which both students were on the Brown campus at the same time (Brown's 2016 spring weekend between April 15-17, 2016, when their paths did not cross).  *Id*. at ¶¶ 102, 113

When Jane Doe returned to Brown for spring weekend in April 2016, Brown informed Plaintiff that it was updating his continuing no contact order from the Title IX 1 case to be consistent with its practices implemented in its new Title IX protocols, which took effect earlier in the 2015-16 academic year.  *Id*. at ¶¶ 111-120.  Brown was simply instructing and reminding Plaintiff to avoid contact with Jane Doe, to which he reacted angrily with threats of a lawsuit and proclamations that "the nation would agree with [him]."  *Id*. at ¶¶ 116, 118.  Regardless of his

19

displeasure with Brown's mere updating of the no contact order, the record shows that he and Jane Doe stayed away from each other, which was beneficial for both students.  Most importantly, as the record shows, the updating of the April 2016 updating of the no contact order, in no way whatsoever, ever impaired Plaintiff's ability to enjoy campus life to the <u>fullest</u> extent, as he did through his varsity sport participation and many recreational and social activities.  *Id*. at ¶¶ 107-08, 121-23.

Putting the timelines together, the undisputed facts evidence that (1) Plaintiff has not shown any actionable sexual harassment by Jane Doe after the completion of the Title IX 1 case on March 12, 2014 and before his late October 2014 leave of absence: (2)  Plaintiff was away from the Brown campus from November 2014 through September 2015, and Jane Doe was away from campus from September 2015 through September 2016 (with the exception of April 15-17, 2016); and (3) there were no interactions between the two students during Jane Doe's final year at Brown from September 2016 through May 2017.

Even if all of what Plaintiff has pled in his Second Amended Complaint could somehow be proven through admissible evidence (which is hardly the situation in the record), it would still not be enough to impose Title IX liability against Brown.  Plaintiff's "argument rests on a logical fallacy.  He assumes that because the initial allegations against him concerned a sexual act that everything that follows from it is 'sex based' within the meaning of Title IX.  He is wrong.  Taken to its logical extreme, [Plaintiff's] position would lead to the conclusion that those who commit, or are accused of committing sexual assault are a protected class under Title IX.  The statute does not permit that result."  *Nungesser I*, 169 F. Supp. 3d at 364.

4815-9664-2483.1

Applying *Nungesser's* analysis to this case, the following quoted passage is particularly

pertinent:

> Title IX prohibits discrimination "on the basis of sex." The word sex has two distinct meanings: "(1) The sum of the peculiarities of structure and function that distinguish a male from a female organism. (2) Sexual intercourse." Black's Law Dictionary 1583 (Bryan Garner, et. al., eds. 10th ed. 2014). Anti-discrimination laws, such as Title VI, Title VII, and Title IX, are concerned with the first definition – the gender status conferred by a particular set of characteristics. Implicit in [Plaintiff's] claim is the belief that sex-based discrimination, for purposes of Title IX, means "based on the act of sex" rather than "gender." As both the case law and logic show, this cannot be correct.
>
> "On the basis of sex," as used in Title IX refers to one's status, not to whether the underlying conduct was sexual in nature. "[T]he natural meaning of the phrase 'one the basis of sex' is on the basis of the plaintiff's sex . . . Even within Title VII of the Civil Rights Act of 1964 itself, Congress used the phrase 'one the basis of sex' as shorthand for discrimination 'on the basis of the individual's sex.' " *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 185, 125 S. Ct. 1497, 161 L. Ed 2d 361 (2005) (Thomas, J. dissenting). Thus, "[t]he mere fact that sexual harassment proceedings have as their subject sexual behavior and speech does not implicate itself sex discrimination . . . ." *Haley v. Virginia Commonwealth Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996).
>
> Harassment, "even harassment between men and women" is not automatically considered to be gender-based discrimination "merely because the words used have sexual content or connotations." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998). In order to be considered gender-based harassment, the harassing conduct must "support an inference of discrimination based on sex." *Id.*; *see also Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000) (holding plaintiff was not subjected to a hostile environment for purposes of Title VII because "[w]hile he may have been subject to intimidation, ridicule, and mistreatment, he has not shown that he was treated in a discriminatory manner because of his gender."). In evaluating whether actions against a particular plaintiff were discriminatory, "courts have consistently emphasized that the ultimate issue is the reasons for the *individual plaintiff's* treatment." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (affirming grant of summary judgment to defendants in Title VII case, where female plaintiff was subjected to "highly cruel and vulgar" harassment, but harassment did not reflect an attack on plaintiff as a woman."). "In other words, was Plaintiff being harassed because of [his or her] gender or for some other reason?" *Patenaude v. Salmon River Central Sch. Dist.*, 3:03-cv-1016, 2005 WL 6152380, at *5 (N.D.N.Y. 2005).
>
> That the accusations against [Plaintiff] involved an act of sex does not mean they were motivated by his gender . . . .

