**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

**JOHN DOE**

**v.**                                        **C.A. 17-cv-191-JJM-LDA**

**BROWN UNIVERSITY**

**PLAINTIFF'S MEMORANDUM SUBMITTED IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT.**

**PRELIMINARY STATEMENT**

In the fall of 2013, Plaintiff, John Doe (John) arrived as a freshman at Brown University ("Defendant" or "Brown") with a multi-syllabic Afro-centric name, and an Afro-centric identity. (Plaintiff's Statement of Facts—"PSOF"—¶ 1). The oldest son of a white mother and an African father whose grandfather was a chief in the Ngomby tribe, John was under pressure to bring honor to his African heritage of dignified purpose and to be a professional with financial security and financial responsibility to his family, particularly with respect to his younger brother who is disabled. (PSOF ¶ 2). An All-American in high school having won awards not only for his athleticism, but his character and sportsmanship, John came to Defendant to play lacrosse and major in finance. He was a happy, outgoing team player with no prior social or emotional issues. (PSOF ¶¶ 3, 4).

At its core, this case deals with the experiences of three students: Jane who is white, and female; Sally, also white and female; and John. (PSOF ¶ 5) All three alleged sexual misconduct to Defendant. Of the three, Defendant provided Jane and Sally with support even before they filed a complaint and the opportunity to have Defendant fully investigate and prove their claims. (PSOF ¶ 6). In comparison, the sexual misconduct John experienced as a result of Jane's actions

1

was repeatedly ignored by his advisor, Carolan Norris (Norris), during the sexual misconduct investigation and hearing and disregarded by Yolanda Castillo-Appollonio (YCA), who worked in Defendant's Office of Student Life (OSL)[1] and was the hands-on administrator of sexual misconduct complaints during the relevant time period between 2013-2016.  The core of the dispute in this action is that gender and/or racial bias and hostility towards John depleted his opportunities at Brown to experience the attention, care and experiences Sally and Jane, both white, female students experienced.  During the relevant time period 100% of all students against whom a complaint of sexual misconduct was made were male. (PSOF ¶ 8)  Moreover, John was the only African-American male student Norris advised. (PSOF ¶ 9).

As a result of Defendant's mistreatment, and as will be discussed below, by 2014, John was clinically depressed and suicidal.  His grades were suffering and his participation with his beloved lacrosse team was greatly diminished:  He was forced by Defendant to move out of the team's house (PSOF ¶ 10); he was "robbed" of playing in an NCAA tournament with the team; experienced a deterioration of teamwork with the other athletes (PSOF ¶ 11); he changed majors and career goals from finance to acting (PSOF ¶ 12); he suffered a loss of reputation (PSOF ¶ 13); and "enormous life-altering psychological harm"—both "major depressive disorder" and "persistent depressive disorder" as a result of his "adverse experiences with Brown" that have "devastated" John's life. (PSOF ¶ 13)  The physical symptoms of John's persistent depressive disorder "is marked by pervasively depressed mood, markedly diminished energy and

---

[1] During the relevant time period from 2013-2015, Title IX cases fell under the auspices of the OSL.  YCA worked under Dean Allen Ward, who in turn answered to Margaret Klawunn, who during the relevant time period was Vice President for Campus Life and Student Services (PSOF ¶ 7).

motivation, hypersomnia, hypophagia, diminished libido, anhedonia, hyperirritability, feelings of helplessness, and feelings of hopelessness." (PSOF ¶ 13)[2]

Plaintiff alleges that gender and racial bias are the cause of this downturn; however, racial bias is of particular concern.  The Office of Civil Rights does not keep statistics on the race of students accused of sexual misconduct (Defendant also did not keep and/or provide statistics on race); however, cautious observers of racial bias in sexual misconduct processes on campus have reported that "the number of accused who are men of color is just creepily high," and mirrors "the overenforcement of criminal and criminal-like sanctions against people of color continuous with what's going on in the legal system. . . . the bias that's in all of our heads is producing this." (PSOF ¶ 14).  Indeed, in her testimony, YCA recalled her communications with John's Father, who expressed his concerns "about [John's] identifying as a black male athlete, and how that may have impacted the hearings." (PSOF ¶ 15).  In the context of that conversation about race with John's Father, YCA admitted "there are unconscious biases, and that we all have them." (PSOF ¶ 16).  During the relevant time, Defendant provided John with no clear definition of consent, relying only on community standards, which allowed "biases" to run rampant against John, the rare, if not lone black male.[3] (PSOF ¶ 17).  This hard truth is particularly insidious

---

[2] Defendant's Memo of Law provides a detailed description of how John received some assistance with his career from his lacrosse coach and a Brown alumnus.  Further, Defendant noted that Plaintiff has not publicly renounced his affiliation with Brown and has even posted graduation photos. *See, e.g., Def. MOL, pp. 2-3*.  None of this is relevant to this action.  While John's coach and certain alumni may have treated Plaintiff well, that stands in stark contrast to the way he was treated by Defendant herein.  As for the social network photos, Defendant's wish that one's happiness can be determined by pictures posted on FB or in graduation photos is as shallow as the smiles shown.

[3] YCA could not recall the number of African-American males involved in OSL sexual misconduct cases, but expressed that there was more than one, otherwise she could not "isolate" them. (PSOF ¶ 18).

when Defendant's policies are overtly biased against its respondents who were all male.[4]  This bias is expressed explicitly in Defendant's description of its 2013-2014 "current hearing model" in which the complainant is described as a "survivor" and the hearing process is praised "an important venue for a survivor to feel personally empowered." (PSOF ¶ 20).  At the same time, bearing in mind that all respondents were male, Defendant praised its practices as being proficient in revealing the respondent's "power dynamics" and "potentially manipulative tactics" which "can be massive influences on a finding." (PSOF ¶ 21).  Such black and white division of virtues between the accuser, female, and the accused, male, is bad enough in what should be a fair and just framework, but when the accused is also a potential accuser, as was the case here, the biases rear their head to thwart and oppress Defendant's policies and obligations.

Given Defendant's inherent preference to cater the conduct hearings to "empower" the female survivor and unmask the "manipulative tactics" of the male respondent, it is no surprise that John's allegations of sexual misconduct against Jane were not only discouraged, but were not even recognized as sexual misconduct.  Defendant's bias, unconscious or not, against John as a black male is the genesis of the series of events that caused John's inability to participate in Defendant's lacrosse team and fully in his education and goals at Brown and what led to his depression and suicide attempt.

## STATEMENT OF FACTS

### 2013-TITLE IX First Action ("T91")

On or about September 20, 2013 Jane, a white, female sophomore at Brown and John had a brief encounter at a popular student bar.  The encounter began with a sado-masochistic episode

---

[4] Klawunn agreed that when men were complainants, they "were in cases that involved men as respondents." 31:13-16 (PSOF, ¶ 19).

in which Jane bit John's lip so hard it bled.  She also tried to asphyxiate him and declared, "I make the rules," (PSOF ¶ 22), which was not exactly a conversation-starter about mutual consent (the *50 Shades of Grey* series featuring erotic S&M reached a peak of ecstatic popularity in August 2013. See *Fifty Shades - Novel Series, Wikipedia*).  However, it was John who Defendant found responsible for the more neo-Victorian misstep of trying to lift Jane's dress once, twice, but no further once he discerned she was not interested, which he admitted (PSOF ¶ 23).[5]  Jane was not found responsible for any sexual misconduct. (PSOF ¶ 26).  Indeed, neither YCA nor Norris, two of Defendant's employees most closely connected to T91, even recognized Jane's actions as being non-consensual or in any way violative of Defendant's Code of Conduct. (PSOF ¶ 27).

Jane filed her complaint against John on or about December 6, 2013. (PSOF ¶ 28).  On the same day, Defendant charged John with both III a and III b violations as well as offense II a, which address actions that "result in or reasonably expected to result in physical harm . . . ." (PSOF ¶ 29).

Defendants' sexual misconduct policy was as follows (PSOF ¶ 30):

III Sexual Misconduct

    a.  Sexual Misconduct that involves non-consensual physical contact of a sexual nature.

---

[5] At the hearing, John addressed why he continued to try to raise Jane's dress after it was stated it should have been clear Jane was disinterested, John explained that "[g]irls in my experience don't like to be rushed, they like to take their time, they like to be seduced in my experience . . . . is after I asked—like again, I just asked nonverbally, got my answer, which was a no, and I did not ask again." (PSOF ¶ 24).  Margaret Klawunn, Defendant's Vice President for Campus Life and Student Services, and YCA's superior during the relevant time period, who addressed and did not grant Jane's appeal explained John's malfeasance for which he was sanctioned as follows:  John tried "to pull her dress up and down, which she did not want. And so, that was the reason why they felt that the behavior—where the nonconsensual behavior came, but that it wasn't clear that there had been anything more than that. (PSOF ¶ 25).

    b.  Sexual Misconduct that includes one or more of the following: penetration, violent physical force, or injury.

In its "comment" to the Code, Defendant notes that violations of offense "III b will result in more severe sanctions from the University, separation being the standard." (PSOF ¶ 30)

At the same time, John was put under a No-Contact Order in favor of Jane. (PSOF ¶ 31). The No-Contact Order was mutual, and Jane also received one in favor on John. (PSOF ¶ 31).

One week later, on or about December 13, John provided his statement about the incident. In it he described the encounter as "violent":

> As we steadily kissed, she bit hard on my lower lip. She bit down to the point of breaking the skin and drawing blood. It startled me as I had never experienced a bite like this before. However, I continued kissing, ignoring the wound. As we continued kissing, she next put her hand to my throat, pushed me against the wall, and her hand pushed against my throat to the point of cutting off my breath. She continued adding pressure until I began to actually choke. She was smiling at me and although I felt slightly wheezy, I was smiling back . . . Her gestures suggested that she wanted to assume a dominant role in our interaction. After a few moments she released me. . . . we kissed for another few moments . . . . Her hand returned to my throat and she again leaned in to apply steady pressure to my throat although more purposely this time. She appeared to be aroused that she was causing me to choke. . . . I wasn't comfortable with this interaction and tried to indicate that we should move on from this. I put my hand against her choking hand to push it away from my throat. I met some resistance to her stopping and by now was feeling short of breath from choking so I pushed harder against her wrist to get her to stop . . . and asked her what we should do now. . . . [W]hat stood out was a statement she made saying, "I make the rules." She indicated that this style of making out would continue were we to stay there. I found it awkward and too violent. . . .and told her I was going to leave. . . . [but] she seemed to be commanding me that I had not received permission to leave. . . . I simply turned and left. (PSOF ¶ 32).

John expressed his desire to bring a complaint against Jane directly to YCA. (PSOF ¶ 33). Defendant does not prohibit a respondent from filing a complaint. Klawunn confirmed that where "an accused student has a complaint against his accuser . . . we definitely offered students the possibility of submitting counter-complaints. . . ." (PSOF ¶ 34). YCA too acknowledged that the respondent could file complaint against his accuser, which if brought early enough in the investigation of the first complaint, it would be investigated and heard together. (PSOF ¶ 35).

However, that is not what John was told.  When John spoke with YCA about filing a complaint, he got "no support" and was told that he "would have to do a whole separate process." Moreover, YCA "made it seem, the process I was in had to conclude and then we'd open up a new one." (PSOF ¶ 36).

YCA had no recollection of discussing with John about filing a complaint against Jane (PSOF ¶ 37); however, YCA's explanation as to why John did not need to file his own complaint sounded suspiciously like the explanation John testified YCA told him.  In YCA's words, there was no reason for John to file his own complaint against Jane because in a situation like Plaintiff's where he is complaining of the same event as the complainant, the hearing would consider both. (PSOF ¶ 38).  However, without a complaint, no charges could have been brought against Jane, no findings could be made with respect to John's allegations, and no sanctions against Jane could be considered or imposed. (PSOF ¶ 39).  Without a complaint against Jane, the charges, allegations and sanctions went in one direction only: against John.

However, even if John did not ask YCA to file a complaint against Jane, YCA acknowledged a duty pursuant to the OCR's so-called "Dear Colleague Letter" dated April 11, 2011 (the "Letter") to address sexual misconduct under its "know or should have known standard" (PSOF ¶ 40).  YCA acknowledged that pursuant to the Letter, if the school knew or should have known about sexual misconduct, the school has a duty to "take immediate action to eliminate" sexual harassment even if the student-target of the harassment does not make a complaint. (PSOF ¶ 41)  Moreover, YCA affirmed that pursuant to the "know or should have known standard", if any party to the sexual misconduct process discloses in his or her response allegations of sexual misconduct other than the misconduct the accuser has alleged, her office "would look into that." (PSOF ¶ 42).

