UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

**JOHN DOE**

**v.**                                                                      **C.A. 17-cv-191-JJM-LDA**

**BROWN UNIVERSITY**

**PLAINTIFF'S STATEMENT OF FACTS IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

1.      In the fall of 2013, Plaintiff, John Doe (John) arrived as a freshman at Brown University

(Defendant, or Brown) with a multi-syllabic Afro-centric name, and an Afro-centric identity.

(Ex. 1, John Doe Transcript—*Doe Tr.*—26:20-25) (Ex. 2, John Doe Declaration—*Doe Dec.*—¶

5) (Ex. 3, Maria Suarez Transcript—*Suarez Tr.*—31:15-19).

2.      John is the oldest son of a white mother and an African father whose grandfather was a

chief in the Ngomby tribe, John was under pressure to bring honor to his African heritage of

dignified purpose and to be a professional with financial security and financial responsibility to

his family, particularly with respect to his younger brother who is disabled. (Ex. 1, *Doe Tr.*,

26:20-25; Ex. 2, *Doe Dec.*; Ex. 3 *Suarez Tr.*, 31:15-19).

3.      John was an All-American in high school having won awards not only for his athleticism,

but his character and sportsmanship. (Ex. 2, *Doe Dec.*, ¶ 2).  John came to Defendant to play

lacrosse and major in finance. (*Id*. ¶ 6).

4.      At the time he enrolled at Brown, John was a happy, outgoing team player with no prior

social or emotional issues. (Ex. 2, *Doe Dec.*, ¶ 4; Ex. 8, Opinion Letter of Dr. John Daignault—

*Daignault Op.*—p. 17).

5.      Jane who is white, and female; Sally, a white and female and John, a black male, all

alleged sexual misconduct to Defendant. (Ex. 2, *Doe Dec.*, ¶ 7).

1

6.      Defendant provided Jane and Sally with support even before they filed a complaint and the opportunity to have Defendant fully investigate and prove their claims. (Ex. 4, Bita Shooshanni Transcript—*Shooshani Tr.*—88-89 generally).

7.      During the relevant time-period from 2013-2015, Title IX cases fell under the auspices of the OSL. (Ex. 5, Yolanda Castillo-Appollonio Transcript—*YCA Tr.*—46:1-4).  YCA worked under Dean Allen Ward, who in turn answered to Margaret Klawunn, who during the relevant time-period was Vice President for Campus Life and Student Services. (Ex. 5, *YCA Tr.*, 48:10-17).

8.       During the relevant time period, 100% of all students against whom a complaint of sexual misconduct was made were male. (See Ex. 6, Defendant's Gender Chart).

9.      John was the only African-American male student Norris advised. (Ex. 7, Carolan Norris Transcript—*Norris Tr.*—28:4-11).

10.     By 2014, John was clinically depressed and suicidal.  His grades were suffering (Ex. 1, *Doe Tr.*, ,186:12-20; 121:20-24; 122:1-23) and his participation with his beloved lacrosse team was greatly diminished.  He was forced by Defendant to move out of the team's house. (Ex. 1, Doe 128:3-25)

11.     John was "robbed" of playing in an NCAA tournament with the team (Ex. 1, Doe, 129:5-17; 146:1-18) and experienced a deterioration of teamwork with the other athletes. (Ex. 1, Doe 147:19-25; 148:1-6)

12.     John changed majors and career goals from finance to acting. (Ex. 1, *Doe Tr.*, 31:1-3; 28:17-21; 30:11-14, 24-25).

13.     John suffered a loss of reputation (Ex. 1, Doe 26:20-25; 29:24-25; 130:1-19; 51:3-6) and "enormous life-altering psychological harm"—both "major depressive disorder" and "persistent

depressive disorder" as a result of his "adverse experiences with Brown" that have "devastated" John's life. (Ex. 8, *Daignault Op*., pp. 16-19).  The physical symptoms of John's persistent depressive disorder "is marked by pervasively depressed mood, markedly diminished energy and motivation, hypersomnia, hypophagia, diminished libido, anhedonia, hyperirritability, feelings of helplessness, and feelings of hopelessness." (Ex. 8, Daignault, p. 18).

14.     The Office of Civil Rights does not keep statistics on the race of students accused of sexual misconduct however, observers have reported that "the number of accused who are men of color is just creepily high," and mirrors "the overenforcement of criminal and criminal-like sanctions against people of color continuous with what's going on in the legal system. . . . the bias that's in all of our heads is producing this." (*See* Ex. 9 *The Revolt of the Feminist Law Profs, The Chronicle of Higher Education,* Wesley Yang, August 2019, p. 8).

15.     Indeed, in her testimony, YCA recalled her communications with John's Father, who expressed his concerns "about [John's] identifying as a black male athlete, and how that may have impacted the hearings." (Ex. 5, *YCA Tr*., 211:14-17, and *see generally,* Ex. 5, *YCA Tr*., 211:11-24; 212-213; 254:4-16).

16.     In the context of that conversation about race with John's Father, YCA admitted "there are unconscious biases, and that we all have them."  (Ex. 5, *YCA Tr*., 212:16-22; 254:4-9).

17.      During the relevant time, Defendant provided John with no clear definition of consent, relying only on community standards, which allowed "biases" to run rampant against John, the rare, if not lone black male. (Ex. 5, *YCA Tr*., 171:15-22).

18.     YCA could not recall the number of African-American males involved in OSL sexual misconduct cases, but expressed that there was more than one, otherwise she could not "isolate" them. (Ex. 5, *YCA Tr*., 214:19-24, 215:1-4).

19.     Klawunn agreed that when men were complainants, they "were in cases that involved men as respondents." (Ex. 10, Margaret Klawunn Transcript—*Klawunn Tr.*—31:13-16).  There were no women at Brown accused of sexual misconduct in this period. (*Id*. 31:24-32:6).

20.     Defendant's description of its 2013-2014 "current hearing model" calls the complainant a "survivor" and the hearing process is praised "an important venue for a survivor to feel personally empowered." (Ex. 11, Student Conduct Hearings 2013-2014, p. 11).

21.     Defendant praised its practices as being proficient in revealing the respondent's "power dynamics" and "potentially manipulative tactics" which "can be massive influences on a finding." (*Id.*)

### 2013-TITLE IX First Action ("T91")

22.     On or about September 20, 2013 Jane, a white, female sophomore at Brown and John had a brief encounter at a popular student bar.  The encounter began with a sado-masochistic episode in which Jane bit John's lip so hard it bled. She also tried to asphyxiate him and declared, "I make the rules." (Ex. 12, Doe's Statement T91).

23.     John was found responsible for trying to lift Jane's dress twice, but not continue attempts once he discerned she was not interested.  He admitted to this behavior. (Ex. 12, Doe's Statement T91).

24.     At the hearing, John addressed why he continued to try to raise Jane's dress after it was stated it should have been clear Jane was disinterested, John  explained that "[g]irls in my experience don't like to be rushed, they like to take their time, they like to be seduced in my experience . . . .  is after I asked—like again, I just asked nonverbally, got my answer, which was a no, and I did not ask again." (Ex. 1, *Doe Tr.*, 103:13-104:2).

25.     Margaret Klawunn, Defendant's Vice President for Campus Life and Student Services, and YCA's superior during the relevant time-period, addressed Janes appeal and denied it explaining John's malfeasance for which he was sanctioned as follows:  John tried "to pull her dress up and down, which she did not want. And so, that was the reason why they felt that the behavior—where the nonconsensual behavior came, but that it wasn't clear that there had been anything more than that. (Ex. 10, *Klawunn Tr.*, 79:5-13; Ex. 13, Appeal Decision; Ex. 14, Klawunn Email to YCA)

26.     Jane was not charged with or found responsible of any sexual misconduct against John. (Ex. 5, *YCA Tr.*, 103:19-22).

