UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

JOHN DOE,
        Plaintiff,

v.                                              C.A. No. 17-191-JJM-LDA

BROWN UNIVERSITY,
        Defendant.

**DEFENDANT'S POST-HEARING MEMORANDUM**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

When the Court adjourned the summary judgment hearing on June 25, 2020, Brown had addressed Plaintiff's Title IX, Title VI, § 1981, RICRA counts, and touched upon the contract counts, but it had not yet reached the intentional infliction of emotional distress count. Below, Brown summarizes its oral argument (supplemented with a few additional points in response to Plaintiff's contentions) and addresses the intentional infliction of emotional distress count.

**I.**     **The Title IX Counts (Counts I, II and IV)**

    **A.**     **Deliberate Indifference Analysis (Counts I and II)**

Brown has shown that Plaintiff's Title IX challenge to the Title IX 1 case under Counts I and II is time-barred, just like his previously dismissed erroneous outcome and selective enforcement challenges to the Title IX 1 case under Counts III and IV. 327 F. Supp. 3d 397, 410 (D.R.I. 2018) (Rule 12(b)(6) Mem. and Order). The Title IX 1 case must stand. Even if any claims as pled in Counts I and II are timely, all fail for many reasons as a matter of law, under *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), and its progeny. *See also Porto v. Town of Tewksbury*, 488 F.3d 67, 72 (1st Cir. 2007) (applying *Davis*).[1]

---

[1]   In its Rule 12(b)(6) ruling, the Court held that *Davis* controls the analysis in Counts I and II. 327 F. Supp. 3d at 403 (citing *Davis* and *Porto*). Plaintiff agrees that *Davis* controls. *See* Pl. Opp. Mem. (Doc. No. 67-1) at 35 (citing the Court's Rule 12(b)(6) analysis and *Porto*).

Brown responds to a point raised during Plaintiff's argument in which Plaintiff contended that there was an "anchoring event" during 2016, somehow enabling him to apply the continuing violation theory and extend his claims to before May 4, 2014. Brown assumes that Plaintiff alluded to either the April 15, 2016 amendment of the no-contact order or his Facebook chat with Sally Roe in or about late May 2016. Neither is relevant to a continuing violation analysis, nor is either an anchoring event of alleged actionable sexual harassment, under *Davis*, by Jane Doe or anyone else. In fact, Plaintiff has not identified a single incident of alleged actionable sexual harassment against him, under *Davis* in Brown's education programs or activities before or after May 4, 2014.

Also, upon learning of the amended no-contact order on April 15, 2016, Plaintiff boldly warned Brown that he "will sue the school" and "the nation would agree with me." Brown Ex. II, Doc. No. 61-35. Despite his proclamation, he did not file his suit until over a year later on May 4, 2017. At some point, Plaintiff must accept responsibility for his choices, rather than continually blaming Brown. He waited to sue Brown over three years after the completion of the Title IX 1 case in March 2014, which he did not appeal at Brown and never filed a complaint against Jane Doe. His choice on the timing of his lawsuit has dispositive consequences that he alone caused.[2]

---

[2] Plaintiff appears to be asserting the "discovery" rule, not the continuing violation theory. The Rhode Island Supreme Court has cautioned that tolling a statute of limitations under the discovery rule should only occur in certain narrowly defined factual situations. *Boudreau v. Automatic Temperature Controls, Inc.*, 212 A.3d 594, 600 (2019). *See also Hill v. R.I. State Employees Retirement Bd.*, 935 A.3d 608, 617 (R.I. 2007) (refusing to apply the discovery rule to toll negligence and intentional infliction of emotional distress claims). The Court has prescribed a "reasonable diligence standard" to the discovery rule's application. *Martin v. Howard*, 784 A.2d 291, 299 (2001). Plaintiff and his parents communicated with Brown frequently during (1) the Title IX 1 case, (2) the Title IX 2 case, (3) Plaintiff's father's meeting on campus with Dean Yolanda Castillo-Appollonio in September 2014, (4) the October 28, 2014 meeting between Plaintiff, his mother, Vice President Margaret Klawunn and Dean Maria Suarez, and (5) Plaintiff's readmission application between April 2015 and June 2015. It is wholly unreasonable for Plaintiff to contend that he first learned of his possible claims against Brown during the spring of 2016 – whether upon the amended no-contact order in April 2016 or his Facebook chat with Sally Roe in late May 2016.

