UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

JOHN DOE,

    Plaintiff

v                                                               C.A. No. 17-191-JJM-LDA

BROWN UNIVERSITY,

    Defendant

### PLAINTIFF'S POST-HEARING MEMORANDUM IN REPLY

Pursuant to the Court's instructions, Plaintiff hereby replies to Defendant's oral argument on June 25, 2020 and its post-hearing memorandum of law (Brown MOL) dated June 30, 2020.

**I.**    **Continuing Violation Doctrine**

Plaintiff alleged three counts to which the continuing violation doctrine applies pursuant to this Court's decision in *Doe v Brown Univ.*, 327 F Supp 3d 397, 408 [DRI 2018] (the "Decision") as follows: Count I—Title IX Hostile Education Environment/Sexual Harassment; Count II—Title IX Gender Discrimination; and Count V— Title VI Racial Discrimination. In it's decision, this Court relied on *AMTRAK v Morgan*, 536 US 101, 105 [2002], which held "that consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible . . . so long as any act contributing to that hostile environment takes place within the statutory time period." *Id.* The "continuing violation doctrine" applies if "a plaintiff experiences a 'continuous practice and policy of discrimination.'" *Hauff v State Univ. of NY*, 425 F Supp 3d 116, 134 [EDNY 2019]. *See also Quality Cleaning Prods. R.C. v SCA Tissue N. Am., LLC*, 794 F3d 200, 206 [1st Cir 2015]("Courts have largely, if not exclusively, held that application of the continuing violation doctrine is cabined to certain civil rights or tort actions"); and *Centro Medico Del Turabo, Inc. v De Melecio*, 321 F

1

Supp 2d 285, 291-292 [DPR 2004] (Holding that within the continuing violation doctrine, "systemic violations" occur when a plaintiff "has been harmed by the application of a discriminatory policy or practice and that said policy or practice continues into the limitations period" *citing Rodriguez v. Frito Lay Snacks Caribbean*, 265 F.3d 15, 21 (1st Cir. 2001)).[1]

Defendant breached its policies and practices and created discriminatory policies and practices in the post-May 4, 2014 as well as in the pre-May 4, 2014 period. Such "clear procedural irregularities "permit a plausible inference" of discrimination. *Menaker v. Hofstra Univ.,* 935 F.3d 20, 33 (2nd Cir. 2019). A brief overview of the material facts follows:

**Post May 4, 2014 Events**

May 7, 2014: Brown placed John on interim suspension when he did not present a danger to Brown's community and an interim suspension is not required even in the event of a second complaint. Brown also breached the 60-day rule and other requirements regarding disclosure of witnesses, notice of specific violations and scheduling a hearing. (PSOF 167-178). Such violations are particularly pernicious given that Sally's claims were encouraged by Jane and Sally admitted to the Dean that Doe presented no danger. (PSOF 174, 179-180).

May 7, 2014-August 7, 2014: In response to multiple communications from John and his family and their expressions of emotional distress (PSOF 163-165), Defendant gaslighted John and his family into believing that Brown was immersed in an investigation even though Sally stopped participating in Title IX 2 and the "investigation" consisted of Brown cajoling Sally to call or write. The interim suspension lasted for 92 days (PSOF 157-162).[2] By way of

---

[1] Defendant relies on *Polanco et al. v. Lombardi*, 209 A.3d 567 (R.I. 2020) regarding the discovery rule as an exception to the tolling of the statute of limitations, which is not the applicable standard in dealing with systemic racial or gender-based discrimination.
[2] *See John Doe v. Oberlin College*, 2020 U.S. App. LEXIS 20226, 17-18 (6th Cir June 29, 2020) (Citing Oberlin's breach of it 60-day rule to resolve a Title IX claim where Oberlin's

legitimizing these breaches, Defendant argues that Brown has an obligation to investigate Title IX 2.  Brown also had an obligation to uphold its policies and practices and not discriminate.  Defendant provides no legitimate reason for the specific policy and practice violations it engaged in to pursue a claim it knew was encouraged by Jane, and made at Jane's behest involving nothing that was dangerous. As Sally told the Dean—John gently pushed her towards the shower before she freely rejected the offer and left John (PSOF 119-120, 137).

