# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| | ) | |
| JOHN DOE[1], | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 17-191-JJM-LDA |
| | ) | |
| BROWN UNIVERSITY, | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

John Doe[1] ("John") was a student at Brown University ("Brown") who was accused of sexual assault by a female classmate. In his twelve-count Second Amended Complaint, John outlines a chain of events following this accusation that he posits as the workings of a conspiracy to have him removed from campus, based on racial and gender animus. ECF No. 21. After extensive discovery, briefing, and argument, Brown now moves for summary judgment on all remaining counts. ECF No. 59. After reviewing the undisputed facts, all the evidence, and the law this Court GRANTS Brown's Motion for Summary Judgment. *Id.*

## I.    FACTS AND PROCEDURAL BACKGROUND

The intricate facts begin in September 2013 when John arrived at Brown University as a first-year student. ECF No. 70, ¶ 1. John is an African American male and was a member of Brown's Division I lacrosse team. *Id.* ¶¶ 1-3.

---

[1] The Court granted John leave to proceed under a pseudonym. ECF No. 16.

*Jane's Allegations*

The evening of September 20, 2013 precipitated the events that would eventually lead to this litigation, John went out to an off-campus bar in Providence where he met Jane Doe ("Jane")[2], a sophomore at Brown.  *Id.* ¶¶ 5, 22.  Jane is a Caucasian woman.  *Id.*  At the bar, John and Jane consumed alcohol, although they were both under the legal drinking age.  *Id.*  After meeting inside the bar, John and Jane stepped outside where they continued talking and flirting before they stepped into a nearby alley and began kissing.  *Id.* ¶ 22.  John and Jane diverge in their versions of the subsequent events.

Jane alleges that John engaged in "nonconsensual sexual contact" with her and was physically aggressive with her, including choking her and pushing or slapping her face.  ECF No. 61-4 at 2.  John alleges that in the back alley, he and Jane engaged in consensual "kinky" behavior.  *Id.*  He alleges Jane choked him and bit his lip so hard it bled, and Jane pushed him against a wall and held him there.  *Id.*  He says that Jane declared "I make the rules" and restrained John at one point when he tried to leave.  *Id.*; ECF Nos. 64-5, 64-6.  Eventually, John left the alley and returned to the bar, as did Jane.  ECF Nos. 64-3, 64-5.

Over two months later, Jane filed a complaint against John with Brown's Office of Student Life, in which she alleged nonconsensual and forcefully aggressive sexual misconduct.  ECF No. 69 ¶ 37.  Before filing the complaint, Jane sought and used several on campus resources for counsel and assistance in drafting her

---

[2] The Court uses pseudonyms for all students named in the lawsuit.

complaint, including, for example, meeting and discussing the incident with Brown's Coordinator for Sexual Assault Prevention and Advocacy.  ECF No. 74 ¶ 6.  John received written notice of Jane's complaint (ECF No. 61-4), and Brown simultaneously imposed a mutual no-contact order ("MNCO") on both students, pending an investigation.  ECF No. 61-5; ECF No. 69 ¶¶ 38-39.  John's alleged Code of Conduct violations included (1) actions that can be reasonably expected to result in physical harm; (2) sexual misconduct involving nonconsensual physical contact; (3) sexual misconduct involving penetration, violent force, or injury; (4) illegal use of alcohol.  ECF No. 64-3.  John was entitled to an advisor in disciplinary proceedings and selected Carolyn Norris, who was then a Senior Associate Athletic Director.  ECF No. 69 ¶ 40.  John submitted a written response to the allegations, in which he said Jane was the aggressor.  ECF No. 60 ¶ 43; ECF No. 64-7.

John was formally charged, and a Student Conduct Board ("SCB") hearing was scheduled.  ECF No. 60 ¶ 45.  John alleges he expressed his wishes to file a complaint against Jane to Ms. Norris and to Yolanda Castillo-Appollonio, who was then Senior Associate Dean for Student Life.  *Id.* ¶ 22; ECF No. 70 ¶¶ 35-39.  The record does not clarify when exactly these interactions took place, but we know they occurred between John's receipt of the allegation notice and the date of the SCB hearing.  *See id.*  No charges were brought against Jane.

The record is light on facts around the SCB hearing.  John's initial pleadings suggested several procedural irregularities in the hearing, including his inability to present certain evidence or ask certain questions, and Jane's ability to make

conclusory and stereotypical arguments.  ECF No. 21 ¶¶ 52-60.  John alleged these irregularities were inconsistent with an accused student's rights under the Code of Conduct.  *Id.*  However, neither party expounds upon these alleged irregularities in their statements of facts and the germane piece of evidence in the record, the SCB hearing agenda, shows that both parties were afforded witnesses and the ability to cross-examine and make opening and closing statements.  ECF No. 64-11.[3]

The SCB found John "responsible" for sexual misconduct involving nonconsensual physical contact and illegal use of alcohol.  ECF No. 74 ¶ 90.  The MNCO remained in effect after the hearing.  *Id.* ¶ 96.  Also, Brown placed John on deferred suspension for one year.  *Id.* ¶ 94.  No sanctions were brought against Jane. ECF No. 70 ¶ 26.  Dissatisfied with the decision, however, Jane appealed claiming that John's punishment was not commensurate with the conduct for which John was found responsible.  ECF No. 74 ¶ 103.  Dean Castillo-Appollonio and Margaret Klawunn (who was then Vice-President of Campus Life and Student Services, and Dean Castillo-Appollonio's superior) reviewed Jane's appeal.  *Id.*; ECF No. 71-5. Finding the sanction in line with disciplinary precedent, Vice-President Klawunn and Dean Castillo-Appollonio denied Jane's appeal and the sanction against John was unchanged.  ECF No. 74 ¶ 104.  John did not appeal the decision despite having the right to do so and testified that he had "no problem" with the outcome of this investigation and "saw no need to pursue things further."  ECF No. 64-5.

