IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JOHN DOE,<br><br>      Plaintiff,<br><br>vs.<br><br>BROWN UNIVERSITY, in Providence in the State of Rhode Island and Providence Plantations<br><br>Defendant. | CA No. 17-cv-191-JJM-LDA |

**PLAINTIFF'S OPPOSITION TO BROWN'S MOTION
FOR THE COURT'S RECONSIDERATION OF ITS PRIOR ORDERS
ALLOWING PLAINTIFF TO LITIGATE PSEUDONYMOUSLY**

Plaintiff John Doe, through his attorneys, Susan Kaplan and Sonja L. Dayoe, respectfully submit this memorandum of law in opposition to Defendant Brown University's Motion to Require Plaintiff to Proceed under His Real Name.

**<u>INTRODUCTION</u>**

Defendant's present motion is its second effort to seek an order requiring Plaintiff to proceed under his real name. Plaintiff initially sought to proceed under a pseudonym by motion (ECF No. 16) in 2017. Plaintiff's Pseudonym Motion relied on *Doe v. Blue Cross*, 794 F. Supp. 72, 74 (D.R.I. 1992), which holds that "[t]he common thread running through these [pseudonym] cases is the presence of some social stigma." Moreover, the *Blue Cross* Court identified "mental illness" and the "right not to disclose . . . sexual histories and preferences" as

1

issues that give rise to stigmatization, noting that "[m]atters of sexual identity and sexual preference are exceedingly personal . . ." The Court granted Plaintiff's motion "after Brown took no position on the motion." Order dated Nov, 19, 2018, ECF No. 47 (the "Order").

Defendant filed its first Motion to Compel Plaintiff to Proceed Under his Real Name on October 10, 2018 (ECF No. 36), arguing that Plaintiff graduated from Brown and publicized his status as a Brown graduate so he should have to disclose his identity. Plaintiff argued in opposition that "[i]n this Court, the criteria for granting a pseudonym is long standing and clear and focuses on the party's "privacy interest" in matters that could create a "social stigma." Pertinent to this action, such stigmatizing private interests have included mental illness and sex. Relying on *Doe v Univ. of Rhode Is.*, 1993 US Dist LEXIS 19257, at *4-5, 6-7 (DRI Dec. 28, 1993, C.A. No. 93-0560B) [*internal quote not cited*], Plaintiff argued that the Court held that "[a] plaintiff should be permitted to proceed anonymously in cases where a substantial privacy interest is involved. The most compelling situations involve matters which are highly sensitive, such as social stigmatization, real danger of physical harm, or where the injury litigated against would occur as a result of the disclosure of the plaintiff's identity . . . Cases of this type commonly involve abortion, *mental illness*, personal safety, homosexuality, transsexuality and illegitimate or abandoned children in welfare cases [*emphasis added*]."

In the Court's Order denying Defendant's first motion, the Court pointed out that "the main thrust of Brown's motion is that Plaintiff is no longer a student at Brown, and that he has publicized on social media his status as a Brown graduate," yet Brown "fails to articulate why this factor changes the calculus."

Disregarding this Court's Order, Defendant once again in its present motion asserts that Plaintiff should proceed without a pseudonym because "[m]uch has changed since the outset of

this litigation over five years ago on May 4, 2017. When Plaintiff sued Brown, he was an undergraduate student with still over a year before his scheduled May 2018 graduation, so the Court allowed him to proceed pseudonymously." See Defendants Memorandum of law supporting its motion to reconsider (the "Def. MOL", p. 3). Defendant also relies on the current status of this case as set forth in *Doe v Brown Univ.*, 43 F.4th 195 (1st Cir. 2022) (the "Appeal Decision"), in which the First Circuit sustained this Court's decision in Defendant's summary judgment motion but for Plaintiff's intentional infliction of emotional distress claim arguing that Plaintiff's tort claim does not warrant a pseudonym. There is no case law exempting plaintiff's asserting tort claims from using a pseudonym.