*Nungesser I*, 169 F. Supp. 3d at 364-65 (emphasis in original).  *Nungesser's* cogent legal

reasoning, as well as several other Title IX deliberate indifference rulings applying the

same analysis, is fatal to Plaintiff's post-May 4, 2014 deliberate indifference claims and

show that Brown has no Title IX liability to him, even if he were able to somehow prove

what he has pled.

      In *Nungesser I*, a female student accused the male plaintiff of sexual assault.  After

the university found the plaintiff "not responsible" for "non-consensual sexual

intercourse," the female student allegedly told other students to file complaints against him,

notified a student group that he was a rapist, accused him of rape in media publications

ultimately causing his name to be published, and undertook the "Mattress Project" to draw

attention to what she portrayed as a sexual assault.  169 F. Supp. 3d at 359-61.  The plaintiff

sued the university asserting a Title IX claim, which the court dismissed because he failed

to show any discrimination he suffered "on the basis" of his gender.  *Id*. at 364.  The court

explained that just because the underlying conduct was "sexual in nature" did not mean

that the plaintiff's treatment implicated gender discrimination as required by Title IX.  *Id*.

at 365.  The court found that calling someone a rapist, while a hurtful allegation, was not

"inherently gendered."  *Id*.  Further, the court reasoned that the plaintiff had alleged that

the female student's comments about him were motivated by her anger at his rejection of

her, which demonstrated that any harassment he suffered was the result of their personal

relationship not because of his status as a male.  *Id*. at 365-66.  The female student's

activism and public statements were all in response to a specific act and were directed at a

specific individual, and thus there was no actionable claim for Title IX sexual harassment.

*Id*. at 366-67.

22

As *Nungesser I* held:

[T]he Mattress Project . . . and [the female complainant's] public statements that she wanted her rapist off campus are not the type of conduct that creates an actionable Title IX claim  . . . To hold otherwise would, in essence, create a new right of action under which all students accused of sexual assault could bring a Title IX claim against their educational institutions – so long as they could plausibly plead that the accusations were known to the institution and that the institution failed to silence their accusers simply because the misconduct they were accused of has a sexual element.  Neither the text nor the purpose of Title IX supports this conclusion, and the Court declines to read it into the statute.

*Id*. at 366-67.

After its ruling in *Nungesser I*, the court granted the plaintiff with leave to amend, which resulted in a subsequent dismissal in *Nungesser II* because there was still no showing of any actionable sexual harassment because of his gender to support his Title IX deliberate indifference claim against the university.  The court reiterated that to hold that a plaintiff has a Title IX claim "simply because the term 'rapist' involves a sexual act would give every accused campus rapist the opportunity to sue under Title IX merely because the alleged criminal act complained of involved sex, as opposed to any other form of violence."  244 F. Supp. 3d at 366.  The Court declined to accept a categorical proposition that the use of the term "rapist" by an alleged student victim to describe the accused student necessarily establishes the predicate of a Title IX claim because the term may also have a "gendered secondary meaning."  *Id*. at 367.  Again, the court dismissed the plaintiff's allegations due to his failure to show "that he was harassed because of his male gender, nor that he was subjected to sexually harassing conduct that gives rise to a claim of student-on-student . . . . harassment."  Just as the plaintiff in *Nungesser I & II* failed to show, Plaintiff cannot not prove here that he was subjected to any actionable sexual harassment by Jane Doe "on the basis of sex" as required by Title IX.

4815-9664-2483.1

Similarly, in *Doe v. University of Chicago*, No. 16 C 08298, 2017 WL 4163960, at *7 (N.D. Ill. Sept. 20, 2017), the court rejected the plaintiff's Title IX deliberate indifference claim because he failed to show that his harassment, which included his alleged victims' public accusations of rape and his placement on a list of rapists in the university community, was "plausibly sex-based." The court explained that "a false accusation of sexual assault is not, without more, harassment based on sex, notwithstanding the sexual content of the accusation." *Id*. (citations omitted). In this context, the court reasoned that the plaintiff's allegations about the victims' public comments were not aimed at him because of his gender, instead they harassed him "because they believed he had committed sexual assault or because of personal – not gender – animus." *Id*. at *8. Thus, the court concluded that because the plaintiff had "not alleged facts plausibly suggesting that [his alleged victims'] harassment was based on sex, he [had] failed to state a viable deliberate indifference claim." *Id*.