Yet, when applying these standards to John, YCA discouraged John from filing a complaint.  For example, YCA testified that she would allow the respondent to file a complaint against the accuser if it was brought early enough in the investigation of the first complaint so that both complaints could be investigated and heard together. (PSOF ¶ 43).  John's statement was received by YCA on December 13, 2014, about a week into the investigation of Jane's complaint that was initiated with the Charging Letter on December 6, 2013, early enough to be part of the investigation and hearing process Jane initiated. (PSOF ¶ 44).  Further, YCA read John's statement upon receipt. (PSOF ¶ 45).  When it came to John, YCA changed the rules.

YCA not only discouraged John from filing a complaint, she was also dismissive of the idea that John even had the basis for a complaint.  YCA did not perceive the events Plaintiff alleged occurred as violations of Defendant's sexual misconduct standard. (PSOF ¶ 46).  Having checked her biases, YCA blamed Defendant's failure to act on John's behalf on John himself and the way he presented his allegations against Jane. (PSOF ¶ 47).  In the first instance, YCA opined that John's statement did not include a statement directing Jane to "stop." (PSOF ¶ 48).[6] Indeed, in another variation of  YCA's reasoning, Plaintiff did not allege that he could not "leave

---

[6] These are absurd requirements and, indeed, patently false when compared to the Defendant's own educational materials about what constituted consent.  During the 2013-2014 academic year, and indeed throughout the relevant time period, Defendant did not have a policy on sexual consent, as stated.  During this period, Defendant relied on discussion groups on consent during orientation to decide the "community standards" (PSOF ¶ 50) and posted a video on-line that included snippets of students contributing a statement as to what consent meant to them. Among them is the statement that "silence is not consent." (*Id*). Overtly saying stop and/or allegations that the accuser was restrained or otherwise could not leave are not required.  In any event, John's gesture of putting "my hand against her choking hand to push it away from my throat" is a non-verbal gesture to "stop." (PSOF ¶ 51).  This Video was part of Brown's training and orientation on consent and "every incoming freshman was supposed to watch the consent video." (PSOF ¶ 52).

or stop." (PSOF ¶ 49).[7]  YCA further pointed out yet another deficit in John's claims was that though he identified Jane's actions as "violent," he did not "indicate" that the events were "sexual misconduct" and it was not identified as a "Complaint" even though, once again, none of these criteria are required for Defendant to meet its obligations under the Code or to investigate sexual misconduct so long as it knew or should have known it occurred. (PSOF ¶ 53).[8]

These deficits notwithstanding, YCA testified that Defendant would have had to pursue a unilateral investigation, but only if John's claims met Defendant's requirements for "special circumstances." (PSOF ¶ 57).  Not surprisingly, Plaintiff's allegations of being bitten until he bled and asphyxiated until he wheezed and couldn't breathe did not rise to a special circumstance, as stated:

> Q:  What are special circumstances?
> A:   Typically, I would say there's . . . or if a particular incident was so severe, either if there was a weapon involved or there were severe injuries, that kind of thing . . . . (PSOF ¶ 58).

With regard to "special circumstances," YCA explained that Defendant would not bring a complaint against a student who choked another student with her bare hands because Defendant's definition of "weapon does not include your hands."  YCA did acknowledge if the student were choked to death, Defendant would act (PSOF ¶ 59), but by that reasoning a student who beat up a fellow student with his fists, but does not punch him to death, he may not have his actions challenged by Defendant because he used his hands.

---

[7] In his statement, John actually stated that he found the interaction with Jane to be "awkward and *too violent* . . . and told Jane he "was going to leave . . .," but Jane "seemed to be commanding me that I had not received permission to leave." (PSOF ¶54).

[8] However, YCA acknowledged that Plaintiff did characterize the events as sexual assault at the hearing, but it was procedurally too late to address his allegations. (PSOF ¶ 55).  YCA's belated observation contradicts her own claim that Defendant did not need to bring a complaint because the "panel would be able to consider both. . ." (PSOF ¶ 56).

Let's be clear— regardless of YCA's variable application on Defendant's policies, as the gate keeper to sexual misconduct complaints, there was no way that Defendant would charge Jane with any act of sexual misconduct and no way this African-American male would be permitted to bring his complaint against Jane.  Quite simply, despite his allegations of injury and violence, Plaintiff's experience did not raise a red flag for YCA in what was alleged by Jane to be a sexual encounter. (PSOF ¶ 60).  To add insult to injury, YCA also opined that John's allegations against Jane did not warrant being a complaint because in YCA's opinion, "some people choke and like choking," regardless of the fact that John clearly stated in his statement that he was "uncomfortable" with the choking and was "short of breath," and found the experience to be "violent." (PSOF ¶ 61).

YCA's determinations not only deprived John of his procedural right to file a complaint against Jane, YCA also deprived John of the intensive and patient pre-complaint support Defendant provides to alleged victims of sexual misconduct, a process in which the alleged victim's experience and will to move forward with a complaint are central to Defendant's concerns.  As Klawunn explained, "[w]e were trained to talk to students about what their options were on campus and off campus, if they wanted to pursue any support, or if they wanted to bring a complaint forward off campus or on campus. . . .You can choose to pursue your case; you may not want to pursue your case.  And I would, sometimes, work with the student for a couple of years while they were finishing up their degree. . . . So, sometimes they had hearings; sometimes they didn't, but I would continue to provide support.  And I had—actually, I had a student who went all the way through.  Her assault happened when she was an undergraduate. She went all the way through Brown Medical School, and I went to her med school graduation." (PSOF ¶ 62).

Jane clearly benefited from Defendant's pre-complaint support efforts. As stated, the incident between Jane and John occurred on September 20, 2013, but Jane did not file her complaint until December 4, 2013. (PSOF ¶ 63). Between those dates and before Jane felt "ready to proceed" to file her complaint, Jane met with Bita Shooshani, Brown's Coordinator of Sexual Assault Prevention and Advocacy. With Shooshani's help, Jane participated in SAPE, which is a peer education group regarding sexual assault, where she "shared her personal experience with the group." Through this pre-complaint support, Jane tested the waters by sharing her story about John and experiencing support and was able to disclose her experience with her parents and professors before proceeding. (PSOF ¶ 64).

In comparison, when John disclosed his experience with sexual misconduct to YCA, it led nowhere. (PSOF ¶ 65). To make matter worse, John's advisor, Carolan Norris, like YCA, experienced "unconscious bias" and did not recognize the sexual misconduct a black male student suffered at the literal hands of a white female student. (PSOF ¶ 27).

Norris is currently Brown's Senior Associate Athletic Director, but to the best of her recollections, she was the head field hockey coach or assistant athletic director, and was John's advisor during T91. (PSOF ¶ 66). She also advised students "through hearings," in connection with various code violations including sexual misconduct since the 1990's. (PSOF ¶ 67). During her tenure as an advisor, she was John's only advisor, and to the extent that she advised students in sexual misconduct cases, all of the students she advised were male. (PSOF ¶ 68). John was the only black, male student she ever advised.[9] (PSOF ¶ 69).

---

[9] Norris also advised a black female student, but that was in connection with a roommate-dispute matter, not a sexual misconduct case. (Norris 27:19-25; 28:1-11)

Norris did not like John and she refused to advise him in T92 when he called her requesting her help because he called her at ten of three and wanted to meet at 3 o clock. (PSOF ¶ 70). Of course, Norris is free to like or dislike whomever she pleases, but not if her reasons are indicia of a bias against male and/or African-American student she is advising in a situation that could jeopardize his education and future. Generally, Norris thought that John was both "arrogant"— he wanted to "take charge of the whole—it wasn't almost like he needed any advising" and at the same time, was also not "serious." (PSOF ¶ 71). Norris' depiction of John as both "arrogant" but "not serious" discloses Norris' sense of discomfort in this black male rising above his station (arrogant), when he does not have the temperament to be in a position of authority ("not serious"), a variation on the common and classic racist stereotype of Blacks being "uppity" How dare John ask Norris to meet in 10 minutes like he was her boss! Apparently, John, a black, "arrogant" and "not serious" student, due to his station, did not even have a right to request to have his serious educational needs met, where Norris, his advisor, clearly had the power to accept or decline his request.

More specifically, Norris' gripes about John are contradictory and irrational. Norris was particularly piqued that John didn't know Jane's name at the time of the incident. (PSOF ¶ 72). However, when Norris was asked whether she knew if Jane knew John's name at the time of the event, Norris replied that she "never thought of it." (PSOF ¶ 73). Norris also did not like that John told her that "he likes butts" (PSOF ¶ 74), though Norris also acknowledged that there was nothing wrong with liking butts and any such preference was irrelevant to T91. (PSOF ¶ 75).

Moreover, Norris did not like that John wanted to defend himself, and wouldn't take responsibility for his actions. (PSOF ¶ 76). She was offended that John called Jane a "bitch or she's a crazy bitch" and did not appreciate that John thought "he was in the right." (PSOF ¶ 77).

12

However, when Norris was reminded that to the extent John called Jane "a bitch," it was because Jane bit and choked him, and was asked whether John had to take responsibility for being choked, she remarkably replied, "that's not for me to judge" even though she took it upon herself to judge whether John was responsible to Jane. (PSOF ¶ 78). Norris, mind you, was John's advisor during this period and worked as an advisor to men who were accused of sexual misconduct on campus.

Norris worked with John on his statement yet, when asked whether she thought John should have brought a case against Jane, Ms. Norris said, "No  . . . . It never came into my mind." (PSOF ¶ 79). When asked whether Jane was responsible to John for choking John, Norris, demurred and said, "I wasn't there, so I don't know." (PSOF ¶ 80). When she was asked if Jane did choke John, would that act "be attributable to a hook up gone wrong?," Norris said, "No."(PSOF ¶ 81). When asked about JJ's witness who corroborated that he had a swollen lip, Ms. Norris said, "his friend could have lied about his swollen lip." (PSOF ¶ 82). When asked if she was skeptical of all witnesses or just John's witnesses in particular, she said "no." (PSOF ¶ 83).[10]

---

[10] Despite this whirl of contradictions and "unconscious" bias, Norris also testified that she expressed to John that she was "sorry" about what he alleged Jane did to him (PSOF ¶ 86), yet she was unable to balance the rights and wrongs in both Jane's and John's actions. Norris had been involved in another case wherein a white, male respondent acknowledged his wrongdoing but alleged that the female complainant also had dirty hands (PSOF ¶ 87). However, Norris could not recall if there was any other case like this even though she was John's advisor in T91 and was literally being questioned about John's claims against Jane. (PSOF ¶ 88). Being a black male accused by a white woman of sexual misconduct is ground zero for America's "unconscious" biases. Indeed, as John observed, ". . . discrimination exists, and the fact that a white girl accused me of hitting her, and . . . in the case it turns out I came nowhere close to striking her, damn, it just doesn't look good." (PSOF ¶ 89).

In addition to these reasons for disliking John, Norris also admonished John for not taking "ownership of anything on that night" (PSOF ¶ 84), because something must have happened because a hearing had been scheduled (*Id*).  However, when it was pointed out to her that John literally took responsibility in his statement for lifting Jane's dress, which was what he was found responsible for and sanctioned, Ms. Norris did not revoke her admonition, and confirmed it as "just her opinion." (PSOF ¶ 85).

After the T91 hearing, John was found responsible for III a only. (PSOF ¶ 90).  In an internal memo the hearing board sent to YCA dated February 11, 2014, the Board explained that with regard to the panel's finding that John was not responsible for the III b violation, the panel did "not find the physical interaction was violent, and no injury was sustained." (PSOF ¶ 91). Neither the charges, the Findings, nor the Decision addressed Jane's acts of choking John, his loss of breath or John's bitten and bloodied lip. (PSOF ¶ 92).  Indeed, as YCA clarified, if neither John nor Defendant Brown brought a charge against Jane, then there is no way she could be found responsible for any sexual malfeasance. (PSOF ¶ 93).