27.     Indeed, neither YCA nor Norris, two of Defendant's employees most closely connected to T91, even recognized Jane's actions as being non-consensual or in any way violative of Defendant's Code of Conduct. (Ex. 15, Code of Student Conduct 2013-2014, the "Code"; Ex. 1, *Doe Tr.*, 132:25-133:12; Ex. 5, *YCA Tr.*, 87:1-7, 91:14-24, 93:11-24; Ex.4, *Norris Tr.*, 64:4-19).

28.     Jane filed her complaint against John on or about December 6, 2013. (Ex. 16, Jane's Complaint).

29.     On the same day, Defendant charged John with both III a and III b violations as well as offense II a, which address actions that "result in or reasonably expected to result in physical harm . . . ." (Ex. 17, December 6, 2013 Charging Letter).

30.     Defendants' sexual misconduct policy was as follows (Ex. 15, Code, p.4):

III Sexual Misconduct
   a.  Sexual Misconduct that involves non-consensual physical contact of a sexual nature.
   b.  Sexual Misconduct that includes one or more of the following: penetration, violent physical force, or injury.

5

In its "comment" to the Code, Defendant notes that violations of offense "III b will result in more severe sanctions from the University, separation being the standard." *Id*.  The Code also states that a respondent "is to be assumed not responsible of any alleged violation unless she/he is so found through the appropriate student conduct hearing." (*Id*., p. 7)

31.    At the same time, John was put under a No-Contact Order in favor of Jane. (Ex. 18, last page).  The No-Contact Order was mutual, and Jane received one in favor on John. (Ex. 19).

32.    One week later, on or about December 13, John provided his statement about the incident.  In it he described the encounter as "violent" (Ex. 12):

> As we steadily kissed, she bit hard on my lower lip.  She bit down to the point of breaking the skin and drawing blood.  It startled me as I had never experienced a bite like this before.  However, I continued kissing, ignoring the wound. As we continued kissing, she next put her hand to my throat, pushed me against the wall, and her hand pushed against my throat to the point of cutting off my breath. She continued adding pressure until I began to actually choke.  She was smiling at me and although I felt slightly wheezy, I was smiling back . . . Her gestures suggested that she wanted to assume a dominant role in our interaction.  After a few moments she released me. . . . we kissed for another few moments . . . . Her hand returned to my throat and she again leaned in to apply steady pressure to my throat although more purposely this time.  She appeared to be aroused that she was causing me to choke. . . . I wasn't comfortable with this interaction and tried to indicate that we should move on from this. I put my hand against her choking hand to push it away form my throat.  I met some resistance to her stopping and by now was feeling short of breath from choking so I pushed harder against her wrist to get her to stop . . . and asked her what we should do now. . . . [W]hat stood out was a statement she made saying, "I make the rules."  She indicated that this style of making out would continue were we to stay there. I found it awkward and too violent. . . .and told her I was going to leave. . . . [but] she seemed to be commanding me that I had not received permission to leave. . . . I simply turned and left.

33.    John expressed his desire to bring a complaint against Jane directly to YCA. (Ex 1. *Doe Tr.*, 133:2-12)

34.    Defendant does not prohibit a respondent from filing a complaint.  Klawunn confirmed that where "the accused student has a complaint against his accuser . . . we definitely offered

students the possibility of submitting counter-complaints. . . ." (Ex. 10, *Klawunn Tr.*, 63:18-64:8).

35.     YCA acknowledged that a respondent could file a complaint against his accuser, which if brought early enough in the investigation of the first complaint, it would be investigated and heard together. (Ex. 5, *YCA Tr.*, 60:16-61:22).

36.     When John spoke with YCA about filing a complaint, he got "no support" and was told that he "would have to do a whole separate process."  Moreover, YCA "made it seem, the process I was in had to conclude and then we'd open up a new one." (Ex. 1, *Doe Tr.*, 132:25-133:12).

37.     YCA had no recollection of discussing with John about filing a complaint against Jane. (Ex. 5, *YCA Tr.*, 87:1-7).

38.     In YCA's words, there was no reason for John to file his own complaint against Jane because in a situation like Plaintiff's where he is complaining of the same event as the complainant, the hearing would consider both. (Ex. 5, *YCA Tr.*, 91:14-92:2).

39.     However, without a complaint, no charges could have been brought against Jane, no findings could be made with respect to John's allegations, and no sanctions against Jane could be considered or imposed. (Ex. 5, *YCA Tr.*, 93:17-24).

40.     However, even if John did not ask YCA to file a complaint against Jane, YCA acknowledged a duty pursuant to the OCR's so-called "Dear Colleague Letter" dated April 11, 2011 (the "Letter") to address sexual misconduct under its "know or should have known standard." (Ex. 13, the Letter, p. 4).

41.     YCA acknowledged that pursuant to the Letter, if the school knew or should have known about sexual misconduct, the school has a duty to "take immediate action to eliminate the

harassment" even if the student-target of the harassment does not make a complaint. (Ex. 5, *YCA Tr.*, 39:8-19, 44:22-45:5).

42.     Moreover, YCA affirmed that pursuant to the "know or should have known standard", if any party to the sexual misconduct process discloses in his or her response allegations of sexual misconduct other than the misconduct the accuser has alleged, her office "would look into that." (Ex. 5, *YCA Tr.*, 57:13-58:7).

43.     Yet, when applying these standards to John, YCA discouraged John from filing a complaint.  For example, YCA testified that she would allow the respondent to file a complaint against the accuser if it was brought early enough in the investigation of the first complaint so that both complaints could be investigated and heard together. (Ex. 5, *YCA Tr.*, 60:16-62:2).

44.     John's statement (Ex. 12) was received by YCA on December 13, 2014, about a week into the investigation of Jane's complaint that was initiated with the Charging Letter on December 6, 2013 (Ex. 17), early enough to be part of the investigation and hearing process Jane initiated.

45.      Further, YCA read John's statement upon receipt. (Ex. 5, *YCA Tr.*, 84: 1-16).

46.     YCA not only discouraged John from filing a complaint, she was also dismissive of the idea that John even had the basis for a complaint.  YCA did not perceive the events Plaintiff alleged occurred as violations of Defendant's sexual misconduct standard. (Ex. 5, *YCA Tr.*, 87:21-88:9).

47.     YCA blamed Defendant's failure to act on John's behalf on John himself and the way he presented his allegations against Jane. (Ex. 5, *YCA Tr.*, 88:18-89:2).

48.     In the first instance, YCA opined that John's statement did not include a statement directing Jane to "stop." (*Id.*).

49.     Indeed, in another variation of YCA's reasoning, Plaintiff did not allege that he could not "leave or stop." (Ex. 5, *YCA Tr.*, 99:20-24)

50.     During the 2013-2014 academic year, Defendant did not have a policy on sexual consent, as stated.  During this period, Defendant relied on discussion groups on consent during orientation to decide the "community standards" (Ex. 5, *YCA Tr.*, 26:4-21) and posted a video on-line that included snippets of students contributing a statement as to what consent meant to them.  Among them is the statement that "silence is not consent." (YouTube video, *Brown Students ask for Consent,* https://www.youtube.com/watch?v=8lRIWWItLx4, posting date July 18, 2012).

51.     Overtly saying stop and/or allegations that the accuser was restrained or otherwise could not leave are not required.  In any event, John's gesture of putting "my hand against her choking hand to push it away from my throat" is a non-verbal gesture to "stop." (Ex. 12).