B.  **Selective Enforcement Claim Limited Only to the Title IX 2 Case (Count IV)**

As explained in Brown's briefing and oral argument, neither Jane Doe nor Sally Roe is an actual comparator for purposes of the Title IX selective enforcement analysis, which is limited by the Court's Rule 12(b)(6) ruling to only Brown's investigation of the second sexual misconduct complaint against Plaintiff. 327 F. Supp. 3d at 412-13. Sally Roe is not a comparator because Plaintiff never contended that Brown should have "enforced" any Code provision against her. Jane Doe, who was never the subject of any sexual misconduct complaint at Brown filed by Plaintiff, is not a comparator for the reasons held by the First Circuit in *Haidak v. University of Massachusetts-Amherst*, 933 F.3d 56, 74 (1st Cir. 2019). Also, as Plaintiff admitted in his deposition, he never complained or reported to Brown that Jane Doe violated the mutual no contact order imposed in the Title IX 1 case. Brown SUF (Doc. 60) at ¶¶ 64-66.

Plaintiff has failed to prove that Brown initiated its investigation in the Title IX 2 case because of his sex, which compels the entry of summary judgment in Brown's favor. *Haidak*, 933 F.3d at 74 ("At most, Haidak has alleged that the university pursued [female complainant's] case instead of his because [she] made the allegation first – *not because Haidak's sex influenced the university*.") (emphasis added). The absence of intentional gender discrimination is fatal to Plaintiff's selective enforcement claim as to the Title IX 2 case.

**II.  The Title VI and § 1981 Racial Discrimination Claims (Counts V and XII)**

As Brown argued, Plaintiff's Title VI challenge to the Title IX 1 case is also time-barred. Again, the Title IX 1 case must stand. And, the record is devoid of any racially discriminatory intent to support any claim under Title VI or § 1981 – whether before or after May 4, 2014. Plaintiff's mere reliance upon his subjective bluster and hyperbole fails to meet his burden of proof at the summary judgment stage.

4820-2792-1857.1

As Brown referenced during the hearing, the United States Supreme Court recently issued a unanimous ruling, which controls the § 1981 racial discrimination analysis here (and the Title VI analysis in the logical application of the Court's ruling).³  On March 23, 2020, in *Comcast v. National Association of African American-Owned Media*, 190 S. Ct. 1009 (2020), the Supreme Court held that a plaintiff alleging racial discrimination in a § 1981 private cause of action must plead and prove that race was a "but for" cause of the alleged injury, not merely an alleged or assumed motivating factor. *Id*. at 1014-19.  The Supreme Court held that this burden of proof is mandatory throughout the litigation in the judicially implied, private cause of action under § 1981, including when a § 1981 claim is analyzed under the *McDonnell-Douglas* burden-shifting paradigm. *Id*. at 1018-19.  As a result, Plaintiff's must show "but for" causation at this summary judgment stage. *Id*. at 1014.  Nothing in the record proves that Plaintiff's race was a "but for" cause of any action taken by Brown, so Counts V and XII fail as a matter of law.

**III.    The Rhode Island Civil Rights Act (Counts VI and VII)**

Brown relies upon its briefing and oral argument regarding Plaintiff's RICRA claims, which are subject to a three-year limitations period under R.I.G.L. § 42-112-2.

**IV.    Intentional Infliction of Emotional Distress (Count IX)**

Plaintiff's intentional infliction of emotional distress claim is subject to a three-year limitation period under R.I.G.L. § 9-1-14(b), reaching only events post-dating May 4, 2014.