September 2014-October 2014:  John returned to campus with an undiagnosed depression caused by the anguish of Brown's prolonged and baseless "investigation" over the summer, making it the worst his life.  John visited CAPS multiple times and had a "crisis appointment." He was diagnosed with depression in connection with his experiences with Title IX 1 and Title IX 2.  His school work was suffering. (PSOF 184-192).  Defendant was aware of John's medical history pursuant to authorizations granted to Defendant by John (PSOF 200).

October 19-October 27, 2014: Both John's Mother, on John's behalf, and Jane present Brown with alleged violations of the mutual no-contact order against the other.  John complained about Jane showing up at his team's parties.  Jane's complained of mere incidental contact at public events or restaurants that Jane deemed "minimal" (PSOF 193-195).  Brown's policy regarding MNCO offenses is to have a conversation with the offending student.  Brown's policy regarding retaliation prohibits "repeated complaints" against another party to a Title IX action (PSOF 107-109).  Defendant ignored John's MNCO complaints against Jane and pursued Jane's "minimal" complaints against John.  Without first having a conversation with John, Defendant threatened John with a hearing, an extreme measure given Brown's own policies. (PSOF 193-

---

investigation alone lasted 120 days, as an inference of sex bias, particularly in light of Doe's expressed "emotional devastation wrought by the delays in his proceeding").

198).  Klawunn continued to threaten John with a hearing for the alleged MNCO violation as late as June 2015 when John's readmission to Brown was challenged (PSOF 222-223).[3]

October 24, 2014-October 29, 2014: John attempted to kill himself and immediately explained to the hospital that he did so because of his depression caused by Title IX 1 and Title IX 2.  He stayed in the hospital for four days and expressed concern about a compelled leave from Brown.  At this time, his academics were weakening. He still wanted to play with his team and stay in school.  Ultimately CAPS cleared him to return to school and his team. (PSOF 199-203, 206).

Oct. 29, 2014:  Suarez and Klawunn decide to pressure John into taking a voluntary medical leave to separate John from Brown.  In practice, a medical leave is ordinarily supported by the student's medical providers and Suarez would give the student their options and walk them through the pros and cons of the decision (PSOF 207-208).  With John, Suarez's plans involved threats of multiple disciplinary actions, for violations of Jane's MNCO violations and a revival of the closed Title IX 2 matter. (PSOF 182-183).  When Suarez shared her plan with John's psychologist at Defendant's CAPS program, Dr. Twitchell, she expressly discouraged Suarez from pursuing this plan in light of John's suicide attempt.  Suarez and Klawunn nevertheless moved forward with the plan (PSOF 209-210).  Defendant attempts to legitimize

---

[3] Defendant's knowledge of Jane's dissatisfaction with the severity of the sanction against John and the denial of her appeal (PSOF 106) combined with Defendant's tolerance of Jane's acts of retaliation, role in Title IX 2, and its willingness to prosecute Jane's MNCO violations and ignore John's allegations were influenced by bias. *See Menaker v Hofstra Univ.*, 935 F3d 20, 34 [2d Cir 2019] ("When the evidence substantially favors one party's version of a disputed matter . . . without an apparent reason based in the evidence, it is plausible to infer . . . that the evaluator has been influenced by bias." Such bias can also be inferred from Hofstra's knowledge "that at least one of the accusations against [Plaintiff] was false and believed . . . to be a 'ploy.'")