---

[3] None of the alleged procedural claims about the hearing involving Jane's allegations are cognizable because they fall outside the statute of limitations.

Over the course of the 2013-14 academic year, John and Jane both claimed the other breached the MNCO several times.   ECF No. 60 ¶¶ 64-66; ECF No. 71-47. These breaches generally consisted of John and Jane by chance being at the same events or places and resulted with either or both students leaving the area with no interaction.  *Id.*  The record does not show that any further action was taken on these MNCO violations.   Also, John alleged that Jane discussed the investigation with other students and made disparaging comments about him, which he intimates violates a Code of Conduct provision affording confidentiality to accused students.[4] ECF No. 70 ¶ 110; ECF No. 74-15.

*Sally's Allegations*

John received two notices from Brown administrators in May 2014,[5] the first notifying him of sexual misconduct allegations by another Brown student, Sally Roe ("Sally"), and the second notifying him that "effective immediately, [he] was separated and barred from the Brown University campus on an interim basis."  ECF No. 70 ¶ 139.

Sally's allegations against John recount an interaction taken place on an unknown day seven months earlier in October 2013.  After meeting at a party, John and Sally began kissing, until John "floated the idea of taking a shower together."  *Id.* ¶ 113; ECF No. 71-26.  Sally was not interested in the shower and stated John tried to lead her to the shower and "gently push[ed]" her, apparently in a bid to convince

---

[4] John never filed a complaint with Brown concerning Jane's actions.

[5] The Court pauses here to point out that the facts alleged prior to May 4, 2014, fall outside the statute of limitations.  *But see*, footnote 7.

Sally otherwise.   ECF No. 70 ¶ 114; ECF No. 71-26.   Sally, still uninterested, eventually left without resistance from John.  ECF No. 70 ¶ 115.

Several months after John and Sally's interaction, Jane and Sally fortuitously met and became acquaintances.  *Id.* ¶ 110; ECF No. 71-26.  Sally had joined the sorority of which Jane was a member, and at some point, the two women and their other sorority sisters were discussing "certain men on campus and negative interactions [they] have had." *Id.*  Upon hearing about Sally's interaction with John, Jane asked Sally's permission to report that information to Brown's administration. ECF No. 70 ¶ 116.  Sally agreed, and Jane notified Dean Ashley Ferranti, who then met with Sally to discuss her interaction with John.  *Id.*  Sally eventually filed a complaint, in which she stated she "finally felt comfortable enough to report" and that she believed John to be "dangerous."  ECF No. 64-18.  Sally also requested a no-contact order.  *Id.*

Dean Castillo-Appollonio received Sally's complaint, which did not name John, and contacted Sally several times to gather more information.  *Id.*; ECF No. 71-34. Dean Castillo-Appollonio testified in her deposition that she spoke with Dean Ferranti after she received Sally's complaint, who clarified that the complaint was in fact about John.   ECF No. 71-34.   Despite repeated requests, Sally expressed reluctance to discuss her complaint further, at one point noting she felt "forced to report." *Id.* Dean Castillo-Appollonio issued an MNCO against John and Sally.  Dean Castillo-Appollonio gave John an interim separation notice and notice of Sally's allegations.  ECF No. 74 ¶ 135.

John alleged in his Second Amended Complaint that at some point after Brown issued these notices, Dean Suarez, in conversation with lacrosse coach Lars Tiffany ("Coach Tiffany"), made comments to the effect of, "We've got your boy now. He is out of here," and "You think you know your boy, but you don't."  ECF No. 21 ¶¶ 80-81. John also alleged that Coach Tiffany recounted these comments to John's mother.  *Id.* During her deposition, John's mother did not recall such a comment from Coach Tiffany; although, she referred to a comment from Coach Tiffany implying Dean Suarez "had it out" for John.  ECF No. 64-16.  Dean Suarez testified at her deposition that the use of the word "boy" as a racial epithet or in reference to a grown man is personally offensive to her.  ECF No. 64-15.

After Sally's allegations and the interim separation notices were sent to John, a meeting was scheduled with John, Dean Castillo-Appollonio, and Dean Suarez. ECF No. 74 ¶¶ 141, 143.  Upon discussing the new allegations against him, John became distraught and began to pace about the room and cry.  ECF No. 70 ¶ 151. Because John's distress was so clear, Dean Suarez walked John to Brown's Counseling and Psychological Services ("CAPS") for a psychiatric evaluation.  *Id.* ¶ 152.  While crossing the campus green, John, apparently in a panic, pointed out "two or three" women with whom he had "hooked up," and expressed concern to Dean Suarez that these women could also accuse him of sexual assault.  *Id.* ¶¶ 152-53. CAPS personnel evaluated John, and—while he expressed suicidal ideation—CAPS diagnosed him with "an adjustment reaction mixed with anxiety and depression" and released him back to campus.  ECF No. 71-38.  Brown allowed John to remain on

campus until 5 p.m., the day of his last final, despite the interim separation.  ECF No. 60 ¶ 84.  John failed two of his exams because of the stress of the separation and was placed on academic warning.  ECF No. 21 ¶ 88.  John returned home to California for the summer.  ECF No. 60 ¶ 85.