In its Order concerning Defendant's first motion for reconsideration of Plaintiff's use of a pseudonym, this Court held that "[t]he First Circuit has been consistent in its admonition that courts are to grant motions for reconsideration in only extreme circumstances and only where specific factors are present. This Court in its Order determined the following:

> The granting of a motion for reconsideration is "an extraordinary remedy which should be used sparingly." *Palmer v. Champion Mol'tg.,* 465 F.3d 24, 30 (1st Cir. 2006) (quoting 11 Charles Alan Wright et al., Federal Practice and Procedure § 2810.1 (2cl eel. 1995)). The moving party "must 'either clearly establish a manifest error of law or must present newly discovered evidence.'" *Ma1ie v. Allied HomeMo1·tg. C0lp.,* 402 F.3d 1, 7 n.2 (1st Cir. 2005) (quoting *Pomerleau v. W. Springfield Pub. Sch.,* 362 F.3d 143, 146 n.2 (1st Cir. 2004)). *Fabrica de Muebles J.J. Alvarez, Incorporado v. Inversiones Mendoza, Inc.,* 682 F.3d 26, 31 (1st Cir. 2012). Brown has failed to show either a manifest error of law or newly discovered evidence."

Defendant's current motion to reconsider its prior orders allowing plaintiff to litigate pseudonymously also fails to show manifest error of law or newly discovered evidence. The Court, therefore, must deny Defendant's current motion in its entirety.

## NATURE OF THE CASE

This case is rife with descriptions of sexual activity among Plaintiff and other alumni of Brown as well as Plaintiff's suicidal ideation, suicide attempt and diagnosis with mental illness. The events surrounding the Intentional Infliction of Emotional Distress (IIED) claim build from the accrued Title IX investigations and Plaintiff's decline in mental health—the docket, the evidence, the deposition transcripts are rife with this information. In the Appeal Decision, the Court provides a brief, descriptive summary of the underlying sexual encounter between Jane and Plaintiff and Jane's complaint against John as follows *Id.*:

> Shortly after he began his freshman year at Brown University, John Doe, an African-American man, had a brief encounter with Jane Doe, a white woman. Their stories of what happened differ slightly in emphasis but are generally consistent. They met at a bar and both decided to move to an outside patio. There, they kissed. The pair then moved to a small alleyway behind the building -- the record is unclear whether Jane or John initiated the relocation to the more private spot. According to Jane (as expressed in her formal complaint about the incident), John became more aggressive and repeatedly tried to lift her dress without her express permission. According to John, Jane was aggressive throughout the encounter, choking him, biting his lip, and telling him, "Stop, I make the rules." Jane admitted going "for his neck" and saying, "Stop, I make the rules here." John said that, feeling uncomfortable, he ended the interaction and walked away.

*Doe v Brown Univ.*, 43 F.4th 195 (1st Cir 2022)

The Appeal Decision also describes the sexual encounter involving John that led to the second Title IX claim made against him by Sally, who was encouraged by Jane, her sorority sister:

> [Sally] told her sorority sisters that she and John had met at a party and consensually kissed. She explained that he wanted to take a shower with her and continued to encourage her (either verbally or physically, she couldn't remember) even after she said no. When she started to feel uncomfortable, she left "[a]nd that was the end of [their] interaction."

*Doe v Brown Univ.*, 43 F.4th 195 (1st Cir 2022)

The appeal decision also describes and accounts for John's mental health as it deteriorated after the second Title IX investigation commenced, which led to his suicide attempt:

Dean Maria Suarez—who was the Associate Director of Brown's Psychological Services—and Dean Castillo met with John . . . to explain his removal [from campus for an indefinite period of time, "effective immediately."]. When Dean Suarez told John that he had been accused of sexual assault again, he became distraught and expressed suicidal thoughts. He fell to the floor, rolled into a ball, and cried. Both Dean Suarez and Dean Castillo testified that they found John's response extreme. They permitted him to remain on campus to finish his finals (the [removal] letter came in the middle of finals week [for the spring semester]), but he was required to immediately leave campus once his last exam was over. In light of John's response, Dean Suarez brought John to the Brown University Counseling and Psychological Services (CAPS) for an emergency crisis evaluation. The doctor who evaluated him at CAPS was concerned and recommended hospitalization . . . .