Further, the Seventh Circuit recently applied the same reasoning to find no Title IX deliberate indifference liability in *Doe v. Columbia Coll. Chicago*, 933 F.3d 849 (7th Cir. 2019). The plaintiff, who was found responsible in a sexual misconduct disciplinary process, contended that he was subsequently subjected to a hostile environment because of his gender. *Id*. at 856. The plaintiff asserted that he was punched by someone who believed that he raped the complainant and was the target of abuse on social media labeling him as a "rapist" and "predator." *Id*. at 856-57. Affirming a judgment in the college's favor, the Seventh Circuit held "[w]e cannot infer from the allegations that the conduct was based on Doe's gender or that [the College] was deliberately indifferent in light of these circumstances." *Id*. Finding that no actionable sexual harassment occurred, the Seventh Circuit held that the alleged acts "were directed at Doe not because of his gender, but because the individuals believed that he had raped someone. Doe alleges no facts that

24

would cause us to plausibly infer that he was harassed because he is a man, rather than because his harassers believe that he raped their friend." *Id*. at 857.[10]

Here, Plaintiff alleges generally, but has not proven specifically with admissible evidence, that Jane Doe engaged in vindictive behavior against and targeting him because of her dissatisfaction with the result in the Title IX 1 case. Unlike Plaintiff who had "no problem" with the result of the Title IX 1 case (SUF at ¶ 57), Jane Doe disagreed with the deferred suspension sanction, believing that Brown should have suspended or expelled Plaintiff (*id*. at ¶ 61). Jane Doe's dissatisfaction was likely further heightened when Brown denied her appeal on March 12, 2014. *Id*. at ¶ 62. After the Title IX 1 case closed, Jane Doe's purported conduct aimed at Plaintiff (whether, when, and to what extent that it may have actually occurred – all of which are unproven) was motivated by Plaintiff's status as the respondent whom she had accused of sexual assault and whom she believed Brown treated too leniently in the Title IX 1 case. Even if Jane Doe's alleged statements and actions were *ad hominem* attacks on Plaintiff, personal animus is not the same thing as gender animus, and only the latter can form the basis of a Title IX violation by a school in a student-on-student matter.

---

[10]    *See Bowman v. Shawnee St. Univ.*, 220 F.3d 456, 464 (6th Cir. 2000) ("[w]hile [plaintiff] may have been subject to intimidation, ridicule, and mistreatment, he has not shown that he was treated in a discriminatory manner because of his gender."); *Doe v. Washington Univ.*, Case No. 4:19 CV 300 (JMB), 2020 WL 353587, at *11 (E.D. Mo. Jan. 21, 2020) (adopting with approval the analysis in *Nungesser I & II* and *University of Chicago*); *Doe v. Univ. of Mass-Amherst*, No. CV 14-30143-MGM, 2015 WL 4306531, at *8 (D. Mass. July 14, 2015) (dismissing a Title IX claim where the plaintiff cited only comments that targeted him as a student accused of sexual assault, not any comments "based on his gender" or "suggestive of any gender bias"); *Salau v. Denton*, 139 F. Supp. 3d 989, 1000 (W.D. Mo. 2015) (plaintiff failed to show that he was sexually harassed based on his gender, as opposed to experiencing harassment because he was believed to have sexually assaulted another student).

The analysis of the above-described cases is directly on point.  Regarding the time period after May 4, 2014, Plaintiff has no Title IX claim against Brown because he was not subjected to any actionable sexual harassment "because of his gender."

### 3.      Plaintiff's Deliberate Indifference Claim Also Fails for Lack of Causation

As a further fatality to Plaintiff's deliberate indifference claim, even if Plaintiff could prove that Jane Doe engaged in actionable sexual harassment because of his gender (which he has not proven) and Brown responded unreasonably to it, there is a still causation requirement that must also be proven in the deliberate indifference analysis.  He must show that severe and actionable sexual harassment "deprive[d] [him] of access to educational opportunities or benefits provided by the school."  *Davis*, 526 U.S. at 650.  "The most obvious example" of actionable peer harassment would "involve the overt, physical deprivation of access to school resources."  *Id*.  "It is not necessary, however, to show physical exclusion to demonstrate have been deprived by the actions of another student or students on the basis of sex."  *Id*. at 651.  In situations in which there is no physical exclusion, courts consider whether the harassment "had a concrete, negative effect" on the plaintiff's "ability to receive an education."  *Id*. at 654.