As a result of these findings, John was placed on a deferred suspension through May 15, 2015. (PSOF ¶ 94).  In the Findings Memo, the Board also recommended that "the no-contact order should remain in place if either complainant *or respondent* would wish it to be maintained [*emphasis added*]." (PSOF ¶ 95).  Whereas the Decision did not address the Mutual No-Contact Order (the "MNCO"), the MNCO did indeed remain in place until 2016 when Defendant unilaterally changed it to a singular No Contact Order ("NCO") to allegedly conform to a new, yet non-retroactive rule regarding NCO's and which only affected John, as will be discussed below. (PSOF ¶ 96).

14

Also, in its Decision, Defendant modified and enhanced the deferred suspension from its version in the Code which in its entirety follows:

> Deferred suspension is used for offenses found serious enough to warrant suspension, but where the specific circumstances of the case mitigate the offense or for repeated offenses of a less serious nature.  Deferred suspension is a designed period of time during which a student is given the opportunity to demonstrate the ability to abide by the community's expectations of behavior articulated in the Code of Student Conduct. A deferred suspension may be accompanied by a transcript remark." (PSOF ¶ 97).

In the Decision, the sanction included the following enhanced scrutiny and elevation of sanctions against John, stating as follows in relevant part:

> During the period of your deferred suspension, any *allegations* [*emphasis added*] that you violated the Standards of Student Conduct will receive greater scrutiny by the Office of Student Life and will increase the likelihood that the matter is resolved through a hearing in which more serious outcomes are possible, *including separation from the University* [*emphasis in original*]. (PSOF ¶ 98).

YCA, who "participated in drafting" the Decision, (PSOF ¶ 99), acknowledged that the version in the Code is the "bible," the one in which students are "aware of" and "rely on." (PSOF ¶ 100).  YCA also confirmed that Jane received a copy of the decision letter with the definition of deferred suspension promising enhanced sanctions one the mere assertion of "any allegation." (PSOF ¶ 101).

John did not appeal the decision.  But knowing how nefariously the events of T91 led to T92, he regrets that he did not appeal the decision. (PSOF ¶ 102).  Jane did.[11]   During Jane's appeal process, YCA, who in the spirit of her earlier advice to John that he did not have to complain against Jane because his side will be heard, had an opportunity to balance the record and address John's allegations about Jane's physical aggression towards him.  Instead, in her summary memo to Klawunn, who was decided Jane's appeal, YCA specifically identified John's

---

[11] To her dismay Jane lost her appeal of the sanction given to John. (PSOF ¶ 106).

alleged acts of choking Jane for which he was not found responsible, but made no reference whatsoever to Jane's acts of biting John's lip and/or choking him to the point of wheezing. (PSOF ¶ 103).[12]  Including these claims in her report without acknowledging John's similar claims against Jane was particularly pernicious as it did not reflect the panel's findings, which acknowledged that John  "was confused" by Jane's actions, and that John did not intend to cause Jane harm. (PSOF ¶ 105).

**SPRING 2014 T92**

According to YCA, retaliation among students involved in sexual misconduct cases is prohibited and YCA claimed to take precautions against retaliation by informing complainants to not retaliate. (PSOF ¶ 107).  Examples of retaliation include such acts as repeated complaints from one party about the other  or "spreading information about a person." (PSOF ¶ 108).  In the event retaliation occurs, the procedure is to talk to the student being retaliated against and determine whether the behavior warrants more attention. (PSOF ¶ 109).

In the spring semester of 2014, Jane retaliated against John by engaging Sally, and other members of her sorority, in a discussion about "certain men on campus and negative interactions we have had." (PSOF ¶ 110).  At some point in the conversation, Jane disclosed that John had tried to touch her, and that he choked her.  However, Jane did not mention that she bit John or choked him. (PSOF ¶ 111).

---

[12] In not granting Jane's appeal, Klawunn explained that "we had a finding of responsibility for offense III a, and not for Offense III b, which was the sexual misconduct with penetration, violent physical force, or injury.  "But in his case it was very significant that he was found responsible for III a and not for III b, and that's what made the difference. (PSOF ¶ 104).

Since Jane identified John, and since Sally too had had an interaction with John, Sally described to Jane her encounter with John. (PSOF ¶ 112).  In her telling, Sally clarified that she had consented to kissing, but nothing more.  While kissing, however, John floated the idea of taking a shower together. Sally was not interested in taking a shower with John. (PSOF ¶ 113). Regardless, "[John] held me kind of—I don't want to say 'push' because it wasn't aggressive. But it was more kind of leading me there. So not forcing but not—gently pushing me, leading me to the shower stall." (PSOF ¶ 114).  Disinterested in the shower, Sally left without resistance from John. (PSOF ¶ 115).  Jane pounced on this as further evidence that John was a black male predator.

As a result of Sally's disclosure about John to Jane, Jane asked Sally for permission to share her story with a Dean. (PSOF ¶ 116).[13]  As a result of Jane's disclosure to the Dean, the Dean contacted Sally and asked her to "come in and make a formal complaint regarding [John]." (PSOF ¶ 117).  When Sally met with the Dean, Sally expressly explained that she was not interested in making a formal complaint about this event for her own sake, but would do so "for [the] protection of others." (PSOF ¶ 119).  However, as Sally knew of no other woman who had an encounter with John, the other woman Sally wanted to protect was Jane. (PSOF ¶ 120). Jane's influence on Sally and T92 loomed large.  Indeed, Sally was not uncomfortable with or scared of John as a result of her encounter with him, but became so after listening to Jane's story. (PSOF ¶ 121).

Sally did file a complaint against John on April 18, 2014.  Her account of the events in the complaint were more dire than what she said she reported to Jane and the Dean, however.  In

---

[13] Sally could not recall the name of the Dean, but YCA was certain that the Dean in question was Ashley Ferranti. (PSOF ¶ 118).

the complaint, Sally characterized John's "gentle pushing" as "force."  Sally also stated in her complaint that as a result of her meeting with the Dean, Sally now felt "comfortable enough to finally report" her encounter with John.  Sally also included a reference to her friend, Jane's "even worse experience with the same male," and concluded the complaint with the opinion that John is "dangerous," though she "promptly left" John once she felt "uncomfortable" about her interaction with him without any resistance from John. (PSOF ¶ 122).

As will discussed below, YCA devoted months of patient attention to Sally to help investigate her claim, a wonderous act of fortitude given that Sally's complaint did not include YCA's criteria for a complaint, or at least the criteria a complaint from a black, male requires: Indeed, like John, Sally alleged that she was able to leave the encounter; like John, Sally did not report that she said "stop. " (PSOF ¶ 123).  Unlike John who described such non-consensual acts as being choked and bitten,  Sally actually did not describe any "sexual misconduct" and relied on conclusory comments like "force" and "dangerous." (PSOF ¶ 123).  In John's statement, he used the word "violent" in connection with being choked so hard he was losing his breath and left the encounter without saying stop, none of which raised a "red flag" for YCA. (PSOF ¶ 124).

Sally's T92 complaint is the only contribution Sally made to T92. (PSOF ¶ 125).  From April 18, 2014 until August 6, 2014, when Defendant closed the investigation, Sally refused to participate. (PSOF ¶ 126).  Indeed, YCA emailed Sally on April 29, 2014 and May 2, 2014 to elicit her participation. (PSOF ¶ 127).  YCA found it necessary to email Sally, because she "tried to communicate with her by phone and was not able to reach her." (PSOF ¶ 128).

In the May 2, 2014 email, YCA asked Sally to let her know if she wanted Defendant "to move forward with the complaint." (PSOF ¶ 129).  Defendant, by May 2, 2014, indeed had not yet started the process in Sally's case "because we would not start an investigation without

speaking to her first . . . to get more information." (PSOF ¶ 130).  YCA also wanted to make sure that Defendant didn't do anything Sally didn't want, such as move on with the investigation without her or issue a NCO. (PSOF ¶ 131).

With no response from Sally, YCA emailed Sally again on May 6, 2014 in which YCA explained that she needs Sally's cooperation "regarding the details of the incident including the name of the other student involved." (PSOF ¶ 132).  Sally responded, and stated that she did not "want to take serious action." (PSOF ¶ 133).  She did not provide any further information about the incident or even John's identity. (PSOF ¶ 134).  Regardless, Defendant suddenly determined that "the serious nature of the allegations" warranted an investigation.  Defendant commenced an investigation and issued MNCO orders for John and Sally. (PSOF ¶ 135).

The sudden seriousness of the case is notable.  YCA testified that the Dean Sally met with provided information about the incident that raised the case to "serious." (PSOF ¶ 136).  Otherwise, Sally testified that she told the Dean that she "wasn't formally complaining that he sexually assaulted me," but that John asked her to go into the shower with him and continued to gently push her towards the shower after she said no with her then leaving the encounter. (PSOF ¶ 137).  When asked what information the Dean provided that helped YCA determine Sally's accusation was serious, YCA explained that the Dean did not provide new information but clarified information, which they could now move forward on  - namely John's identity. (PSOF ¶ 138).

On May 7, 2014, Defendant "removed and barred" John from campus "effective immediately" because of the "seriousness of the allegations against you."  It was finals week (PSOF ¶ 139) and summer break was right around the corner.  Further, John and Sally had been

coexisting on campus since October 2013 when the shower incident occurred and since April 18 when she filed her complaint. (PSOF ¶ 140).

YCA scheduled a meeting with John in which he was informed of the charges and the interim suspension in T92. (PSOF ¶ 141).  The purpose of the interim suspension was intended to help Defendant make a determination about charges against him, *if any* [*emphasis added*]. (PSOF ¶ 142).

Present at the May 7th meeting with YCA and John was Maria Suarez, Associate Dean and Director of the Student Support Services during the relevant time period. (PSOF ¶ 143). Suarez helped students in "crisis," and with "mental health issues;" she basically helped students who were "struggling with any issue that was impairing their ability to be successful. (PSOF ¶ 144).  A clinical social worker, Suarez holds an MSW and has an undergraduate degree in psychology. (PSOF ¶ 145).  During the relevant time period, she was Associate Dean and Director of the Student Support Services and prior to that, Suarez "saw students for short-term psychotherapy" in her position as Associate Director of Brown's Psychological Services, subsequently known as CAPS. (PSOF ¶ 146).  John was one of the students Suarez helped. During T91, Suarez has sessions with John around 10 times with each lasting at least 30 minutes and some lasting 50-60 minutes. (PSOF ¶ 147).  During these sessions, Suarez and John "talked a lot about race and pressures, and his pressures growing up at home." (PSOF ¶ 148).  In particular, they discussed "the difficulties if being a biracial male, both at home when he was growing up and on campus" and "the pressure of being the eldest son of an African man and the responsibilities of or the expectations of that family in Africa on them." (PSOF ¶ 149).  They had "identity discussions," and one of the conversations they had "was about dating women, white women, black women, who he was attracted to." (PSOF ¶ 150).

YCA recalled that at the meeting John was devastated by the accusation and the interim suspension.  YCA testified that John "screamed, he cried, he paced.  He got on the floor and cried." (PSOF ¶ 151).  At the end of the meeting, Suarez thought John was so distraught that she proceeded to walk John over to Defendant's Counseling and Psychological Services (CAPS) for a psychiatric evaluation. During the walk to CAPS, Suarez recalled that John identified women on the green whom he had "hooked up with,"[14] and wondered aloud whether any of these women would accuse him of sexual misconduct. (PSOF ¶ 152).  Suarez believed that she reported John's legitimate, fear-based, comments to Dean Ward in her debriefing with him. Suarez characterized this experience, while walking with John to CAPS, as "stunning" especially in the context of him being accused of sexual misconduct. (PSOF ¶ 154).  When asked whether John may have revealed this history as an effort to protect himself as he had just been accused for the second time as a freshman of sexual misconduct, Suarez responded as if that possibility never occurred to her. (PSOF ¶ 155).  To Suarez, the issue was John's "stunning" expression of proficient sexual experiences, which is a danger sign for black males, not John's sense of being persecuted for his sexuality, being a male, or the perception of him being a black male predator. Both gender and racial stereotypes are clearly implicated here.

At CAPS, John reported suicidal ideation upon hearing about T92 and thought that he might "slit his wrists," or climb "to the top of the OMAC and jump" or "take some drugs." Noting that John was experiencing "an adjustment reaction with mixed anxiety and depression," CAPS reported to Suarez that he was safe to return to campus. (PSOF ¶ 156).