52.     This Video was part of Brown's training and orientation on consent and "every incoming freshman was supposed to watch the consent video."  (Ex. 4, *Shooshani Tr.*, 52:19-21)

53.     YCA pointed out a deficit in John's claims was that while he identified Jane's actions as "violent," he did not "indicate" that the events were "sexual misconduct" and it was not identified as a "Complaint" even though none of these criteria are required for Defendant to meet its obligations under the Code or to investigate sexual misconduct so long as it knew or should have known it occurred (Ex. 5, *YCA Tr.*, 88:18-90:7; Ex. 15).

54.     In his statement, John stated that he found the interaction with Jane to be "awkward and *too violent . . .* and told Jane he "was going to leave . . .," but Jane "seemed to be commanding me that I had not received permission to leave [*emphasis added*]." (Ex. 12).

55.     However, YCA acknowledged that Plaintiff did characterize the events as sexual assault at the hearing, but it was procedurally too late to address his allegations. (Ex. 5, *YCA Tr.*, 103:9-104:9).

56.     YCA's belated observation contradicts her own claim that Defendant did not need to bring a complaint because the "panel would be able to consider both. . . ." (Ex. 5, *YCA Tr.*, 91:18-24).

57.     YCA testified that Defendant would have had to pursue a unilateral investigation, but only if John's claims met Defendant's requirements for "special circumstances." (Ex. 5, *YCA Tr.*, 93:3-10).

58.     Plaintiff's allegations of being bitten until he bled and asphyxiated until he wheezed and couldn't breathe did not rise to a special circumstance, as stated:

> Q:  What are special circumstances?
> A:   Typically, I would say . . . if a particular incident was so severe, either if there was a weapon involved or there were severe injuries, that kind of thing . . . . (*Id.*)

59.     With regard to "special circumstances," YCA explained that Defendant would not bring a complaint against a student who choked another student with her bare hands because Defendant's definition of "weapon does not include your hands." (Ex. 5, *YCA Tr.*, 106:2-3).  Yet, YCA did acknowledge if the student were choked to death, Defendant would act. (*Id.*, 106:4-107:1; *see also* 104:24-105:24).

60.     Despite his allegations of injury and violence, Plaintiff's experience did not raise a red flag for YCA in what was alleged by Jane to be a sexual encounter. (Ex. 5, *YCA Tr.*, 98:9-99:5).

61.     YCA opined that John's allegations against Jane did not warrant being a complaint because in YCA's opinion, "some people choke and like choking," regardless of the fact that

John clearly stated in his statement that he was "uncomfortable" with the choking and was "short of breath," and found the experience to be "violent." (Ex. 12) (Ex. 5, *YCA Tr.*, 125:20-127:10).

62.     With respect to the Title IX process, Klawunn explained, "we were trained to talk to students about what their options were on campus and off campus, if they wanted to pursue any support, or if they wanted to bring a complaint forward off campus or on campus. . . .You can choose to pursue your case; you may not want to pursue your case.  And I would, sometimes, work with the student for a couple of years while they were finishing up their degree. . . . So, sometimes they had hearings; sometimes they didn't, but I would continue to provide support. And I had—actually, I had a student who went all the way through.  Her assault happened when she was an undergraduate. She went all the way through Brown Medical School, and I went to her med school graduation." (Ex. 10, *Klawunn Tr.*, 27:6-22).

63.     The incident between Jane and John occurred on September 20, 2013, but Jane did not file her complaint until December 4, 2013. (Ex. 16, Jane's Complaint).

64.     Between those dates and before Jane felt "ready to proceed" to file her complaint, Jane met with Bita Shooshani, Brown's Coordinator of Sexual Assault Prevention and Advocacy. With Shooshani's help, Jane participated in SAPE, which is a peer education group regarding sexual assault, where she "shared her personal experience with the group."  Through this pre-complaint support, Jane tested the waters by sharing her story about John and experiencing support and was able to disclose her experience with her parents and professors before proceeding. (Ex. 21, Emails between Jane and Shooshani)

65.     When John disclosed his experience with sexual misconduct to YCA, he received no assistance.  (Ex 1, *Doe Tr.*, 133:3-12)

11

66.     Norris is currently Brown's Senior Associate Athletic Director, but to the best of her recollections, she was the head field hockey coach or assistant athletic director and was John's advisor during T91. (Ex. 7, *Norris Tr.*, 11:14-19).

67.     She also advised students "through hearings," in connection with various code violations including sexual misconduct since the 1990's. (Ex. 7, *Norris Tr.*, 13:5-8, 15:14-19).

68.     During her tenure as an advisor, she was John's only advisor, and to the extent that she advised students in sexual misconduct cases, all of the students she advised were male. (Ex. 7, *Norris Tr.*, 21:4-12).

69.     John was the only black, male student she ever advised in a title IX proceeding involving alleged sexual misconduct. (Ex. 7, *Norris Tr.*, 27:19-28:11).

70.     Norris did not like John and she refused to advise him in T92 when he called her requesting her help because he called her at ten of three and wanted to meet at 3 o'clock. (Ex. 7, *Norris Tr.*, 47:10-17).

71.     Generally, Norris thought that John was both "arrogant"— he wanted to "take charge of the whole—it wasn't almost like he needed any advising" (Ex. 7, *Norris Tr.*, 48:4-8); and at the same time, he was not serious. (Ex. 7, *Norris Tr.*, 52: 4-10).

72.     Norris was particularly piqued that John didn't know Jane's name at the time of the incident. (Ex. 7, *Norris Tr.*, 48:22-23).

73.     When Norris was asked whether she knew if Jane knew John's name at the time of the event, Norris replied that she "never thought of it." (Ex. 7, *Norris Tr.*, 49:11-19).

74.     Norris also did not like that John told her that "he likes butts." (Ex. 7, *Norris Tr.*, 48: 11-15).

12

75.     Norris acknowledged that there was nothing wrong with liking butts and any such preference was irrelevant to T91. (Ex. 7, *Norris Tr.*, 67:11-22).

76.     Norris did not like that John wanted to defend himself, and wouldn't take responsibility for his actions. (Ex. 7, *Norris Tr.*, 51:14-24).

77.     She was offended that John called Jane a "bitch or she's a crazy bitch" (Ex. 7, *Norris Tr.*, 58:19-22) and did not appreciate that John thought "he was in the right." (*Id.*, 59:4-9).

78.     When Norris was reminded that to the extent John called Jane "a bitch," it was because Jane bit and choked him, and was asked whether John had to take responsibility for being choked, she remarkably replied, "that's not for me to judge" even though she took it upon herself to judge whether John was responsible to Jane. (Ex. 7, *Norris Tr.*, 59:10-60:6).

79.     Norris worked with John on his statement (Ex. 7, *Norris Tr.*, 55:5-17), yet, when asked whether she thought John should have brought a case against Jane, Ms. Norris said, "No  . . . . It never came into my mind." (Ex. 7, *Norris Tr.*, 64:4-19).

80.     When asked whether Jane was responsible to John for choking John, Norris, demurred and said, "I wasn't there, so I don't know." (Ex. 7, *Norris Tr.*, 62:2-3).

81.     When she was asked if Jane did choke John, would that act "be attributable to a hook up gone wrong?," Norris said, "No." (Ex. 7, *Norris Tr.*, 62:16-63:5).

82.     When asked about JJ's witness who corroborated that he had a swollen lip, Ms. Norris said, "his friend could have lied about his swollen lip." (Ex. 7, *Norris Tr.*, 71:17-23).

83.     When asked if she was skeptical of all witnesses or just John's witnesses in particular, she said "no." (Ex. 7, *Norris Tr.*, 72:20-24).

84.    Norris also admonished John for not taking "ownership of anything on that night" (Ex. 7, *Norris Tr.*, 53:9-10), because something must have happened because a hearing had been scheduled. (*Id.*, 53:13-54:3).