---

³  Title VI of the Civil Rights Act of 1964 provides at 42 U.S.C. § 2000d: "No person in the United States shall, *on the ground of race, color, or national origin*, be excluded from participating in, denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  (Emphasis added).

### A. The Title IX 2 Case

Brown did not act in an extreme and outrageous manner that shocks the conscious in proceeding with its investigation of the Title IX 2 case. *Jalowy v. Friendly Home, Inc.*, 818 A.2d 698, 708 (R.I. 2003) (elements of an IIED claim). In its oversight of its community, Brown would have acted contrary to its Code and Title IX obligations if it did not investigate a second sexual misconduct filed against Plaintiff, which Sally Roe submitted in accordance with the Code's requirements and reported allegations that Plaintiff forcefully tried to coerce her into a non-consensual sexual encounter with him.[4]

As Brown briefed in its initial memorandum, federal courts have consistently rejected intentional infliction of emotional distress claims relating to student sexual misconduct disciplinary processes. Brown Mem. (Doc. No. 59-1) at 35-36. After Brown moved for summary judgment and as cited in its reply memorandum, another federal court reached the same result. Brown Reply Mem. (Doc. No. 73) at 32-33. Recently, another federal court has rejected such an intentional infliction of emotional distress claim. *Doe v. Indiana Wesleyan Univ.*, 2020 WL 2474483, at * 10 (N.D. Ind. May 12, 2020).

---

[4] Plaintiff now remembers vividly and admits for the first time in his declaration (filed in opposition to Brown's summary judgment motion (No. 71-2)) details about his May 7, 2014 interaction with Dean Suarez, which he claimed during his deposition that he could not recall at all and believed to have never occurred. As he states to serve his own purposes (as opposed to acknowledging during his deposition or correcting thereafter through an errata sheet), on May 7, 2014 when Dean Suarez walked him to Brown's Counseling and Psychological Services Office to obtain supportive measures, he pointed out to the dean "two to three" female students on campus (other than Jane Doe and Sally Roe) with whom he had sexual encounters during the academic year. Plaintiff's apparent disrespect for his sworn oath is troubling, but it is consistent with his ever-changing, say-anything narrative in this litigation.

### B.     The October 28, 2014 Meeting

Regarding the October 28, 2014 meeting between Vice President Klawunn, Dean Suarez, Plaintiff, and his mother, it is important to put the surrounding circumstances in their full context, which Plaintiff did not offer during his oral argument.  Plaintiff was on deferred suspension status (akin to probation) through May 2015, having been held by the Student Conduct Board to be partially responsible for sexual misconduct charges in the Title IX 1 case.  During the fall 2014 semester, Plaintiff was not focusing on his academics at Brown.  Brown SUF (Doc. No. 60) at ¶¶ 97-100.  As Plaintiff testified during his deposition, he had already failed one of his fall 2014 courses and was on a clear path to fail more courses.  He had received an academic warning because of his poor grades, and he was clearly heading toward an academic suspension, which he did not want to happen.  Brown Ex. F (Doc. No. 61-6), Pl. Dep. Tr. at 202:18 to 203:8.

On October 20, 2014, Brown received a report from Jane Doe (Pl. Ex. 47, Doc. No. 71-47), alleging that Plaintiff had violated the no-contact order on at least five occasions during the first month and a half of the fall 2014 semester.  In the oversight of its campus community, Brown was within its rights to address these allegations.

During the early morning hours of October 24, 2014 and shortly after Plaintiff had smoked marijuana excessively while socializing with friends, he jumped onto the hood of a vehicle slowing to a complete stop and banged on the windshield with his arms, injuring himself.  As he stated during his hospitalization, he "ha[d] never been that high."  Brown SUF at ¶ 94.

In his 425-paragraph Second Amended Complaint and 240-paragraph L.R. Civ. 56(a)(4) Counterstatement of Facts, Plaintiff makes no mention of his excessive marijuana intake shortly before the incident.  During the hearing, Plaintiff nonchalantly dismissed this material undisputed

6

fact, by claiming that "marijuana is not a hallucinogenic" and purporting that he "remembers everything about that evening."