its' actions by pointing out that Klawunn, who did not remember the meeting (PSOF 212), nevertheless, encouraged John to take the medical leave as a benefit to his education. This is a farce. Defendant also argues that by the time of the meeting, John had already decided to take leave, though the record shows that John did not agree to leave until *after* the meeting (PSOF 213). Both theories are a pretext. If John had agreed to take a medical leave before the meeting, why have the meeting at all, especially since it was objected to by Dr. Twitchell? The discriminatory motive and animus is palpable. Klawunn and Suarez had the meeting to forward their objectively cruel pre-determined narrative and hurled at John threat after threat of disciplinary actions to torment him and hit him where it hurt. Their behavior was unjustified, uncivilized and a very strong indicia of racism and gender discrimination. Moreover, the record shows that Defendant's motive was not to benefit John, but to remove him from campus permanently. After John went on leave, Defendant told Jane that John would be gone from campus at least until 2016, maybe never to return. Jane was very pleased (PSOF 225-229).

June 2015: In keeping with its promise to Jane and its plan to keep John off campus, Defendant rejected John's reapplication. When John's Father communicated to President Paxton that he suspected racist motivations, within days of review and finding no legitimate reason to deny John's reapplication, Defendant approved his return. Nonetheless, Klawunn continued to express her interest in pursuing Jane's alleged MNCO allegations with a hearing in continuing defiance of Defendant's policies and practices regarding retaliation and conversing with the student instead of a hearing. (PSOF 107-109, 215-224). Defendant has provided no legitimate reason for Brown's tolerance of Jane's acts of retaliation.

2015-2016 Academic Year: Brown released Jane from the MNCO in response to a new policy that awarded an NCO to the prevailing party in a Title IX action. Under that policy, an

5

MNCO could stay in place if the non-prevailing party so requested, which John did. Brown rejected his request (PSOF 230-238). As a result, John remained vulnerable to Jane's claims of NCO violations, but Jane, with impunity, was free to attend John's team events, which John's Mother complained about (PSOF 193). Defendant again perverted its policies and practices to benefit Jane, a white woman, and oppress John, a Black male. While Defendant attempts to minimize the impact of this biased application of policies and practice, Defendant has not provided a legitimate reason for denying John the MNCO.

**Pre—May 4, 2014**

Premier among the material breaches of policy and practice is Yolanda Castillo-Appollonio's (YCA's) (PSOF 7) attempt to legitimize her refusal to allow John to bring a complaint against Jane contemporaneously with Defendant's investigation of Jane's complaint against John. As the record shows, John alleged that Jane choked him until he couldn't breath and bit his lip until it bled while demanding that he obey her rules. John described these events as "violent."[4] Instead of investigating his complaint, YCA manufactured numerous pretexts for not treating John's complaint like it treated Jane's (or Sally's).[5] Among such pretexts is the absurdity that John failed to use magic words such as Jane used a weapon (other than her hands) against him, that he couldn't leave, or that he said stop. In fact, YCA mused that some people

---

[4] In all respects, John's complaint is as violent-filled and specific if not more so than Jane and Sally's complaint. In all respects, John has alleged as much as if not more violations of Brown's Title IX policy than Jane and Sally alleged. (PSOF 114-124).

[5] The record further shows that Brown's policies and practice is to allow counter complaints (PSOF 33-35, 38-45). However, Defendant relies on *Haidak v Univ. of Massachusetts-Amherst*, 933 F3d 56, 76 [1st Cir 2019] for its similarities involving a fact pattern wherein both the male and female students alleged sexual assault against the other. However, Brown's practices are distinguishable from those considered in Haidak, which at heart is an analysis of the procedural due process rights to which a student at a public institution is entitled. Regardless, the Court found that U Mass-A had "a race to file first policy." As such, the Court found that all that Haidak alleged was "that the university pursued Gibney's case instead of his because Gibney made the allegation first—not because Haidak's sex influenced the university."

like to be choked, even though John described the experience as "violent." (PSOF 46-61) The old-school sexism in YCA's outdated requirements for the victim of a sexual assault to demonstrate that they struggled against their attacker is palpably untrue today (Did the attacker have a weapon?  Was she able to leave? Did she say stop?).  Jane and Sally were not expected to allege anything of the sort.  But John was.  YCA's attempts to legitimize an unjustifiable position against John and his experience is patently sexist.  And as John's Father told Brown, it is also racist (PSOF 8-9, 14-15).  A reasonable jury will see Defendant's position on John's claim for what it is.