The summer of 2014 was marked by a flurry of emails: John and his mother requesting updates on the Sally investigation from Dean Castillo-Appollonio, Dean Castillo-Appollonio continuing to follow up with Sally for more information on her complaint, and Brown administrators updating each other on the situation.  ECF Nos. 64-20, 64-25, 71-43, 71-44.  After Sally's continued failure to respond to Dean Castillo-Appollonio's emails, Vice-President Klawunn determined the investigation into John should be closed.  ECF No. 71-44.  Brown notified John of the closure, that it would take no further action against him, and Brown would allow him to return to campus in the Fall.  ECF No. 60 ¶ 88.

### Sophomore Year–2014-15 and the Events Leading to John's Medical Leave

When John returned to Brown to begin his sophomore year, he continued to seek psychiatric help at CAPS, noting how the Jane investigation and various other personal stressors were a strain on his psyche.  ECF No. 70 ¶¶ 188-92; ECF No. 71-38.  One day in October 2014, after he smoked a great deal of marijuana, John attempted suicide by jumping in front of a moving vehicle.  ECF No. 60 ¶¶ 90-95.  He was transported to Rhode Island Hospital.  Four days later, after a psychiatric evaluation and treatment for bruises and lacerations, the hospital discharged John. ECF No. 70 ¶¶ 200-202.

The same day the hospital discharged him, John was summoned to a meeting with Dean Suarez and Vice-President Klawunn.  ECF No. 60 ¶ 99.  John and his mother attended the meeting where Dean Suarez and Vice-President Klawunn indicated their belief that given the seriousness of the suicide attempt, and the fact that John was struggling academically, it was in his best interest to take a medical leave of absence.  ECF No. 70 ¶ 213; ECF No. 71-49.  John and his mother believed that Dean Suarez and Vice-President Klawunn also implied that if John stayed on campus, he could face additional disciplinary charges for damage to the vehicle he jumped in front of, or even a revival of the investigation into Sally's allegations.  ECF Nos. 71-2, 71-48.  Neither Dean Suarez nor Vice-President Klawunn remember the exact details of the meeting, but they remember discussing their view that John would investigation into by taking medical leave.  ECF Nos. 71-3, 71-10.

Despite this tense meeting, John chose to take a year of medical leave and returned home to California, where he sought counseling services.  ECF No. 60 ¶ 102.  John testified in his deposition, given his poor academic performance that semester and based on conversations with academic support deans, he knew staying at Brown that Fall was "probably not going to be doable," and he ultimately decided to take leave.  *Id.* ¶¶ 97-98.

John's application for readmission for the 2015-16 academic year was at first denied, as Brown believed he would benefit from "a longer period of sustained stability."  *Id.* ¶ 103; ECF No. 70 ¶ 99.  John appealed this decision, and Brown changed course and admitted him.  *Id.*; ECF No. 64-31.

*John Returns to Brown—2015-16*

The 2015-16 year was relatively uneventful. John and Sally had a conversation in which Sally shared that Jane had a significant role in Sally's complaint. ECF No. 71-64. Sally also told John about her and Jane's conversation at the sorority house in 2014, and she never felt anything "bad" had happened between them. *Id.* Sally apologized to John for his experience. *Id.*

During the 2015-16 academic year, Jane was on leave from Brown. ECF No. 60 ¶ 113. She did return to campus briefly in 2016 for Brown's Spring Weekend. ECF No. 70 ¶ 230. Before her arrival, Jane contacted Dean Castillo-Appollonio to ask whether the no-contact order against John was still in effect. *Id.*; ECF No. 60 ¶ 113. Dean Castillo-Appollonio noted that while the no-contact order was, at that point, still mutually binding on both students, she would update it to a unilateral no-contact order against John and in favor of Jane. ECF No. 60 ¶ 113. Dean Castillo-Appollonio stated she did this to reflect a change in Brown's Title IX policies and since John had been found "responsible" in a prior disciplinary hearing, the new policy warranted imposing a unilateral no-contact order. *Id.* John received a message from Dean Castillo-Appollonio informing him that the no-contact order was still in place against him and that he should inform her immediately if Jane engaged in any behavior that was "harassing or retaliatory in nature." *Id.* ¶¶ 113-17; ECF No. 64-34. Neither John nor Jane had contact during Spring Weekend. ECF No. 60 ¶ 119.

*John Graduates from Brown*

John graduated from Brown in 2018 with a degree in theater and performance studies.  *Id.* ¶¶ 144, 154.  Brown afforded John several accommodations to help him graduate on time, such as extensions on classwork after he suffered a concussion during a lacrosse game and approval to take classes at RISD, which Brown would count toward his concentration.  *Id.* ¶¶ 129-30, 137-43.  John's Brown transcript has no remarks about either investigation or the deferred suspension but does state he was on medical leave during the 2014-2015 academic year.  ECF No. 64-2; ECF No. 60 ¶ 2.  No other disciplinary actions were brought against John, and he alleges no other race or gender-based discrimination during his last two academic years at Brown.