On August 7, Dean Castillo informed John by email that Brown was "lifting the emergency removal" and that he would "be able to resume classes and all activities for the upcoming fall [2014] semester." She also explained that, although they were closing this complaint for now, the school could "choose to proceed at a later time" if it received more information.

The fall semester did not go well for John. He had trouble attending classes and by late October was told by one professor not to come back to class. That led John to again seek crisis help at CAPS, which resulted in a referral for a psychiatric evaluation that occurred the following day. He reported sleeping sixteen hours a day, feeling anxious about the state of his family due to the second accusation, having difficulty in his interactions with women, having trouble managing anger, binge-drinking, and smoking marijuana daily. He was diagnosed with Major Depressive Disorder and was prescribed antidepressant medication. A day later, after smoking marijuana with some friends, John dove onto the windshield of a truck as it was slowing to a stop. He was taken to Rhode Island Hospital, where he was given an Initial Psychiatric Evaluation. He explained during the evaluation that he had been "ruminating on the charges against him and convinced himself he could be guilty." He maintained that he was not guilty, but he explained that those thoughts triggered "a panic attack," which caused "an impulsive urge to stop the panic attack." He remained in the psychiatric ward of Rhode Island Hospital for four days.

*Doe v Brown Univ.*, 43 F.4th 195 (1st Cir 2022)

Moreover, the First Circuit, relying on Plaintiff's expert opinion, accounts for the John's mental health as a result of the extreme and outrageous conduct Dean Suarez and Vice President Klawunn, whose actions during the October 2014 meeting is the crux of the IIED as follows:

> John's psychological expert—whom Brown did not move to exclude below even while seeking to strike his expert on damages—concluded that "the mandate that [John] be removed from the Brown campus for a year of purported medical leave without any known clinical basis for such a decision" -- that is, the result of the meeting with Dean Suarez and Vice President Klawunn -- "caused overwhelming psychological damage in

5

[John] that continues to reverberate in him to the present in many spheres of his life." The expert also concluded that John "suffers from enormous, life-altering psychological harm in [the] aftermath" of "the manner in which Brown University conducted itself in managing the[] accusations against [John]." The manifestation of that harm includes "Persistent Depressive Disorder," which "is marked by pervasively depressed mood, markedly diminished energy and motivation, hypersomnia, hypophagia, diminished libido, anhedonia, hyperirritability, feelings of helplessness, and feelings of hopelessness."

*Doe v Brown Univ.*, 43 F.4th 195 (1st Cir 2022)

John's IIED claim nor the docket in this case can escape the dual social stigmas of sexual malfeasance and suicidal ideation. Yet, despite these interconnected sexual and mental health issues, Defendant asserts a callous and reductive proposal to this Court:

> Plaintiff, who graduated from Brown over four years ago and will soon turn twenty-eight years old, stands no differently than the many other tort claimants who appear daily before the public and in this Court under their actual names (not anonymously behind a pseudonym). Going forward, the Court should require Plaintiff to litigate using his actual name in the case caption, on the Court's CM/ECF docket, in all future pre-trial filings, and during all courtroom proceedings on remand.

Def. MOL, p. 1

Defendant does not address the nature of any other tort claim to support this facile generalization, but the fact that a claimant's case revolves around a tort claim clearly should not disqualify the claimant from proceeding with a pseudonym if the tort involved explicit sexual and mental health issues, as is the case here. See *Doe v Rhode Is. Sch. of Design,* 516 F Supp 3d 188 (D.R.I. 2021) (Plaintiff pursued negligence claims only).