As Brown shows in its SUF, Plaintiff finished his academic requirements for the 2013-14 year and completed his season with his varsity team.  During the 2014-15 year, Plaintiff engaged in behavior on October 24, 2014 for which he should accept his own personal responsibility rather than blaming Brown.  Specifically, after he smoked a large amount of marijuana (2-3 joints within approximately 90 minutes) while socializing with friends during the early morning hours of October 24, 2014, he later told his Rhode Island Hospital health care providers that he had never been so high.  SUF at ¶¶ 94-95.  After the serious incident in which he smashed a vehicle's windshield in a hallucinogenic state and was speaking incoherently when Brown EMS personnel

26

arrived on the scene, Plaintiff, Plaintiff's providers, and Brown collectively and appropriately concluded that it was in Plaintiff's best interests to take a leave for the rest of the 2014-15 academic year.[11] *Id.* at ¶¶ 96-101, <u>EX CC</u> (Brown Incident Report).

Once he returned from leave in September 2015 and over his final three academic years Brown, Plaintiff declared and studied an academic concentration that he enjoyed very much (Theater and Performing Arts) to further his post-graduation aspirations of becoming a motion picture actor.  While pursuing in academic concentration, he participated actively in motion picture, theatrical, and fashion productions – both on and off campus.  He had many friends, including his fraternity brothers, and enjoyed a healthy social life.  Most of all, with considerable guidance, counseling and assistance from Brown, he was able to meet his academic requirements to graduate from the University.  The record shows overwhelmingly that Plaintiff was not denied access to any educational opportunities due to any alleged deliberate indifference by Brown (which there was none).

### C.   Plaintiff's Selective Enforcement Challenge to the Title IX 2 Case Fails as a Matter of Law

Under the Court's Rule 12(b)(6) ruling addressing Count IV of the Second Amended Complaint, Plaintiff's only surviving disparate treatment claim is his selective enforcement challenge to the Title IX 2 case.  Plaintiff's selective enforcement challenge of the Title IX 1 case was dismissed by the Court as time-barred.  327 F. Supp. 3d at 410.

To challenge the Title IX 2 case as disparate treatment, Plaintiff must show that "the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's

---

[11]     While Plaintiff pled extensive allegations in his Second Amended Complaint about the October 24, 2014 incident and his leave of absence, there is no a single mention in his pleading to his excessive marijuana intake during the approximately ninety (90) minutes before the incident.

gender." *Haidak*, 933 F.3d at 74 (citing *Yusuf*, 35 F.3d at 715). "To prevail on a 'selective enforcement' claim, the plaintiff must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his [] gender." *Doe v. Cummins*, 662 F. Appx 437, 452 (6th Cir. 2016); *see also Mallory v. Ohio Univ.*, 76 F. App'x 634, 641 (6th Cir. 2003) ("To support a claim of selective enforcement, [a male plaintiff] must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorable by the [u]niversity."); *Yu v. Vassar Coll.*, 97 F. Supp. at 480 ("The male plaintiff must show that the University's actions against the male plaintiff were motivated by his gender and that a similarly situated woman would not have been subjected to the same disciplinary proceedings.").

On April 18, 2014, "Sally Roe," the second complainant, submitted a sexual misconduct complaint to Brown on April 24, 2014.[12] SUF at ¶¶ 73-74. In the Title IX 2 case, Plaintiff did not claim that Sally Roe sexually assaulted him or should have been disciplined by the University, rather he claimed that their encounter was consensual.

Upon Sally Roe's filing of her complaint, Plaintiff became a respondent in a University sexual misconduct case *for a second time*, after he had recently been found partially responsible for misconduct in the Title IX 1 case and while he was subject to a one-year deferred suspension. Plaintiff has failed to identify any female student at Brown *who was similarly situated and treated*

---

[12]    In its Rule 12(b)(6) ruling, the Court appears to have assumed that the Title IX 2 case was filed by Jane Doe (the complainant in the Title IX 1 case), not Sally Roe. 327 F. Supp. 3d at 412-13 & n.11 (stating that, in the Title IX 2 case, "Jane made a complaint against [Plaintiff], even though the conduct did not involve her" and "Jane complained of someone else's [sexual assault]"). The undisputed facts show that Sally Roe filed the Title IX 2 complaint herself, not through Jane Doe. In her deposition, Sally Roe testified that it was her own choice, without anyone influencing her, to file her complaint against Plaintiff. SUF at ¶ 76. She also testified that no Brown dean pressured her to file a complaint against Plaintiff. *Id*. at ¶ 77.