---

[14] Suarez clarified that "hooked up" covered the entire range of sexual interaction including merely kissing. (PSOF ¶ 153).

Defendant's investigation of T92 moved forward. From May 7 to August 7, the investigation basically consisted of John's Statement, which he submitted on May 23 and one other email from YCA to Sally, on June 17, 2014 at 3:48 pm, in which YCA asked Sally to call her "to talk briefly about the complaint you filed." (PSOF ¶ 157).  The apparent reason YCA sent Sally this email is because on June 12, 2014, John emailed YCA to ask for an update about T92. YCA responded to John's email on June 17, 2014 at 3:35 pm, and stated "that nothing will move forward until the Fall." (PSOF ¶ 158).  At 3:48 pm, YCA once again entreated Sally to communicate with her. (PSOF ¶ 159).  Sally did not respond to the June 17 email. (PSOF ¶ 160). On July 30, YCA emailed John's Mother to report that "[w]e have been working with the other party [Sally] . . . ."  (PSOF ¶ 161).  This assertion was categorically false. (PSOF ¶ 161).  On August 1, YCA reported to Dean Ward an accurate account of the degree of work on T92 YCA had achieved stating: "FYI, I still have not heard from the other student." (PSOF ¶ 162). Defendant gaslighted John and his family all summer. (PSOF ¶ 163).

In the meantime—from May 12 to July 22— John's Mother ("Mother") communicated with YCA in a series of emails (PSOF ¶ 164).  In the course of these emails, Mother addressed the emotional duress John and the family were experiencing especially given the amount of time the investigation was taking and their being left in the dark. (PSOF ¶ 165).  Moreover, she addressed procedural anomalies in the investigation. (PSOF ¶ 166).

In particular, Mother noted that the Defendant's Code specifically required that a hearing must commence 60 days from receipt of the complaint unless extended by written petition by the case administrator, the complainant or the respondent. (PSOF ¶ 167).  No hearing was ever

scheduled and there was no written petition filed, yet John remained in purgatory during this period. (PSOF ¶ 168).[15]

Moreover, the Code provides specific requirements with regard to complaints "filed more than sixty (60) days after the alleged incident." (PSOF ¶ 171). In such circumstances, the complaint needs to include name(s) of all witnesses, or others who have information . . ." (PSOF ¶ 172). As we have seen, the T92 complaint does not even identify John, nor does it identify any witnesses or factual allegations about the incident. (*Id*). Another anomaly was that Defendant failed to adhere to its own interim suspension policy, which permits an interim suspension of "individuals [which] pose a danger to themselves or the immediate well-being of the University community." (PSOF ¶ 173). John was not a danger to himself, nor was he an "immediate" danger to the community. (PSOF ¶ 174). The event alleged in T92 occurred nearly 6 months before Sally filed her complaint, and Sally told the Dean that she was not in danger and that she knew of no one other than Jane who had been impacted by John. (PSOF ¶ 175). Indeed, as YCA acknowledged, that when a student is on deferred suspension and a second complaint arises, the student is not automatically "separated from the community." (PSOF ¶ 176). According to YCA, there has to be another standard of "danger of some sort." (PSOF ¶ 177). There was no danger of any sort to anyone.

Yet another anomaly in T92 is that the Code required that, to be actionable, Complaints must "allege violations of the Code . . . ." (PSOF ¶ 178) which T92 did not. We have seen that Sally used the word "force" in her complaint. T92 Complaint. (PSOF ¶ 179). However, Sally testified that she described the incident to the Dean as "gentle pushing," and specifically stated to

---

[15] YCA had underscored the likelihood of there being a hearing because T92 was a repeated offense and because John was already on deferred suspension. (PSOF ¶ 169). Indeed, the Code identities John's situation as one requiring a hearing for these reasons. (PSOF ¶ 170).

the Dean that she was not filing a complaint about any "sexual assault" she experienced. (PSOF ¶ 179).  Defendant knew that Sally expressed no event that violated the Code, but was encouraged to report John anyway, and Defendant was aware from Sally's meeting with the Dean and her explanation of events that there was no danger that John posed.[16]  Defendant knew Jane was the driver of these events against John.

Given "scrutiny and the fact that Mom is a lawyer," Klawunn determined that Sally should get one more week to cooperate with the investigation; otherwise Defendant would close the case. (PSOF ¶ 181).  Defendant at last closed the case and released John from the interim suspension on August 7, 2014 and declared that it would not move "forward with any further action" unless "we obtain additional information."(PSOF ¶ 182).  Sally provided no further information to Defendant. (PSOF ¶ 183).

## 2014 INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS:

From the time John was put on interim suspension on May 7, 2014 in connection with T92 to when T92 was closed on August 7, 2014, John was under tremendous emotional duress. As we have seen, John experienced a complete emotional breakdown and suicidal ideation when he was informed of T92.  The months waiting for the next shoe to fall was constant duress for him and his family. (PSOF ¶ 184).  When John returned to campus for the fall 2014 semester, he was depressed and self-medicating with marijuana. (PSOF ¶ 186).  On October 22, 2014, John had a crisis appointment with Dr. Braithwaite-Gardner at CAPS.  John reported that he "has been sleeping all day" and "having trouble getting out of bed."  John explained that he had "worst summer of his life" as a result of "being accused of sexual misconduct" and being "asked to

---

[16] Defendant misrepresents that Sally made her complaint against John "without anyone influencing her." Sally actually testified that Jane encouraged her to complain. (PSOF ¶ 180).

leave campus." (PSOF ¶ 187).  John further disclosed that "the uncertainty put a strain on his family.  Everyone was fighting and it almost ended his parents' marriage." (PSOF ¶ 188).[17] Prior to that appointment, he met with an MSW who reported that John was putting "on a very brave front as if trying not to cry."  The MSW concluded that John seemed "hopeless" and "disconnected from his feelings." (PSOF ¶ 189).

On October 23, 2014, John was assessed by John Kane, MD at CAPS.  The assessment accounts for John's "history of depressive symptoms and substance abuse" that "emerged during his freshman year . . . in the context of two accusations of sexual misconduct."  In particular, John reported that the second accusation caused him "significant depression" as well as "suicidal ideation." (PSOF ¶ 190).  Dr. Kane assessed John's psychiatric status as being "moderate to severe depression including hypersomnia, decreased appetite, concentration and energy." (PSOF ¶ 191).  Dr. Kane also noted that John was "contending with significant repercussions from the two allegations last year including a sense of shame and anger at himself, a decrease in self-esteem, and significant conflict with his family." (PSOF ¶ 192).

On October 24, 2014, while John was still suffering from the repercussions of T91 and T92, Jane pushed her agenda against John, and scheduled a meeting with YCA to discuss alleged violations to their MNCO. (PSOF ¶ 194).  On October 27, 2014 Jane produced a document of the alleged violations, which she described to Shooshani in an October 20, 2014 email as "somewhat minimal" though "less than enjoyable." (PSOF ¶ 195).[18]

_____

[17] Defendant was aware of the strain the interminable wait puts on students.  Suarez noted that "the most difficult aspect of the conduct hearing . . . is not knowing the outcome … and not having power over what the outcome is going to be. (PSOF ¶ 185).

[18] On October 19, 2014, John's Mother sent an email to YCA in which she accused Jane of violations of the WNCO and reminded YCA of her husband's request to protect John from Jane's and Sally's "conspiracies." (PSOF ¶ 193).  John stated that "[Jane] would show up at

While repeated complaints from one party about the other may be retaliation, the process of dealing with MNCO violations between students was in the first instance, a conversation with the accused student that would be an instructional on parameters.  If further action was required, there would be a hearing (PSOF ¶ 196); however, given the foot print of the campus and the unavoidable and unintended contact, the dean's hearing is reserved for "persistent and repeated" violations that have been addressed but for which there has been no change, or if the violation was "significant and clearly intentional" such as "banging on the person's door. (PSOF ¶ 197).

Jane's "minimal" violations mostly address off campus encounters, and in all cases, John exited them even though both Jane and John were still under *mutual* NCO's at this time. (*Id*). There is no record that any process regarding Jane's alleged MNCO violations occurred to determine whether they were serious, or if anyone met with John to discuss Jane's alleged violations and the MNCO parameters. (PSOF ¶ 198).

Late in the evening of October 24, 2014 John attempted suicide by "jumping in front of a car in the context of 2 allegations of sexual misconduct during the last school year." (PSOF ¶ 199).  John was admitted to Rhode Island Hospital on October 24, 2014 and discharged on October 28, 2014. (PSOF ¶ 200).  In his discharge summary, RIH reported that John denied "guilt" in connection with the accusations but began to believe "that it must be true" and that he had suicidal ideation during T91, but also during T92. (*Id*).[19]

---

lacrosse house parties, parties that were put on by the lacrosse team in the lacrosse home . . . I felt that it was rather interesting that she would choose to go to an event where I would be." (*Id*).

[19] Defendant misleadingly misrepresents that Brown's incident report characterizes John as being in an "hallucinogenic state" and also speaking incoherently. (Def. Brief pp. 30-31; Def. Ex. CC). Ex. CC makes no mention John being in a "hallucinogenic state" or speaking incoherently—in fact the report accounts for John's clear statement "that he was going to harm himself."

Defendant was aware of the event and John's stated reasons for its occurrence. John provided Defendant with two medical authorizations to release his CAP's records to on October 22, 2014 and to Suarez on October 28, 2014 prior to the Oct. 28 meeting, (PSOF ¶ 200). Moreover, In the discharge notes compiled by Jackie Twitchell, Psych. D. of CAPS on October 28, 2014, she noted that what led John to jump in front of a moving vehicle is connected to having "been devastated by the accusations against him" and "thinking that if people are accusing him of being a rapist, maybe he is a rapist" and deserved to die.  John also reported that "he does not feel supported" by the lacrosse team, "playing lacrosse is the one thing that has kept him motivated to stay at Brown." (PSOF ¶ 201).  Dr. Twitchell reported to Suarez that "the hospital cleared him and that the doctor does not see him as a threat to himself or others and they did not prescribe medication." (PSOF ¶ 202).

Throughout this incident, John was concerned that he would be forced to take a medical leave as he wanted to continue playing lacrosse and did not want to leave school again.  He expressed his concerns "about being forced to take leave" on October 24, 2014 to Sherri North, PhD at CAPS, who explained to John that at Brown, "leave is not a forgone conclusion." (PSOF ¶ 203).  That being said, Dr. North took John's suicidal attempt and ideation very seriously and urged his hospitalization. (PSOF ¶ 204).  By October 28, 2014, RIH determined that John was "medically stable to resume his Lacrosse responsibilities without restrictions effective immediately." (PSOF ¶ 206).[20]

---

[20] How seriously Defendant wants to take John's suicide attempt has been a moveable feast. Currently, it is in Defendant's interest to make light of John's suicide attempt.  However, in real time and as seen, Defendant's CAP's personnel took John's actions seriously.  Moreover, when it suited Klawunn, she too expressed concern about "the seriousness of the incident", though actions speak louder than words. (PSOF ¶ 205).

Suarez and Klawunn had different plans. As defined by Suarez, "medical leave of absence is a leave of absence . . . that is supported by the student's healthcare provider." At the time, mandated leaves of absence, as opposed to voluntary leave of absence, was no longer allowed. (PSOF ¶ 207). When considering medical leave with a student, Suarez, testified that "she works closely with students giving them their options and walks them through the pros and cons of the leaves available to them as well as looking at what it is that they are hoping to gain from time away." (PSOF ¶ 208).

With mandatory medical leave removed as an option, Suarez had a plan to coerce John to leave voluntarily. Dr. Twitchell's notes account for a telephone conversation she had with Suarez as follows:

> 10/28/2014 I called Dean Suarez . . . . She said that Margaret Klawunn and her were meeting with [John] at 5:30 to tell him that there is a no contact order violation against him and he will have to move out of his room in the lacrosse fraternity as a result. There will also be conduct charges against him for underage drug use and conduct charges against him for damage to the car he threw himself toward. . . . After some reflection, *I called her back and expressed my concern for his safety if these charges were brought against him the same night he was discharged from the hospital and asked that this be delayed in light of his recent suicide attempt.* She indicated that the move would have to be addressed because he cannot go back to his room given the accusation that he violated his no contact order. We discussed how much he should know up front and how much should be mediated given his fragile state *[emphasis added]*. (PSOF ¶ 209).