85.    When it was pointed out to her that John literally took responsibility in his statement for lifting Jane's dress (Ex. 12), which was what he was found responsible for and sanctioned, Ms. Norris did not revoke her admonition, and confirmed it as "just her opinion." (Ex. 7, *Norris Tr.*, 56:5-19).

86.    Norris also testified that she expressed to John that she was "sorry" about what he alleged Jane did to him (Ex. 7, *Norris Tr.*, 66:21-22), yet she was unable to balance the rights and wrongs in both Jane's and John's actions.

87.    Norris had been involved in another case wherein a white, male respondent acknowledged his wrongdoing but alleged that the female complainant also had dirty hands (Ex. 7, *Norris Tr.*, 38:6-39:8).

88.    Norris could not recall if there was any other case like this even though she was John's advisor in T91 and was literally being questioned about John's claims against Jane (Ex. 7, *Norris Tr.*, 38:6-39:23).

89.    John observed, ". . . discrimination exists, and the fact that a white girl accused me of hitting her, and . . . in the case it turns out I came nowhere close to striking her, damn, it just doesn't look good." (Ex. 1, *Doe Tr.*, 139:17-21)

90.    After the T91 hearing, John was found responsible for III a only. (Ex. 22, Defendant's T91 decision dated February 14, 2014, the "Decision").

91.    In an internal memo the hearing board sent to YCA dated February 11, 2014 (Ex. 17, the "Findings Memo"), the Board explained that with regard to the panel's finding that John was not

14

responsible for the III b violation, the panel did "not find the physical interaction was violent, and no injury was sustained." *Id.*

92.    Neither the charges (Ex. 17), the Findings (Ex. 23), nor the Decision (Ex. 22) addressed Jane's acts of choking John, his loss of breath or John's bitten and bloodied lip.

93.    YCA testified if neither John nor Defendant Brown brought a charge against Jane, then there is no way she could be found responsible for any sexual malfeasance. (Ex. 5, *YCA Tr.*, 93:17-24).

94.    As a result of these findings, John was placed on a deferred suspension through May 15, 2015. (Ex. 22).

95.    In the Findings Memo, the Board also recommended that "the no-contact order should remain in place if either complainant *or respondent* would wish it to be maintained [*emphasis added*]." (Ex. 23).

96.    While the Decision did not address the Mutual No-Contact Order (the "MNCO"), it remained in place until 2016 when Defendant unilaterally changed it to a singular No Contact Order ("NCO") to allegedly conform to a new, yet non-retroactive rule regarding NCO's and which only affected John. (Ex. 5, *YCA Tr.*, 236:11-13).

97.    In its Decision (Ex. 22) Defendant modified and enhanced the deferred suspension from its version in the Code which in its entirety follows (Ex. 15, Code, pp. 19-20):

> "Deferred suspension is used for offenses found serious enough to warrant suspension, but where the specific circumstances of the case mitigate the offense or for repeated offenses of a less serious nature.  Deferred suspension is a designed period of time during which a student is given the opportunity to demonstrate the ability to abide by the community's expectations of behavior articulated in the Code of Student Conduct. A deferred suspension may be accompanied by a transcript remark."

98.    In the Decision, the sanction included the following enhanced scrutiny and elevation of
sanctions against John, stating as follows in relevant part (Ex. 22, p. 1):

> During the period of your deferred suspension, any *allegations* [*emphasis added*]
> that you violated the Standards of Student Conduct will receive greater scrutiny
> by the Office of Student Life and will increase the likelihood that the matter is
> resolved through a hearing in which more serious outcomes are possible,
> *including separation from the University* [*emphasis in original*].

99.    YCA "participated in drafting" the Decision. (Ex. 5, *YCA Tr.*, 123:14-16).

100.    YCA acknowledged that the version in the Code is the "bible," the one in which students
are "aware of" and "rely on." (Ex. 5, *YCA Tr.*, 121:1-14).

101.    Jane received a copy of the decision letter with the definition of deferred suspension
promising enhanced sanctions one the mere assertion of "any allegation." (Ex. 5, *YCA Tr.*,
133:17-21).

102.    John did not appeal the decision but knowing how nefariously the events of T91 led to
T92, he regrets that decision. (Ex. 1, *Doe Tr.*, 130:20-22, 131:10-15; 132:15-24).

103.    Jane appealed the decision and during Jane's appeal process, YCA, had an opportunity to
balance the record and address John's allegations about Jane's physical aggression towards him
in her summary memo to Klawunn, who was the decision maker on Jane's appeal.  In the
memorandum, YCA specifically identified John's alleged acts of choking Jane for which he was
not found responsible, but did not reference Jane's acts of biting John's lip and/or choking him to
the point of wheezing. (Ex. 24, March 6 Memo from YCA to Klawunn re Jane Appeal T91; Ex.
5, *YCA Tr.*, 131:12-14; 132:1-17).

104.    In denying Jane's appeal, Klawunn explained that "we had a finding of responsibility for
offense III a, and not for Offense III b, which was the sexual misconduct with penetration,
violent physical force, or injury . . . But in his case it was very significant that he was found

16

responsible for III a and not for III b, and that's what made the difference." (Ex. 10, *Klawunn Tr.*, 77:4-23).

105.    YCA's summary memorandum on the appeal did not reflect the panel's findings, which acknowledged that John "reported confusion" concerning Jane's actions, and that John did not intend to cause Jane harm. (Ex.s 23, 24).

106.    Jane lost her appeal of the sanction given to John.  She was not happy about it. (Ex. 5, *YCA Tr.*, 135:10-12; Ex. 7, *Klawunn Tr.*,101:13-18; Ex. 25, emails from Klawunn to YCA).


**SPRING 2014 T92**

107.    According to YCA, retaliation among students involved in sexual misconduct cases is prohibited and YCA claimed to take precautions against retaliation by informing complainants to not retaliate. (Ex. 5, *YCA Tr.*, 37:23-38:3).

108.    Examples of retaliation include such acts as repeated complaints from one party about the other or "spreading information about a person." (Ex. 5, *YCA Tr.*, 38:4-13; 222:15-19).

109.    In the event retaliation occurs, the procedure is to talk to the student being retaliated against and determine whether the behavior warrants more attention. (Ex. 5, *YCA Tr.*, 222:22-223:8).

110.    In the spring semester of 2014, Jane engaging Sally, and other members of her sorority, in a discussion about "certain men on campus and negative interactions we have had." (Ex. 26, Sally Transcript—*Sally Tr.*—18:8-19; 23:11-17; 24:7-8).

111.    At some point in the conversation, Jane disclosed that John had tried to touch her, and that he choked her.  However, Jane did not mention that she bit John or choked him. (Ex. 26, *Sally Tr.*, 26:7-15; 28:3-23).  The Code prohibits breaches of confidentiality. (Ex. 15, p. 7).

112.    Since Jane identified John, and since Sally too had had an interaction with John, Sally described to Jane her encounter with John. (Ex. 26, *Sally Tr.*, 29:7-30:14).

113.    In her telling, Sally clarified that she had consented to kissing, but nothing more.  While kissing, however, John floated the idea of taking a shower together.  Sally was not interested in taking a shower with John. (Ex. 26, *Sally Tr.*, 30:7-9; 30:18-19; 32:2-4).

114.    Sally stated, "[John] held me kind of—I don't want to say 'push' because it wasn't aggressive.  But it was more kind of leading me there.  So not forcing but not—gently pushing me, leading me to the shower stall." (Ex. 26, *Sally Tr.*, 38:13-16).

115.    Disinterested in the shower, Sally left without resistance from John. (Ex. 26, *Sally Tr.*, 30:21-24; 47:13-16).

116.    As a result of Sally's disclosure about John to Jane, Jane asked Sally for permission to share her story with a Dean. (Ex. 26, *Sally Tr.*, 60:7-13).