The record shows that, as of the October 28, 2014 meeting, this was a serious situation involving a student who was not succeeding at Brown and whose academic future at the University (as well as eligibility to participate in his varsity sport) was seriously imperiled. As Plaintiff states in his Second Amended Complaint, <u>before the meeting</u>, his "doctors recommended that he take a medical leave of absence from school so he could clear his failures from his transcript, overcome the trauma of the incident and return fresh in the fall." SAC (Doc. No. 21) at ¶ 103. Also, <u>before the meeting</u>, he had already accepted his providers' recommendation and decided to take a leave of absence from Brown. *Id.* at ¶ 105. As Plaintiff admitted during his deposition, he recognized, <u>before the meeting</u>, that his ability to cure his failing grades with just over a month left in the fall 2014 semester was not "doable." Brown SUF at ¶¶ 96-97.

The October 28, 2014 meeting was tense, and Plaintiff and his mother strongly expressed that they felt wronged by Brown. Yet, nothing about that meeting was "extreme and outrageous" conduct "that shocks the conscious," to "go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Jalowy*, 818 A.2d at 708. As Vice President Klawunn testified in her deposition, "given the fact he was not having a successful semester, and the seriousness of the incident, that it was really important, actually for him to take a medical leave and get some care and come back when he could be successful as a student." Brown Ex. AA (Doc. No. 61-27), Klawunn Dep. Tr. at 122:11-17.

As shown in the record, Plaintiff's decision to take the leave of absence was the right choice, which was consistent with what his Rhode Island Hospital providers recommended. Academically, his permanent academic transcript does not record any of his grades in the fall 2014

7

and simply records a "Leave of Absence" for the 2014-15 academic year and a readmission for the 2015-16 academic year. Brown Ex. A, Doc No. 61-2. While on leave, Plaintiff obtained counseling help and stabilized himself. After his return to Brown at the start of the 2015-16 academic year, he exceled in his varsity sport earning All-Ivy honors for three consecutive seasons, participated in many extracurricular activities both on and off Brown's campus (including theatrical productions, a Brown motion picture production, and fashion shows), secured with Brown's help an internship during the summer of 2017 at an internationally known entertainment company, and received support from several Brown deans who met with him over two dozen times to monitor and guide him academically. Most of all, he earned in May 2018 an Ivy League diploma in his declared academic concentration of Theater and Performing Arts. Plaintiff's Brown academic and extracurricular experiences have enabled him to pursue his career in the Los Angeles entertainment industry, which, as he wrote in an email to his coach on May 3, 2017 (the day before he sued Brown), is exactly what he wanted to do professionally. Brown Ex. JJ (Doc. No. 61-36).

### C.     Plaintiff's Application for Readmission from his Leave

Plaintiff's protestations about the readmission process are a total red herring. While the readmission committee initially denied his request on June 1, 2015, Plaintiff exercised his right to an appeal, which was granted in his favor on June 19, 2015. Brown SUF at ¶¶ 104-05. Plaintiff was not denied any educational opportunities while at home during the summer 2015 recess, and he returned to Brown at the start of the 2015-16 academic year. *See* Court's Rule 12(b)(6) ruling, 397 F. Supp. 3d at 414 (rejecting Plaintiff's arguments about the initial denial because he "succeeded in his appeal of that decision and returned to campus for the 2015-16 academic year").

### D.     The April 2016 Amendment of the No-Contact Order

In April 2016, Brown amended the no-contact order imposed upon Plaintiff in the Title IX 1 case to be consistent with its new Title IX policies and practices, which took effect during the

2015-16 academic year as a result of a one-year community engagement process through its Sexual Assault Task Force. Brown SUF (Doc. No. 60) at ¶¶ 111-20. As the Court appropriately questioned Plaintiff regarding his disagreement with the amended no-contact order: "So what?" Plaintiff had full access to and enjoyment of Brown's programs and activities, and he certainly took full advantage of his opportunities in the classroom, on the athletic field, on the stage and runways, at his fraternity, and within his social networks on campus. Nothing in the record indicates that he and Jane Doe ever crossed paths between April 15, 2016 and her May 2017 graduation from Brown.