      The material policy breach Brown committed during this time period that impacted all other events through 2016 was Defendant's illegitimate re-write of its deferred suspension policy so that John could be separated from Brown on the basis of a mere allegation.  As acknowledged by Brown, its policies and codes are relied on by the students and constitute the school's "bible."  In the sanctions applied specifically to John, the policy was transformed into a draconian summary-separation policy that allowed Defendant to bypass all other policies and practices to achieve John's desired separation (PSOF 97-100).  As the record shows, Defendant exercised this illegitimate policy by nullifying Jane's acts of retaliation, and by foregoing policies and practices throughout the Title IX 2 investigation and the medical leave process as discussed above.[6]  Defendant has provided no legitimate reason for this enormously impactful and detrimental material breach.

---

[6] Defendant further attempts to legitimize its actions against John by noting that John failed to appeal Title IX 1.  However, Plaintiff respectfully asserts that an appeal would have been futile.  As the Court addressed in *Doe v Brown Univ.*, 327 F Supp 3d 397, 415-416 [DRI 2018], "[t]he Court does not believe that any appeal taken by John necessarily would have been futile."  That position was based on "the identified flaws during the hearing" as being "the kinds of procedural errors that would be allowed on appeal."  However, the record shows that YCA's utter dismissal

## II. <u>Selective Enforcement</u>

In this Court's Decision, Plaintiff's selective enforcement claim was limited to Title IX 2. The Decision recognized that Jane and Sally were comparators to John in that all three were alleged victims of sexual assault. The Decision noted that "John alleges that Brown's decision to investigate the Sally incident—and the immediate separation order pending the outcome of that investigation—were affected by his gender. . . . John alleges he was subjected to gender discrimination by Brown creating a hostile education environment stemming from Brown's handling of the first Title IX investigation and its aftermath.  Because the decision to launch the second investigation, and the decision to separate, were directly related to the first investigation, John plausibly alleges that those decisions were affected by his gender."  Decision, at 412.

The record proved these contentions.  Title IX 2 is directly related to Jane, Jane's encouragement of Sally, and Jane's intervention to set up a meeting between Sally and the Dean. (PSOF 116-117).  But for the summary-separation sanction YCE illegitimately wrote for John in Title IX 1, the interim separation and 92-day bogus investigation would have been inconceivable.  Jane and Sally are comparators to John as all three alleged to Brown that they were victims of sexual assault.  The white women's complaints were not only investigated, but the white women were given support and encouragement.  John, the Black male, was not only denied an opportunity to bring a timely complaint against Jane as was Brown's practice (PSOF 43-44), he was also denied the support system that proved to be so comforting and encouraging to Jane and Sally (PSOF 6, 62-65, 122).  Defendant mischaracterizes the Decision and the basis for the comparison.  A reasonable jury will understand gender-based underpinnings connecting

---

of John's allegations demonstrates the futility of John's ability to even get Brown to see him as a victim with the same rights as Jane and Sally to file a complaint against his attacker.

Title IX 1 and Title IX 2 and the shared status of John, Jane and Sally as alleged victims of sexual assault.[7]