*John Sues Brown*

John filed a lawsuit against Brown University.[6]  ECF No. 1-1.  John's Second Amended Complaint asserted twelve Counts: **Counts I through IV**:  Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* (hostile education environment/sexual harassment, erroneous outcome, and selective enforcement), ECF No. 21 at 31–42; **Count V**: Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (racial discrimination), *Id.* at 42–45; **Counts VI through VIII**: Rhode Island Civil Rights Act ("RICRA"), R.I. Gen. Laws § 42-112-1 (gender discrimination,

---

[6] John filed his complaint in state court and the Defendants removed it to this Court.  ECF No. 1.  In addition, John voluntarily dismissed the three individually named Brown administrators: Maria Suarez, Margaret Klawunn, and Yolanda Castillo-Appollonio.  ECF No. 3.  He filed an Amended Complaint (ECF No. 11) which Brown moved to dismiss.  ECF No. 12.  The Court denied the motion to dismiss without prejudice and granted John leave to file a Second Amended Complaint, which he did.  ECF No. 21.

racial discrimination, and disability discrimination), *Id.* at 45–54; **Counts IX–XI**: Rhode Island state common law (intentional infliction of emotional distress, breach of contract, breach of the covenant of good faith and fair dealing), *Id.* at 55–63; **Count XII**: 42 U.S.C. § 1981 (unequal rights under the law by racial discrimination). *Id.* at 63–65.

Brown moved again to dismiss the complaint, claiming all counts were either untimely or did not state a claim. ECF No. 22. The Court dismissed Count III (erroneous outcome of the Jane investigation) and Count IV (selective enforcement in the Jane investigation) because those claims were not brought within the statute of limitations; Count VIII (disability discrimination) because John did not state a claim; and Count X (breach of contract) and Count XI (covenant of good faith and fair dealing) as to all claims except for breach of procedural rights regarding the May 2014 separation order. ECF No. 29.

Discovery went ahead on the remaining claims. Brown now moves for summary judgment on all remaining claims, arguing that there are no disputed issues of material fact in support of John's contentions that Brown discriminated against him, breached its contract, and/or engaged in tortious behavior toward him.

## II.   STANDARD OF REVIEW

When making a summary judgment determination, the Court must review the entire record and consider the facts and inferences in the light most favorable to the nonmoving party. *Cont'l Cas. Co. v. Canadian Univ. Ins. Co.*, 924 F.2d 370, 373 (1st Cir. 1991). Federal Rule of Procedure 56(a) dictates that summary judgment should

be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine dispute of material fact is an issue that "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A dispute is "genuine" when "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party." *Rivera-Muriente v. Agosto-Alicea*, 959 F.2d 349, 352 (1st Cir. 1992) (citing *United States v. One Parcel of Real Prop.*, 960 F.2d 200, 204 (1st Cir. 1992)). If there is a genuine dispute of a material fact, that dispute would "need[ ] to be resolved by a trier of fact." *Doe v. Tr. of Bos. Coll.*, 892 F.3d 67, 79 (1st Cir. 2018) (citing *Kelley v. LaForce*, 288 F.3d 1, 9 (1st Cir. 2002)).

## III.   ANALYSIS

### A.  Title IX Claims–Counts I, II, and IV

Courts generally recognize two lines of Title IX claims against universities, (1) where schools exhibit "deliberate indifference" to "severe, pervasive, and objectively offensive" sexual harassment, *Porto v. Town of Tewksbury*, 488 F.3d 67, 72 (1st Cir. 2007), and (2) where university disciplinary proceedings result in either an "erroneous outcome" or "selective enforcement" of codes of conduct or disciplinary procedures. *Trs. of Bos. Coll.*, 892 F.3d at 90 (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 716 (2d Cir. 1994)).

John brings three claims against Brown under Title IX. Counts I and II, which the parties and this Court have addressed collectively, sound in the first line of Title

IX claims.  Count IV is rooted in the second line of Title IX claims.  The Court will address them in turn.

### 1. Counts I and II–Gender Discrimination and Hostile Work Environment

In Counts I and II, John alleges that Brown was deliberately indifferent to Jane's gender-based harassment of John, and thus Brown violated Title IX by creating a hostile education environment.  ECF No. 21 ¶¶ 213-16.  To prevail on this claim, John must prove

> (1) that he or she was subject to "severe, pervasive, and objectively offensive" sexual harassment by a school peer, . . . (2) that the harassment caused the plaintiff to be deprived of educational opportunities or benefits . . . (3) [that the funding recipient] knew of the harassment, (4) in its programs or activities and (5) it was deliberately indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances.

*Porto*, 488 F.3d at 72–73 (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)); *see Trs. of Bos. Coll.*, 892 F.3d at 93 ("To succeed on a Title IX deliberate indifference claim, a plaintiff must show that an official with authority to implement corrective measures was aware of and deliberately indifferent to an act of discrimination on the basis of sex."); *Morgan v. Town of Lexington, Mass.*, 823 F.3d 737, 745 (1st Cir. 2016) (explaining that severe sexual harassment creating a hostile environment can constitute actionable sex discrimination).

Both parties agree that the elements fleshed out in *Davis* control here; Brown argues that John fails to meet several of those elements.[7]  Brown contends that

---

[7] At the motion to dismiss stage, Brown sought to have these two counts dismissed as untimely.  ECF No. 22 at 16-20.  Brown argued that any actionable events underlying these claims occurred before May 4, 2014, the day the statute of limitations period expired.  *Id.*  The Court found the continuing violation doctrine

neither it nor Jane subjected John to conduct sufficient to rise to the level of "severe, pervasive, and objectively offensive sexual harassment," John was not deprived of any benefits available to him at Brown, and its actions were not "clearly unreasonable" and did not subject John vulnerable to actionable gender-based harassment.