# ARGUMENT

Defendant's motion relies on the First Circuit's recent decision in *Doe v Massachusetts Inst. of Tech.*, 2022 U.S. App. LEXIS 23715, at *1-2 [1st Cir Aug. 24, 2022, No. 22-1056], which tackle[s] a question of first impression . . . : when is it appropriate for a party to a civil suit in federal court to appear under a pseudonym?" As a result of its inquiry, the Court found it useful "to sketch four general categories of exceptional cases in which party anonymity ordinarily will be warranted." *Doe v MIT.*, 2022 U.S. App. LEXIS 23715, at *22 1st Cir 2022. Defendants' reliance is misplaced as each one of these paradigms favor Plaintiff's continued maintenance of his pseudonym as follows:

• **The first paradigm involves a would-be Doe who reasonably fears that coming out of the shadows will cause him unusually severe harm (either physical or psychological).**

As discussed in the Declaration of John Doe, the events surrounding the Title IX investigation and John's documented mental decline at Brown as a result remain present today. Coming out of the shadows for Plaintiff will not only stigmatize him socially and professionally, but Plaintiff's mental health issues, which have not gone away, will be exacerbated.

Defendant seems to scoff at Plaintiff's mental health problems. They point to his employment, and his achievement of approaching his 28th birthday. But these life achievements are a façade: Is it so that people who are employed by virtue of their employment do not suffer from mental illness? Is it true that 28-year-olds by virtue of being 28 years old do not suffer from mental illness? Living life with mental health problems especially if they have been caused by the intentional acts or reckless acts of others is a cautious balance.[1] Hardships occur, the pain of

---

[1] The First Circuit in *Doe v Brown* provides a full throated account of Defendant's flagrant acts as follows: "We start with the second element of this tort: Whether a jury could find Brown's actions extreme and outrageous. [citations omitted] Although this is a "very high standard," Hoffman v. Davenport-Metcalf, 851 A.2d 1083, 1089 (R.I. 2004), for several reasons,

these events reside in us, and life goes on. This Court addressed this balance in *Doe v Rhode Is. Sch. of Design*, 516 F Supp 3d 188 (D.R.I. 2021) as follows:

> Although Jane suffers on many levels from the trauma of rape, it does not mean that she is incapacitated and otherwise unable to enjoy many aspects of life. She is an accomplished scholar and artist who has graduated with honors from a dual degree program at Brown and RISD. During her collegiate days, she engaged in many

---

as combined, a jury could find this standard satisfied by Brown's conduct. First, the parties' relationship required at least some heightened solicitude by Brown. [citations omitted] Thus, a university can "fairly be expected" to act "maturely -- and even with some tenderness and solicitude -- toward" its students. Second, it is quite clear from the record that Dean Suarez and Vice President Klawunn were aware of John's enhanced susceptibility to extreme emotional distress. [citations omitted] Dean Suarez participated in a prior disciplinary meeting with John where his emotional reaction was so strong that it prompted her to immediately walk him to the campus mental health center for an emergency evaluation. Dean Suarez and Vice President Klawunn both knew that John had just been discharged from the hospital that very day after a suicide attempt premised on Brown's disciplinary actions against him. And, most strikingly, Vice President Klawunn was warned by one of John's doctors that she should postpone the meeting given John's fragile mental state. At the very least, the doctor advised, they should only bring up any matters that needed to be discussed that day (such as any necessary immediate suspension from housing). A jury could conclude from these facts that their subsequent conduct in confronting John "become heartless, flagrant, and outrageous when the[y] proceed[ed] in the face of such knowledge, where it would not be so if [they] did not know." Restatement (Second) of Torts § 46 cmt.f. Third, the meeting itself did not comport with the reason given for its supposed urgency. If it were urgent to tell John he was suspended because of Jane's new, facially dubious and seemingly trivial allegations, they simply had to tell him that. Instead, or so a jury might find, they attempted to coerce him into withdrawing by piling on threatened claims that need not have been advanced that evening. Jurors might reasonably ask, why threaten John with reopening the Sally complaint and with charging him for damage to the truck? Brown has made no attempt to argue why those matters could not have been delayed, given its administrators' knowledge of John's mental state and warning from his doctor. Finally . . . . jurors might well disagree with our dissenting colleague that Brown was entitled to immediately remove John from campus based on Jane's unconfirmed, dubious allegations of no-contact order violations or that the Brown officials were acting in good faith in threatening to reopen Sally's complaint. Recall, Dean Castillo testified that the typical process for dealing with no-contact order accusations did not involve immediate suspension; rather, the school was to begin with an instructional conversation with the accused student regarding the parameters of the order. See n.5, supra. If the action persisted, the student was entitled to a hearing. Id. Brown forwent any process here. . . . . .Moving on, we also conclude that there are triable issues regarding the first element of the tort, that is, whether Dean Suarez and Vice President Klawunn "inten[ded]" or acted "in reckless disregard of the probability of causing emotional distress." Gross, 185 A.3d at 1246 (quoting Swerdlick, 721 A.2d at 862). Proceeding with the coercive attempt in the face of the physician's warning could certainly be seen as evidencing a reckless disregard for the distress likely to be caused. *Doe v Brown Univ.*, 43 F.4th 195 (1st Cir 2022).