*differently by Brown*.  With new and distinct sexual misconduct allegations filed against Plaintiff by a second student, Brown was within its administrative discretion under the Code to implement an interim measure of Plaintiff's separation from its campus pending its investigation, which separation did not actually take effect until after Plaintiff's completion of the spring 2014 semester.  SUF at ¶ 84.  Plaintiff was separated from Brown's campus during for a portion of the summer of 2014, while he was home in California.  *Id*. at ¶ 85.  On August 7, 2014 (one month before the start of the 2014-15 academic year), Brown closed the Title IX 2 case in Plaintiff's favor, imposing no charges and enabling him to return to campus for the 2014-15 academic year. *Id*. at 88.

To the extent that Plaintiff seeks to cite to Jane Doe as the comparator for his selective enforcement claim based upon his contention that she sexually assaulted him and was not disciplined in the Title IX 1 case, his claim fails under the First Circuit's rejection of a substantially similar selective enforcement comparison asserted in *Haidak*, analyzed *supra*.  During the Title IX 1 case, Plaintiff did not file a complaint with Brown against Jane Doe and she is therefore not a comparator under *Haidak's* selective enforcement analysis, even if Brown could have independently filed charges against her in the Title IX 1 case without a formal complaint by John Doe.  933 F.3d at 73-75.

### D. Brown did not Engage in any Intentional Racial Discrimination Against Plaintiff

Regarding Plaintiff's racial discrimination claim under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et. seq.*, the Court held that Plaintiff may seek to use a continuing violation theory to prove that he was subjected to a racial discrimination by Brown both before and after May 4, 2014.  327 F. Supp. at 410.  Plaintiff's claim under 42 U.S.C. § 1981 is subject to a four-year limitations period.

Plaintiff has presented no admissible evidence to prove the sensationalism, hyperbole and bluster of his Second Amended Complaint's racial discrimination allegations.  The undisputed facts, not what Plaintiff alleges, prove that there is not any direct or circumstantial evidence of any intentional racial animus by Brown against Plaintiff, a necessary element of his burden of proof under both Title VI and § 1981 claims.  *Goodman v. Bowdoin Coll.*, 380 F. 3d 33 (1st Cir. 2004). To survive summary judgment, Plaintiff must show through admissible evidence that Brown intentionally discriminated against him on the basis of his race.  *Id.*; s*ee also Doe v. Amherst Coll.*, 238 F. Supp. 3d at 224.

Starting with the Title IX 1 case (pre-dating May 4, 2014), Plaintiff alleges in his pleading that the Student Conduct Board "favored" Jane Doe by permitting her to "allege and argue conclusory statements that were based on stereotypes that were racist and/misandristic.  For example, Jane argued that John was a predator and a danger to the Brown community."  SAC at ¶ 56.  Through the undisputed facts and admissible evidence, Brown has detailed the fairness of the Title IX 1 case from its inception on December 4, 2013 with Jane Doe's filing of a complaint through its completion on March 12, 2014 with Brown's denial of her appeal.  SUF at ¶¶ 37-62. Most important, Plaintiff testified under oath that he had "no problem" with the result of the Title IX 1 case, which is he why did not file an appeal as was his right under the Code.  *Id*. at ¶¶ 57-58.

During the Title IX 1 case, if Brown was "out to get" Plaintiff due to a racially discriminatory animus as Plaintiff now alleges, then it begs the following question:  If such animus existed, why didn't its Student Life Office (in processing and investigating the September 30, 2013 incident), Student Conduct Board (in adjudicating the incident), and Vice President of Campus Life & Student Services (as the appeals officer reviewing Jane Doe's contentions that Brown was too lenient) hold Plaintiff responsible for the more serious charges and/or suspend or expel him?

30

Further, as shown in Brown's SUF, throughout his enrollment at Brown, Plaintiff was hardly shy about speaking out and voicing his strongly held opinions, as evidenced by his emails to the highest levels of the University's administration with his bold proclamations and assertions such as the "nation would agree would me."  If the Title IX 1 case was racially biased as he now contends, Plaintiff surely would have spoken out or filed an appeal as was his right under the Code, but he did not do so because he had "no problem" with the result.  SUF at ¶ 57.  There was no racial discrimination by Brown in the Title IX 1 case.

In the Title IX 2 case, Plaintiff's claim of racial discrimination centers on his unsupported allegation that, in early May 2014, Dean Maria Suarez told the Brown varsity lacrosse coach words to the effect of "We've got your boy now," and the coach reported the conversation to Plaintiff's mother, and she then informed Plaintiff.  Even if Plaintiff could somehow parse apart and try to prove each level of this alleged triple hearsay, he has not come anywhere close to doing so in the record.  Plaintiff acknowledged that he never heard Dean Suarez use the alleged words. SUF at ¶ 68.  Dean Suarez strongly denied that she said what is alleged, noting that she would never use the word "boy" in a racist manner because it would be personally offensive to her.  *Id*. at ¶ 69.  Plaintiff's mother and Brown's varsity lacrosse coach communicated frequently during May 2014 regarding Plaintiff's well-being, both by email and telephone.  *Id*. at 70-72.  Yet, nothing in their May 2014 email communications, nor the sworn deposition testimony of Plaintiff's mother regarding the phone conversations, even suggests, never mind confirms, that there was ever any mention of the alleged statement by Dean Suarez.  *Id*.  If Dean Suarez used the word "boy" in the racist manner alleged in the Second Amended Complaint, then the coach and Plaintiff's mother would have discussed her statements during their several May 2014 communications, which they did not.