Suarez did not take Twitchell's advice. John, his Mother, Suarez and Klawunn met on October 28. The following is John's account of the meeting as alleged in the Second Amended Complaint:

> The two Brown officials were aware of John's severe emotional state and that he had been released from the hospital just hours before they held the scheduled meeting. Regardless, they informed John that if he chose not to leave, he could expect to face hearings on several matters, including the damage sustained by the vehicle that he threw himself into when he attempted to harm himself (it would be regarded as vandalism), and an allegation he had violated his "no contact" order with Jane. Vice President Klawunn and Dean Suarez also informed John they would seek to remove John from his dormitory that day because of the claimed violation of his no-contact order. Finally, Vice President Klawunn informed John

that the sexual misconduct complaint from the previous spring involving Sally could still be revived. . . . . John jumped up from his seat and cried, "Do you just want me out of here?"  At that point, John's Mother said to them both, "Enough! This is enough!  You have traumatized him enough." (PSOF ¶ 210).[21]

Conveniently, neither Suarez nor Klawunn recall the details of this meeting. (PSOF ¶ 212).  However, an internal email dated October 29, 2014 disclosed Klawunn as a willing participant:  If John "does not come in saying he will take a medical leave, which is possible given the mother's disgust that we must not want him here if we continue to bring up concerns about his behavior, we will be telling him he has to go—either a mandatory leave or something based on concerns about his behavior." (PSOF ¶ 213).

John went on medical leave for the 2014-2015 academic year effective November 5, 2014, with a plan to re-apply for admission for the fall 2015 semester. (PSOF ¶ 214).  John applied for readmission which included a letter in support from Dr. North who worked in CAPS, among other recommendations. (PSOF ¶ 215).  However, Defendant denied John readmission on June 1, 2015. (PSOF ¶ 216).[22]

Suarez has no recollection of the readmission process for John, but pointed out that it was a committee decision. (PSOF ¶ 218).  On the committee and managing the readmission process was Ashley Ferranti, the Dean who most likely spoke with Sally about T92. (PSOF ¶ 219).  On

---

[21] These threats were vicious and readily achievable by further violating Defendant's policies and practice.  John's Mother had already paid for the windshield that was damaged. (PSOF ¶ 211).  As for Jane's alleged MNCO violations, Defendant's practice and process of talking to John to set parameters had not been met and instead had been violated with the threats.  As for T92, and as we have seen, Defendant would re-open the case if it acquired "more information."  However, Sally did not provide information during the investigation or after the instigation closed (PSOF ¶ 183).  The threat to John was intentionally made despite the fact there was no basis to "revive" it.

[22] To John, the denial for readmission "just went against everything that the school had told me about the process . . . . I was doing everything I possibly could."  (PSOF ¶ 217).

June 4, 2015, John sent an email to Suarez in which he addressed his reluctance to withdraw in the first place, and appealed the decision on June 9, 2015. (PSOF ¶ 220).

On June 12, 2015, John's Father communicated with Brown's President Paxton about the denial of re admission and mentioned racial discrimination as a possible motivation.  On June 18, 2015, President Paxton replied that she shared Father's concerns with Maude Mandel, the Dean of the College. (PSOF ¶ 221).  On June 16, 2015—the interim period between Father's email to President Paxton and President Paxton's reply—Klawunn  reiterated in an internal email a threat to discipline John and that if the issue were not referred to Maude [Mandel], "we would require [John] to have a student conduct board hearing for his behavior *before* considering him for readmission [*emphasis added*]." (PSOF ¶ 222).  When asked during her testimony what the basis to disciplinary hearing was, Klawunn stated that "it may have been around the [alleged violations made by Jane to the] no contact orders." (PSOF ¶ 223).  John was readmitted on June 19, 2015. (PSOF ¶ 224).

The threats of discipline, the medical leave, the denial for readmission, were pre-determined and intended to keep John off campus.  Indeed, Suarez seemed inclined to remove John from campus in connection with T92.  In an email between John's Mother dated October 25, 2014, and Lars Tiffany, John's lacrosse coach, he accounted for a conversation he had with Suarez in May 2014 in connection with T92 in which Suarez "made the strong suggestion that JJ would not be invited back to Brown in the Fall." (PSOF ¶ 225).

The medical leave was Defendant's second chance to get John off campus and keep him off.  On November 6, 2014, just days after the medical leave commenced, YCA scheduled a meeting with Jane to give her "an update about John." (PSOF ¶ 226).  After the meeting, Jane wrote to her sexual assault advisor, Bita Shooshani, that she had good news:  "[John] is officially

. . . no longer on campus.  He is unlikely to return until at least Spring 2016."  Shooshani wrote

back pleased with the "great update."  Jane replied, "They seemed skeptical that he would even

come back then . . . ." (PSOF ¶ 227).

In the Fall of 2015 when John did return to campus, Jane too was on campus, just to visit

as she was taking the 2015-2016 academic year off for medical leave. [23]  In her email to YCA

dated September 15, 2015, she expressed her concern that John was back on campus when it was

her "understanding that he was not going to be returning until at least Spring 2016." (PSOF ¶

229).

## CONTINUING NCO ISSUES (YCA)

On April 13, 2016, for an anticipated return visit to campus in the Spring of 2016 (when

she was also on leave), Jane notified YCA to remind JJ "of the [M]NCO  . . . ." (PSOF ¶ 230).

YCA responded to this request with something better.  On April 14, 2016, YCA informed Jane

that she "will send out an updated NCO to reflect the changes to our policy around sexual

assault" and revoked the MNCO and issued a new NCO restricting John only. (PSOF ¶ 231).

The 2016 change in policy was not intended to be retroactive. (PSOF ¶ 234).

During the relevant time period, the MNCO/NCO policy was that Defendant would issue

a mutual NCO between the accuser and the respondent and if there was a finding of

responsibility, the mutual NCO would remain in place. (PSOF ¶ 232).  However, there was a

change in policy in 2016 which provided a unilateral NCO against the respondent if he was

found responsible. (PSOF ¶ 233).  Regardless, the respondent could still request a mutual no

contact order and indeed, YCA's office, OSL, would still issue mutual no-contact orders, even

---

[23] Whereas YCA alerted Jane as to John's whereabouts, YCA did not alert John to Jane's
whereabouts. (PSOF ¶ 228).

though the Title IX office would issue only unilateral NCO's starting in 2016. (PSOF ¶ 233).
Regardless of these changes, the MNCO in T91 was required to stay in place.  Indeed, as per the
Findings (Ex. 17), the Board confirmed that the mutual no contact order should remain in place
so long as "complainant or respondent would wish it to be maintained." (PSOF ¶ 235).  In two
emails to YCA John demanded that YCA maintain and enforce the MNCO arguing that  Jane's
actions "endangered his life." (PSOF ¶ 236).

　　　　Defendant did not uphold the MNCO and did not impose a NCO on Jane; when YCA
was asked during her deposition whether she was concerned enough by John's claim that Jane
had "endangered his life" to keep Jane under the existing NCO, she replied,  "I did not put an
NCO on [Jane], so I would say no." (PSOF ¶ 237).  John was the only student whose MNCO
was converted to a NCO retroactively under the 2016 guidelines. (PSOF ¶ 238).

　　　　On May 4, 2016 Sally and John communicated with each other through text messages in
which Sally confirmed that when she complained about the incident to Defendant, she "never
said it was sexual assault" and that she "felt like I was pushed into reporting a situation." (PSOF
¶ 239).  Sally also confirmed that Jane initiated the complaint process: "I was called into a dean's
office because [Jane] talked to me about what happened" and Sally "had to I guess report on our
interaction" to the dean. (PSOF ¶ 240).

## ARGUMENT

　　　　The majority of Plaintiff's claims allege either gender discrimination (Title IX, Hostile
Environment/Harassment; Gender Discrimination; Selective Enforcement, R.I.G.L. § 42-112-1),
or racial discrimination (42 U.S.C. § 1981, Title VI, R.I.G.L. § 42-112-1).[24]  In the First

---

[24] The remainder of Plaintiff's claims are Intentional Infliction of Emotional Distress, Breach of
Contract and Covenant of Good Faith and Fair Dealing.

Department, claims of gender bias (as well as racial bias, as will be discussed below), which

entail "unsettled issues of motive and intent . . . will normally preclude the Court from granting

summary judgment. *Mulero-Rodríguez v. Ponte, Inc*., 98 F.3d 670, 677 (1st Cir., 1996)

(reversing summary judgment and emphasizing that "determinations of motive and intent . . . are

questions better suited for the jury").   "These matters can often only be proved by reliance upon

circumstantial evidence except in the rare case where there is uncontroverted proof of a 'smoking

gun'." *Negron v Lexus De San Juan*, 2007 US Dist LEXIS 108888, at *5-6 [DPR 2007].[25]

Consequently, "[t]here is no mathematically precise test" to determine "whether alleged

instances of offensive conduct reach the requisite level of pervasiveness and/or severity to

constitute actual harassment."   Instead, the Court looks to "numerous factors (to which we assign

no particular determinative weight) in order to guide us in our resolution of these difficult

situations: severity of the discriminatory conduct, its frequency, the extent to which the behavior

---

[25] As applicable to Plaintiff's gender-discrimination arguments as it will be to his racial-discrimination arguments discussed below, it is wise to note that "[f]ifty years after the passage of the civil rights laws, it is unlikely that there will be a smoking gun . . .  This is especially so when the contested fact is racial animus.  'Title VII's prohibition against 'disparate treatment because of race' extends both to employer acts based on conscious racial animus and to employer decisions that are based on stereotyped thinking or other forms of less conscious bias." *Thomas v. Eastman Kodak*, 183 F.3d 38, 42 (1st Cir. 1999). Small v Massachusetts Inst. of Tech., 584 F Supp 2d 284, 294 (D Mass 2008).  Moreover, the Second Circuit has similarly recognized that "the court must be mindful of the 'elusive' nature of intentional discrimination," and that "clever men may easily conceal their motivations *[internal cites omitted]*." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015).  As was addressed during the motion to dismiss stage, Brown cannot argue with the clever-men (and women)-who-may-conceal argument.  In a way, Brown has written the book on the nature of concealed racial animus as Brown is in the forefront of studying the ways contemporary, racial animus is expressed in a seemingly sophisticated and post-racial culture.  According to Brown's Center for the Study of Race and Ethnicity in America (CSREA), racism is no longer evidenced by overt "colored-only" laws or a burning cross in the front yard. Racial animus has gone underground and is evidenced by its "structural" components, which are characterized as "the normalized and legitimized range of policies, practices, and attitudes that routinely produce cumulative and chronic adverse outcomes for people of color, especially black people  . . ." (SAC ¶ 160).

is physically threatening or humiliating as opposed to a mere offensive utterance . . . . on a case-by-case basis." *Franchina v City of Providence*, 881 F3d 32, 46 (1st Cir 2018); *see also Gerald v. Univ. of P.R.*, 707 F.3d 7, 18 (1st Cir. 2013).[26]

From September 2013 through May 2016, Defendant through the actions of YCA, Suarez, Klawunn and Norris thwarted, impeded, oppressed and nullified John's dignity as a black man and his rights to a non-hostile and discrimination-free education environment with Nurse Ratched style precision.[27]

John was discriminated against at Brown because of his male gender and sexuality and/or because of his race—with respect to his comparables, Jane and Sally, both white and female, John, a black man.  As John pointed out, ". . . discrimination exists, and the fact that a white girl accused me of hitting her, and . . . in the case it turns out I came nowhere close to striking her, damn, it just doesn't look good." (PSOF ¶ 89).  Being a black male accused by a white woman of sexual misconduct is ground zero for America's "unconscious" biases.

Defendant in its motion for the most part "forwent discovery and rested on unattested and conclusory assertions and conjectures." *Das v Cri-Tech, Inc.*, 1991 U.S. App. LEXIS 13521, *9 (1st Cir., 1991).  It's motion for SJ must be denied in its entirety.

A.      **Title IX:  Hostile Environment/Sexual Harassment/Gender Discrimination**

---

[26] *Franchina v City of Providence*, 881 F3d 32, 46 (1st Cir 2018), which deals with Title VII and does not directly address the claims herein; however, the First Circuit's willingness to adopt Title VII jurisprudence as "an applicable legal framework" for Title IX remains instructive. *See Frazier v Fairhaven Sch. Comm.*, 276 F3d 52, 67 (1st Cir 2002).