117.     As a result of Jane's disclosure to the Dean, the Dean contacted Sally and asked her to "come in and make a formal complaint regarding [John]." (Ex. 26, *Sally Tr.*, 55:24-56:4).

118.    Sally could not recall the name of the Dean (Ex. 26, *Sally Tr.*, 13:18-20), but YCA was certain that the Dean in question was Ashley Ferranti. (Ex. 5, *YCA Tr.*, 149:10-16).

119.    When Sally met with the Dean, Sally expressly explained that she was not interested in making a formal complaint about the event with John for her own sake, but would do so "for [the] protection of others." (Ex. 26, *Sally Tr.*, 62:5-10).

120.    However, as Sally knew of no other woman who had an encounter with John, the other woman Sally wanted to protect was Jane. (Ex. 26, *Sally Tr.*, 60:15-23).

121.    Indeed, Sally was not uncomfortable with or scared of John as a result of her encounter with him, but became so after listening to Jane's story. (Ex. 26, *Sally Tr.*, 78:10-79:8).

122.    Sally did file a complaint against John on April 18, 2014.  In the complaint, Sally characterized John's "gentle pushing" as "force."  Sally also stated in her complaint that as a result of her meeting with the Dean, Sally now felt "comfortable enough to finally report" her encounter with John.  Sally also included a reference to her friend, Jane's "even worse experience with the same male," and concluded the complaint with the opinion that John is "dangerous," though she "promptly left" John once she felt "uncomfortable" about her interaction with him without any resistance from John. (Ex. 27, T92 Complaint).

123.    Sally alleged that she was able to leave the encounter with John; Sally did not report that she said "stop."  Sally did not describe any "sexual misconduct" and relied on conclusory comments like "force" and "dangerous" in her statement.  (Ex. 27).

124.    In John's statement (Ex. 12), he used the word "violent" in connection with being choked so hard he was losing his breath and left the encounter without saying stop, none of which raised a "red flag" for YCA. (Ex. 5, *YCA Tr.*, 98:11-99:12) (Ex. 24).

125.    Sally's T92 complaint is the only contribution Sally made to T92. (Ex. 28-34).

126.    From April 18, 2014 until August 6, 2014, when Defendant closed the investigation (Ex. 28), Sally refused to participate. (Ex. 26, *Sally Tr.*, 76:3-17, 88:12-21, 93:11-94:20).

127.    YCA emailed Sally on April 29, 2014 and May 2, 2014 to elicit her participation. (Ex. 30, Email dated April 29, 2014 from YCA to Sally inviting Sally to meet with YCA to discuss her complaint).

128.    YCA found it necessary to email Sally, because she "tried to communicate with her by phone and was not able to reach her." (Ex. 5, *YCA Tr.*, 145:8-22).

129.    In the May 2, 2014 email, YCA asked Sally to let her know if she wanted Defendant "to move forward with the complaint." (Ex. 31, Email dated May 2, 2014 from YCA to Sally).

130.     Defendant, by May 2, 2014, indeed had not yet started the process in Sally's case "because we would not start an investigation without speaking to her first . . . to get more information." (Ex. 5, *YCA Tr.*, 146:10-147:15).

131.     YCA also wanted to make sure that Defendant didn't do anything Sally didn't want, such as move on with the investigation without her or issue a NCO.  (Ex. 5, *YCA Tr.*, 150:11-151:3).

132.     With no response from Sally, YCA emailed Sally again on May 6, 2014 in which YCA explained that she needs Sally's cooperation "regarding the details of the incident including the name of the other student involved." (Ex. 32, Email from YCA to Sally dated May 6, 2014, 12:51 pm).

133.     Sally responded, stating that she did not "want to take serious action" and that she "felt forced to report." (Ex. 33, Email from Sally to YCA dated May 6, 2014).

134.     Sally did not provide any further information about the incident or even John's identity, but Defendant suddenly determined that "the serious nature of the allegations" warranted an investigation. (Ex. 34, Email from YCA to Sally dated May 6, 2014, 5:45 pm)

135.     Defendant commenced an investigation (Ex. 34) and issued MNCO orders for John and Sally. (Ex. 35, mutual MNCO orders).

136.     The sudden seriousness of the case is notable.  YCA testified that the Dean and Sally met and Sally provided information about the incident that raised the case to "serious." (Ex. 5, *YCA Tr.*, 155:2-156:3) .

137.     Sally testified that she told the Dean that she "wasn't formally complaining that he sexually assaulted me," but that John asked her to go into the shower with him and continued to gently push her towards the shower after she said no with her then leaving the encounter. (Ex. 26, *Sally Tr.*, 62:1-10; 64:8-10; 63:13-21; 64:12-24; 65:1-4).

138.   When asked what information the Dean provided that helped YCA determine Sally's accusation was serious, YCA explained that the Dean did not provide new information but clarified information, which they could now move forward on—namely John's identity. (Ex. 5, *YCA Tr.*, 155:12-15) (Ex. 32).

139.   On May 7, 2014, Defendant "removed and barred" John from campus "effective immediately" because of the "seriousness of the allegations against you."  It was finals week. (Ex. 1, *Doe Tr.*, 130:22-131:15; 186:1-20) (Ex. 36, letter removing Doe from campus, dated May 7, 2014).

140.   John and Sally had been coexisting on campus since October 2013 when the shower incident occurred and since April 18 when she filed her complaint. (Ex 27).

141.   YCA scheduled a meeting with John in which he was informed of the charges and the interim suspension in T92. (Ex. 37).

142.   The purpose of the interim suspension was intended to help Defendant make a determination about charges against John, *if any* [*emphasis added*]. (Ex. 5, *YCA Tr.*, 167:1-17).

143.   Present at the May 7th meeting with YCA and John was Maria Suarez, Associate Dean and Director of the Student Support Services during the relevant time period. (Ex. 5, *YCA Tr.*, 173:2-15).

144.   Suarez helped students in "crisis," and with "mental health issues;" she basically helped students who were "struggling with any issue that was impairing their ability to be successful. (Ex. 3, *Suarez Tr.*, 14:7-8, 12-21).

145.   As a clinical social worker, Suarez holds an MSW and has an undergraduate degree in psychology. (*Id.,* 10:11-15).

146.    During the relevant time period, she was Associate Dean and Director of the Student

Support Services (*Id*., 9:15-16), and prior to that, Suarez "saw students for short-term

psychotherapy" in her position as Associate Director of Brown's Psychological Services,

subsequently known as CAPS. (*Id.,* 16:20-24)

147.    John was one of the students Suarez helped.  During T91, Suarez has sessions with John

around 10 times with each lasting at least 30 minutes and some lasting 50-60 minutes. (Ex. 3,

*Suarez Tr.*, 30:10-31:2).

148.    During these sessions, Suarez and John "talked a lot about race and pressures, and his

pressures growing up at home." (*Id.*, 31:15-17).

149.    They discussed "the difficulties if being a biracial male, both at home when he was

growing up and on campus" and "the pressure of being the eldest son of an African man and the

responsibilities of or the expectations of that family in Africa on them." (*Id.*, 32:7-13).

150.    They had "identity discussions," and one of the conversations they had "was about dating

women, white women, black women, who he was attracted to." (*Id.*, 195:13-20).

151.    YCA recalled that at the meeting John was devastated by the accusation and the interim

suspension.  YCA testified that John "screamed, he cried, he paced.  He got on the floor and

cried." (Ex. 5, *YCA Tr.*, 181:21-182:6).