## V.     The Contract Claims (Counts X and XI)

The Court's Rule 12(b)(6) ruling is clear that Count X (breach of contract) and Count XI (implied covenant of good faith and fair dealing) are limited only to a claim "for breach of procedural rights in connection with the May 2014 separation order." 327 F. Supp. 3d at 415-18. Plaintiff refuses to accept the Court's ruling, arguing that he has "new" contract claims.

Regarding the only claim at issue, Brown did not breach its educational contract with Plaintiff, nor the implied covenant of good faith and fair dealing, with its initiation of the Title IX 2 case following its receipt of a second sexual misconduct complaint against Plaintiff. Contrary to what Plaintiff argued, Brown did not "suspend" him on May 7, 2014. Plaintiff finished the spring 2014 semester on time. His grades did not "tank," and the Title IX 2 case did not "ruin him academically." As Plaintiff's Brown transcript shows (Brown Ex. A, Doc. No. 61-2), he earned "B" and "C" letter grades during the fall 2013 semester, and his spring 2014 grades were in the same range. While Plaintiff was home in California for the summer, Brown closed the Title IX 2 investigation on August 7, 2014 without any charges or a conduct hearing, to allow Plaintiff's return to campus in September 2014 at the start of the 2014-15 academic year.

Regarding Plaintiff's desire to pursue "new" contract claims, Plaintiff enrolled at Brown nearly seven years ago and graduated over two years ago. This litigation has been pending for over three years. Behind the shield of a pseudonym, Plaintiff's filings have publicly disparaged Brown and its deans. Yet, he touts himself in his actual name as a proud Brunonian on social media and professionally and when he travels across the country annually to attend alumni events on Brown's campus. Brown provided to Plaintiff voluminous document productions and detailed interrogatory responses (including information about other disciplinary cases spanning several years). Eleven depositions occurred across several states. Discovery compiled approximately 10,000 pages of information. If Plaintiff truly believed that he has more contract claims beyond those pled in his 425-paragraph, 69-page Second Amended Complaint (his third pleading) or that were first discovered after the Court's Rule 12(b)(6) ruling, he should have moved to file a Third Amended Complaint, not wait to claim that he has "new" contract claims when facing a summary judgment motion.

## VI.  CONCLUSION

Plaintiff has wrongly convinced himself that he "got nothing from Brown." In his avaricious quest for lifetime financial security from his alma matter (including his demand that Brown must pay him nearly $2 million for alleged future damages calculated through his anticipated retirement age of 65 in the year 2060), Plaintiff has hurled untrue allegations and disparaging assertions against Brown. Cutting through Plaintiff's bluster and hyperbole and instead analyzing each count under the factual record (by applying the limitations period, the Court's Rule 12(b)(6) ruling, and the required elements of proof), all remaining nine counts fail as a matter of law. To rephrase Plaintiff's words, he should recover nothing from Brown in this litigation.

4820-2792-1857.1

Defendant,

BROWN UNIVERSITY,

By Its Attorneys,

/s/ Steven M. Richard
Steven M. Richard (#4403)
Nixon Peabody LLP
One Citizens Plaza, Suite 500
Providence, RI 02903
Tel: 401-454-1020
Fax: 401-454-1030
srichard@nixonpeabody.com

Michael D. Grabo (#6871)
Office of the General Counsel
Brown University
Box 1913
Providence, RI 02912
Tel: 401-863-1176
Fax: 401-863-1120
michael_grabo@brown.edu

Dated: June 30, 2020

CERTIFICATE OF SERVICE

    I certify that I filed and served this post-hearing memorandum on June 30, 2020 through the Court's CM/ECF system.

/s/ Steven M. Richard