### III.     42 USCS §1981

Defendant relies on *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009 (March 23, 2020), but Defendant's scant efforts to legitimize Defendant's actions undermine its argument. The "but-for" requirement as it applies to § 1981 must still be analyzed through the McDonnell Douglas burden shifting framework, and plaintiff's indicia of racial animus must still be legitimized. In *Calvelos v City of NY*, 2020 US Dist LEXIS 109266, at *23-38 [SDNY June 22, 2020], a post-*Comcast Corp.* 140 S. Ct. 1009 (March 23, 2020) decision, the Court held that the plaintiff's allegations that Defendants "assigned him to the most dangerous inmate-interactive posts, encouraged inmates to attack him, suppressed UOFs, threatened him with termination and other disciplinary action, and ultimately terminated him without cause, or with manufactured pretextual cause—all on account of his race . . . were sufficient support for the proposition that . . . Defendants were motivated by discriminatory intent and would not have acted against Plaintiff but for his race." *Calvelos'* series of allegations seem like a penal version of John's experience wherein Defendant encouraged or at least turned a blind eye to Jane's acts of retaliation, tormented him emotionally and threatened him with disciplinary action and separated John from campus in breach of school policy and practice as per their plan to keep him off campus through 2016 and perhaps permanently as was promised to Jane as discussed in detail above. Plaintiff is not arguing a mixed motive and a reasonable jury will recognize that Defendant's discriminatory treatment of John was based on repeated breaches

---

[7] Indeed, Brown's policy and practice is to support and encourage accusers, sometimes for months if not years. (PSOF  62).

of its contract with John policies and practices— for no other purpose than to violate John's rights.

## IV. *Davis v Monroe*, 526 U.S. 629 (1999) and Deliberate Indifference

Defendant both wrongly relies on the "severe, pervasive and objectively offensive" language in *Davis* and ignores the roles of YCA, Suarez, Norris and Klawunn whose actions are accountable under *Davis'* deliberate indifferent standard. As this Court noted in its Decision, the language in *Davis* that sets the standard in this action is the requirement that the offending school "must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Davis* at 648-49.[8]

The record establishes sufficient material facts that will lead a jury to find that Brown acted unreasonably in response to his allegations of assault, and by Defendant's harassment of John, through its abject failure to recognize John as a victim of sexual assault, its catering to Jane as a repeat retaliator against John, it's willful rewriting of the deferred sanction language in Title IX 1, and its breach of numerous other policies and practices as accounted for in the record. As the Court noted, John "alleges that both he and Jane reported the other to Brown for sexual assault occurring from their alley encounter, but Brown chose to pursue disciplinary action against John while failing to bring any charges against Jane. In addition, during the disciplinary hearing, John alleges that Brown did not allow him to assert any counterclaim or defense regarding the allegations . . . John alleges that, following the hearing, Brown imposed a no-contact order requiring John to remove himself from situations in which Jane was present; when she showed up at his sporting events, she complained to Brown that John violated the order, and Brown responded to those complaints. John also alleges that Brown knew Jane violated a

---

[8] Jane's actions of choking, biting, and retaliating against John while also spreading false rumors about John's actions in Title IX 1 to her sorority over the course of a year are severe pervasive and objectively offensive.

10

confidentiality order, calling John a rapist and sexual predator on campus [as per Jane's false statements about John to her sorority (PSOF 110-111)], and that Brown took no action against Jane. If John can prove these allegations, a jury could plausibly conclude that Brown's response to Jane's harassment of John was unreasonable." (Decision at 408-411).  The record does support these allegations and provides sufficient material for these claims to go to a jury.

DATED:  July 10, 2020

                Respectfully Submitted,

                THE PLAINTIFF,

By:  /s/ Susan Kaplan
    Susan Kaplan (*pro hac vice*)
    The Kaplan Law Office
    30 Wall Street, 8th Floor
    New York, NY 10005
    Telephone: (347) 683-2505
    skaplan@lawkaplan.com


/s/ Sonja L. Deyoe

Sonja L. Deyoe #6301
395 Smith Street
Providence, RI 02908
(401) 864-5877
(401) 354-7464
sld@the-straight-shooter.com

*Attorneys for Plaintiff, John Doe*

## CERTIFICATE OF SERVICE

I certify that on the 10th day of July, 2020, I filed and served this document via the Court's CM/ECF system.

/s/ Sonja L. Deyoe