> a.   **Severe, Pervasive, and Objectively Offensive Sexual Harassment**

For summary judgment, the Court considers a version of events most favorable to John.  The Court therefore assumes potentially actionable harassment; despite this, John's claim still fails as a matter of law.  As far as physical sexual harassment, John argues that Jane's violent acts in the alley in September 2013 was sexual harassment.   Courts have held that a single instance of student-on-student harassment, while unacceptable, is not "severe" and "pervasive."[8]   *See Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56 (1st Cir. 2019); *see also Doe v. Miami Univ.*, 882 F.3d 579, 591 (6th Cir. 2018) (holding similarly to *Haidak*).

---

applied to these claims to anchor any pre-limitations period conduct to a claim arising out of events in the post-limitations period. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998).  For this reason, we apply the *Davis* framework with an eye toward Brown's conduct both within and before the limitations period where it is appropriate to do so.

[8] Even if a single incident of student-on-student harassment were actionable under Title IX's deliberate indifference framework, if that event falls outside the limitations period, John would also need to show an anchoring event within the limitations period to prevail.  *See Morgan*, 536 U.S. at 115.  John, however, has failed to point to a qualifying instance of harassment within the limitations period that suffices as an anchoring event. *See id.; see also Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 364-65 (S.D.N.Y. 2016).

John also alleges Jane spread misandrist rumors about him, breached confidentiality about the investigation, and purposefully violated the MNCO—all actions John describes as further sex-based harassment. ECF No. 21 ¶ 231. Even if the evidence could prove that Jane did these things, they would not prove as a matter of law that Jane sexually harassed John based on his gender. There is no evidence that Jane's dealings with John were gender-based but rather were personal attacks because she was upset about their encounter. *See Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 366-67 (S.D.N.Y. 2016) (holding that terms such as "rapist" with a "gendered secondary meaning" does not provide a new avenue to a Title IX claim, and do not qualify as harassment within the *Davis* framework). Thus, even if John could prove the alleged spreading of rumors, breaches of confidentiality, and MNCO violations, they do not fall into the ambit of actionable harassment under Title IX. *See id.* John's Title IX claim in Counts I, II, and IV fails because he did not show that Jane's conduct before and after May 4th met the standard of "severe, pervasive, and objectively offensive sexual harassment." *Davis*, 526 U.S. at 650.

### b.    Deprivation of Educational Opportunities or Benefits

Although failing to prove the severe and pervasive element sinks John's case, his claims do not satisfy the second Title IX element either because the evidence does not show that he was deprived of any benefits or educational opportunities resulting from a hostile educational environment. *See Porto*, 488 F.3d at 72–73. A physical separation from campus is "[t]he most obvious example" of a deprivation of benefits. *Davis*, 526 U.S. at 650. While Brown placed John on interim separation from campus in the spring of his first year, he was in fact permitted to remain on campus to finish

his exams that semester.  ECF No. 74 ¶ 139.  And John made this decision to take a medical leave of absence during the 2014-2015 school year in consultation with his mother and his healthcare providers so that decision does not amount to a discriminatory deprivation of benefits, or some gender-motivated conspiracy that Brown conceived.  *Id.* ¶ 203.  John reapplied to Brown for matriculation after his medical leave; while at first, Brown denied his application for readmission, John appealed, and Brown allowed him to return to campus for the 2015-2016 school year. *Id.* ¶ 224.  He only missed the year he opted to take to recover his health and reset his academic path.

Beyond a physical separation, John argues that he was denied institutional support to file a sexual assault claim against Jane.  ECF No. 70 ¶¶ 26-27, 34-36, 79. Despite his contentions, nothing in the record shows that Brown impeded his access to its disciplinary proceedings.   Both Dean Castillo-Appollonio and Ms. Norris testified that John did not wish to file a formal complaint against Jane.  ECF No. 71 ¶¶ 27, 35-38, 79.  Moreover, John testified that he was satisfied with the outcome of the Jane investigation and did not file his own complaint or seek an investigation against Jane.  *Id.* ¶ 102.  He argues that the unilateral no-contact order Brown imposed deprived him of rights available to him under the Code of Conduct, but there is no evidence that this order, entered to reflect a change in Brown's overall policy, had any effect on his Brown career.  ECF No. 70 ¶¶ 232-238.  It did not lead to proceedings for any violation of the order, changes to his academic record, or other disciplinary actions.  ECF No. 60 ¶¶ 121-154.  Brown afforded John a wide array of

personal and academic support services and accommodations during his time at Brown.   ECF No. 60 ¶¶ 131-44.   John remained an accomplished member of the lacrosse team and successfully graduated in 2018.   ECF No. 74 ¶ 3.   All things considered, the evidence does not support the second *Davis* element.

### c.   Remaining *Davis* Elements

Combining its analysis of the remaining *Davis* elements–knowledge of harassment in programs and activities and deliberate indifference to it–the Court finds that the evidence is also lacking.   In short, viewing the evidence in John's favor, Brown's decision not to start an investigation against Jane without a complaint from John was not unreasonable as a matter of law.   *See Haidak*, 299 F. Supp. 3d at 270. John did not himself make a formal complaint against Jane.   Moreover, Dean Castillo-Appollonio and Carolyn Norris understood that John did not wish to do so, and John testified that he was satisfied with the investigation's outcome.   *See id.* (holding as such for a similar situation with female complainant and male counter-complainant).   Therefore, the evidence does not support a finding that Brown was deliberately indifferent for choosing not to pursue an investigation of Jane.   And as for Jane's actions after the evening in the alley, even if the evidence could prove that Jane violated the MNCO and used harsh terms to describe John, John never complained about these incidents to Brown (ECF No. 61-6 at 47); so, without knowledge, Brown cannot have been deliberately indifferent to John's treatment.