extracurricular activities. Post-degree, Jane has enjoyed a deep, loving, and committed relationship with someone she hopes will be her life partner. Jane has developed plans for her future, including applying for a Fulbright Scholarship to study in Iceland, potentially attending graduate school at Harvard Divinity School, and perhaps relocating to Mexico if her partner's visa is not renewed.

*Doe v. Rhode Island School of Design*, 516 Supp. 3d 188, 194 (D.R.I. 2021).

Like many people who live with mental illness, John is striving yet suffering. Coming out of the shadows at this stage in this litigation will be too much for him to bear. Defendant's motion must be denied in its entirety.

• **The second paradigm involves cases in which identifying the would-be Doe would harm "innocent non-parties."**

The IIED claim involves the intentional or reckless acts of Suarez and Klawunn against the advice of Plaintiff's doctor on the day he was released from hospitalization after a suicide attempt in the depths of a depression resulting from the Title IX investigations during his freshman year involving Jane and Sally. As their tool, they used Plaintiff's mental illness and particular vulnerability to accusations of sexual misconduct against him by threatening him with reviving Sally's Title IX claim —the triggering event that led to John's major depression and suicide attempt—even though Defendant had promised John that her case would not be reopened unless there was new evidence; and giving undue credence to Jane's "dubious" and "trivial" allegations involving the no-contact order. *Doe v Brown Univ.*, 43 F.4th 195 (1st Cir 2022). Jane and Sally are inextricably involved in the IIED claim.

The public exposure of John could lead to the public exposure of Jane and Sally. In particular, Sally distanced herself almost immediately from her Title IX claim and did not want to pursue her case and "eventually told Dean Castillo that she requested no "serious action" and had in fact "felt forced to report." *Doe v Brown Univ.*, 43 F.4th 195 (1st Cir 2022).

9

With regard to Jane, this case is filled with descriptions of her sexual encounter with John, in which John accused her of sexual assault by choking him and biting him until he bled.

Defendant's motion undermines Defendant's own confidentiality standards to keep Title IX investigations and the identities of the student's involved confidential and is in direct violation of Jane and Sally's rights to privacy pursuant to the Family Educational Rights and Privacy Act ("FERPA") (20 U.S.C. § 1232g; 34 CFR Part 99) that protects the privacy of student education records.

• **The third paradigm involves cases in which anonymity is necessary to forestall a chilling effect on future litigants who may be similarly situated**.

John's IIED claim addresses how Brown treats its students with mental health issues. Plaintiff is not alone. On August 10, 2021, the Justice Department and U.S Attorney's Office for the District of Rhode Island "announced a settlement agreement with Brown University to ensure that students with mental health disabilities have equal access to educational programs." See the Justice Department's press Release. Link: https://www.justice.gov/opa/pr/justice-department-reaches-agreement-brown-university-ensure-equal-access-students-mental .