Additionally, Brown did not engage in racial discrimination relating to Plaintiff's decision to take a leave of absence from the University in late October 2014.  As Plaintiff admitted in his sworn deposition testimony, he made his voluntary choice to take a leave of absence for the remainder of the 2014-15 academic year, based upon advice from his medical providers and Brown deans, that he would likely not be able to succeed academically.  SUF at ¶¶ 96-101.  Plaintiff made a reasonable personal choice that proved to be the right one, but he should not now get to be able to distort what actually happened and what the undisputed facts show to create a fiction that racial discrimination by Brown caused his actions on October 24, 2014 and compelled him to take the leave of absence against his will or best interests.

Lastly, nothing during Plaintiff's final three academic years at Brown (2015-16 through 2017-18), suggests in any way that he was ever subjected to any racial discrimination by Brown. Brown has detailed the many opportunities that were afforded to Plaintiff within its campus community, as he pursued his academic concentration in Theater and Performing Acts and aspired to become an actor in Los Angeles after his graduation.  Plaintiff excelled on the athletic field, earning All-Ivy honors.  Brown, which he now publicly portrays in this litigation as an institution practicing structural racism, helped him considerably to meet his academic requirements and ensure his graduation in May 2018.  SUF at ¶¶ 121-154.

For the nearly two years after his May 2018 graduation, Plaintiff has publicly touted and promoted his Brown diploma and experiences to pursue opportunities in the entertainment industry and professional athletics, while simultaneously alleging behind the shield of a pseudonym that his alma mater has engaged in prolonged structural racial discrimination (both historically and throughout his five-years of enrollment).  Plaintiff's own actions bely his claims against his alma mater, as he has flown across the country each October to return to the Brown campus and interact

32

as a proud Brunonian with Brown employees, alumni, students, and guests during Parents' Weekend festivities?  *Id*. at ¶ 159.

Simply put, Plaintiff's racial discrimination assertions against Brown and the manner in which he has raised them are ugly and unfair.  Most of all, they are untrue as shown by the undisputed facts and unproven with any admissible evidence to survive summary judgment.

### E.   Brown did not Commit a Contractual Breach in its Initiation of the Title IX 2 Case

In a prior *Doe v. Brown* University case, 210 F. Supp. 3d 310 (D.R.I. 2016), the Court articulated the legal analysis applicable to a claim alleging a breach of an educational contract:

> To prevail in a breach of contract claim, "a plaintiff must prove that (1) an agreement existed between the parties, (2) the defendant breached the agreement, and (3) the breach caused (4) damages to the plaintiff." *Barkan v. Dunkin' Donuts, Inc.*, 627 F.3d 34, 39 (1st Cir. 2009) (citing *Petrarca v. Fid. & Cas. Ins. Co.*, 884 A.2d 406, 410 (R.I. 2005)).  "To establish causation, the plaintiff must prove that the defendant's breach was the 'but for' cause of the alleged damages."  *Id*. (citing *Wells v. Uvex Winter Optical, Inc.*, 635 A.2d 1188, 1191 (R.I. 1994)).  "The relevant terms of the contractual relationship between a student and a university typically include language found in the university's handbook."  *Havlik*, 509 F.3d at 34 (citation omitted).  Rhode Island courts interpret the terms of a student's handbook "in accordance with the parties' reasonable expectations, giving those terms the meaning that the university should reasonably expect the student to take from them."  *Id*. (citing *Mangla v. Brown Univ.*, 135 F.3d 80, 84 (1st Cir. 1998).  Any "[a]mbiguities in a contract must be construed against the drafter of the document," *Haviland v. Simmons*, 45 A.3d 1246, 1259-60 (R.I. 2012), which in the case of a student handbook is the university.
>
> However, "[b]ecause contracts for private education have unique qualities, we must construe them in a manner that leaves the school administration broad discretion to meet its educational and doctrinal responsibilities." *Gorman v. St. Raphael Acad.*, 853 A.2d 28, 34 (R.I. 2004); *see also Schaer v. Brandeis Univ.*, 432 Mass. 474, 735 N.E. 3d 373, 381 (2000) ("[C]ourts are chary about interfering with academic and disciplinary decisions made by private colleges and universities. . . . 'A college must have broad discretion in determining appropriate sanctions for violations of its policies.'" (quoting *Coveney v. President & Trustees of the College of the Holy Cross*, 388 Mass. 16, 445 N.E.2d 136, 139 (1983)).  Therefore, the rules set out in a university's handbook are "enforceable as long as [they