[27] Nurse Ratched, a fictional character in Ken Kesey's, *One Flew Over the Cuckoo's Nest* (1962), was a psychiatric nurse who presided over a men's ward and officiously imposed authoritarian structure and processes to oppress the men in her ward and diminish their dignity.

In order to establish liability in connection with a "Title IX hostile education environment claim, a plaintiff must allege: (1) that he or she was subject to severe, pervasive, and objectively offensive sexual harassment by a school peer, (2) that the harassment caused the plaintiff to be deprived of educational opportunities or benefits (3) that the funding recipient knew of the harassment, (4) in its programs or activities and (5) it was deliberately indifferent to the harassment such that its response (or lack thereon) is clearly unreasonable in light of the known circumstances." *Doe v Brown Univ.*, 327 F Supp 3d 397, 403 (DRI 2018)

In order to establish liability in connection with a "Title IX deliberate indifference claim, a plaintiff must show that an official with authority to implement corrective measures was aware of and deliberately indifferent to an act of discrimination on the basis of sex.  Severe sexual harassment creating a hostile environment can constitute actionable sex discrimination." *Doe v Brown Univ.*, 327 F Supp 3d 397, 403 (DRI 2018).  Moreover, "the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Porto v Town of Tewksbury*, 488 F3d 67, 72 (1st Cir 2007)(alteration in original) (internal cites omitted)..

Sexual harassment, even a single event, even if it does not include YCA's "special circumstances" (PSOF ¶¶ 57-59), in and of itself can create a sexually hostile educational environment, and "Title IX provides a remedy for students, regardless of their sex or gender, who can establish a school's response to their allegations of sexual harassment, including claims of sexual violence, demonstrates deliberate indifference." *Doe v Amherst Coll.*, 238 F Supp 3d 195, 223-224 (D Mass 2017), *quoting Davis*, 526 U.S. at 653-54; *see also Frazier*, *supra*, 276 F.3d at 65-66.  The *Amherst* court explained it as follows:

"The College's obligations, as clarified in the *Dear Colleague* letter (¶ 40), do not commence only upon the filing of a formal complaint, but whenever a school 'knows, or

reasonably should know, about possible harassment' of a student, regardless of whether the harassed student actually makes a complaint.  Thus, while Doe never filed a formal complaint, the College certainly learned that Jones may have engaged in sexual activity with Doe while he was 'blacked out' and yet, Doe asserts, the College did not take even minimal steps to determine whether Doe should have been viewed as a victim under the terms of the *Policy*. These allegations provide a sufficient basis for Doe to proceed with a Title IX deliberate indifference claim against the College."

 *Amherst Coll.*, *supra*, at 223-224.

With regard to the "single incident" standard, a student's claim of hostile environment can arise from a single incident.  *Torres v Puerto Rico*, 2004 US Dist LEXIS 30406, *16-17 (DPR, 2004) (citing *Brown v. Hot, Sexy and Safer Productions,* 68 F.3d 525, 541 n. 13 (1st Cir. 1995)) (noting that "a one-time episode is not per se incapable of sustaining a hostile environment claim").  A hostile environment claim requires the victim to have been subjected to harassment severe enough to compromise the victim's educational opportunities and, in the case of a Title IX claim, the institution must have had actual knowledge of the harassment and have exhibited deliberate indifference to it. *Id*., (quoting *Wills v. Brown Univ.,* 184 F.3d 20, 26 (1st Cir. 1999))..

At last, the harassment has to be on the "basis of sex" which can, but need not be motivated by sexual desire." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998); *see also Morgan v. Town of Lexington, MA*, 823 F.3d 737, 745 (1st Cir. 2016) (quoting 20 U.S.C. § 1681(a)); (*Lopez v City of Somerville*, 2018 US Dist LEXIS 103701, at *14, n 8 (D Mass, 2018).

John alleged that Jane choked and bit him until he bled.  He couldn't breathe.  He called this behavior "violent."  These are allegations of severe sexual violence.  John disclosed these acts to Defendant in his December 6, 2014 statement required in T91.  His advisor, Norris, did not at the time of T91 nor at the time of her deposition recognize these claims as being acts even

of sexual harassment let alone sexual violence. (PSOF ¶ 27).  Neither did YCA. (*Id*).  John spoke to YCA about making a complaint against Jane based on these claims.  YCA discouraged John from making the complaint, unless he wanted to do so after T91 concluded even though Defendant had a practice of allowing students to make "counter" complaints against their accuser. (PSOF ¶ 34).  Although YCA acknowledged obligations to investigate sexual harassment pursuant to the *Dear Colleague Letter*, she imposed "special circumstances" criteria that required the use of weapons.  One's hands, even if being used to choke someone, did not fit YCA's unilaterally imposed and inconsistently applied criteria. (PSOF ¶¶ 57-59).

John's comparators, Jane and Sally, both white and female, were treated differently. Both were encouraged to make their complaints.  Jane, in particular, benefitted from a pre-complaint support system for months between the incident and when she filed her complaint in which she was able to cultivate her story against John before fellow students at SAPE and prepare her parents and professors. (PSOF ¶ 64).  Sally, with Jane's encouragement and intervention to connect the Dean with Sally, was invited to a meeting with the Dean who made her feel comfortable enough to file her complaint against John. (PSOF ¶¶ 116-119).  When Sally's interest in the case faltered, Defendant kept the investigation going for months and continued to encourage her to participate through emails. (PSOF ¶¶ 127-128).  When Sally failed to respond, Defendant unilaterally decided to pursue the investigation, though Sally's claims, which were known to Defendant to be far less dramatic than the actual complaint stated, had none of the "special circumstances" YCA required of John.  Moreover, Defendant breached the Code to proceed.

Defendant relies on *Nungesser v. Columbia* I and II to argue that being identified as a rapist does not satisfy Title IX's "basis of sex," requirement.  However, the evidence shows that

Brown's discriminatory management of T91 and T92 left John appropriating the identity of a "rapist" in the same way people who are systemically discriminated against appropriate the negative characteristics and become parodies of the gender or racial stereotype that are imposed upon them (such examples include the dumb-blond bombshell, the neurotic Jew, the hyper-sexed strapping black athlete).  Heartbreakingly, John appropriated Defendant's biases during and after his suicide attempt on October 24, 2014 in that John called himself a "rapist" and was motivated to kill himself as a result—"*if people are accusing[me] of being a rapist, maybe [I am] a rapist and deserve to die.*" (PSOF ¶ 201).  The proof of Defendant's discrimination is in its spoils: John started Brown as an All American having won awards for his athleticism and character and after a year at Brown (and one year of coerced medical leave), John was a diminished, broken man, self-identified as a rapist.  A lesser man might have hyped-up the swagger (though it could be argued that John's switch from finance to theater/acting/modeling and its accompanying focus on parties, events and fashion is a lingering manifestation of his perceived fall).  Instead, John deemed himself unworthy to be alive.  John got to that point on the basis of Defendant's "unchecked biases" against his gender (and race).

## B.     Title IX—Selective Enforcement (T92)

To prevail on his Title IX selective enforcement claim, must establish that his gender was a motivating factor behind Defendant's decision to pursue T92. *Doe v Amherst Coll.*, 238 F Supp 3d 195, 223 (D Mass 2017).  As this Court determined, "a similarly situated comparator of another gender is required." *Doe v Brown Univ.*, 327 F Supp 3d 397, 412-413 (DRI 2018).  John has two—Jane and Sally.

As discussed above, John was subject to gender discrimination not just because Defendant discouraged John's access to Defendant's pre-complaint support system and "counter-

complaint" process in place or because it ignored its obligations pursuant to the Dear Colleague

Letter—the heart of the discrimination was Defendant's utter failure to even recognize John as a

victim of sexual misconduct.  Indeed, John's experience of being bitten until he bled/choked

until he wheezed while Jane smiled and demanded his allegiance to her "rules" were ignored by

both Norris and YCA.  The gender bias here is palpable.  Another comparable would be the "two

or three" women John pointed out to Suarez as they walked to CAPS. (PSOF ¶¶ 152-154).  John

was traumatized by the news of T92 and the immediate suspension; he was considering suicide.

As Suarez escorted John to CAPS he confided in her—because she was his counselor and

confidant during T91—his fears that these women too may report him for no reason (John's

assessment that Sally's claim was baseless was proven by Sally's own admission to him in the

May 2016 test messages).  He felt vulnerable and shared these feelings with Suarez. (PSOF ¶

152).  Remarkably, Suarez did not see the vulnerability or the fear.  She found John's disclosures

"stunning," and out of sync with his predicament—but concerning enough to consider it as the

kind of disclosure worth mentioning to Dean Ward.  To Suarez the two or three white women on

the green on the way to CAPS were of more concern than John, the black male who stood before

her in despair.

  With regard to Jane and as this Court assessed, "the fact that the relevant conduct

involving Jane as a comparator occurred before May 4, 2014, has limited relevance given

the other similarities between them.  Both John and Jane were students at Brown.  Both brought

complaints of sexual assault.  Both complaints of sexual assault occurred, at most, within six

months of each other.  Brown investigated Jane's complaint; it ignored John's complaint.  While

the two are not exactly identical, the allegations as pleaded present John and Jane as similarly

situated." *Doe v Brown Univ.*, 327 F Supp 3d 397, 412-413 (DRI 2018).  The evidence supports

the Court's assessments. Both John and Jane complained of sexual misconduct. Defendant not only pursued her complaint, but cultivated it through its pre-complaint support system in which Jane met with Shooshani and worked with SAPE where her experience with John was revealed. She was supported while she gathered her strength to tell her parents and professors, as she anticipated that complaint process may impact her studies. John's experience in comparison has that "second-class citizen" feel inherent to discriminatory systems and societies. In this case the white women get the special treatment; the black men get the usual—nothing.

As John alleged, Jane's fingerprints are also all over T92. Jane initiated a discussion about bad encounters with men with her sorority and talked about John. (PSOF ¶ 110). When Sally disclosed that she too had an encounter with John, Jane went into action and asked Sally if she could report her story to the Dean. Sally agreed, and the Dean contacted Sally to encourage her to make a formal complaint. Sally met with the Dean, who made her feel "comfortable enough to finally report" her encounter with John. (PSOF ¶ 122). Yet, Sally's May 2016 text messages to John suggest that she was not as comfortable as she testified. Indeed, in an email to YCA she complained that she was "forced" to report and that the Dean "wrote the no contact order without me asking for it" (PSOF ¶¶ 133, 239-240). To this extent Defendant's zeal in pursuing Sally's complaint in contrast to Defendant's dismissiveness of John's allegations further underscore the discrimination.

Defendant's accommodation of Jane as the prime-mover is another issue that discloses nefarious intent towards John. Defendant's retaliation policy prohibits "repeated complaints from one party about the other." (PSOF ¶¶ 107-108). Sally's encounter with John in which he "gently pushed" her to the shower and asked her to take a shower with him is hard to shoe-horn into a claim of mere rudeness let alone sexual misconduct. Sally testified that this is the story

she told Jane and the story she told the Dean.  Sally also said that she told the Dean that she didn't think what happened to her was sexual assault, but that she was reporting it to protect other women, even though she knew of no other woman but Jane who had a problem with John. (PSOF ¶¶ 119-120).  Yet, Defendant moved forward with T92—instigated as it was by Jane, and made in the spirit of underscoring Jane's experience and protecting Jane—without any of this raising a red flag that Jane may have been retaliating against John.

John actually has two comparables—Jane and Sally.  With regard to Sally, she was a reluctant accuser who did not even have an issue that rose to misconduct, yet Defendant's groomed her and pursued her complaint like gangbusters.  Whereas Sally's experience involved gently pushing and a request to take a shower after she said no after which she left John without any resistance from John; John's experience included aggressive choking until he wheezed, a demand he follow Jane's rules, and resistance from Jane when he wanted to leave.

This case is distinguishable from *Haidek v, University of Massachusetts-Amherst,* 933 F.3d 56 (1st Cir. 2019).  The present case is not "a race to the dean's office" which could be won by any gender.  The gender bias herein lies in the utter failure of Defendant to even recognize that John had endured sexual misconduct of any kind when he actually endured misconduct that caused him physical pain and in terms of severity out-weighs the skirt-lifting and "gentle pushing" of both Jane and Sally combined.  Yet, Defendant is able to so clearly see sexual misconduct or the potential for sexual misconduct—on the green, near the shower—when it involves white women.