152.    At the end of the May 7 meeting, Suarez thought John was so distraught that she

proceeded to walk John over to Defendant's Counseling and Psychological Services (CAPS) for

a psychiatric evaluation.  During the walk to CAPS, Suarez recalled that John identified women

on the green whom he had "hooked up with," and wondered aloud whether any of these women

would accuse him of sexual misconduct, asking "Can she report me?  Can she report me?  Can

she report me?" (Ex. 3, *Suarez Tr.*, 101:16-103:12, 119:19-21).

153.   Suarez clarified that "hooked up" covered the entire range of sexual interaction including merely kissing.  (*Id.,* 100:16-18).

154.   Suarez believed that she reported John's comments to Dean Ward in her debriefing with him.  Suarez characterized this experience, while walking with John to CAPS, as "stunning" especially in the context of him being accused of sexual misconduct. (*Id.*, 119:12-120:7; 121:8-122:13).  In addition to her walk with John to CAPS, Suarez remembered that John "was tall" and "biracial" (*Id.,* 133:1-8).

155.   When asked whether John may have been revealing this history as an effort to protect himself as he had just been accused for the second time as a freshman of sexual misconduct, Suarez responded as if that possibility never occurred to her. (*Id.*, 121:8-122:8, Ex. 2, *Doe Dec.* ¶¶ 9, 10, 11).

156.   At CAPS, John reported suicidal ideation upon hearing about T92 and thought that he might "slit his wrists," or climb "to the top of the OMAC and jump" or "take some drugs." Noting that John was experiencing "an adjustment reaction with mixed anxiety and depression," CAPS reported to Suarez that he was safe to return to campus. (Ex. 38, Psychiatric Records, pp 12-15).

157.   Defendant's investigation of T92 moved forward.  From May 7 to August 7, the investigation basically consisted of John's Statement, which he submitted on May 23 (Ex. 39, John's T92 Statement) and one other email from YCA to Sally, on June 17, 2014 at 3:48 pm, in which YCA asked Sally to call her "to talk briefly about the complaint you filed." (Ex. 40, June 17 Emails between YCA and Sally).

158.    The apparent reason YCA sent Sally this email is because on June 12, 2014, John emailed YCA to ask for an update about T92.  YCA responded to John's email on June 17, 2014 at 3:35 pm, and stated "that nothing will move forward until the Fall." (Ex. 41).

159.    At 3:48 pm, YCA once again entreated Sally to communicate with her. (Ex. 40, YCA's June 17 Emails to John and Sally).

160.     Sally did not respond to the June 17 email. (Ex. 42, YCA emails to Ward)

161.    On July 30, YCA emailed John's Mother to report that "[w]e have been working with the other party [Sally] . . . ." This assertion was categorically false.  (Ex. 42, YCA Email to John's Mother).

162.    On August 1, YCA reported to Dean Ward an accurate account of the degree of work on T92 YCA had achieved stating: "FYI, I still have not heard from the other student." (Ex. 42, YCA emails to Ward) (Ex. 5, *YCA Tr.*, 201:11-22).

163.    Defendant lied to John and his family all summer about the actual status of the complaint process in T92. (Ex. 1, *Doe Tr.*, 137:3-18).  This caused extreme duress for John and his family. In an account of these events to CAPS on October 23, 2014, John stated that his parents "almost split up;" it was "the worst summer ever." (Ex. 38, p. 12).

164.    From May 12 to July 22— John's Mother ("Mother") communicated with YCA in a series of emails (Ex. 43, Email communications between YCA and Mother).

165.     In the course of these emails, Mother addressed the emotional duress John and the family were experiencing especially given the amount of time the investigation was taking and their being left in the dark (See in particular Ex. 43, the July 22, 2014 email, p. 2).

166.    Moreover, John's Mother addressed procedural breaches in the investigation on T92. (Ex. 43).

167.    Mother noted that the Defendant's Code specifically required that a hearing must commence 60 days from receipt of the complaint unless extended by written petition by the case administrator, the complainant or the respondent. (Ex. 43, May 14, 2014 Email, ¶ 4)

168.    No hearing was ever scheduled and was no written petition was ever filed, yet John remained in purgatory during this period. (Ex. 15, Code of Conduct, p. 11, ¶ 12).

169.    YCA had underscored the likelihood of there being a hearing because T92 was a repeated offense and because John was already on deferred suspension. (Ex. 5, *YCA Tr.*, 177:8-178:23).

170.    The Code identities John's situation as one requiring a hearing for these reasons. (Ex. 15, Code of Conduct, p. 8, ¶¶ 3, 5).

171.    The Code provides specific requirements with regard to complaints "filed more than sixty (60) days after the alleged incident." (Ex. 15, Code of Conduct, p 11).

172.    In such circumstances, the complaint needs to include name(s) of all witnesses, or others who have information . . ." (Ex. 15, p. 11).  The T92 complaint does not even identify John, nor does it identify any witnesses or factual allegations about the incident. (Ex. 5, *YCA Tr.*, 143:11-144:8).

173.    Defendant failed to adhere to its own interim suspension policy, which permits an interim suspension of "individuals [which] pose a danger to themselves or the immediate well-being of the University community." (Ex.15, Code of Conduct, p. 9, *YCA Tr.*, 191:5-9).

174.    John was not a danger to himself, nor was he an "immediate" danger to the community nor Sally. (Ex. 26, *Sally Tr.*, 79:5-8).

175.    The event alleged in T92 occurred nearly 6 months before Sally filed her complaint, and Sally told the Dean that she was not in danger and that she knew of no one other than Jane who had been impacted by John. (Ex. 26, *Sally Tr.*, 103:23-104:3).

176.   YCA acknowledged, that when a student is on deferred suspension and a second complaint arises, the student is not automatically "separated from the community." (Ex. 5, *YCA Tr.*, 165:5-17, 190:2-14).

177.   According to YCA, there has to be another standard of "danger of some sort." (Ex. 5, *YCA Tr.*, 190:7-14).

178.   Another anomaly in T92 is that the Code required that, to be actionable, Complaints must "allege violations of the Code . . . ." (Ex. 15, Code p. 11), which T92 did not. (Ex. 27).

179.   While Sally used the word "force" in her complaint. (Ex. 27), Sally testified that she described the incident to the Dean as "gentle pushing," and specifically stated to the Dean that she was not filing a complaint about this "sexual assault" she experienced. (Ex. 26, *Sally Tr.*, 41:12-15, 62:7-10).

180.   Sally testified that Jane encouraged her to complain. (Ex. 26, *Sally Tr.*, 78:6-11).

181.   Given "scrutiny and the fact that Mom is a lawyer," Klawunn determined that Sally should get one more week to cooperate with the investigation; otherwise Defendant would close the case. (Ex. 44, August 1 email from Klawunn to Dean Ward).

182.   Defendant closed the case and released John from the interim suspension on August 7, 2014 and declared that it would not move "forward with any further action" unless "we obtain additional information." (Ex. 45, Ex. 5, *YCA Tr.*, 206:14-24; 207:16-208:1, Ex. 29).

183.   Sally provided no further information to Defendant beyond her initial meeting with the Dean at which time the T92 complaint was drafted. (Ex.s 31-34; Ex. 26, *Sally Tr.*, 87:4-10).

**2014 INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**:

184.   From the time John was put on interim suspension on May 7, 2014 in connection with T92 to when T92 was closed on August 7, 2014, John was under tremendous emotional duress.

As we have seen, John experienced a complete emotional breakdown and suicidal ideation when he was informed of T92. The months waiting for the next shoe to fall was constant duress for him and his family (See Ex. 38, generally).

185.    Defendant was aware of the strain the interminable wait puts on students in as much as Suarez noted that "the most difficult aspect of the conduct hearing . . .is not knowing the outcome … and not having power over what the outcome is going to be." (Ex. 3, *Suarez Tr.*, 59:2-7).