The Court therefore GRANTS Brown's Motion for Summary Judgment on Counts I and II.

18

## 2. Count IV–Selective Enforcement

John's remaining sex discrimination claim rests on his assertion that Brown selectively enforced the Code and disciplinary procedure in the Sally investigation.[9] ECF No. 21 ¶¶ 255-271.  He alleges that Brown was "on the alert and willing" to bring disciplinary action against male students accused by female students, but not against female students accused by male students.  *Id.* ¶¶ 259-60.  Brown moves for summary judgment on this Count for want of a female comparator.  ECF No. 73 at 20-21.

A selective enforcement claim "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender."  *Haidak*, 933 F.3d at 75 (citing *Yusuf*, 35 F.3d at 715).  A comparator is necessary to prevail on a selective enforcement claim.  *Id.* A comparator must be "similarly situated in material respects."  *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996).  To determine whether the circumstances are similarly situated, "[t]he test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated . . . Exact correlation is neither likely nor necessary, but the cases must be fair congeners.  In other words, apples should be compared to apples."  *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989).

As potential comparators, John puts forward Sally, the "two or three" women sitting on the campus green John pointed out to Dean Suarez while walking to CAPS

---

[9] John made a similar claim about the Jane investigation, but the Court dismissed it as untimely.  ECF No. 29 at 14.

with whom he had "hooked up," and Jane.  ECF No. 21 ¶¶ 257-58; ECF No. 67 at 39.

The Court can quickly dispose of the first two suggestions.  A prudent person would

not view John's and Sally's circumstances as equivalent.  John did not claim that

Sally sexually assaulted him and did not file a complaint or seek an investigation

against her; there was no conflicting claim and counterclaim of sexual assault.  ECF

No. 74 ¶ 5.  And there is no reliable evidence in the record of the "two or three" women

John identified on the campus green.   ECF No. 70 ¶¶ 110-134.  Despite John's

assertion that he feared that they too could lodge Title IX complaints against him,

there is no evidence that these women are "protagonists similarly situated" to John

such that a jury would be left speculating about their circumstances.  *Dartmouth*

*Review*, 889 F.2d at 19.

That leaves Jane as the only possible comparator.  Despite this Court noting

at the 12(b)(6) stage that the evidence could prove that John and Jane were similarly

situated (ECF No. 29 at 19-20), it is no longer tenable to so hold given the First

Circuit's ruling in *Haidak*.  *See* 933 F.3d at 75.  In *Haidak*, a female student lodged a

sexual assault complaint against a male student, which the university investigated.

*Id.* at 61-63.  The male student in turn accused the female student of assault and

misconduct, but the university did not investigate her.  *Id.* at 63.  The First Circuit

determined that the two students were not similarly situated because the female

student affirmatively contacted university administrators to lodge her complaint,

while the male student's accusations "came second in time and arose only

defensively."  *Id.* at 74.

Jane lodged her complaint with Brown first.  ECF No. 70 ¶ 28.  Upon learning Jane had complained against him, John accused Jane in his defense, but did not lodge a formal complaint against her.  *Id.* ¶¶ 32-35.  Because John's counterclaim against Jane "came second in time and arose only defensively," John and Jane are not similarly situated so are not comparators for purposes of this selective enforcement claim.  *See Haidak*, 933 F.3d at 74.  John therefore has not presented apples to compare with apples; he has presented "two persimmons and a pear."  *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 21 (1st Cir. 1999).  Thus, his selective enforcement claim cannot be sustained as a matter of law, and this Court GRANTS Brown's Motion for Summary Judgment on Count IV.

## B.  Count V and XII–Race Discrimination

John describes the environment at Brown as one that is steeped in institutional and societal racism—particularly toward African American male athletes.  ECF No. 67 at 3.  John alleges that Brown discriminated against him in violation of 42 U.S.C. § 2000d *et seq.* and 42 § U.S.C. 1981[10] by preventing him, an African American male, from exercising his rights and privileges under the Code of Conduct and because Dean Suarez allegedly referred to John using racially charged language while talking with his lacrosse coach.  ECF No. 21 ¶¶ 81, 287.

Because obvious evidence of intentional discrimination to establish as claim under either statute is often hard to come by, "courts have crafted a burden-shifting

---

[10] Although John brings race discrimination claims under two separate statutes, these claims "hinge upon identical legal standards."  *Conward*, 171 F.3d at 18.

framework to be used in cases where direct evidence of intentional discrimination is lacking." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). "Under this framework, the initial burden is on the plaintiff, who must make a prima facie showing of discrimination." *Sanchez v. P. R. Oil Co.*, 37 F.3d 712, 718–19 (1st Cir. 1994).