The agreement, which provided a money settlement in the amount of $684,000 to the students who were harmed, "resolved the department's findings that Brown University violated Title III of the Americans with Disabilities Act (ADA) by not allowing students who took medical leave for mental health reasons to return to school even though they were ready to return to campus life.[2] The Justice department "found that, between fall 2012 and spring 2017, dozens of undergraduate students were denied readmission to Brown after taking mental health-related

---

[2] Plaintiff faced this particular issue as well, as asserted in his complaint (See the Amended Complaint, Docket [], pp. []).

medical leave. These students met the requirements for returning to Brown, and each of the students' treatment providers reported to Brown that the students were ready to resume their studies and participate in campus life."

What is interesting to note about this issue, is that Brown's violations overlap with Plaintiff's time on campus, and may involve some of the same actors here. Moreover, not all of the dozens of students involved in the investigation may have participated in the settlement, and it is likely that not all students who were affected were uncovered. It is not clear whether the period of 2017 and 2021 when the settlement was reached whether more abuses occurred, and it does not address the type of abuse Plaintiff asserts in his IIED claim in which Brown, having relinquished involuntary medical leaves, attempted to compel John under duress to leave Brown "voluntarily". In any event, there are students at Brown or other institutions in the shadows with a private history of mental illness whose rights may have been abused, and such students may be pressured into not litigating if they knew their identity would be disclosed.

Disclosures of mental health in litigation is stigmatizing and has been the basis for allowing plaintiffs to proceed pseudonymously as well. See: *Doe v Regional Sch. Unit No. 21*, 2020 US Dist, LEXIS 94293, at *11 (D. Me. May 29, 2020, No. 2:19-00341-NT) ("The Plaintiff has represented that there is a real danger of harm if he cannot proceed under alias because of the trauma and mental health distress associated with Lamontagne's alleged sexual abuse"); Doe v Trustees of Dartmouth College, 2018 WL 2048385 (D.N.H. 2018) ("While recognizing that one of the "essential qualities of a Court . . . is that its proceedings should be public," courts have accepted that exceptional circumstances may justify the use of a pseudonym, including in cases involving "abortion, birth control, transsexuality, *mental illness*, welfare rights of illegitimate children, AIDS, and homosexuality. *(emphasis added);* Doe v Std.

11

*Ins. Co.*, 2015 US Dist LEXIS 134474, at *7-8 (D. Me. Oct. 2, 2015, No. 1:15-cv-00105-GZS) (Holding that "[t]o deny Plaintiff's request under the circumstances of this case might not only prevent Plaintiff from proceeding on her claim, but might also discourage others who suffer from a serious mental health condition from asserting their claims for mental health related benefits to which they are entitled, or otherwise seeking the assistance of professionals and others in their effort to treat and address their condition. Particularly when the public will have access to the facts relevant to the parties' arguments and the Court's ultimate decision in the case, an order permitting Plaintiff to proceed under a pseudonym will not unreasonably interfere with the public's interest in access to judicial records and will promote the public's interest in enhancing the likelihood that individuals suffering serious mental illnesses will seek appropriate assistance"); *Anonymous v Legal Servs. Corp.*, 932 F Supp 49, 50 (D.P.R. 1996) ("The argument overlooks, however, the long tradition in both federal and state courts of permitting parties to proceed anonymously when they have a strong privacy interest in doing so. Here, plaintiff's allegations involve a treatable mental illness.").

Disclosing Plaintiff's identity at this delicate phase of the litigation which centers as much on mental health issues as it does on the Title IX investigations against him will surely impede other vulnerable students from litigating. Therefore, Defendant's motion must be denied in its entirety.