are] not against public policy or law." *Gorham*, 853 A.2d at 39.  A rule "violates public policy only if it is: '[1] injurious to the interests of the public, [2] interferes with the public welfare or safety, [3] is unconscionable; or [4] tends to injustice or oppression.'" *Id*. (quoting *City of Warwick v. Boeng Corp.*, 472 A.2d 1214, 1218 (R.I. 1984)).  Courts may also "provid[e] a judicial remedy to members of private voluntary organizations aggrieved by the arbitrary and capricious application of otherwise reasonable rules by the officers of those organizations." *King v. Grand Chapter of Rhode Island Order of E. Star*, 919 A.2d 991, 998 (R.I. 2007).

*Id*. at 330-31.

Based upon the Court's ruling on Brown's Rule 12(b)(6) motion, the only remaining contract claim relates to "breach of procedural rights in connection with the May 2014 separation order [as part of the Title IX 2 case]." 327 F. Supp. 3d at 415-17, 418.  Consequently, the Title IX 1 case is not at issue, nor are any events that occurred between the 2014-15 and 2017-18 academic year (when Plaintiff graduated from Brown).

Focusing on the May 7, 2014 separation order, it is undisputed that Plaintiff was allowed to complete Brown's spring 2014 semester.  SUF at ¶¶ 73-88.  His "separation" from the University did not take effect until he returned home for the summer of 2014 and was vacated in August 2014 before he returned for the 2014-15 academic year, without delaying his academic progress.  *Id*. While Plaintiff may protest and disagree with the reasonableness of Brown's actions upon its receipt of a second sexual misconduct complaint against him, the separation order did not prevent his completion of the spring 2014 semester and only prevented him from being on campus while he was across the country at home in California for the summer.

### F.     Plaintiff's Claim of a Breach of the Implied Covenant of Good Faith and Fair Dealing Fails with his Contract Claim

Under Rhode Island law, there is an implied covenant of good faith and fair dealing by and between the parties to a contract.  *T.G. Plastics Trading Co., Inc. v. Toray Plastics (America), Inc.*, 958 F. Supp. 2d 315, 326 (D.R.I. 2013).  Breach of the covenant of good faith and fair dealing is

a claim sounding in contract not tort, *Pride Hyundai, Inc. v. Chrysler Financial Company, LLC*, 263 F. Supp. 2d 374, 394 n.39 (D.R.I. 2003), and the implied covenant may not be used to rewrite the contract – the implied covenant only requires the parties to perform the obligations actually expressed in the contract. *T.G. Plastics Trading Co., Inc.*, 958 F. Supp. 2d at 327.

Good faith and fair dealing "cannot be separated from context," and, in evaluating those covenants in the context of private educational contracts, the First Circuit has directed that "courts must afford a school some measure of deference in matters of discipline." *Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 35 (1st Cir. 2007) (citing *Gorman v. St. Raphael Acad.*, 853 A.2d 28, 34 (R.I. 2004)). Not every breach of contract necessarily involves a breach of the covenant," but if there is no breach of contract, then there can be no breach of the covenant." *Honda Corp. v. Polymer Research Corp. of America*, 275 F. Supp. 2d 229, 237 (D.R.I. 2003). A court's determination that no breach of contract occurred extinguishes a claim for breach of the implied covenant of good faith and fair dealing. *Pride Hyundai, Inc.,* 263 F. Supp. 2d at 394 n.39. Because Plaintiff's breach of contract claim fails as a matter of law, so does his claim asserting a breach of the implied covenant of good faith and fair dealing.

### G. Plaintiff's Claim for Intentional Infliction of Emotional Distress Fails as a Matter of Law

As the Court held in its Rule 12(b)(6) ruling, under Rhode Island law, in order to prove intentional infliction of emotional distress, Plaintiff must show four elements:

> (1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe.

327 F. Supp. 3d at 414 (citing *Champlin v. Wash. Tr. Co. of Westerly*, 478 A.2d 985, 989 (R.I. 1984). Also, a plaintiff must prove physical sympomathology resulting from the alleged improper conduct. *Id*. (citing *Vallinoto v. DiSandro*, 688 A.2d 830, 838 (R.I. 1997)). The conduct must be

35

"so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citing *Hoffman v. Davenport-Metcalf*, 851 A.2d 1083, 1090 (R.I. 2004)).