Defendant's demand for summary judgment on this claim must be denied.

**C. Title VI, 42 U.S.C. § 1981, and R.I.G.L. § 42-112-1 (Race and Gender)**

Whereas the claims in this section address racial discrimination, only § 1981, and R.I.G.L. address disparate impact. *See Thomas v Salem State Univ.*, 2013 US Dist LEXIS 98448, at *15-16 (D Mass, 2013), *Lakshman v Univ. of Maine Sys.*, 328 F Supp 2d 92, 96 (D Me 2004) and *Kriegel v Rhode Island*, 266 F Supp 2d 288, 292 (DRI 2003).  Regardless, all three statutes are subject to "the familiar McDonnell Douglas burden shifting framework." *Pina v Children's Place*, 740 F3d 785, 796 (1st Cir 2014).  The burden of production starts a showing from Plaintiff that "creates a rebuttable presumption that [Defendant] engaged in discrimination.  This is not the end of the matter, however, and if the [Defendant] is able to articulate a legitimate, non-discriminatory reason for the termination, the presumption of discrimination disappears.  At the third and final stage of the McDonnell Douglas paradigm, the burden of production returns to the plaintiff, who must offer evidence that the defendant's explanation is pretextual and that discriminatory animus prompted the adverse action.  The burden of persuasion remains on the plaintiff at all times." *Id*.; *see also Mayale-Eke v Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 754 F Supp 2d 372, 384 (DRI 2010); *Boston's Children First v City of Boston*, 62 F Supp 2d 247, 260, n 31 (D Mass 1999).  Whereas it is axiomatic that all three statutes address racially-discriminatory adverse actions, § 1981 addresses racial discrimination to the extent that Plaintiff's ability contractual rights are impaired. *Rodriguez Cuervos v Wal-Mart Stores, Inc.*, 1998 US Dist LEXIS 22445, at *8 (DPR, 1998).  Moreover, Title VI requires a showing that Defendant receives federal funds, a matter so apparent, Defendant has not in any way challenged it. *Boston's Children First v City of Boston*, 62 F Supp 2d 247, 260, n 31 (D Mass 1999).

As this Court considered it its motion to dismiss Order, John "a black man—was unable to exercise his rights under Brown's Code of Student Conduct, while Jane and Sally—white women—could."  Further, the Court cited *Mayale-Eke v. Merrill Lynch*, 754 F. Supp. 2d 372,

381 (D.R.I. 2010) for the observation "that it is 'unrealistic to think that in the 21st century any sophisticated' person would make a blatant statement tainted with impermissible discriminatory animus". *Doe v Brown Univ.*, 327 F Supp 3d 397, 413 (DRI 2018).

To support his racial discrimination claims, Plaintiff brings the full weight of the evidence and arguments set forth herein thus far—every breach, every slight, every dismissive comment made by YCA or Norris, every act of bad will, every cruel word that occurred in the October 28, 2014 meeting with John and his Mother; every tone deaf failure of Suarez to recognize John's emotional pain whether he is walking across a green or trying to salvage his athletic and academic life after a suicide attempt, every flagrant appeasement to Jane whether its overlooking her acts of retaliation against John or granting Jane a unilateral NCO retroactively and in bad faith when even she would have been happy if Defendant just reminded John to adhere to the MNCO already in place, to threatening John with instant sanctions for Jane's "minimal" MNCO violations—reeks of discrimination against John.

As Defendant's motion seems to primarily focus on damages and is devoid of serious analysis of any relevant fact, it is difficult to discern what legitimate reason it may proffer. Defendant's scant attention to the premiere issues in T92 disclose that Jane filed a complaint and the complaint was heard and that John was sanctioned but he didn't appeal are obvious low-hanging fruit.  In T92, once again, a complaint was filed, but out of "fairness" to Plaintiff it was closed and no harm was done—the immediate suspension was in name only as it occurred right before summer break and it was lifted before the fall (which begs the question as to why Defendant imposed the immediate suspension at all, if not to make John scramble under extreme distress to complete his finals and suffer for three months over the summer not knowing if he could return to school).

As for the medical leave, Defendant seems to again assert that there's nothing to see here folks, just a normal day in the suicide ward threatening a student who wanted to kill himself as a result of the disciplinary actions, T91 and T92, with more disciplinary actions in defiance of his psychologist who warned Defendant not to do it because John was too fragile.  Defendant doesn't even try to legitimate the readmission process except to offer an all's well that ends well conclusion, which in no way addresses the clear evidence that Defendant wanted John "out of here" for at least two years until 2016 and maybe not to return at all as YCA informed Jane. Defendant relies on John's cannabis consumption, which John's medical documents from CAPS and RIH also address, but as a symptom of his depression, not the cause, a conclusion Dr. Daignault also reached; Defendant did not provide any expert testimony to address the role of cannabis in John's mental health.

Plaintiff brings the entire weight of arguments herein to support his contention that Defendant's legitimate reasons are not only a pretext for discrimination—there are too many anomalies, breaches, expressed disdain for John (*e.g.* Norris) and blatant disinterest in his experiences and suffering and excessive back bending and race to break the rules to coddle and support white women to even characterize Defendant's actions as legitimate—they are wholly based on skewed application of procedures and policies, outright breaches of the Code and bad faith so extensive and severe, the only conclusion is that the lone black man in this entire debacle from 2013 through 2016 was discriminated against.

Defendant's motion must be denied in its entirety.

### D.      Intentional Infliction of Emotional Distress

This Court requires proof of the following "four elements necessary to sustain a claim of intentional infliction of emotional distress under Rhode Island law:  (1) the conduct must be

intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe." *Forbes v Rhode Is. Bhd. of Corr. Officers*, 923 F Supp 315, 329 (DRI 1996).  Moreover, "plaintiffs attempting to maintain emotional distress claims must also provide some proof of medically established physical symptomatology." *Adams v Town of Burrillville*, 249 F Supp 2d 151, 155 (DRI 2003).  With regard to the second prong of the elements requiring the "conduct to be extreme and outrageous," this Court has held that "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Restatement (Second) of Torts* § 46 cmt. d (1965)." *Forbes*, <u>supra, at</u> 329.

T92 triggered John's suicidal ideation.  On May 7, 2014, when YCA informed him of T92 and the interim suspension, he curled up in a ball on the floor and cried; Suarez escorted him to CAPS. (PSOF ¶¶ 151-152).  At CAPS, John revealed that he wanted to kill himself. (PSOF ¶ 156).  With this state of mind he completed finals as best he could and left campus for the summer.  Although T92 as an investigation remained dead in the water over the summer because of Sally's disinterest in the case and her unwillingness to participate, Defendant misled John and his Mother into believing that they "have been working with the other party" (PSOF ¶¶ 161-163).  In the dark, John and his family experienced extreme emotional distress.  His parents "almost split up;" it was "the worst summer ever." (PSOF ¶ 163).  Once the interim suspension was lifted and John was able to return to campus, he was depressed and unable to get out of bed and began seeking help from CAPS and identified T92 and T91 as the cause of his emotional issues. (PSOF ¶¶ 186-187).  On October 24, 2014, he jumped in front of the vehicle believing

that "*if people are accusing[me] of being a rapist, maybe [I am] a rapist*" and that he "deserved to die." (PSOF ¶ 201).  Although diagnosed with major depression and his class attendance and work were suffering, John wanted to stay in school and continue playing lacrosse. (PSOF ¶ 203). Defendant was aware of his mental health as John had provided an authorization to release his CAPS record on October 22, 2014, and another authorization to release his CAPS record to Suarez on October 28, 2014. (PSOF ¶ 156—Ex. 38).

John was hospitalized at RIH until October 28, 2014. (PSOF ¶ 200).  Upon his release, Suarez and Klawunn scheduled a meeting with John and his Mother to discuss medical leave. Defendant no longer required mandatory medical leave; the only option was for John to take voluntary medical leave.  The topic of the meeting was to coerce John to leave "voluntarily."  In a telephone with Dr. Twitchell, a CAPS psychiatrist, Suarez disclosed her plan.  Dr. Twitchell's notes account for Suarez's plan and Dr. Twitchell's response as follows (PSOF ¶ 209):

> 10/28/2014 I called Dean Suarez . . . . She said that Margaret Klawunn and her were meeting with [John] at 5:30 to tell him that there is a no contact order violation against him and he will have to move out of his room in the lacrosse fraternity as a result.  There will also be conduct charges against him for underage drug use and conduct charges against him for damage to the car he threw himself toward. . . .  After some reflection, *I called her back and expressed my concern for his safety if these charges were brought against him the same night he was discharged from the hospital and asked that this be delayed in light of his recent suicide attempt.*  She indicated that the move would have to be addressed because he cannot go back to his room given the accusation that he violated his no contact order.  We discussed how much he should know up front and how much should be mediated given his fragile state [*emphasis added*].

Suarez did not take Dr. Twitchell's advice.  At the meeting not only did Suarez and Klawunn threaten John with the alleged NCO violation, they threatened him with even more disciplinary actions (PSOF ¶ 210) as follows:

> The two Brown officials were aware of John's severe emotional state and that he had been released from the hospital just hours before they held the scheduled meeting. Regardless, they informed John that if he chose not to leave, he could expect to face hearings on several matters, including the damage sustained by the vehicle that he threw

46

himself into when he attempted to harm himself (it would be regarded as vandalism), and an allegation he had violated his "no contact" order with Jane.  Vice President Klawunn and Dean Suarez also informed John they would seek to remove John from his dormitory that day because of the claimed violation of his no-contact order.  Finally, Vice President Klawunn informed John that the sexual misconduct complaint from the previous spring involving Sally could still be revived. . . .  John jumped up from his seat and cried, "Do you just want me out of here?"  At that point, John's Mother said to them both, "Enough! This is enough! You have traumatized him enough."

Suarez's callousness to and bias against John is merely underscored in this atrocious episode.  Suarez is an MSW and has an undergraduate degree in psychology.  During the relevant time period, she was Associate Dean and Director of the Student Support Services, and prior to that, Suarez "saw students for short-term psychotherapy" in her position as Associate Director of Brown's Psychological Services, subsequently known as CAPS. (PSOF ¶¶ 145-146).  She provided John with numerous counseling sessions about his family and his racial identity (*Id*. ¶¶ 147-150).  Yet, when she walked John across the green to CAPS after he was informed of T92 and had rolled up in a ball on the floor crying and presented at CAPS presented suicidal ideation, Suarez's  interpreted his "stunning revelation" in which he identified some women on the green with whom he had "hooked up," as something worthy of reporting to Dean Ward, who was YCA's superior in the OSL, which addressed sexual misconduct cases.  She also remembers that John was "tall and bi-racial." (PSOF ¶ 154).

Suarez's response to John walking across the green as "stunning" worthy of reportage to Defendant's sexual misconduct office rather than as an expression of his fear of being "targeted" in T92 and a plea to understand why "anyone I had been with previously in any context could come out against me since it was seeming like women were coming out against me for no reason as in Sally's case" is a notable indicia of Suarez's "unchecked bias" against John (PSOF ¶¶ 154-155).  To Suarez, John, the tall and biracial young man was a sexual threat, his voraciousness was "stunning" as if it had no bounds even in the face of a sexual misconduct violation. (PSOF ¶

47

155).  As a result and as Klawunn so overtly stated, John "has to go." (PSOF ¶ 213).  Whatever it takes to get him off campus, "either a mandatory leave or something based on concerns about his behavior." (*Id*).  What is truly stunning is that Suarez transferred her callousness to John and misconstrued it as John's flagrant expression of sexual appetite? His indifference to women? T91? T9?  Whatever "stunning" means it is not commensurate with support or compassion in this case.   Given the context there is no other reasonable explanation—John had just been suspended from Brown during finals week; he was on the floor in a ball crying.  John and Suarez are literally walking to CAPS where John is about to disclose the suicidal ideas that are swirling through his head.  Yet, Suarez, as an MSW with training and experience in psychology and a counseling relationship with John was unable to even minimally understand John's state of mind, point of view and fears.