186.    When John returned to campus for the fall 2014 semester, he was depressed and self-medicating with marijuana. (See, Ex. 38, generally).

187.    On October 22, 2014, John had a crisis appointment with Dr. Braithwaite-Gardner at CAPS. John reported that he "has been sleeping all day" and "having trouble getting out of bed." John explained that he had "worst summer of his life" as a result of "being accused of sexual misconduct" and being "asked to leave campus." (Ex. 38, p. 10).

188.     John further disclosed that "the uncertainty of it put a strain on his family. Everyone was fighting and it almost ended his parents' marriage." (Ex. 38, p. 10).

189.    He indicated that prior to that appointment, he met with an MSW who reported that John was putting "on a very brave front as if trying not to cry." With the MSW concluding that John seemed "hopeless" and "disconnected from his feelings." (Ex. 38, p. 11).

190.    On October 23, 2014, John was assessed by John Kane, MD at CAPS. The assessment accounts for John's "history of depressive symptoms and substance abuse" that "emerged during his freshman year . . . in the context of two accusations of sexual misconduct." In particular, John reported that the second accusation caused him "significant depression" as well as "suicidal ideation." (Ex. 38, p. 12).

191.    Dr. Kane assessed John's psychiatric status as being "moderate to severe depression symptoms including hypersomnia, decreased appetite, concentration and energy." (Ex. 38, p. 14).

192.    Dr. Kane also noted that John was "contending with significant repercussions from the two allegations last year including a sense of shame and anger at himself, a decrease in self-esteem, and significant conflict with his family." (Ex. 38, p. 14).

193.    On October 19, 2014, John's Mother sent an email to YCA in which she accused Jane of violations of the MNCO and reminded YCA of her husband's request to protect John from Jane's and Sally's "conspiracies." (Ex. 46).  John stated that "[Jane] would show up at lacrosse house parties, parties that were put on by the lacrosse team in the lacrosse home . . . I felt that it was rather interesting that she would choose to go to an event where I would be." (Ex. 1, *Doe Tr.*, 164:19-24).

194.    On October 24, 2014, Jane scheduled a meeting with YCA to discuss alleged violations to their MNCO. (Ex. 5, *YCA Tr.*, 218:1-2).

195.     On October 27, 2014 Jane produced a document of the alleged violations, which she described to Shooshani in an October 20, 2014 email as "somewhat minimal" though "less than enjoyable." (Ex. 47—*see* Bates page 2381).

196.    While repeated complaints from one party about the other may be retaliation (Ex. 5, *YCA Tr.*, 222:15-19), the process of dealing with MNCO violations between students was in the first instance, a conversation with the accused student that would be an instructional on parameters. If further action was required, there would be a hearing. (Ex. 5, *YCA Tr.*, 67:17-68:24).

197.    Given the foot print of the campus and the unavoidable and unintended contact, the dean's hearing is reserved for "persistent and repeated" violations that have been addressed but

for which there has been no change, or if the violation was "significant and clearly intentional" such as "banging on the person's door." (Ex. 5, *YCA Tr.*, 69:1-18; 220:22-221:2).

198.     There is no record that any process regarding Jane's alleged MNCO violations occurred to determine whether they were serious, or if anyone met with John to discuss Jane's alleged violations and the MNCO parameters.

199.     Late in the evening of October 24, 2014 John attempted suicide by "jumping in front of a car in the context of 2 allegations of sexual misconduct during the last school year." (Ex. 38, p. 18).

200.     John was admitted to Rhode Island Hospital on October 24, 2014 and discharged on October 28, 2014. (*Id.*, p. 17).  In his discharge summary, RIH reported that John denied "guilt" in connection with the accusations, but began to "believe it must be true" and that he had suicidal ideation during T91, but also during T92. (*Id.,* p. 18).  Defendant was aware of the event and John's stated reasons for its occurrence as John provided Defendant with two medical authorizations to release his CAP's records to Dean Grenadier on October 22, 2014 and to Suarez on October 28, 2014 prior to the Oct. 28 meeting, (Ex. 38 pp. 2, 3; Ex. 3, *Suarez Tr.*, 135:9-12).

201.     In the discharge notes compiled by Jackie Twitchell, Psych. D. of CAPS, on October 28, 2014, she noted that what led John to jump in front of a moving vehicle is connected to having been "devastated by the accusations against him" and "thinking that if people are accusing him of being a rapist, maybe he is a rapist" and deserved to die.  John also reported that "he does not feel supported" by the lacrosse team, "playing lacrosse is the one thing that has kept him motivated to stay at Brown." (Ex. 38, pp. 24-25).

202.    Dr. Twitchell reported to Suarez that "the hospital cleared him and that the doctor does not see him as a threat to himself or others and they did not prescribe medication." (*Id*).

203.    Throughout this incident, John was concerned that he would be forced to take a medical leave as he wanted to continue playing lacrosse and did not want to leave school again.  He expressed his concerns "about being forced to take leave" on October 24, 2014 to Sherri North, PhD at CAPS, who explained to John that at Brown, "leave is not a forgone conclusion." (Ex. 38, p. 16).

204.    That being said, Dr. North took John's suicidal attempt and ideation very seriously and urged his hospitalization. (*Id*).

205.    Klawunn expressed concern about "the seriousness of the incident", though actions speak louder than words. (Ex. 10, *Klawunn Tr*., 122:1-17).

206.     By October 28, 2014, RIH determined that John was "medically stable to resume his Lacrosse responsibilities without restrictions effective immediately." (Ex. 38, p. 17).

207.    As defined by Suarez, "medical leave of absence is a leave of absence . . .that is supported by the student's healthcare provider."  At the time, "mandated medical leaves were no longer on the table." (Ex. 3, *Suarez Tr*., 74:19-24; 76:3-7).

208.    When considering medical leave with a student, Suarez, testified that "she work[s] closely with students giving them their options and so walk them through the pros and cons of the leaves available to them as well as looking at what it is that they are hoping to gain from time away." (Ex. 3, *Suarez Tr*., 93:19-24)

209.    With mandatory medical leave removed as an option, Suarez had a plan to coerce John to leave voluntarily.  Dr. Twitchell's notes account for a telephone conversation she had with Suarez as follows (Ex. 38, p. 25):

10/28/2014:  I called Dean Suarez . . . . She said that Margaret Klawunn and her were meeting with [John] at 5:30 to tell him that there is a no contact order violation against him and he will have to move out of his room in the lacrosse fraternity as a result.  There will also be conduct charges against him for underage drug use and conduct charges against him for damage to the car he threw himself toward. . . . After some reflection, *I called her back and expressed my concern for his safety if these charges were brought against him the same night he was discharged from the hospital and asked that this be delayed in light of his recent suicide attempt.* She indicated that the move would have to be addressed because he cannot go back to his room given the accusation that he violated his no contact order. We discussed how much he should know up front and how much should be mediated given his fragile state *[emphasis added]*.

210.    Suarez did not take Twitchell's advice.  John, his Mother, Suarez and Klawunn met on

October 28, 2014.  The following is John's account of the meeting as alleged in the Second

Amended Complaint  (SAC, ¶¶ 106-111; Ex 2, *Doe Dec.*, ¶¶ 13-19; Ex. 48, Declaration of Kelly

Prichett—*Mother's Dec.*—¶¶ 2-7):

> The two Brown officials were aware of John's severe emotional state and that he had been released from the hospital just hours before they held the scheduled meeting. Regardless, they informed John that if he chose not to leave, he could expect to face hearings on several matters, including the damage sustained by the vehicle that he threw himself into when he attempted to harm himself (it would be regarded as vandalism), and an allegation he had violated his "no contact" order with Jane. Vice President Klawunn and Dean Suarez also informed John they would seek to remove John from his dormitory that day because of the claimed violation of his no-contact order.  Finally, Vice President Klawunn informed John that the sexual misconduct complaint from the previous spring involving Sally could still be revived. . . . . John jumped up from his seat and cried, "Do you just want me out of here?"  At that point, John's Mother said to them both, "Enough! This is enough! You have traumatized him enough."