A plaintiff proves a prima facie showing that (1) the defendant discriminated against him on the basis of race; *see, e.g., Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 602–03 (1983); (2) the alleged discrimination must be intentional, *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001); and (3) the discrimination must be a "but-for" cause of the defendant's actions. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1014-15 (2020) (only applying to 42 U.S.C. § 1981 claims). Once a prima facie case is proven, Brown must then articulate a legitimate and nondiscriminatory reason for its actions. *Burdine*, 450 U.S. at 254–55. John must then show, by a preponderance of the evidence, that Brown's proffered reason is pretext for discrimination. *Id.*

Brown argues that John fails to make a prima facie case for racial discrimination, but, even if he did, Brown argues that it has provided a legitimate nondiscriminatory, non-pretextual, motive for its actions so that John's claim fails. ECF No. 73 at 26. Neither party disputes that John, as an African American man, is a member of a racial minority and protected class. ECF No. 74 ¶¶ 1, 2. At issue is

whether Brown racially discriminated, if it had the intent to do so, and the discrimination was a cause of Brown's actions.

The Court declined to dismiss John's race discrimination claim based on his allegation that his mother told him that Coach Tiffany told her that Dean Suarez used a racially charged term, "boy," when referring to him.  ECF No. 21 ¶¶ 81, 287. Discovery did not bear this comment out; John's mother stated in her deposition that she did not recall such a comment, and Dean Suarez affirmed in her deposition that she did not say it and does not use the word "boy" because she finds it personally offensive and demeaning.  *Id.* ¶¶ 67-72.  The furthest John's mother would go in recounting her conversation with Coach Tiffany was to say that he told her that Brown and Dean Suarez "had it out for" her son.

Setting that unproven allegation aside, John points the Court to articles discussing potential trends of racial disparities in Title IX disciplinary cases (ECF No. 70-9) and to a conversation his father had with Dean Castillo-Appollonio about implicit biases.  ECF No. 70 ¶¶ 15, 16.  While these materials are noteworthy, and the Court acknowledges the presence of implicit bias in our country—this reality alone does not support an inference of Brown's intent to discriminate against John based on his race.  Because no evidence connects any of Brown's actions to John's race, John fails to make out a sufficient prima facie case for race discrimination under either Title VI or § 1981.

Even if John could make out a successful prima facie case, Brown has articulated legitimate, nondiscriminatory, reasons for its actions.  Dean Castillo-

Appollonio and Ms. Norris did not provide him support to file a complaint against Jane because, based on their interactions with him, they did not believe he wished to file one.  ECF No. 71 ¶¶ 27, 35-38, 79.  John essentially confirmed this when he testified that he was satisfied with the outcome of Brown's investigation and decided not to appeal.  ECF No. 61-6 at 36-38 ("I was really good with that.  You know, honestly, at that point no problem with the school").  Brown changed the MNCO to a unilateral no-contact order not because John is African American, but because Brown updated its Title IX policies during the 2015-2016 school year—not racially based discrimination against John.  ECF No. 71 ¶¶ 233-235.  Finally, Brown did not force John to take a year off after the second investigation.  John decided to take a medical leave prior to his meeting at CAPS to take care of his health and well-being; the fact that the Brown deans encouraged that decision does not suggest a racial bias.  *Id.* ¶¶ 212-214.

"Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).  There is no evidence beyond generalizations and perceptions showing that Brown's reasons were a mere pretext for discriminatory animus, and thus cannot sustain his discrimination claims.  Because the Court finds that John's race discrimination case relies only on speculation, his racial discrimination claims cannot survive summary

judgment.  The Court GRANTS Brown's Motion for Summary Judgment on Counts V and XII.

### C. Counts VI and VII–RICRA

John brings analogous state law claims for sex and race discrimination under RICRA.  R.I. Gen. Laws § 41-112-1.  Because the Court looks to federal law in construing analogous civil rights statutes in assessing discrimination claims under RICRA, *see Colman v. Faucher,* 128 F. Supp. 3d 487, 491 n.8 (D.R.I. 2015), and given this Court's decision to grant Brown's Motion for Summary Judgment on John's Title IX, Title VI, and § 1981 claims, the Court GRANTS Brown's Motion for Summary Judgment on Counts VI and VII for the same reasons.

### D. Count IX–Intentional Infliction of Emotional Distress ("IIED")

John's next claim against Brown is for IIED.  At the motion to dismiss phase, the Court limited this claim to events on or after May 4, 2014, identifying one such incident that could, if proven, lead a jury to find he made his claim.  ECF No. 29 at 23-25.  The Court held John's allegation that Dean Suarez referred to him as "boy" in her conversation with his coach could support a claim that Brown intentionally targeted him for the second Title IX investigation based on his race and that such intentional conduct could inflict actionable emotional distress.  *Id.* at 24.  Brown moves for summary judgment.

To avoid summary judgment on this claim, John must show "(1) that the conduct [was] intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct [was] extreme and outrageous, (3) there [was] a

causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question [was] severe." *Champlin v. Wash. Tr. Co. of Westerly*, 478 A.2d 985, 989 (R.I. 1984). The conduct required to state an IIED claim in Rhode Island must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hoffman v. Davenport-Metcalf*, 851 A.2d 1083, 1090 (R.I. 2004) (emphasis deleted) (quoting *Jalowy v. Friendly Home, Inc.*, 818 A.2d 698, 707 (R.I. 2003)). This is a "very high standard." *Id.*

Surely, a dean making a racially charged comment about an African American student in the context of a sexual assault allegation would be extreme and outrageous such that a jury could find that Brown intentionally inflicted emotional distress on John. However, as noted, the evidence did not bear this allegation out. His mother, who John alleged was told that Dean Suarez made the comment by Coach Tiffany, did not affirm this at her deposition. John presented no evidence that Dean Suarez made this comment in the face of her absolute denial.