• **The fourth paradigm involves suits that are bound up with a prior proceeding made confidential by law**. Under this paradigm, the First Circuit focuses on whether the prior proceeding that led to the litigation was confidential by law. Noting that "both Congress and the Executive Branch have given careful thought to the proper conduct of Title IX proceedings," the First C. determined that "[c]onfidentiality is an important aspect of that vision. By enacting the

Family Educational Rights and Privacy Act of 1974 (FERPA), 88 Stat. 571, 20 U.S.C. § 1232g, Congress sought to prevent educational institutions from unilaterally disclosing "sensitive information about students," *Owasso Indep. Sch. Dist. No. I-011 v. Falvo*, 534 U.S. 426, 428, (2002). In *Doe v. Massachusetts Institute Technology,* 46 F.4th 61,75 (1st Cir. 2022), the First Circuit acknowledged that the plaintiff in that case, had been out of school since 2015 as he was expelled just weeks prior to his graduation as a result of a Title IX investigation, was married and working professionally. Regardless, the Court noted that the Appellant's underlying disciplinary action at MIT was "brought under Title IX of the Education Amendments of 1972, 20 U.S.C. § § 1681-1688, was conducted confidentially, and he has since kept his participation in it on the downlow."

As set forth in Plaintiff's Affidavit, John too has kept his participation in the events surrounding his IIED claim, which unavoidably includes the events surrounding the Title IX claims and investigations above and beyond on the downlow—he has maintained confidentiality, as have the attorneys and this Court for the past five years. In its characterization of Plaintiff's claim, the Appeal Decision, the Court recognizes the genesis of Plaintiff's Title IX experience at Brown—Jane's initial filing of "a complaint against John with Brown's Office of Student Life—as the event commencing a multi-year process leading to John's suspension from school, [and] a suicide attempt. . . ." *Doe v Brown Univ.*, 43 F.4th 195 (1st Cir. 2022). To remove his pseudonym now would be to expose five years of litigation that is rife in sexual activity, accusations of sexual malfeasance and such mental health issues as suicidal ideation, a suicide attempt, major depression as well as Plaintiff's other mental health issues as a result of the awful events of the Oct. 2014 meeting and its aftermath.

*Doe v. MIT* does not alter the fundamental basis for allowing a party to proceed pseudonymously for the reasons most pertinent to this case: mental illness and sexual activity. *Doe v MIT* clearly supports the use of a pseudonym in cases involving these stigmatizing factors, particularly if they occur in a school setting under the confidentiality mandates of Title IX, and FERPA. When John was a student at Brown, the Title IX investigations, his medical records at Brown's CAPS and hospital records were maintained confidentially pursuant to Title IX and FERPA—these privacy rights do not vanish when a student graduates, or gets employed, or ages into adulthood. Yet, Defendant's seek the public exposure of events and issues in Plaintiff's life that have remained confidential at Brown since 2013 and throughout this litigation. *Doe v. Massachusetts Institute Technology,* 46 F.4th 61,75-76 (1st Cir. 2022). Defendant's motion must be denied in its entirety.

**CONCLUSION**

*Doe v MIT* deals with the issue of whether a pseudonym should be decided in the first place. In this action, the Court has already made that decision and affirmed it after Defendant's first motion to reconsider. In its second motion to reconsider, Defendant repeats much of the same arguments in its first effort and ignores the years of litigating two Title IX investigations and the privacy and confidentiality rights of John as well as Jane and Sally. While Doe v MIT does express the exceptional nature of the use of pseudonyms in litigation, it offers robust support for the use of a pseudonym for plaintiffs whose litigation rises out Title IX. Plaintiff has maintained this confidentiality and seeks the continuation of his pseudonym. Defendant's motion must be denied in its entirety.

DATED: September 27, 2022

        Respectfully Submitted,

        THE PLAINTIFF,

By:   */s/ Susan Kaplan*
      Susan Kaplan (*pro hac vice*)
      The Kaplan Law Office
      30 Wall Street, 8th Floor
      New York, NY 10005
      Telephone: (347) 683-2505
      skaplan@lawkaplan.com

      /s/ Sonja L. Deyoe
      Sonja L. Deyoe #6301
      395 Smith Street
      Providence, RI 02908
      (401) 864-5877
      (401) 354-7464
      sld@the-straight-shooter.com

      *Attorneys for Plaintiff, John Doe*

## **CERTIFICATION OF SERVICE**

I hereby certify that on this 27th day of September, 2022, a copy of the foregoing and accompanying papers was filed via the Court's ECF and served on all parties.


By: ___/s/ Sonja L. Deyoe___