Further, an intentional infliction of emotional distress claim is subject to a three-year limitations period. *Id.* (citing § 9-1-14(b)). Consequently, this claim cannot reach back before May 4, 2014 and address the Title IX 1 case. *Id.* The focus is solely on events on or after May 4, 2014.

As shown above, Plaintiff has not proven that Dean Suarez made the alleged statements in May 2004. Further, to the extent that Plaintiff seeks to use this claim to more broadly challenge the Title IX 2 case, courts have been especially unwilling to allow intentional infliction of emotional distress claims relating to a university disciplinary process. *See Doe v. Brandeis Univ.*, Civil Action No. 15-11557-FDS, 2016 WL 1274533, at *45 (D. Mass. Mar. 31, 2016) (holding that despite the apparent unfairness and unreasonableness of the university's actions, the facts in the complaint did not constitute the sort of "targeted, deliberate, and malicious conduct that is required for an IIED claim."); *Harris v. St. Joseph's Univ.*, Civil Action No. 13-3937, 2014 WL 1910242, at * 11-12 (E.D. Pa. May 13, 2014) (holding that the complaint "fail[ed] to satisfy the requisite outrageous conduct for such a claim" despite allegations that plaintiff was falsely portrayed as a "'cruel sex offender'"); *Fellheimer v. Middlebury Coll.*, 869 F. Supp. 2d 246-47 (D. Vt. 1994). ("A College's decision, when confronted with a female student's accusation of rape, to confront the male student with charges, hold a hearing, and support the findings of the initial tribunal on appeal, even where various procedural errors are alleged, cannot form the basis of a IIED claim.").

To the extent that Plaintiff seeks to focus on his leave of absence, Brown's actions can hardly be deemed to shock the conscious.  In late October 2014, the University was entirely within his administrative and academic discretion to recommend a leave of absence for Plaintiff, who was struggling academically and harmed himself in a serious incident after he smoked an excessive amount of marijuana with his friends.

Finally, looking at Plaintiff's final three academic years (2015-16, 2016-17, and 2017-18), the University was not "out to get him" as he wrongly contended at Brown and has asserted throughout this litigation.  The record shows overwhelmingly that Brown afforded Plaintiff with many opportunities and avenues to succeed academically, theatrically, athletically, and socially. At the same time that Plaintiff was filing this lawsuit in May 2017, Brown was helping him to make connections in the Los Angeles entertainment industry.   Most important for Plaintiff's prospects for long-term success, Brown's deans afforded him with interactive guidance and considerable academic accommodations to enable him to reach his ultimate undergraduate accomplishment – an Ivy League diploma.  It is unfortunate and regrettable that, in his unjustified quest for large amounts of money from his alma mater and lifetime financial security through this litigation, Plaintiff has lost sight of all that Brown did for him, apparently convincing himself that he "got nothing from them!"  SUF at ¶ 164.

## IV.    CONCLUSION

For the above-stated reasons and as supported by Brown's SUF, Brown requests that the Court grant the University's summary judgment motion and enter final judgment in its favor as to each of the remaining counts in Plaintiff's Second Amended Complaint:

- Count I (Title IX - Hostile Environment/Sexual Harassment),

- Count II (Title IX – Gender Discrimination),

37

- Count IV (Selective Enforcement, as to the Title IX 2 case only),

- Count V (Title VI – Racial Discrimination),

- Count VI (RICRA – Gender Discrimination),

- Count VII (RICRA – Racial Discrimination),

- Count IX (Intentional Infliction of Emotional Distress),

- Count X (Breach of Contract, as breach of procedural rights in connection with the May 2014 separation order),

- Count XI (Covenant of Good Faith and Fair Dealing), and

- Count XII (42 U.S.C. § 1981 – Racial Discrimination)

BROWN UNIVERSITY

By its Attorneys,

/s/ Steven M. Richard
Steven M. Richard (#4403)
Nixon Peabody LLP
One Citizens Plaza, Suite 500
Providence, RI  02903
Tel: (401) 454-1020
Fax: (401) 454-1030
srichard@nixonpeabody.com

Dated:  January 31, 2020

Michael Grabo (#6871)
Brown University
Office of the General Counsel
Box 1913
Providence, RI 02912
Tel: 401-863-3122
Fax: 401-863-1120
Email: mgrabo@brown.edu

38

<u>CERTIFICATE OF SERVICE</u>

I certify that, on the 31st day of January, 2020, I filed and served this memorandum via the Court's CM/ECF system.

/s/ Steven M. Richard

4815-9664-2483.1