How else to explain Defendant's patently unfair and biased characterization of all respondents, 100% male during the relevant time frame as abusers of "power dynamics" employing "manipulative tactics" in these matters. (PSOF ¶ 21).  How else to explain Defendant's breach of the Code to modify the terms of John's "deferred suspension" as warranting more extreme sanctions on the mere "allegation" of a violation without any evidence or in Sally's claim, nothing but conclusory allegations. (PSOF ¶ 98).  How else to explain YCA's

The only reasonable conclusion is gender and/or racial discrimination—what other human and social malady has the effect of dehumanizing "the other" and causing this degree of callousness to another person's suffering and fears of injustice.  The experience of the black community in America is a history of such callousness.  And men, at least young college men, white or black, are the new targets of discrimination.

How else to explain Defendant's patently unfair and biased characterization of all respondents, 100% male during the relevant time frame as abusers of "power dynamics" employing "manipulative tactics" in these matters. (PSOF ¶ 21).  How else to explain Defendant's breach of the Code to modify the terms of John's "deferred suspension" as warranting more extreme sanctions on the mere "allegation" of a violation without any evidence or in Sally's claim, nothing but conclusory allegations. (PSOF ¶ 98).  How else to explain YCA's

and Norris' complete dismissal and distrust of John's experience with Jane in T91 (PSOF ¶¶ 71-80).

How else to explain YCA's refusal to maintain the MNCO between John and Jane.  YCA revoked the MNCO issued in T91, and retroactively issued a NCO in favor of Jane only even though John had a right as per the findings to the MNCO as long as either party wanted it (¶¶ 96, 238) and even though the new 2016 rule that permitted unilateral NCO's was not retroactive. (PSOF ¶ 234).  John's plea to maintain the MNCO was ignored by YCA even though John claimed that Jane had "endangered his life." (PSOF ¶ 236).  While the phrase "endangered his life" on the face of it is far more dire claim than Sally's claim that John "forced me to have a shower with him," (PSOF ¶ 179), we note that Sally's claim was affirmatively encouraged by Defendant, triggered an interim suspension, an investigation and all of the events leading to John's depression and suicide attempt on Oct. 24 and the medical leave on Oct. 28 as the threat of Defendant re-opening Sally's case was one of the continuing threats Suarez and Klawunn used against John.  On the other hand, John's life-endangerment claim didn't raise a "red flag" for YCA, who did not issue an NCO against Jane.

How else to explain Brown's initial failure to reject John's readmission application, but accepted him only after his Father raised the specter of racial bias (PSOF ¶ 221).  Disappointing for YCA who clearly saw the medical leave as a way to keep John off campus through 2016, perhaps for good. (PSOF ¶ 227).  Unchecked biases, indeed.

These events prove Plaintiff's IIED claim, as follows:

(1) *The conduct must be intentional or in reckless disregard of the probability of causing emotional distress*.  As stated, Defendant, and Suarez in particular, was aware of John's emotional distress (Suarez, an experienced MSW who provided psychological counseling, was in

possession of John's CAPS authorization and in communication with Dr. Twitchell who warned her to not threaten John with disciplinary actions, which was the reason why he was in emotional distress and suicidal in the first place). Despite Dr. Twitchell's advice, Suarez moved forward with her plan to threaten John. Klawunn too participated in the Oct. 28 meeting and her intentions were clear—John "has to go." (PSOF ¶ 213). Even after John's medical leave as he was appealing the denial of his readmission to Brown, Klawunn was still threatening John with Jane's "minimal" NCO violations. (PSOF ¶¶ 195, 222).

(2) *The conduct must be extreme and outrageous*. As your Honor acknowledged, racial motivation "is extreme and outrageous behavior intolerable in a civilized community." *Doe v Brown Univ.*, 327 F Supp 3d 397, 415 (DRI 2018). Suarez's motivations, Klawunn's motivations, Norris's motivations, YCA's motivations and bias's unchecked or flagrant, whether based on race or gender, speak for themselves.

(3) *There must be a causal connection between the wrongful conduct and the emotional distress*. John's CAPS and RIH records clearly identify T91 and T92, and the grueling summer John awaited information about the T92 investigation as the basis for his depression, suicidal ideation and suicide attempt. (¶¶ 163, 187-192; Ex. 8, Daignault Opinion, Ex. 31, CAPS records).

(4) *The emotional distress in question must be severe* (and present with physical symptoms). John tried to kill himself. And Dr. Daignault has identified numerous physical effects of his persistent depression. (¶ 13, Ex. 8).

A jury could plausibly include that Defendant's motives and intents not only satisfy the elements of this IIED claim, but Plaintiff's claims in gender and race discrimination as well.

## E.      Breach of Contract and Covenant of Good Faith and Fair Dealing

To prevail on the merits, of a breach of contract claim, Plaintiff must establish: (1) that a contract existed; (2) that there was a breach of the contract; and (3) that the breach caused the plaintiff damages. *Doe v Brown Univ.*, 943 F3d 61, 67 (1st Cir 2019).  It is axiomatic in this Court that "the relationship between a student and a private university is based in contract" and that "[t]he relevant terms of the contractual relationship between a student and a university typically include language found in the university's student handbook." (*Id.*).  As YCA acknowledged, the Code is the student's "bible," on which they relied. (PSOF ¶ 100).

Defendant breached the Code in the following ways: a) In its sanction of John in T91, defendant changed the terms of its deferred suspension sanction in the Code, which was as follows:

> "Deferred suspension is used for offenses found serious enough to warrant suspension, but where the specific circumstances of the case mitigate the offense or for repeated offenses of a less serious nature.  Deferred suspension is a designed period of time during which a student is given the opportunity to demonstrate the ability to abide by the community's expectations of behavior articulated in the Code of Student Conduct. A deferred suspension may be accompanied by a transcript remark." (PSOF ¶ 97).

However, YCA, who had a hand in writing the Decision in T91 modified and enhanced the sanction to include the following statement:  "During the period of your deferred suspension, any *allegations* [*emphasis added*] that you violated the Standards of Student Conduct will receive greater scrutiny by the Office of Student Life and will increase the likelihood that the matter is resolved through a hearing in which more serious outcomes are possible, *including separation from the University*." (PSOF ¶¶ 98-99).  This enhanced sanction that relies on mere "allegations" will receive "greater scrutiny" is a breach within a breach as it sideswipes all other procedural protections in the Code in a race to "more serious outcomes . . . *including separation*."  Jane received the Decision including this enhanced portal to more extreme sanctions.  She was disappointed with the sanction and appealed it; the loss of the appeal caused

her more dismay. (PSOF ¶ 106).  The enhanced sanction could give Jane and any other party

interested in upending John's life and education the opportunity to have a field day with this.

Jane recruited Sally and brought claims of NCO violations against John (¶¶ 194-195).  And

defendant picked up on Jane's agitations and ran with them:  T92 which barely expressed a

sexual misconduct violation and didn't even include John's name triggered an interim suspension

during finals week and three months of unendurable waiting for the outcome of an investigation

that wasn't even occurring.  Jane's alleged NCO violations fueled Suarez's and Klawunn's antics

during the October 28 meeting with John and his Mother, and Klawunn was still banking on the

alleged NCO violations to keep John from being readmitted after his medical leave (PSOF ¶ 209-

210).

(b)  During T92, Defendant breached the Code as detailed in PSOF ¶¶ 166-179.  This

caused John tremendous damage as these procedures, if exercised, would have deterred

Defendant from putting John on interim suspension and launching a baseless investigation

causing him tremendous emotional distress that was the foundation to his suicide attempt on

October 24, 2014.

In addition to the breaches of the contractual elements of the Code, John also alleges that

Defendant breached its "implied duty" of good faith and fair dealing, which exists in every

contract under Rhode Island law. *Doe v Brown Univ.*, 943 F3d 61, 69 (1st Cir 2019).  Defendant

breached this duty in three significant ways.  In the first instance, Defendant discouraged

Plaintiff where it encouraged Jane and Sally with regard to pre-complaint support and in

procuring a complaint.  Defendant did not expect Jane or Sally to enter into the complaint

process without a lot of hand-holding—nearly four months of support from Shooshani and

participation in SAPE where she presented story about John and it was well received.  Sally too

was escorted into the process by Jane who made introduction with the Dean, who in turn

encouraged Sally to file her complaint.  Like Jane and Sally, John was a "survivor" of sexual

misconduct—he had been bitten and choked.  But that's not how Defendant saw it.  Instead, John

faced discouragement where Jane and Sally found encouragement.

       The second way Defendant breached its implied duty was by overlooking Jane's

retaliatory acts.  During the relevant time period Defendant prohibited students from retaliating

against students who were party to a sexual misconduct disciplinary action.  Examples of

retaliation include such acts as repeated complaints from one party about the other or spreading

information about a person. (PSOF ¶¶ 107-108).  In the event retaliation occurs, the procedure is

to talk to the student being retaliated against and determine whether the behavior warrants more

attention. (PSOF ¶¶ 108-109).  Jane made repeated complaints about John in that she informed

the Dean about Sally's experience and she reported John for what even she had to admit were

"minimal" alleged violations of her MNCO with John. (PSOF ¶ 195).  Jane also spread

information about John during her discussion about hook-ups with her sorority. (PSOF ¶¶ 110-

111).  This was not only impermissible retaliation, it also violated confidentiality provisions of

the Code. (*Id*).

       The third way Defendant breached its implied duty was by revoking the MNCO issued

between Jane and John.  The MNCO in T91 was required to stay in place per the Findings so

long as "complainant *or respondent* would wish it to be maintained." (PSOF ¶ 235, *emphasis*

*added*).  Both parties wished to maintain it.  Indeed, in April 2016, Jane contacted YSA to ask

her to remind John of the NCO as she was returning to campus the following fall. (PSOF ¶ 230).

Instead, YCA revoked the MNCO and issued a unilateral NCO in accordance with a new policy.

However, the new policy was not to be enacted retroactively, and John was the only student with

a disciplinary record prior to 2016 who had his MNCO revoked (PSOF ¶ 234, 238).  John demanded that YCA maintain the MNCO claiming that Jane had "endangered his life." (PSOF ¶ 236).  John's life-endangerment claim didn't raise a "red flag" for YCA who did not issue a NCO against Jane. (PSOF ¶ 237).[28]  To the extent that YCA unnecessarily revoked the MNCO retroactively and would not reinstitute it despite John's plea (and his right under the Findings) are not only indicia of her racial and/or gender bias against John, but it was underhanded, unfair and in very bad faith.[29]

---

[28] As argued above, while the phrase "endangered his life" on the face of it is far more dire claim than Sally's claim that John "forced me to have a shower with him," (PSOF ¶ 179), we note that Sally's claim was encouraged by Jane who reported to a dean about Sally's interaction with John, and the Dean in turn contacted Sally and ultimately encouraged her to file a complaint against Jane (PSOF ¶ 117).  Such chain of events stemming from Jane triggered an interim suspension, an investigation and all of the events leading to John's depression and suicide attempt on Oct. 24 and the medical leave on Oct. 28 as the threat of Defendant re-opening Sally's case was one of the threats Suarez and Klawunn used against John.  Such an obvious chain of events also should have triggered a red flag that Jane was retaliating against John.

[29] Finally, the Code states that a respondent "is to be assumed not responsible of any alleged violation unless she/he is so found through the appropriate student conduct hearing." (PSOF ¶ 30).  Defendant's conduct with respect to Plaintiff hardly evinces the spirit of this right.

**CONCLUSION**

For the above-stated reasons and as supported by Plaintiff's Statement of Facts pursuant to Fed. R. Civ. P. 56.1, Plaintiff respectfully requests that the Court deny Defendant's summary judgement motion in its entirety.


DATED:          March 31, 2020

                                                    Respectfully Submitted,

                                                    THE PLAINTIFF,

                                                    By:      _/s/ Susan Kaplan_____
                                                             Susan Kaplan (*pro hac vice*)
                                                             The Kaplan Law Office
                                                             30 Wall Street, 8th Floor
                                                             New York, NY 10005
                                                             Telephone: (347) 683-2505
                                                             skaplan@lawkaplan.com

                                                             /s/ Sonja L. Deyoe
                                                             Sonja L. Deyoe #6301
                                                             395 Smith Street
                                                             Providence, RI 02908
                                                             (401) 864-5877
                                                             (401) 354-7464
                                                             sld@the-straight-shooter.com


                                                    *Attorneys for Plaintiff, John Doe*

**CERTIFICATE OF SERVICE**

I certify that on the 31st day of March, 2020, I filed and served this document via the Court's CM/ECF system.

/s/ Sonja L. Deyoe