211.    John's Mother paid for the windshield that was damaged (Ex. 48, *Mothers' Dec.*, ¶ 8 and

attachment).

212.    Neither Suarez nor Klawunn recall the details of this meeting. (Ex. 3, *Suarez Tr.*, 136:15-

22; 180:21-181:19) (Ex. 10, *Klawunn Tr.*, 122:18-123:24).

213.    In an internal email dated October 29, 2014, Klawunn stated if John "does not come in

saying he will take a medical leave, which is possible given the mother's disgust that we must

not want him here if we continue to bring up concerns about his behavior, we will be telling him he has to go—either a mandatory leave or something based on concerns about his behavior." (Ex. 49).

214.    John went on medical leave for the 2014-2015 academic year effective November 5, 2014, with a plan to re-apply for admission for the fall 2015 semester. (Ex. 50).

215.    John applied for readmission, which included a letter in support from Dr. North who worked in CAPS, among other recommendations. (Ex. 51).

216.    However, Defendant denied John readmission on June 1, 2015. (Ex. 52).

217.    To John, the denial for readmission "just went against everything that the school had told me about the process . . . . I was doing everything I possibly could." (Ex. 1, *Doe Tr*., 170:7-23).

218.    Suarez has no recollection of the readmission process for John but pointed out that it was a committee decision. (Ex. 3, 184:17-20)

219.    On the committee and managing the readmission process was Ashley Ferranti, the Dean who most likely spoke with Sally about T92. (Ex. 3, Suarez, 185:24-186:12).

220.    On June 4, 2015, John sent an email to Suarez in which he addressed his reluctance to withdraw in the first place, and appealed the decision on June 9, 2015. (Ex. 53, 54).

221.    On June 12, 2015, John's Father communicated with Brown's President Paxton about the denial of re admission and mentioned racial discrimination as a possible motivation.  On June 18, 2015, President Paxton replied that she shared Father's concerns with Maude Mandel, the Dean of the College. (Ex. 55, Email communications between Father and President Paxton).

222.    On June 16, 2015—the interim period between Father's email to President Paxton and President Paxton's reply—Klawunn  reiterated in an internal email a threat to discipline John and that if the issue were not referred to Maude [Mandel], "we would require [John] to have a student

conduct board hearing for his behavior *before* considering him for readmission [*emphasis added*].ᵀ (Ex. 56).

223.    When asked during her testimony what the basis to disciplinary hearing was, Klawunn stated that "it could have been around the [alleged violations made by Jane to the] no contact orders." (Ex. 10, *Klawunn Tr.*, 139:1-25).

224.    John was readmitted on June 19, 2015. (Ex. 57).

225.    In an email between John's Mother dated October 25, 2014, and Lars Tiffany, John's lacrosse coach, he accounted for a conversation he had with Suarez in May 2014 in connection with T92 in which Suarez "made the strong suggestion that JJ would not be invited back to Brown in the Fall." (Ex. 58).

226.    On November 6, 2014, just days after the medical leave commenced, YCA scheduled a meeting with Jane to give her "an update about John." (Ex. 57).

227.    After the meeting, Jane wrote to her sexual assault advisor, Bita Shooshani, that she had good news:  "[John] is officially . . . no longer on campus.  He is unlikely to return until at least Spring 2016."  Shooshani wrote back pleased with the "great update."  Jane replied, "They seemed skeptical that he would even come back then . . . ." (Ex. 60, Emails between Jane and Shooshani).

228.    YCA did not alert John to Jane's whereabouts. (Ex. 5, *YCA Tr.*, 230:10-12).

229.    In the Fall of 2015 when John did return to campus, Jane too was on campus, just to visit as she was taking the 2015-2016 academic year off for medical leave.  In her email to YCA dated September 15, 2015, she expressed her concern that John was back on campus when it was her "understanding that he was not going to be returning until at least Spring 2016." (Ex. 61).

**CONTINUING NCO ISSUES (YCA)**

230. On April 13, 2016, for an anticipated return visit to campus in the Spring of 2016 (when she was also on leave), Jane notified YCA to remind Doe "of the [M]NCO . . ." (Ex. 62).

231. On April 14, 2016, YCA informed Jane that she "will send out an updated NCO to reflect the changes to our policy around sexual assault" and revoked the MNCO and issued a new NCO restricting John only. (*Id*).

232. During the relevant time period, the MNCO/NCO policy was that Defendant would issue a mutual NCO between the accuser and the respondent and if there was a finding of responsibility, the mutual NCO would remain in place. (Ex. 5, *YCA Tr.*, 65:24-67:11).

233. However, there was a change in policy in 2016 which provided a unilateral NCO against the respondent if he was found responsible.  Under the new policy, the respondent could still request a mutual no contact order and indeed, YCA's office, OSL, would still issue mutual no-contact orders, even though the Title IX office would issue only unilateral NCO's starting in 2016. (Ex. 5, *YCA Tr.*, 82:11-83:15).

234. The 2016 change in policy with respect to the no-contact order was not intended to be retroactive. (Ex. 5, *YCA Tr.*, 236:11-13).

235. The MNCO in T91 was required to stay in place per the Findings, where the Board confirmed that the mutual no contact order should remain in place so long as "complainant or respondent would wish it to be maintained." (Ex. 23).

236. In two emails to YCA John demanded that YCA maintain and enforce the MNCO, arguing that Jane's actions "endangered his life." (Ex. 63).

237. Defendant did not uphold the MNCO and did not impose a NCO on Jane; when YCA was asked during her deposition whether she was concerned enough by John's claim that Jane

had "endangered his life" to keep Jane under the existing NCO, she replied, "I did not put an

NCO on [Jane], so I would say no." (Ex. 5, *YCA Tr.*, 248:11-12).

238.    John was the only student whose MNCO was converted to a NCO retroactively under

the 2016 guidelines. (Ex. 5, *YCA Tr.*, 238:7-13).

239.    On May 4, 2016 Sally and John communicated with each other through text messages in

which Sally confirmed that when she complained about the incident to Defendant, she "never

said it was sexual assault" and that she "felt like I was pushed into reporting a situation," and

complained that the Dean "wrote the no contact order without me asking for it." (Ex. 64, May 4

Text Messages between Sally and John, p. 9; Ex. 26, *Sally Tr.*, 47:17-48:2).

240.    In those text, Sally also confirmed that Jane initiated the complaint process: "I was called

into a dean's office because [Jane] talked to me about what happened," (Ex. 64, p. 12) and Sally

"had to I guess report on our interaction" to the dean. (*Id.*, p. 9).


DATED:        March 31, 2020

                                    Respectfully Submitted,

                                    THE PLAINTIFF,

                            By:       */s/ Susan Kaplan*
                                    Susan Kaplan (*pro hac vice*)
                                    The Kaplan Law Office
                                    30 Wall Street, 8th Floor
                                    New York, NY 10005
                                    Telephone: (347) 683-2505
                                    skaplan@lawkaplan.com

                                    /s/ Sonja L. Deyoe
                                    Sonja L. Deyoe #6301
                                    395 Smith Street
                                    Providence, RI 02908
                                    (401) 864-5877
                                    (401) 354-7464
                                    sld@the-straight-shooter.com

                                    *Attorneys for Plaintiff, John Doe*

**CERTIFICATE OF SERVICE**

I certify that on the 31st day of March, 2020, I filed and served this document via

the Court's CM/ECF system.


/s/ Sonja L. Deyoe