In arguing against summary judgment, John goes beyond the Dean's alleged comment and invokes many incidents as evidence that Brown's conduct was extreme and outrageous. He argues that Brown led him to believe that the entire second investigation was ongoing over the summer, causing John extreme emotional distress. John became depressed after returning to school, causing his grades to suffer, and leading to a suicide attempt. He argues that Brown's handling of the October meeting held after the hospital released him—including threatening him

with new charges for smoking marijuana, damaging a car, and violating the no-contact-order—caused his severe emotional distress, and led him to leave school for the year.

Student disciplinary investigations and the face-to-face meetings no doubt could cause a wide range of emotional distress. Universities must strike a balance between taking allegations of sexual assault seriously, investigating those fully and in accordance with school policies, and ensuring that the student accused is treated with fairness and dignity. Courts must be "chary about interfering with academic and disciplinary decisions made by private colleges and universities." *Schaer v. Brandeis University*, 432 Mass. 474, 478 (Mass. 2000) (quotation and citations omitted). Brown would have violated its own policies if it did not pursue the second investigation into Sally's complaint. Brown defends its handling of the October meeting, acknowledging that while it was contentious, anything said or done cannot be causally linked to John's distress because he and his mother had decided before the meeting that he should take a leave from Brown to address his physical and mental health. While the second investigation understandably impacted John negatively, there is no evidence that would allow a jury to reasonably conclude that Brown's conduct was so outrageous or so extreme so atrocious to be "utterly intolerable in a civilized community." *Hoffman v. Davenport-Metcalf*, 851 A.2d 1083, 1090 (R.I. 2004) (emphasis deleted) (quoting *Jalowy v. Friendly Home, Inc.*, 818 A.2d 698, 707 (R.I. 2003)). For these reasons, John's claim for IIED fails, and the Court GRANTS Brown's Motion for Summary Judgment on Count IX.

### E. Count X and XI—Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing

John alleged that Brown breached its contracts and, along with them, the covenant of good faith and fair dealing, many times. After reviewing the complaint and motion to dismiss, the Court found that John adequately pled one alleged breach in which Brown ordered John separated from campus pending the outcome of the investigation of Sally's complaint—when John did not meet the criteria for separation under the Code because he did not "pose a danger to [himself] or the immediate well-being of the University community." ECF No. 22-2 at 10. The Court will address the breach of contract claim and motion thereon first.

In its defense of issuing the order, Brown cites Sally's testimony that she felt uncomfortable around John and notes that she requested a no-contact order. ECF No. 74 ¶ 174; ECF No. 61-18 at 4 ("I believe that this individual is dangerous."). Brown also notes that the separation order did not impact John's education or athletic career at Brown because it was only in effect during the summer of 2014 when he was home in California. In support of his claim, John asserts that he was not a danger to himself or the community, intimating that Brown latched onto Sally's complaint because it wanted to get rid of him.

"[A] student and private university relationship is essentially contractual in nature, but [courts] recognize that the relationship has unique qualities, and thus does not require strict adherence to contract law." *Gorman v. St. Raphael Acad.*, 853 A.2d 28, 34 (R.I. 2004). In light of these unique qualities, courts "must construe them in a manner that leaves the school administration broad discretion to meet its

28

educational and doctrinal responsibilities. Courts have recognized that implicit in an educational contract is the right to modify disciplinary and academic rules and regulations." *Id.*; *see, e.g.*, *Mahavongsanan v. Hall*, 529 F.2d 448, 450 (5th Cir. 1976) ("[i]mplicit in the student's contract * * * is the student's agreement to comply with the university's rules and regulations, which the university clearly is entitled to modify so as to properly exercise its educational responsibility").

There is no breach of contract here. Brown had to consider Sally's complaint and act when she expressed concerns for her well-being. And Brown's decision to enter an interim suspension order against John did not take effect until after he finished the semester and it was vacated in August 2014 before he returned to campus so had no significant damaging effect on his academic or athletic career. The contention that the separation order was a cloud hanging over his head during the summer does not rise to the level of a material breach of contract. The Court thus finds that the issuance of the separation order could not constitute a breach of contract. The Court GRANTS Brown's Motion for Summary Judgment on Count X.

Because John's breach of the covenant of good faith and fair dealing claim rises with his breach of contract claim, it falls with it as well. *Hord Corp. v. Polymer Research Corp. of Am.*, 275 F. Supp. 2d 229, 237 (D.R.I. 2003). The Court GRANTS Brown's Motion for Summary Judgment on Count XI.

## IV.   CONCLUSION

While John's case has highlighted the reality that navigating the academic and social waters of a college environment can be dangerous, the storms are not always

caused by gales of discrimination.  Sadly, for John, a claim of misconduct in his first month at Brown, which he denies, seems to have followed him through his time at Brown.  Despite the treacherous waves folks encounter during their voyage through college, John successfully played four years Division I lacrosse, graduated from an Ivy League college, and has a good start on his career.  While John believes that Brown subjected him to actionable racial and gender bias, the undisputed evidence in the record does not support his legal claims.

The Court GRANTS Brown's Motion for Summary Judgment on all counts. ECF No. 59.[11]  The case is DISMISSED.

IT IS SO ORDERED.


s/John J. McConnell, Jr.
_____
John J. McConnell, Jr.
Chief Judge
United States District Court

September 24, 2020

---

[11] The Court also DENIES AS MOOT, Brown's Motion to Strike Plaintiff's Future Damages Claim Through the Year 2060 and Exclude the Testimony of Lee E. Miller.  ECF No. 62.